1           UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF CALIFORNIA
2                  SAN JOSE DIVISION

3
      UNITED STATES OF AMERICA,
4
              PLAINTIFF,            CASE NO.  CR-15-226-EJD
5
         VS.                        SAN JOSE, CALIFORNIA
6
      DOUGLAS STROMS YORK,          AUGUST 25, 2015
7
                 DEFENDANT.         VOLUME 1
8
                                    PAGES 1 - 188
9

10                  TRANSCRIPT OF TRIAL
         BEFORE THE HONORABLE EDWARD J. DAVILA
11        UNITED STATES DISTRICT JUDGE AND A JURY

12
                   A-P-P-E-A-R-A-N-C-E-S
13

14   FOR THE PLAINTIFF:    OFFICE OF THE UNITED STATES ATTORNEY
                           BY:   BRIANNA PENNA
15                               JEFFREY SCHENK
                           50 ALMADEN BOULEVARD, SUITE 900
16                         SAN JOSE, CALIFORNIA 95113

17
     FOR THE DEFENDANT:    OFFICE OF THE FEDERAL PUBLIC DEFENDER
18                         BY:   GRAHAM ARCHER
                           55 S. MARKET STREET, SUITE 820
19                         SAN JOSE, CALIFORNIA 95113

20   ALSO PRESENT:         LAKISHA HOLLIMAN
                           AMY SENIA
21
     OFFICIAL COURT REPORTER:    IRENE L. RODRIGUEZ, CSR, RMR, CRR
22                               CERTIFICATE NUMBER 8074

23

        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY,
24   TRANSCRIPT PRODUCED WITH COMPUTER.

25

INDEX OF PROCEEDINGS

GOVERNMENT'S OPENING STATEMENT          P. 139

DEFENDANT'S OPENING STATEMENT           P. 145


FOR THE GOVERNMENT:


**ALLAN HESSENFLOW**
DIRECT EXAM BY MS. PENNA                 P. 147
CROSS-EXAM BY MR. ARCHER                 P. 180

INDEX OF EXHIBITS


                                    IDENT.          EVIDENCE

GOVERNMENT'S:

4                                                   152
5                                                   163
8                                                   167
13                                                  172

```
 1    SAN JOSE, CALIFORNIA                    AUGUST 25, 2015

 2                    P R O C E E D I N G S

 3         (JURY IN AT 9:08 A.M.)

 4              THE COURT:  FOLKS, IF YOU COULD REMAIN STANDING AND

 5    RAISE YOUR RIGHT HAND, OUR COURTROOM DEPUTY WILL PLACE YOU

 6    UNDER OATH.

 7         (PROSPECTIVE JURORS WERE GIVEN THE OATH.)

 8              THE COURT:  THIS IS THE PART WHERE YOU SAY YES.

 9              PROSPECTIVE JURORS:  YES.

10              THE COURT:  THANK YOU.  PLEASE BE SEATED.  GOOD

11    MORNING AGAIN, LADIES AND GENTLEMEN.  THANK YOU FOR COMING THIS

12    MORNING, LADIES AND GENTLEMEN.  I WANT TO TELL YOU A LITTLE BIT

13    ABOUT WHAT YOU'RE GOING TO BE DOING TODAY.

14         YOU HAVE BEEN CALLED TO SERVE AS PROSPECTIVE JURORS THIS

15    MORNING, LADIES AND GENTLEMEN, IN A CRIMINAL CASE.  THE TITLE

16    OF THE CASE IS UNITED STATES OF AMERICA VERSUS

17    DOUGLAS STROMS YORK.  THE INDICTMENT IN THIS CASE CHARGES THE

18    DEFENDANT AS FOLLOWS:

19         THE DEFENDANT IS CHARGED IN A SUPERSEDING INDICTMENT IN

20    COUNT 1 WITH A VIOLATION OF 18 UNITED STATES CODE SECTION 912,

21    COMMONLY REFERRED TO AS FALSE IMPERSONATION OF AN EMPLOYEE OF

22    THE UNITED STATES.

23         IT IS ALLEGED THAT ON OR ABOUT FEBRUARY 23, 2012, IN THE

24    NORTHERN DISTRICT OF CALIFORNIA, THE DEFENDANT,

25    DOUGLAS STROMS YORK, DID FALSELY ASSUME AND PRETEND TO BE AN
```

1    OFFICER AND EMPLOYEE OF THE UNITED STATES ACTING UNDER THE

2    AUTHORITY THEREOF, THAT IS, AS AN AGENT OF THE INTERNAL REVENUE

3    SERVICE AND IN SUCH ASSUMED AND PRETENDED CHARACTER DID ACT AS

4    SUCH IN THAT HE FALSELY STATED THAT HE WAS AN AGENT OF THE

5    INTERNAL REVENUE SERVICE ENGAGED IN INVESTIGATING TAX RECORDS

6    IN VIOLATION OF TITLE 18 UNITED STATES CODE SECTION 912.

7         THE DEFENDANT IS CHARGED IN COUNT 2 OF THE SUPERSEDING

8    INDICTMENT WITH A VIOLATION OF 47 UNITED STATES CODE SECTION

9    223(A)(1)(C), COMMONLY REFERRED TO AS TELECOMMUNICATIONS DEVICE

10   HARASSMENT.

11        IT IS ALLEGED THAT ON OR ABOUT FEBRUARY 23, 2012, IN THE

12   NORTHERN DISTRICT OF CALIFORNIA, THE DEFENDANT,

13   DOUGLAS STROMS YORK, WITHOUT DISCLOSING HIS IDENTITY AND WITH

14   INTENT TO ABUSE, THREATEN, AND HARASS A SPECIFIC PERSON, DID

15   MAKE A TELEPHONE CALL AND UTILIZED A TELECOMMUNICATION DEVICE

16   IN INTERSTATE AND FOREIGN COMMUNICATIONS IN THAT HE LEFT A

17   VOICEMAIL FOR ALLAN HESSENFLOW.  AND YOU WILL LEARN THE CONTENT

18   OF THAT VOICE MESSAGE, THAT VOICEMAIL, IN THE EVIDENCE, ALL IN

19   VIOLATION OF 47 UNITED STATES CODE SECTION 223(A)(1)(C).

20        NOW, LADIES AND GENTLEMEN, THE INDICTMENT IS NOT EVIDENCE

21   OF ANY KIND AND IT IS THE CHARGING DOCUMENT THAT IS FILED IN

22   THE CASE.  TO THESE CHARGES MR. YORK HAS PLED NOT GUILTY, WHICH

23   IS AN ABSOLUTE DENIAL OF THE CHARGES.  IT WILL BE THE PURPOSE

24   OF THIS TRIAL FOR YOU TO DETERMINE IF THE GOVERNMENT HAS MET

25   THEIR BURDEN IN PRESENTING THEIR CASE TO YOU.

1          NOW, JURY SERVICE IS VERY IMPORTANT AND I WOULD LIKE TO,

2     AGAIN, WELCOME AND THANK YOU FOR YOUR SERVICE BUT BEFORE WE

3     BEGIN, I'M GOING TO DESCRIBE FOR YOU HOW THE TRIAL WILL BE

4     CONDUCTED AND EXPLAIN TO YOU WHAT YOU, THE LAWYERS, AND I WILL

5     BE DOING.

6          NOW, FIRST OF ALL, WHEN I REFER TO THE GOVERNMENT, I MEAN

7     MS. BRIANNA PENNA AND MR. JEFFREY SCHENK WHO ARE ASSISTANT

8     UNITED STATES ATTORNEYS.

9          AND I'M GOING TO ASK COUNSEL IF YOU CAN IDENTIFY

10    YOURSELVES AND INTRODUCE YOUR TEAMS, PLEASE.

11          MR. SCHENK:  GOOD MORNING.  MY NAME IS JEFF SCHENK,

12    AND I'M AN ASSISTANT UNITED STATES ATTORNEY.  SITTING WITH ME

13    AT COUNSEL TABLE IS OUR PARALEGAL LAKISHA HOLLAND.

14          MS. PENNA:  AND I'M BRIANNA PENNA, SPECIAL ASSISTANT

15    UNITED STATES ATTORNEY.

16          AND THIS IS SPECIAL AGENT DONNA AGUIRRE.

17          THE COURT:  THANK YOU.  NOW, WHEN I REFER TO DEFENSE

18    COUNSEL I MEAN MR. GRAHAM ARCHER WHO REPRESENTS THE DEFENDANT

19    MR. DOUGLAS YORK.

20          MR. ARCHER, IF YOU COULD INTRODUCE YOUR TEAM.

21          MR. ARCHER:  GOOD MORNING, FOLKS.  MY NAME IS

22    GRAHAM ARCHER, AND I'M A MEMBER OF THE FEDERAL PUBLIC

23    DEFENDER'S OFFICE AND TO MY LEFT IS MR. YORK WHO IS THE

24    DEFENDANT IN THIS CASE AND TO HIS LEFT IS AMY SENIA OF OUR

25    OFFICE.

1            THE COURT:  THANK YOU.  NOW, LADIES AND GENTLEMEN, I

2    WANT TO TELL YOU SOMETHING THAT YOU HAVE BEEN CALLED AS A JUROR

3    IN THIS CASE.  TYPICALLY IT'S NOT UNUSUAL FOR CASES IN THIS

4    COURTHOUSE, IN FEDERAL COURTHOUSES, TO HAVE DURATIONS OF

5    SEVERAL WEEKS, MONTHS.  SOME CASES LAST SEVERAL MONTHS

6    ACTUALLY.

7            I KNOW YOU WILL BE DELIGHTED TO HEAR THAT THIS CASE HAS A

8    TRIAL ESTIMATE OF PERHAPS THREE TO FOUR DAYS.  SO THIS IS -- I

9    HOPE THAT YOU RECOGNIZE THAT THIS IS A WONDERFUL OPPORTUNITY

10   TO -- AND PERHAPS SOME OF YOU ARE DISAPPOINTED THAT YOU DON'T

11   HAVE TO SIT ON A LENGTHY TRIAL.  BUT THIS DOES PRESENT AN

12   OPPORTUNITY FOR YOU TO PARTICIPATE IN YOUR JUSTICE SYSTEM IN

13   WHAT WE BELIEVE TO BE A RELATIVELY BRIEF INTERFERENCE WITH YOUR

14   DAILY SCHEDULES.  IT IS EXPECTED TO TAKE ABOUT THREE OR

15   FOUR DAYS OF EVIDENCE IN THE CASE, PERHAPS LESS.

16           OF COURSE, DELIBERATIONS ARE UP TO THE JURY.  AND IF

17   YOU'RE SELECTED AS A JUROR IN THIS CASE, THE JURY WILL DECIDE

18   HOW MUCH TIME AND WHEN THEY WILL DELIBERATE.

19           THIS MORNING WE WILL BE SELECTING JURORS WHO WILL SIT TO

20   HEAR THIS CASE.  I EXPECT WE WILL FINISH THIS PROCESS THIS

21   MORNING AND POSSIBLY INTO THE AFTERNOON.  WE MAY BEGIN OPENING

22   STATEMENTS THIS AFTERNOON AND POSSIBLY ENGAGE EVIDENCE THIS

23   AFTERNOON AS WELL.

24           WE'LL THEN RECESS FOR TODAY IN THE AFTERNOON.  WE WILL

25   BEGIN THE CASE AGAIN ON THURSDAY, WHICH IS TO SAY THAT WE WILL

1    NOT BE IN SESSION ON WEDNESDAY, THE 20 -- EXCUSE ME -- THE

2    26TH.  I'LL TELL YOU OUR SCHEDULE HERE.  WE'LL BE IN SESSION

3    ALL DAY TODAY, THE 25TH.  WE WILL NOT BE IN SESSION ON

4    WEDNESDAY THE 26TH.  WE WILL NOT BE IN SESSION IN THE MORNING

5    OF THE 27TH.  IT'S POSSIBLE THAT WE WILL BE IN SESSION THURSDAY

6    AFTERNOON, BUT I'LL KNOW MORE ABOUT THAT THIS AFTERNOON.

7         WE'LL BE IN SESSION ALL DAY ON FRIDAY THE 28TH, AND MONDAY

8    THE 31ST IN THE MORNING, AND TUESDAY THE 1ST, ALL DAY WEDNESDAY

9    THE 2ND, ALL DAY.  IT'S MY -- AS I INDICATED, IT'S MY

10   EXPECTATION, BASED ON WHAT THE LAWYERS HAVE TOLD ME, THAT THE

11   EVIDENCE IN THIS CASE MAY VERY WELL BE CONCLUDED BY FRIDAY OR

12   MONDAY.

13        SO, AGAIN, THIS IS A TRIAL OF A BRIEF DURATION.

14        NOW, WE WILL HAVE MORNING AND AFTERNOON BREAKS OF 10 OR 15

15   MINUTES, AND I REALIZE SOME PEOPLE WILL NEED TO TAKE AN

16   UNSCHEDULED BREAK FOR SOME REASON.  IF YOU ARE SEATED AS A

17   JUROR IN THIS CASE AND IF YOU OR ANYONE OR COUNSEL NEEDS TO

18   TAKE A BREAK FOR WHATEVER REASON, PLEASE ALERT ME, AND WE'LL BE

19   ABLE TO TAKE A BRIEF RECESS.

20        NOW, I'M GOING TO ASK MS. GARCIA TO CALL OUT THE NAMES OF

21   THOSE PROSPECTIVE JURORS WHO HAVE BEEN RANDOMLY SELECTED TO SIT

22   IN THE JURY BOX HERE.

23        AND, MS. GARCIA, IF YOU COULD PLEASE CALL THE NAMES.

24        AND, FOLKS, WE'LL TELL YOU WHERE TO SIT.  THAT FIRST SEAT

25   WOULD BE THAT FAR LEFT SEAT IN THE BACK ROW.

1          MS. GARCIA.

2              THE CLERK:  BRADLEY DUVERNAY.

3              THE COURT:  ALL EYES ARE ON YOU, MR. DUVERNAY.  THAT

4     BACK ENTRANCE IS GOOD.  BUT IT'S GOOD THAT YOU SHOWED US THAT

5     BACK ENTRANCE AS WELL.

6              THE CLERK:  ALONZO SPENCER; BAMBI SALAMIDA.

7              THE COURT:  MS. SALAMIDA, IT MIGHT BE MORE

8     CONVENIENT TO ENTER THROUGH THE DOOR THAT MR. DUVERNAY SHOWED

9     YOU.

10             THE CLERK:  LAKSHMAMMA VENKATA; NASSINET KAHSAI;

11    PETER LEE; JONATHAN DILLER; VICKEY PERKINS; ERMELINDA SILVA.

12             THE COURT:  AND, MS. SILVA, WE'LL HAVE YOU SIT IN

13    THAT FRONT SEAT.

14             PROSPECTIVE JUROR:  THANK YOU.

15             THE COURT:  ON THE OTHER SIDE.

16             PROSPECTIVE JUROR:  YES.

17             THE CLERK:  YEN THI LE HOANG; YVONNE MCGUIRE;

18    KIMBERLY LINDSAY; GLENN POLINI; LUIS GUZMAN; GANESH JAMPANI;

19    MICHAEL ROJAS; MARGARET JOHANSON.

20             THE COURT:  THERE IN THE FRONT SEAT THERE AT THE

21    END, MS. JOHANSON.  THANK YOU.

22             THE CLERK:  BARBARA VAN WINKLE; PHYLLIS ROMITO;

23    CHIENHWA HO; CHARLES BAUGHMAN OR BOWMAN; ROBERT MCNAMARA;

24    STEVEN EGSTAD; SIEW TEO.

25             THE COURT:  THANK YOU.  NOW, LADIES AND GENTLEMEN,

1    THE FIRST STEP IN THE TRIAL FOLLOWING THE SELECTION OF THE JURY

2    IS THE GOVERNMENT'S OPENING STATEMENT.  THE DEFENSE MAY CHOOSE

3    TO GIVE AN OPENING STATEMENT FOLLOWING THE GOVERNMENT OR AT THE

4    BEGINNING OF THE DEFENSE CASE.

5        THE PURPOSE OF AN OPENING STATEMENT IS TO GIVE YOU AN IDEA

6    AND AN OVERVIEW OF WHAT THE ATTORNEYS EXPECT THE EVIDENCE WILL

7    SHOW.

8        NEXT, THE GOVERNMENT WILL OFFER THEIR EVIDENCE.  EVIDENCE

9    USUALLY INCLUDES WITNESS'S TESTIMONY AND EXHIBITS.  AFTER THE

10   GOVERNMENT PRESENTS THEIR EVIDENCE, THE DEFENSE MAY ALSO

11   PRESENT EVIDENCE BUT IT IS NOT REQUIRED TO DO SO BECAUSE HE IS

12   PRESUMED INNOCENT.

13       MR. YORK DOES NOT HAVE TO PROVE THAT HE IS NOT GUILTY.

14       NOW, YOU HAVE A LIST IN FRONT OF YOU THAT MAY HAVE THE

15   CALENDAR ON IT AND IT MAY HAVE -- I BELIEVE IT INCLUDES

16   POTENTIAL WITNESSES.  I'D LIKE TO READ THOSE NAMES TO YOU NOW.

17       EXPECTED WITNESSES THAT MAY TESTIFY IN THIS CASE ARE

18   ALLAN HESSENFLOW; SPECIAL AGENT DONNA AGUIRRE; DOUGLAS COLE;

19   AND NATHAN COOPER.

20       NOW, YOU SHOULD NOTE THAT THE PARTIES ARE NOT REQUIRED AND

21   MIGHT NOT WISH TO CALL ALL OF THESE WITNESSES AND THEY MAY

22   LATER FIND IT NECESSARY TO CALL OTHER WITNESSES.

23       IT MAY OCCUR THAT THE PARTIES STIPULATE TO A WITNESS'S

24   TESTIMONY OR AN EXHIBIT.  THIS MEANS THAT THE PARTIES HAVE

25   AGREED THAT THE STATEMENT, THE TESTIMONY OR EXHIBIT MAY BE

1        INTRODUCED INTO EVIDENCE.

2            AFTER YOU HAVE HEARD ALL OF THE EVIDENCE AND AFTER THE

3        ATTORNEYS HAVE GIVEN THEIR FINAL ARGUMENTS, I WILL THEN

4        INSTRUCT YOU ON THE LAW THAT DOES APPLY TO THE CASE.

5            AFTER YOU HAVE HEARD THE ARGUMENTS AND MY INSTRUCTIONS,

6        YOU WILL RETIRE TO THE JURY ROOM TO DELIBERATE ON THE MERITS OF

7        THE CASE AND THEN TO RETURN WITH YOUR FINDINGS.

8            NOW, JURY SERVICE IS AN OBLIGATION.  IT MAY BE

9        INCONVENIENT TO YOU, BUT I WOULD ALSO HOPE THAT YOU VIEW JURY

10       SERVICE AS A PRIVILEGE TO SERVE YOUR COMMUNITY AND TO

11       PARTICIPATE IN YOUR SYSTEM OF JUSTICE.

12           WE ALL KNOW AND WE'RE SENSITIVE TO THE FACT THAT NONE OF

13       YOU ARE HERE -- I EXPECT NONE OF YOU ARE HERE BECAUSE YOU HAVE

14       NOTHING ELSE TO DO WITH YOUR TIME OR THAT PERHAPS YOU

15       VOLUNTEERED FOR JURY DUTY OUT OF THE BENEVOLENCE OF AND

16       GOODNESS OF YOUR HEARTS.

17           I RECOGNIZE AND WE ALL RECOGNIZE THAT JURY SERVICE IS AN

18       IMPOSITION ON EACH OF YOU.  THIS SERVICE TAKES YOU FROM THOSE

19       WHO NEED YOU AT YOUR HOME, AT YOUR WORKPLACE.  FOR MANY OF US

20       WORKING IN THE JUSTICE SYSTEM, HOWEVER, TRYING TO IMPROVE THE

21       QUALITY OF JUSTICE WHILE MAINTAINING FAIRNESS ACROSS THE BOARD

22       IS A CHALLENGE.

23           IT'S A CHALLENGE TO DELIVER ON THE PROMISE OF THE JURY OF

24       ONE'S PEERS, A TRUE CROSS-SECTION TO EVERYONE WHO ENTERS OUR

25       COURTS, AND IT IS A PROMISE THAT WE ENDEAVOR TO FULFILL AS WE

1    RECOGNIZE WE, OURSELVES, WOULD RELY ON THAT PROMISE IF WE WERE

2    EVER TO COME INTO THE JUSTICE SYSTEM AS A PARTY.

3         NOW, OUR CONSTITUTION GUARANTEES THE RIGHT TO A JURY

4    TRIAL, AND THAT IS THE BASIS FOR ALL OF OUR OBLIGATIONS, YOURS

5    AS WELL AS MINE, TO SERVE AS JURORS.

6         AND I SHOULD TELL YOU JURY NOTICES ARE NOT FOREIGN TO MY

7    HOUSEHOLD.  WE GET, IN MY HOUSEHOLD, WE GET JURY NOTICES ALSO

8    AND WE RECEIVE THOSE.  MY WIFE AND I, WE'RE OBLIGATED TO

9    RESPOND TO THE CALL.  AND A FEW MONTHS AGO MY WIFE RECEIVED A

10   SUMMONS TO GO TO THE STATE COURT FOR JURY SERVICE AND SHE WENT.

11        SHE, OF COURSE, TALKED TO HER SUPERVISOR AT WORK AND SHE

12   TOLD THE PRESIDING JUDGE, BECAUSE YOU SEE, SHE IS A JUDGE ALSO,

13   AND SHE TOLD HER BOSS, THE PRESIDING JUDGE, I WAS CALLED TO

14   SERVE, AND I'M GOING TO GO.  AND THE PRESIDING JUDGE SAID YOU

15   GO AND WE'LL FIND ANOTHER JUDGE THAT WON'T REPLACE YOU BUT

16   THEY'LL DO THE BEST THAT THEY CAN IN YOUR SERVICE.

17        SO WE'RE NOT IMMUNE FROM THAT ALSO.  SO WE GET CALLED JUST

18   AS YOU DO.

19        NOW, LET ME ASK THIS, IS THERE ANYTHING ABOUT THE DURATION

20   OR TIMING -- LET ME DIRECT THIS TO THE SEATED JURORS, IS THERE

21   ANYTHING ABOUT THE DURATION OR TIMING OF THIS CASE THAT WOULD

22   MAKE IT DIFFICULT OR IMPOSSIBLE?

23        LET'S SEE.  IS THAT MS. KAHSAI?

24             PROSPECTIVE JUROR:  KAHSAI, YES.

25             THE COURT:  YES.  WE'LL GET A MICROPHONE FOR YOU IN

1 JUST A SECOND.

2   PROSPECTIVE JUROR:  WELL, WHEN I RECEIVED THE

3 SUMMONS I RESPONDED THINKING THAT I WASN'T, YOU KNOW, I WAS

4 FREE DURING THIS TIME PERIOD BUT MY GRANDFATHER IS ILL SO I'M

5 LEAVING THE COUNTRY ACTUALLY THIS FRIDAY TO GO SPEND TIME WITH

6 HIM, YOU KNOW, BEFORE HE PASSES.

7   THE COURT:  I SEE.  YOU HAVE ALREADY SECURED --

8   PROSPECTIVE JUROR:  YEAH.  I HAVE THE PLANE TICKET

9 IF YOU'D LIKE TO SEE.

10   THE COURT:  IN CASE I DIDN'T BELIEVE YOU?

11   PROSPECTIVE JUROR:  YEAH.  I DIDN'T KNOW.

12   THE COURT:  WELL, THAT WAS VERY THOROUGH OF YOU AND

13 GOOD PLANNING AND -- BUT THAT WON'T BE NECESSARY.  I APPRECIATE

14 THAT, AND I WILL EXCUSE YOU.  I WISH YOU AND YOUR FAMILY WELL.

15   PROSPECTIVE JUROR:  THANK YOU.

16   THE COURT:  SO YOU CAN WORK YOUR WAY OUT OF THE BOX

17 THERE AND GO BACK DOWNSTAIRS AND PLEASE LET THEM KNOW, IF YOU

18 WOULD.

19   PROSPECTIVE JUROR:  OKAY.

20   THE COURT:  AND, MS. GARCIA, IF YOU COULD CALL A

21 REPLACEMENT NAME.

22   THE CLERK:  RAFAEL YAHALOM.

23   PROSPECTIVE JUROR:  DID YOU NEED THIS (HANDING)?

24   THE COURT:  OH, YOU CAN LEAVE IT ON THE CHAIR.

25   PROSPECTIVE JUROR:  OH, SORRY.

```
1                    THE COURT:  THAT'S GOOD.  GOOD MORNING, SIR.

2               PROSPECTIVE JUROR:  GOOD MORNING.  SHOULD I JUMP

3      OVER THERE (INDICATING)?

4                    THE COURT:  PLEASE.

5               PROSPECTIVE JUROR:  MR. YAHALOM, LET ME ASK ANYTHING

6      ABOUT THE DURATION OF THIS TRIAL THAT CAUSES YOU ANY

7      DIFFICULTY?

8                    THE COURT:  THANK YOU.  WE'LL GET THAT MICROPHONE

9      BACK FROM YOU BEFORE IT EXPLODES.

10              PROSPECTIVE JUROR:  I WANTED TO SAY SOMETHING.

11                   THE COURT:  YOU HAD SOMETHING YOU NEEDED TO TELL ME,

12     MS. VENKATA?

13              PROSPECTIVE JUROR:  YES.

14                   THE COURT:  YES.

15              PROSPECTIVE JUROR:  THANK YOU.

16                   THE COURT:  YOU CAN BE SEATED.

17              PROSPECTIVE JUROR:  I LOOKED AT THE SCHEDULE, AND IT

18     IS THE SEPTEMBER 2ND IT DOES SAY WE HAVE A TRIAL FROM 1:30 TO

19     5:00 P.M.

20                   THE COURT:  YES.

21              PROSPECTIVE JUROR:  I TEACH AT A COMMUNITY COLLEGE

22     AND THAT'S THE FIRST DAY OF ORIENTATION, THE FIRST DAY OF

23     CLASS.

24                   THE COURT:  AND ARE YOU REGISTERED FOR CLASS?

25              PROSPECTIVE JUROR:  YES, PLEASE.
```

1          THE COURT:  AND WHAT -- IT'S AN EVENING CLASS?

2          PROSPECTIVE JUROR:  YES.

3          THE COURT:  YES.  SO I THINK YOU'LL BE ABLE TO MAKE

4     THAT CLASS?

5          PROSPECTIVE JUROR:  YES.  AND THE ORIENTATION STARTS

6     IN THE EVENING.  IT'S AT 5:00 O'CLOCK I HAVE TO BE AT

7     ADMISSIONS.

8          THE COURT:  THANK YOU FOR BRINGING THAT TO MY

9     ATTENTION.

10         PROSPECTIVE JUROR:  YOU'RE VERY WELCOME.

11         THE COURT:  OH.  JUST A MOMENT AGO THERE WERE NO

12    HANDS.

13         PROSPECTIVE JUROR:  WELL, SHE RAISED HERS FIRST AND

14    WE WERE WAITING ON HER.

15         THE COURT:  YES, IS THAT MR. LEE?

16         PROSPECTIVE JUROR:  YES.  IT'S JUST THE DURATION ON

17    THE 4TH OF SEPTEMBER I'M AT A TRIP PLANNED IN SOUTHERN

18    CALIFORNIA THAT AFTERNOON.

19         THE COURT:  I APPRECIATE YOU LETTING ME KNOW.  SIR,

20    ANOTHER HAND.

21       YES, IS THIS MR. DILLER?

22         PROSPECTIVE JUROR:  YES.

23         THE COURT:  YES, SIR.

24         PROSPECTIVE JUROR:  I'M NOT SURE IF IT'S A TIMING

25    ISSUE, BUT I RECENTLY HAD BACK SURGERY WHICH MADE SITTING FOR A

1     LONG PERIOD OF TIME --

2             THE COURT:  THANK YOU.  THAT WAS MY NEXT QUESTION

3     WHICH IS WHETHER OR NOT ANY MEMBER OF THE PANEL OR ANYONE IN

4     THE AUDIENCE HAS ANY SPECIAL ISSUE, DISABILITY OR OTHER ISSUE

5     THAT MIGHT MAKE SERVING AS A MEMBER OF THE JURY DIFFICULT OR

6     IMPOSSIBLE, AND THIS IS NOT INFREQUENT THAT SOME INDIVIDUALS

7     MIGHT HAVE BACK ISSUES.

8         IT'S A SHORT TRIAL, AS I INDICATED.

9         WE CAN AND WE HAVE IN THE PAST BEEN ABLE TO ACQUIRE SOME

10    CUSHIONS.  WE HAVE SOME CUSHIONS.  WE ALSO COULD ALLOW AND I

11    HAVE HAD JURORS WITH SIMILAR ISSUES.  WE'VE TAKEN MORE FREQUENT

12    RECESSES.  AND ALSO WE'VE ALLOWED THE JURORS TO STAND WHEN THEY

13    NEED AS LONG AS THEY'RE NOT --

14            PROSPECTIVE JUROR:  IT ALSO HAD TO DO WITH MY

15    COMMUTE IN OVER IN SANTA CRUZ COUNTY.

16            THE COURT:  YES.

17            PROSPECTIVE JUROR:  AND SO THE DRIVE OVER.

18            THE COURT:  YOU KNOW, THE NORTHERN DISTRICT OF

19    CALIFORNIA EXTENDS FROM THE NORTHERN BORDER OF CALIFORNIA TO

20    THE SOUTHERN TIP OF MONTEREY.

21        AND MERCIFULLY THE SAN JOSE COURTHOUSE WAS PUT HERE IN THE

22    EARLY '90S, LATE '80S, '90S, SO THAT INDIVIDUALS WOULD NOT HAVE

23    TO TRAVEL TO SAN FRANCISCO AND OAKLAND TO DO THEIR JURY

24    SERVICE.  SO THAT'S THE HISTORY OF OUR COURTHOUSE HERE.

25        WE DO RECOGNIZE THAT YOUR NEIGHBORS OVER THE HILL, AS THEY

1    CALL IT, ARE REQUIRED TO TRAVEL HERE TO FLAT LAND, I THINK IS

2    AS YOU CALL IT, AND PARTICIPATE.  SO I APPRECIATE THAT.

3              PROSPECTIVE JUROR:  AND WHAT I MEAN BY THAT IS I'M

4    UNABLE TO DO THE COMMUTE.  ACTUALLY, I'VE BEEN UNABLE TO WORK

5    OVER HERE SITTING FOR THAT PERIOD OF TIME TO COME OVER.

6              THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

7         AND LET'S SEE, IS THIS MS. PERKINS?

8              PROSPECTIVE JUROR:  YES.

9              THE COURT:  YES.

10             PROSPECTIVE JUROR:  HI.  SO MY HUSBAND RECENTLY

11   STARTED A JOB THREE WEEKS AGO, AND HE GOES IN EARLY IN THE

12   MORNING, AND I'M THE ONLY ONE LEFT TO TAKE OUR SON INTO SCHOOL

13   AND SUBSEQUENTLY I PICK HIM UP FROM SCHOOL.

14             THE COURT:  OKAY.

15             PROSPECTIVE JUROR:  SO HE HAS TO BE AT SCHOOL AT

16   8:45.  THIS MORNING I DROPPED HIM OFF AT THE CLASSMATE'S HOUSE

17   AT 7:00, BUT IT WOULD BE REALLY CHALLENGING MOVING FORWARD TO

18   FACILITATE THE DROP-OFF AND PICKUP FOR THE TRIAL.

19             THE COURT:  LET'S SEE, SCHOOL THE FIRST DAY WAS

20   TODAY?

21             PROSPECTIVE JUROR:  NO.  HE'S BEEN IN SCHOOL.  THIS

22   IS THE SECOND WEEK.

23             THE COURT:  SO WE'RE NOT IN SESSION TOMORROW.  WE

24   WON'T BE IN SESSION THURSDAY MORNING.

25        BUT WE'LL BE IN SESSION FRIDAY AND MONDAY MORNING AGAIN.

1          AND THEN WHAT TIME DO YOU COLLECT HIM?

2          PROSPECTIVE JUROR:  2:00 O'CLOCK.

3          THE COURT:  2:00 O'CLOCK.  SO IT SOUNDS LIKE YOU

4     MADE ARRANGEMENTS TO DROP HIM OFF AT A NEIGHBOR OR FRIEND OR

5     SOMETHING LIKE THAT TO TAKE HIM TO SCHOOL?

6          PROSPECTIVE JUROR:  I DO, YES.  BUT WE DON'T HAVE

7     FAMILY IN THE AREA TO HELP OUT, AND I FELT LIKE I WAS IMPOSING

8     TO DROP HIM OFF IN HIS PAJAMAS WHEN I DROPPED HIM OFF TO BE

9     HONEST.

10          THE COURT:  SO I WANT TO UNDERSTAND, WHEN YOU

11     RECEIVED THE JURY SUMMONS SEVERAL WEEKS AGO, DID YOU MAKE ANY

12     PLANS ABOUT GETTING YOUR CHILD TO SCHOOL?

13          PROSPECTIVE JUROR:  NO, BECAUSE MY HUSBAND WAS STILL

14     WITH HIS PREVIOUS EMPLOYER WHEN I FIRST RECEIVED THE SUMMONS.

15          SO WHEN HE SWITCHED EMPLOYERS HE STARTED I BELIEVE

16     AUGUST 9TH OR 11TH, I JUST KIND OF CROSSED MY FINGERS AND HOPED

17     FOR THE BEST.  I HAVE SERVED ON A JURY BEFORE AND I THOUGHT IT

18     WAS AN AMAZING EXPERIENCE BUT --

19          THE COURT:  OKAY.

20          PROSPECTIVE JUROR:  -- BUT I JUST DON'T THINK I CAN

21     PULL IT OFF THIS TIME.

22          THE COURT:  OKAY.  WELL, THANK YOU FOR LETTING ME

23     KNOW THAT.

24          ARE THERE OTHER HANDS?  LET'S PASS THE MICROPHONE.

25          MR. JAMPANI.

1          PROSPECTIVE JUROR:  I RECENTLY TOOK VACATION FROM MY

2     WORK, AND I HAVE A LOT OF STUFF TO DO, AND THERE'S A PRODUCT

3     RELEASE COMING UP.  AND I JUST CAME BACK FROM VACATION, AND I

4     GOT THIS, AND I HAVE A LOT OF WORK TO DO.  AND MY JOB NEEDS ME

5     RIGHT NOW.

6          THE COURT:  ALL RIGHT.  THANK YOU FOR LETTING ME

7     KNOW THAT.  AND IF YOU PASS THIS DOWN.

8          PROSPECTIVE JUROR:  THE DOCTOR -- EXCUSE ME.

9          THE COURT:  I'M SORRY.  LET'S -- THIS IS MR. EGSTAD.

10         PROSPECTIVE JUROR:  YES.  THANK YOU FOR PRONOUNCING

11    THAT RIGHT.

12         THE DOCTOR RECENTLY CHANGED MY MEDICATION FOR MY BLADDER

13    SO I DON'T GET A LOT OF NOTICE TO VISIT THE MEN'S ROOMS, AND I

14    MEAN LIKE THAT -- I'VE HAD ACCIDENTS IN PUBLIC ALREADY.

15         THE COURT:  OKAY.

16         PROSPECTIVE JUROR:  SO I DON'T KNOW -- WHEN IT'S

17    TIME, I'VE GOT TO GO.

18         THE COURT:  OKAY.

19         PROSPECTIVE JUROR:  THERE'S NO RAISE YOUR HAND AND

20    ASK TO LEAVE.  IT'S EITHER THAT OR I DO IT ON MYSELF.

21         THE COURT:  OKAY.  I APPRECIATE THAT, SIR.  THANK

22    YOU.

23         OKAY.  LET'S PASS THE MICROPHONE OVER.  IS THERE ANYONE IN

24    THE FRONT ROW?

25         YES.  IS THAT MS. HOANG?

```
 1                    PROSPECTIVE JUROR:  YES.

 2                    THE COURT:  YES.

 3                    PROSPECTIVE JUROR:  I HAVE A CYST ON MY HEAD, AND SO

 4          I'M SCHEDULED TO SEE THE SPECIALIST NEXT MONDAY.

 5                    THE COURT:  WHAT TIME IS THAT?

 6                    PROSPECTIVE JUROR:  I THINK IT'S AT 1:00 O'CLOCK.

 7                    THE COURT:  OH.

 8                    PROSPECTIVE JUROR:  AND ALSO DURING THE WEEK

 9          AUGUST 31ST THROUGH SEPTEMBER 4TH I'M THE ONLY ONE WHO -- I'M

10          AN ACCOUNTANT, AND SO I'M THE ONLY ONE IN THE COMPANY TO CLOSE

11          THE BOOKS THAT WEEK.  SO IF I SERVE JURY DUTY MY JOB WOULD BE

12          IN JEOPARDY BECAUSE I'M THE ONLY ONE.

13                    THE COURT:  OKAY.  ALL RIGHT.  WELL, THANK YOU.

14               AND, MS. SILVA, YOU --

15                    PROSPECTIVE JUROR:  I'D LIKE TO SPEAK PRIVATELY TO

16          YOU.

17                    THE COURT:  OKAY.  ALL RIGHT.  WE'LL DO THAT IN A

18          MOMENT.

19               ARE THERE ANY OTHER HANDS?

20               I SEE NO HANDS.

21               LET ME ASK THIS OF THOSE OF YOU IN THE AUDIENCE WHO HAVE

22          NOT YET BEEN SELECTED, IS THERE ANYONE -- FIRST OF ALL, LET ME

23          ASK THIS, IS THERE ANYONE WHO MIGHT REQUIRE THE SERVICES OF AN

24          ASSISTED LISTENING DEVICE?  WE DO HAVE THOSE AVAILABLE HERE,

25          AND I WANT YOU TO SING OUT.
```

```
 1           I SEE NO HANDS.  ALL RIGHT.  THANK YOU.

 2           ALL RIGHT.  WELL, LET'S TALK WITH MS. SILVA.  MS. SILVA,

 3      IF YOU COULD STAND DOWN OVER HERE.

 4           IS THE MICROPHONE WORKING?

 5           SO, COUNSEL, IF YOU COULD JOIN US.  RIGHT HERE, MS. SILVA.

 6      AND WAIT UNTIL EVERYONE GETS HERE, AND I'M GOING TO ASK YOU TO

 7      FACE THE MICROPHONE AND SPEAK INTO THAT.

 8           AND WE'RE AT SIDE-BAR WITH COUNSEL AND MS. SILVA.

 9           (SIDE-BAR CONFERENCE ON THE RECORD.)

10           PROSPECTIVE JUROR:  RECENTLY I'VE BEEN PUT ON

11      ANXIETY MEDICINE, AND THE REASON IS THAT FOR THE LAST

12      THREE YEARS I'VE BEEN DEALING WITH I.R.S., AND I CAN SHOW YOU

13      PROOF.  IT SAYS THAT I'M THE EXECUTOR OF AN ESTATE, AND I'VE

14      BEEN DEALING WITH THIS FOR THREE YEARS AND THIS LAST MONTH I

15      HAD AN ANXIETY ATTACK.

16           THE COURT:  DO YOU TAKE IT DAILY?

17           PROSPECTIVE JUROR:  I TAKE IT DAILY.  SIX MONTHS

18      FROM NOW I'M SURE I'D BE BETTER, BUT I KNOW THAT THIS IS GOING

19      TO CAUSE ME MORE ANXIETY, ESPECIALLY SINCE I'M DEALING WITH

20      SOMETHING WITH THE I.R.S.

21           THE COURT:  ANY QUESTIONS, COUNSEL?

22           MR. ARCHER:  NO.

23           THE COURT:  WHY DON'T YOU GO AHEAD AND HAVE A SEAT.

24      COUNSEL, YOU CAN REMAIN.

25           WE'RE AT SIDE-BAR.  MS. SILVA HAS LEFT.  DO COUNSEL WISH
```

```
 1        TO BE HEARD ABOUT MS. SILVA?

 2                  MR. ARCHER:  NO, YOUR HONOR.

 3                  THE COURT:  I WILL EXCUSE MS. SILVA.  I WILL EXCUSE

 4        MR. EGSTAD AS WELL.

 5           I REALIZE MS. PERKINS HAS THIS CHILDCARE ISSUE, BUT I WILL

 6        PROBABLY EXCUSE HER, TOO.  AND THAT'S ABOUT AS FAR AS I'M GOING

 7        TO GO WITH WHAT I'VE HEARD SO FAR JUST TO GIVE YOU INFORMATION

 8        ON THAT AND THEN WE'LL SEE WHERE IT TAKES US.

 9           THANK YOU, COUNSEL.

10        (END OF DISCUSSION AT SIDE-BAR.)

11                  THE COURT:  THANK YOU, COUNSEL.  ALL RIGHT.  BEFORE

12        WE GO FURTHER, I WILL EXCUSE MR. EGSTAD.  THANK YOU, SIR.

13        YOU'RE EXCUSED.  JUST GO BACK DOWNSTAIRS, IF YOU WOULD, PLEASE,

14        AND LET THEM KNOW, AND BY "THEM," MEANING THE JURY FOLKS, WHAT

15        OCCURRED.

16           AND, MS. PERKINS, I WILL EXCUSE YOU.

17           AND, MS. SILVA, I WILL EXCUSE YOU AS WELL.

18                  PROSPECTIVE JUROR:  THANK YOU.

19                  THE COURT:  IF YOU WOULD LEAVE THE CALENDARS ON THE

20        CHAIRS.  THANK YOU.

21           AND, MS. GARCIA, IF YOU COULD CALL ADDITIONAL NAMES.

22        WE'LL START WITH SEAT 8.

23                  THE CLERK:  JOSEPH STOLZ.

24                  THE COURT:  MR. STOLZ, SEAT 8 THERE IN THE BACK,

25        SIR.  YES, PLEASE.  THANK YOU.
```

```
 1              THE CLERK:  DINAH CHENG.

 2              THE COURT:  AND, MS. CHENG, THE SEAT NEXT TO

 3     MS. HOANG, PLEASE, IN THE FRONT ROW.

 4              THE CLERK:  AND TONGSHENG CHU.

 5              THE COURT:  ALL RIGHT.  THANK YOU.  LET ME ASK THOSE

 6     OF YOU NEW TO THE JURY BOX HERE IS THERE ANYTHING ABOUT THE

 7     DURATION OF THE TRIAL THAT WILL CAUSE A PROBLEM?

 8          ANYTHING ABOUT THE DURATION OF THE TRIAL THAT WILL CAUSE

 9     ANYONE HARM HERE?

10          MS. CHENG, YES?

11              PROSPECTIVE JUROR:  MAY I TALK TO YOU IN PRIVATE?

12              THE COURT:  YES, AND WE'LL MEET OVER HERE,

13     MS. CHENG.

14          (SIDE-BAR CONFERENCE ON THE RECORD.)

15              THE COURT:  YOU CAN SPEAK RIGHT INTO THIS

16     MICROPHONE, MS. CHENG.  WE'RE AT SIDE-BAR WITH MS. CHENG AND

17     COUNSEL.

18              PROSPECTIVE JUROR:  I'M CURRENTLY UNEMPLOYED, AND

19     I'M CURRENTLY LOOKING FOR JOBS, AND I HAVE AN INTERVIEW ON THE

20     3RD OF SEPTEMBER.

21              THE COURT:  WHAT TIME?

22              PROSPECTIVE JUROR:  3:00 O'CLOCK AND ONE IN THE

23     MORNING.

24              THE COURT:  WELL, THANK YOU FOR LETTING ME KNOW

25     THAT.  ANYTHING, COUNSEL?
```

```
1                    MS. PENNA:  NO.

2                    MR. ARCHER:  NO.

3                    THE COURT:  THANK YOU, COUNSEL.

4              (END OF DISCUSSION AT SIDE-BAR.)

5                    THE COURT:  THANK YOU, COUNSEL.  THANK YOU,

6        MS. CHENG.

7              ALL RIGHT.  ANYONE ELSE NEW TO THE BOX ABOUT THE TRIAL

8        DURATION?

9              I SEE NO HANDS.

10             NOW, LADIES AND GENTLEMEN, WE NOW COME TO THAT PORTION OF

11       THE TRIAL WHERE I WILL ASK YOU SOME QUESTIONS REGARDING YOUR

12       QUALIFICATIONS TO SIT AS JURORS IN THIS CASE, AND COUNSEL WILL

13       ALSO HAVE THE OPPORTUNITY TO ASK YOU SOME QUESTIONS.  THIS

14       PROCESS IS VERY IMPORTANT BECAUSE THE PARTIES WANT FAIR AND

15       IMPARTIAL JURORS, JURORS WHO ARE FREE OF ANY PRECONCEIVED IDEA,

16       BELIEF, ATTITUDE, BIAS OR PREJUDICE WITH THE CRIMES CHARGED OR

17       THE ACCUSED AND JURORS WHO WILL DECIDE THIS CASE ONLY AFTER

18       HEARING ALL OF THE EVIDENCE, THE ARGUMENTS OF COUNSEL, AND THE

19       LAW AS GIVEN TO YOU BY THE COURT, AND THEN ONLY AFTER HAVING

20       DELIBERATED WITH YOUR FELLOW JURORS.

21             BY THE OATH YOU'VE TAKEN, YOU ARE OBLIGATED TO ANSWER ALL

22       OF THESE QUESTIONS TRUTHFULLY AND COMPLETELY.  YOU WILL HELP

23       THE PROCESS BY VOLUNTEERING INFORMATION ABOUT YOUR EXPERIENCES,

24       FEELINGS, OR BIASES, IF ANYTHING, EVEN THOUGH IF YOU FEEL YOU

25       CAN'T PUT ASIDE THOSE FEELINGS OR BIASES OR FEELINGS AND SERVE
```

1    AS AN IMPARTIAL JUROR.

2         NOW, IF YOU CAN'T ANSWER ANY OF THESE QUESTIONS, PLEASE

3    LET ME KNOW AND WE CAN DISCUSS THE MATTER PRIVATELY AT SIDE-BAR

4    AS YOU HAVE SEEN.

5         WHEN SELECTING A JURY, EACH SIDE IS PERMITTED A CERTAIN

6    NUMBER OF PREEMPTORY CHALLENGES TO PROSPECTIVE JURORS.  THESE

7    ARE CHALLENGES WHERE AN ATTORNEY NEED NOT STATE A REASON FOR

8    EXCUSING A JUROR.

9         THE ATTORNEY MAY ASK THAT A CERTAIN PROSPECTIVE JUROR BE

10   EXCUSED BECAUSE IN THEIR OPINION THEY FEEL THIS IS NOT THE

11   RIGHT CASE FOR THE JURY.

12        CHALLENGES FOR CAUSE ARE CHALLENGES WHERE A PARTY OR THE

13   COURT FEELS THAT A PROSPECTIVE JUROR CANNOT SIT ON A CASE

14   BECAUSE OF A BIAS AND INTEREST OR OTHER INABILITY TO BE FAIR

15   AND IMPARTIAL.  I WILL DETERMINE WHETHER OR NOT A JUROR SHOULD

16   BE EXCUSED FOR CAUSE.

17        NOW, THE QUESTIONS OF THE COURT AND COUNSEL AND THE

18   ANSWERS OF PROSPECTIVE JURORS ASSIST THE ATTORNEYS IN THESE

19   DECISIONS.

20        NOW, FOLLOWING MY QUESTIONS AND THE QUESTIONS OF COUNSEL,

21   THE ATTORNEYS WILL HAVE AN OPPORTUNITY TO MAKE DECISIONS AS TO

22   ANY CHALLENGES THAT THEY MAY HAVE.

23        WE'LL TAKE A MOMENT WHILE THE ATTORNEYS COMPLETE THEIR

24   DECISIONS, AND I'LL RECEIVE THE INFORMATION FROM THE LAWYERS.

25   IT MAY BE THAT WE'LL TAKE A STANDING BREAK HERE IN THE COURT TO

1     ALLOW THE LAWYERS TO TRY TO MAKE THOSE DECISIONS.

2          FOLLOWING THAT, ANY CHALLENGED JURORS MAY BE EXCUSED AND

3     HAVE JURORS FROM THE OTHER FRONT ROW FILL THOSE IN.  AND WE'RE

4     GOING TO SELECT 12 JURORS AND TWO ALTERNATES.  WE'LL RECHARGE

5     THE JURY BOX AS NEEDED IF THERE ARE CHALLENGES.

6          NOW, ALTERNATE JURORS WILL SIT IN THE JURY BOX DURING THE

7     TRIAL AND SHOULD A MEMBER OF THE 12 JURORS BE UNABLE TO

8     CONTINUE TO SIT AS A JUROR, THE ALTERNATE JUROR WILL REPLACE

9     THAT SITTING JUROR AND WILL JOIN THE OTHER JURORS DURING

10    DELIBERATION AT THE CONCLUSION OF THE CASE.

11         IF THERE IS NO NEED FOR SUBSTITUTION OF A SITTING JUROR AT

12    THE CONCLUSION OF THE EVIDENCE, THE ALTERNATE JURORS WILL NOT

13    JOIN THE DELIBERATIONS OF THE SITTING JURORS BUT THEY WILL BE

14    PERMITTED TO LEAVE THE COURT, THEY WILL GIVE US THEIR CONTACT

15    INFORMATION, AND SHOULD THEY BE NEEDED AGAIN WE WILL CALL THEM

16    BACK AND DELIBERATIONS WILL BEGIN ANEW.

17         NOW, LADIES AND GENTLEMEN, THOSE OF YOU OUT IN THE

18    AUDIENCE WHO HAVE NOT YET HAD THE PRIVILEGE OF BEING CALLED TO

19    THIS BOX, I INVITE YOU TO PLEASE DO PAY ATTENTION TO THE

20    QUESTIONS AND ANSWERS OF THE PROSPECTIVE JURORS.

21         IT MAY BE THAT YOU, TOO, WILL BE CALLED TO SIT IN THIS --

22    IN THE JURY BOX HERE AND RESPOND TO SIMILAR QUESTIONS.

23         SO, LADIES AND GENTLEMEN, THOSE YOU OF IN THE JURY BOX

24    HERE, ANY OF YOU HEARD OR READ ANYTHING ABOUT THIS CASE?

25         I SEE NO HANDS.

1          DO ANY OF YOU KNOW THE ASSISTANT UNITED STATES ATTORNEYS

2     OR THE DEFENSE COUNSEL?  ANY OF YOU KNOW THESE GOOD LAWYERS?

3          I SEE NO HANDS.

4          DO ANY OF YOU KNOW THE DEFENDANT, MR. YORK?

5          I SEE NO HANDS.

6          DO ANY OF YOU KNOW ANY OF THE WITNESSES WHO I MENTIONED,

7     ANY OF THOSE WITNESSES ON YOUR WITNESS LIST?

8          I SEE NO HANDS.

9          DO ANY OF YOU KNOW ANYONE ELSE ON THE PANEL?

10          NO HANDS.

11          HAS ANYONE SPOKEN TO ANY OF YOU AT ANY TIME ABOUT THIS

12     CASE OR ATTEMPT TO INFLUENCE YOU IN ANY WAY ABOUT YOUR SERVICE

13     AS A JUROR?  ANYONE DONE ANY OF THOSE THINGS?

14          I SEE NO HANDS.

15          HAVE ANY OF YOU HAD BUSINESS DEALINGS WITH THE ATTORNEYS

16     OR BEEN REPRESENTED BY THEM OR MEMBERS OF THEIR FIRMS, THE

17     DEPARTMENT OF JUSTICE, OR ANY OTHER OFFICE OF THAT AGENCY?

18     ANYONE IN THAT CAPACITY?

19          I SEE NO HANDS.

20          HAVE YOU OR ANY MEMBERS OF YOUR FAMILIES OR ANY CLOSE

21     FRIEND EVER BEEN EMPLOYED BY A LAW ENFORCEMENT AGENCY, WHICH

22     WOULD INCLUDE A DISTRICT ATTORNEY'S OFFICE, THE UNITED STATES

23     ATTORNEY'S OFFICE, OR OTHER REGULATORY OR SECURITY AGENCY?  ANY

24     FAMILY MEMBERS IN THAT?

25          ALL RIGHT.  I SEE MS. HOANG WITH HER HAND UP.  DO YOU HAVE

1    THE MICROPHONE MS. HOANG?  YES.

2            PROSPECTIVE JUROR:  MY YOUNGER BROTHER IS WORKING IN

3    PROBATION AS I GUESS A MANAGER IN DISTRICT COURT; AND MY

4    YOUNGER ONE IS SAN JOSE P.D.

5            THE COURT:  SO YOU HAVE ONE BROTHER WHO IS A

6    PROBATION OFFICER?

7            PROSPECTIVE JUROR:  I THINK HE'S A MANAGER OF

8    PROBATION.

9            THE COURT:  FOR FEDERAL PROBATION OR STATE

10   PROBATION?

11           PROSPECTIVE JUROR:  COUNTY OF SANTA CLARA.

12           THE COURT:  I SEE.  AND THEN YOUR YOUNGER BROTHER IS

13   A POLICE OFFICER?

14           PROSPECTIVE JUROR:  YES.

15           THE COURT:  WITH SAN JOSE POLICE DEPARTMENT?

16           PROSPECTIVE JUROR:  CORRECT.

17           THE COURT:  OKAY.  ALL RIGHT.  AND YOU SEE THEM

18   REGULARLY?  YOU SEE THEM WITH SOME REGULARITY?

19           PROSPECTIVE JUROR:  REGULARLY.

20           THE COURT:  YES.  DID THEY TALK TO YOU ABOUT THEIR

21   WORK?

22           PROSPECTIVE JUROR:  NO.

23           THE COURT:  OKAY.  IS THERE ANYTHING ABOUT THE FACT

24   THAT YOUR BROTHERS ARE EMPLOYED IN LAW ENFORCEMENT THAT YOU

25   THINK WILL AFFECT YOUR ABILITY TO BE FAIR AND IMPARTIAL TO BOTH

1          SIDES IN THIS CASE?

2                    PROSPECTIVE JUROR:  YES.

3                    THE COURT:  YOU THINK IT WILL AFFECT YOUR ABILITY?

4                    PROSPECTIVE JUROR:  (NODS HEAD UP AND DOWN.)

5                    THE COURT:  OKAY.  IN WHAT WAY?

6                    PROSPECTIVE JUROR:  I THINK GENERALLY BECAUSE MY

7          WHOLE FAMILY WORKS FOR THE GOVERNMENT, AND I FEEL LIKE THE

8          GOVERNMENT IS -- I'M PROBABLY, YOU KNOW, KIND OF BIASSED THAT

9          THE GOVERNMENT IS DOING THE RIGHT THINGS.

10                    THE COURT:  OKAY.  WELL, DID YOU KNOW THAT THIS

11         COURT IS PART OF THE GOVERNMENT?

12                    PROSPECTIVE JUROR:  THAT'S RIGHT.

13                    THE COURT:  AND THIS TRIAL IS PART OF THE

14         GOVERNMENT.  IT'S PART OF OUR CONSTITUTION, AS I MENTIONED.

15         EVERYONE HAS A CONSTITUTIONAL RIGHT TO A FAIR TRIAL.

16              AND WHAT WE TRY TO DO HERE IS TO HAVE JURORS PARTICIPATE

17         IN A CASE, AND WE'RE TRYING TO SEE IF WE CAN HAVE JURORS WHO

18         ARE FAIR AND IMPARTIAL WHO WON'T BE BIASSED TO ONE SIDE OR THE

19         OTHER.

20              SO I APPRECIATE THE FACT THAT YOU HAVE LAW ENFORCEMENT IN

21         YOUR FAMILY.  DO YOU THINK YOU COULD BE FAIR TO THE DEFENSE IN

22         THIS CASE?

23                    PROSPECTIVE JUROR:  I DON'T KNOW.  THAT'S WHY I'M

24         KIND OF BIASSED BECAUSE, YOU KNOW, MY WHOLE FAMILY SINCE MY DAD

25         AND EVERYONE IS WORKING FOR THE GOVERNMENT.

```
 1                  THE COURT:  YES.  WELL, ONE OF THE THINGS THAT OUR
 2      CONSTITUTION, I MENTIONED IT EARLIER, OUR CONSTITUTION
 3      GUARANTEES IS THE PRESUMPTION OF INNOCENCE.
 4           SO THE GOVERNMENT HAS THE BURDEN OF CONVINCING THE JURY
 5      THAT THAT PRESUMPTION CAN BE OVERCOME IN PROVING THEIR CASE.
 6           DO YOU UNDERSTAND THAT?  DO YOU UNDERSTAND THAT?
 7                  PROSPECTIVE JUROR:  YEAH.
 8                  THE COURT:  WELL, LET ME ASK YOU, MS. HOANG, DO YOU
 9      THINK THAT YOU COULD BE FAIR TO BOTH SIDES IN THIS CASE?
10                  PROSPECTIVE JUROR:  YEAH.
11                  THE COURT:  DO YOU THINK YOU CAN?
12                  PROSPECTIVE JUROR:  I WILL TRY.
13                  THE COURT:  WELL, I APPRECIATE YOUR EFFORT.  I
14      APPRECIATE THAT.  BUT DO YOU -- LET ME ASK YOU THIS, IF THE
15      EVIDENCE AT THE CONCLUSION OF THE CASE IF YOU'RE SEATED AS A
16      JUROR IN THIS CASE AND IF THE EVIDENCE, YOU WERE CONVINCED THAT
17      THE EVIDENCE SHOWED THAT YOU SHOULD RETURN A VERDICT OF NOT
18      GUILTY, COULD YOU DO THAT AND STILL FACE YOUR BROTHERS?
19                  PROSPECTIVE JUROR:  SEE, I DON'T KNOW.
20                  THE COURT:  OKAY.  ALL RIGHT.  I APPRECIATE THAT.
21      THANK YOU.
22           WERE THERE ANY OTHER HANDS?  LET'S SEE.  LET'S GIVE THAT
23      MICROPHONE BACK TO MR. LEE.
24           MS. JOHANSON.
25                  PROSPECTIVE JUROR:  THIS MAY OR MAY NOT BE
```

1    APPLICABLE.  I HAVE A BROTHER THAT IS AN ATTORNEY IN MICHIGAN,

2    AND HE'S THE FORMER PROSECUTOR IN HIS COUNTY IN MICHIGAN.

3              THE COURT:  IT SOUNDS LIKE HE'S RETIRED.

4              PROSPECTIVE JUROR:  YES, HE'S IN PRIVATE PRACTICE.

5              THE COURT:  IS THERE ANYTHING ABOUT THAT

6    RELATIONSHIP OR HIS JOB THAT YOU THINK WOULD IMPAIR YOUR

7    ABILITY TO BE FAIR AND IMPARTIAL TO BOTH SIDES IN THIS CASE?

8              PROSPECTIVE JUROR:  NO.

9              THE COURT:  OKAY.  THANK YOU.  AND, MR. LEE, I'LL

10   GET THE MICROPHONE TO YOU.

11             PROSPECTIVE JUROR:  I HAVE A QUESTION.  MY

12   BROTHER-IN-LAW IS AN ATTORNEY DOWN IN TEXAS, PROSECUTOR AND NOW

13   DEFENSE ATTORNEY, BUT I DON'T THINK IT WOULD AFFECT MY ABILITY

14   TO BE FAIR AND IMPARTIAL.

15             THE COURT:  OKAY.  THANK YOU VERY MUCH.

16          ANYONE ELSE?  YES.  IS THAT MS. LINDSAY?

17             PROSPECTIVE JUROR:  UH-HUH.

18             THE COURT:  YES.

19             PROSPECTIVE JUROR:  SO MY HUSBAND IS A POLICE

20   OFFICER, AND I DON'T THINK IT MATTERS BUT --

21             THE COURT:  OKAY.  HE'S A POLICE OFFICER -- WHAT

22   AGENCY?

23             PROSPECTIVE JUROR:  MOUNTAIN VIEW.

24             THE COURT:  MOUNTAIN VIEW POLICE.  OKAY.  YOU'RE

25   CHIEF OF POLICE JUST RETIRED, I THINK, SCOTT VERMEER.

1              PROSPECTIVE JUROR:  I DON'T KNOW THE CHIEF OF

2      POLICE.  I WORK FOR THE CITY OF SUNNYVALE, OUR CHIEF.

3              THE COURT:  I THINK SCOTT VERMEER WAS THE FORMER

4      CHIEF OF POLICE OF THE MOUNTAIN VIEW POLICE DEPARTMENT AND HE

5      RETIRED, AND I'M CERTAIN THAT THERE'S NO COINCIDENCE TO THE

6      FACT THAT HE'S MOVING TO, I THINK HE'S MOVING TO VIRGINIA, AND

7      THERE'S NO COINCIDENCE THE FACT THAT HIS SON, I THINK, IS IN

8      THE SECOND YEAR IN INDIANAPOLIS AND HIS DAUGHTER IS A FIRST

9      YEAR AT YALE, AND I'M SURE THEY'RE DISCONNECTED IN SOME MANNER.

10         SO THAT WILL NOT HAVE ANY IMPACT ON YOUR ABILITY TO BE

11     FAIR AND IMPARTIAL?

12             PROSPECTIVE JUROR:  NO.

13             THE COURT:  THANK YOU.  I SEE NO HANDS.

14         HAVE YOU OR ANY MEMBER OF YOUR FAMILIES OR ANY CLOSE

15     FRIEND EVER SERVED IN THE MILITARY OR WORKED FOR THE MILITARY

16     IN A CIVILIAN CAPACITY?  ANYONE?

17         MR. LEE, YOU HAVE MILITARY EXPERIENCE OR FAMILY MEMBERS?

18             PROSPECTIVE JUROR:  YES.  I RETIRED FROM THE

19     MILITARY, AND I WORK FOR THE NAVY NOW, AND MY WIFE WAS PRIOR

20     MILITARY, AND I HAVE BROTHERS AND SISTERS IN THE MILITARY.

21             THE COURT:  ALL RIGHT.  ANYONE ELSE?

22         YES, IT LOOKS LIKE MR. SPENCER.

23             PROSPECTIVE JUROR:  YES, I'M -- I WAS IN THE NAVY

24     FOR A COUPLE OF YEARS, AND MY FATHER WAS RETIRED FROM THE NAVY,

25     AND MY MOTHER WORKED AS A CIVILIAN IN THE HOSPITAL -- I'M

```
 1           SORRY -- IN GUAM.

 2                    THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

 3           ANYONE ELSE?

 4           YES, MR. ROJAS.

 5                    PROSPECTIVE JUROR:  MY FATHER SERVED FOR THE ARMY

 6           RESERVE AND THE NATIONAL GUARD, BUT HE'S RETIRED RIGHT NOW.

 7                    THE COURT:  OKAY.  THANK YOU.

 8           HAVE ANY OF YOU EVER HAD WHAT YOU MIGHT DESCRIBE AS A LESS

 9           THAN PLEASANT EXPERIENCE WITH ANY LAW ENFORCEMENT OFFICER OR

10           AGENT?  LESS THAN PLEASANT?  NO ONE HERE HAS HAD A SPEEDING

11           TICKET OR ANYTHING LIKE THAT?

12           LET ME ASK YOU SOMETHING ELSE, WHAT ABOUT PLEASANT OR

13           POSITIVE EXPERIENCES, ANYONE HAVE A POSITIVE EXPERIENCE OR WHAT

14           YOU DESCRIBE AS A POSITIVE EXPERIENCE THAT YOU WOULD LIKE TO

15           SHARE?

16           ALL RIGHT.  I SEE NO HANDS.

17           WOULD ANY OF YOU GIVE GREATER OR LESSER CREDENCE TO A

18           WITNESS WHO IS A LAW ENFORCEMENT OFFICER OR AGENT SIMPLY

19           BECAUSE THAT WITNESS IS A LAW ENFORCEMENT OFFICER OR AGENT THAT

20           IS CALLED TO GIVE EVIDENCE BY THE GOVERNMENT?  ANY OF YOU GIVE

21           GREATER OR LESSER WEIGHT TO THAT TESTIMONY JUST BECAUSE OF THAT

22           FACT?

23           MR. LEE?

24                    PROSPECTIVE JUROR:  I WOULD PROBABLY APPLY GREATER

25           WEIGHT BECAUSE I WOULD HOLD THEM TO A HIGHER STANDARD.
```

1          THE COURT:  OKAY.  THE GOVERNMENT AGENT OR OFFICERS,

2     YOU WOULD HOLD THEM TO A HIGHER STANDARD?

3          PROSPECTIVE JUROR:  YES, I WOULD.

4          THE COURT:  OKAY.  CAN YOU DESCRIBE THAT FOR US.

5     TELL US WHAT YOU MEAN BY THAT.

6          PROSPECTIVE JUROR:  SUCH AS THAT I WORK FOR THE

7     GOVERNMENT AND MY JOB INVOLVES INVESTIGATIVE TYPE WORK AND SO

8     WITHIN OUR OFFICE WE TAKE AN OATH AND PART OF THAT OATH IS TO

9     UPHOLD THE CONSTITUTION OF THE UNITED STATES AND THE LAWS AND

10    THE RULES AND THUS THAT WHEN WE PROVIDE TESTIMONY OF WHAT WE

11    OBSERVE OR RIGHT IN THE COURT THAT WE ARE HOLDING OURSELVES TO

12    A HIGHER STANDARD TO THE LAW AND TO TRY TO UPHOLD THAT LAW AND

13    ENFORCE THAT LAW SO THAT IF THAT PERSON WERE, YOU KNOW, IF I

14    WERE TO BE CALLED TO COURT OR MY REPORTS, YOU KNOW, SOMEONE HAS

15    TO SAY, HEY, WHAT I AM SAYING IS TRUE AND CORRECT AND BASICALLY

16    WE'RE HOLDING OURSELVES TO A HIGHER STANDARD BECAUSE THAT'S

17    WHAT WOULD BE EXPECTED.

18          THE COURT:  SO IN YOUR EMPLOYMENT, YOU -- IT SOUNDS

19    LIKE YOU HAVE SET A STANDARD FOR YOURSELF AND PERHAPS YOUR

20    CO-EMPLOYERS SHARED THAT STANDARD OF INTEGRITY AND A STANDARD

21    OF PROOF, I SUPPOSE, THAT YOU HAVE FOR YOURSELF.  AND I DON'T

22    WANT TO PUT WORDS IN YOUR MOUTH, BUT ARE YOU SAYING THAT YOU

23    WOULD REQUIRE THAT SAME OF THE LAW ENFORCEMENT OFFICER OR

24    AGENT?

25          PROSPECTIVE JUROR:  I WOULD SAY I WOULD GIVE THEM

1    GREATER WEIGHT OF THEIR CREDIBILITY OF THEIR EVIDENCE THAT, YOU

2    KNOW, BECAUSE THEIR WHOLE -- I WOULD EXPECT THEM TO BE HELD TO

3    A HIGHER STANDARD.

4            THE COURT:  OKAY.  THANK YOU FOR THAT.

5        SO I GUESS THE QUESTION IS DESIGNED TO, I SUPPOSE, FOSTER

6    A DISCUSSION ABOUT WHETHER OR NOT SOMEONE MIGHT GIVE -- BELIEVE

7    A WITNESS AND WHAT THE WITNESS SAYS MORE OR LESS JUST BECAUSE

8    OF THE NATURE OF THEIR EMPLOYMENT?

9            PROSPECTIVE JUROR:  YES.

10            THE COURT:  AS OPPOSED TO THE NATURE AND QUALITY AND

11    CHARACTER OF THE TESTIMONY.

12            PROSPECTIVE JUROR:  I'M NOT SURE.  FROM THIS ASPECT

13    OF SOMEONE'S JOB IS TO, LET'S SAY, INVESTIGATE THAT THEY WERE

14    TO PROVIDE EVIDENCE AS FAR AS IN THE CASE OF A TRIAL OR IN MY

15    CASE IN THEIR TYPE OF WORK, THAT THE BELIEF THAT WE HAVE TO

16    HOLD THEM AS PROVIDING TRUE AND CORRECT TESTIMONY AND GIVE IT

17    GREATER OR HIGHER WEIGHT OR HELD TO A HIGHER STANDARD BECAUSE

18    OF THE TRAINING AND ETHICAL COMMITMENT THAT THEY HAVE TO THEIR

19    JOB TO GOVERNMENT STANDARD CONDUCT.

20            THE COURT:  OKAY.  I THINK I UNDERSTAND WHAT YOU'RE

21    SAYING.

22        I THINK THE QUESTION IS REALLY DESIGNED TO, I SUPPOSE,

23    FOSTER A DISCUSSION ABOUT WOULD YOU GIVE GREATER WEIGHT, YOU OR

24    ANYONE, GIVE GREATER WEIGHT TO A WITNESS WHO MIGHT BE ENGAGED

25    IN LAW ENFORCEMENT OR AN AGENT OF AN AGENCY, GIVE THAT

1    WITNESS'S TESTIMONY GREATER WEIGHT AS AGAINST THE WITNESS WHO

2    IS NOT SO EMPLOYED?

3            PROSPECTIVE JUROR:  IT'S POSSIBLE, YES.  BUT ALSO I

4    COULD TREAT IT, YOU KNOW, THE SAME AND TREAT THE EVIDENCE THE

5    SAME, BUT I WOULD POTENTIALLY HOLD GREATER WEIGHT OF

6    CREDIBILITY TO THE PERSON THAT'S JOB IS IN THAT AREA OF

7    INVESTIGATIVE TYPE IS THEIR JOB.

8            THE COURT:  RIGHT.  THE EXPECTATION IS THAT IT

9    SOUNDS LIKE WHAT YOU'RE TELLING ME IS THAT THE EXPECTATION IS,

10   YOUR EXPECTATION IS TO SEE THAT THIS PERSON HAS TRAINING, AND I

11   SHOULD GIVE THEIR TESTIMONY MORE WEIGHT BECAUSE OF THAT

12   TRAINING AS OPPOSED TO JUST BECAUSE THEY'RE EMPLOYED BY LAW

13   ENFORCEMENT?

14           PROSPECTIVE JUROR:  YEAH, BECAUSE GENERALLY A LAW

15   ENFORCEMENT POLICE OFFICER WOULD GENERALLY HAVE THE TRAINING OF

16   INVESTIGATIVE TYPE OF THINGS THAT I WOULD GIVE THEM POTENTIALLY

17   A GREATER WEIGHT OF EVIDENCE ON THE CREDIBILITY OF THEIR

18   TESTIMONY.

19           THE COURT:  OKAY.  I SEE.  THERE'S AN INSTRUCTION,

20   FINAL INSTRUCTIONS THAT YOU ALL WILL RECEIVE IF YOU'RE SEATED

21   AS JURORS THAT TALK ABOUT THINGS THAT YOU CANNOT CONSIDER WHEN

22   YOU CONSIDER WITNESS'S TESTIMONY AND A WHOLE LIST OF THINGS

23   THAT YOU CONSIDER, THEIR DEMEANOR, NATURE AND QUALITY AND

24   WHETHER FACTS CONTRADICTED THEIR TESTIMONY AND THESE FACTS.

25        WHAT WE'RE TRYING TO DETERMINE IS WHETHER OR NOT JUST

1    BECAUSE OF SOMEONE'S EMPLOYMENT, THAT PERSON IS, AND NO MATTER

2    WHAT THEY SAY, JUST BECAUSE OF THEIR EMPLOYMENT, THAT WITNESS'S

3    TESTIMONY MIGHT BE GIVEN GREATER CREDIBILITY BY A JURY OR

4    LESSER CREDIBILITY.

5         IT COULD BE THE OPPOSITE.  SOMEONE MIGHT SAY, I'LL NEVER

6    BELIEVE A POLICE OFFICER.  I'LL NEVER BELIEVE A POLICE OFFICER.

7         SO NO MATTER WHAT THEY SAY, NO MATTER WHAT HAPPENS, IF

8    THEY HAVE PEOPLE WHO BOLSTER AND CORROBORATE THEIR TESTIMONY,

9    I'LL NEVER BELIEVE THEM BECAUSE I DON'T BELIEVE POLICE

10   OFFICERS.  THAT'S WHAT THEY'RE TRYING TO DETERMINE, AND I

11   SUPPOSE THE 180 FROM THAT IS THAT I WILL ALWAYS BELIEVE A

12   POLICE OFFICER BECAUSE OF THE NATURE OF THEIR TRAINING.

13        DO YOU FALL IN EITHER OF THOSE CATEGORIES OR SOMEWHERE --

14        PROSPECTIVE JUROR:  I WOULD, YOU KNOW, WEIGH WHAT

15   THE EVIDENCE SAYS AND THEN, YOU KNOW, DEPENDING ON WHAT THE

16   FINAL INSTRUCTIONS ARE.

17        THE COURT:  RIGHT.

18        PROSPECTIVE JUROR:  I WOULD -- YES, I WOULD, I

19   GUESS, INTERNALIZE THAT.  I WOULDN'T HOLD THAT PARTICULAR

20   PERSON'S JOB TO A HIGHER STANDARD IF IT WAS LAW ENFORCEMENT

21   INVESTIGATIVE TYPE OF MATTERS.

22        THE COURT:  SO IS THAT TO SAY THAT IF THE EVIDENCE

23   WERE TO SHOW THAT YOU THOUGHT THAT, GEE, I WISH THAT OFFICER

24   HAD DONE A MORE THOROUGH JOB, THAT THEY DIDN'T MEET THE

25   STANDARDS THAT I LIKE TO THINK THAT I WOULD SET FOR MYSELF OR I

```
1        THINK SHOULD BE SET FOR LAW ENFORCEMENT OFFICERS, I'M NOT GOING

2        TO BELIEVE THAT OFFICER BECAUSE OF THAT.

3                    PROSPECTIVE JUROR:  NO, I WOULDN'T DO THAT.

4                    THE COURT:  YOU WOULDN'T DO THAT.

5                    PROSPECTIVE JUROR:  I WOULD PROBABLY THINK, WELL,

6        THEY PROBABLY COULD HAVE DONE A BETTER JOB BUT STILL THEY

7        PRESENTED EVIDENCE AS THEY PRESENTED IT.

8                    THE COURT:  I GUESS THE -- CAN YOU BE FAIR TO BOTH

9        SIDES IN THIS CASE?

10                    PROSPECTIVE JUROR:  I THINK SO.

11                    THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.  ANYONE

12       ELSE?

13            I SEE NO HANDS.

14            ARE ANY OF YOU OR ANY MEMBER OF YOUR FAMILIES OR ANY OF

15       YOUR CLOSE FRIENDS ATTORNEYS, LAW STUDENTS OR PARALEGALS?

16       ANYONE HAVE -- YES, THAT'S MS. VAN WINKLE.

17                    PROSPECTIVE JUROR:  MY BOSS IS A LABOR ATTORNEY.

18                    THE COURT:  WE'LL GET YOUR MICROPHONE TO YOU.

19                    PROSPECTIVE JUROR:  SORRY.  MY BOSS IS A LABOR

20       ATTORNEY.

21                    THE COURT:  OKAY.  DO YOU WORK FOR A LAW FIRM, THEN?

22                    PROSPECTIVE JUROR:  NO.  I WORK FOR A SEMICONDUCTOR

23       COMPANY WHICH IS THE HEAD OF COMPENSATION TEAM AND MVP OF

24       LEGAL.

25                    THE COURT:  OKAY.  ANYTHING ABOUT THAT THAT YOU
```

```
 1        THINK WILL IMPAIR YOUR ABILITY TO BE FAIR AND IMPARTIAL?

 2                    PROSPECTIVE JUROR:  NO.

 3                    THE COURT:  OKAY.  THANK YOU.  ANYONE ELSE?  ANY OF

 4        YOU OR ANY OF YOUR CLOSE FRIENDS WORK FOR A LAW FIRM?

 5            YES.  IS THAT MR. POLINI?

 6                    PROSPECTIVE JUROR:  YEAH.  I HAVE A FRIEND IN

 7        CONSTRUCTION LAW.

 8                    THE COURT:  DOES HE OR SHE DO CONSTRUCTION DEFECT

 9        LITIGATION?

10                    PROSPECTIVE JUROR:  YES.

11                    THE COURT:  AND ANYTHING ABOUT THE NATURE OF THAT

12        RELATIONSHIP THAT YOU THINK WILL IMPAIR YOUR ABILITY TO BE FAIR

13        AND IMPARTIAL IN THIS CASE?

14                    PROSPECTIVE JUROR:  NO.

15                    THE COURT:  THANK YOU.  ANYONE ELSE?

16            YES, MR. HO.

17                    PROSPECTIVE JUROR:  MY BROTHER-IN-LAW AND HIS WHOLE

18        FAMILY ARE LAWYERS.

19                    THE COURT:  OH.

20                    PROSPECTIVE JUROR:  SO HE HAS A SON AND A DAUGHTER.

21                    THE COURT:  I SEE.

22                    PROSPECTIVE JUROR:  IN VIRGINIA.

23                    THE COURT:  IN VIRGINIA.  ALL RIGHT.  THANK YOU.

24        ANYONE ELSE?

25            I SEE NO HANDS.
```

1    HAVE YOU OR ANY MEMBER OF YOUR FAMILY OR CLOSE FRIENDS

2    EVER BEEN INVOLVED IN A FAMILY LAW PROCEEDING INVOLVING DIVORCE

3    OR CHILD CUSTODY OR ANY OF THOSE ISSUES?

4    ANYONE -- AND LET ME SAY IF YOU'D LIKE TO SPEAK PRIVATELY

5    ABOUT THIS, WE CAN CERTAINLY DO THAT.  IS THIS MR. MCNAMARA?

6              PROSPECTIVE JUROR:  IT IS.

7              THE COURT:  YES, WE'LL HAND THE MICROPHONE TO YOU.

8              PROSPECTIVE JUROR:  OH, I WAS DIVORCED AND WENT

9    THROUGH A CUSTODY BATTLE.

10             THE COURT:  OKAY.

11             PROSPECTIVE JUROR:  SO 15, 17 YEARS AGO.

12             THE COURT:  IS THAT IN THIS COUNTY?

13             PROSPECTIVE JUROR:  IT WAS IN SAN MATEO COUNTY.

14             THE COURT:  OKAY.  I DON'T KNOW BUT THERE MAY BE

15   EVIDENCE ABOUT A FAMILY LAW DISPUTE IN THIS CASE.  WILL YOU BE

16   ABLE TO SEPARATE YOUR PERSONAL SITUATION FROM THE FACTS AND

17   CIRCUMSTANCES IF THERE IS EVIDENCE OF THAT IN THIS CASE?

18             PROSPECTIVE JUROR:  I BELIEVE SO.

19             THE COURT:  OKAY.  GREAT.  THANK YOU.  ANYONE ELSE?

20        YES, MR. ROJAS.

21             PROSPECTIVE JUROR:  MY WIFE WAS DIVORCED -- I'M

22   SORRY.  MARRIED A DIVORCED MAN, AND THERE WAS CUSTODY WITH HIS

23   TWO SONS, OKAY.

24             THE COURT:  OKAY.

25             PROSPECTIVE JUROR:  BUT I DON'T KNOW A WHOLE LOT OF

```
 1     DETAILS ABOUT THAT SO.

 2              THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

 3          MR. LEE, YES, SIR.

 4              PROSPECTIVE JUROR:  DIVORCED 15 YEARS AGO IN

 5     GEORGIA.

 6              THE COURT:  OKAY.  YES, IS IT MS. MCGUIRE?

 7              PROSPECTIVE JUROR:  YES.  MY BROTHER WAS DIVORCED

 8     BACK IN I THINK 2003, 2004 BUT AT THAT TIME IT DID NOT INVOLVE

 9     ANY CHILD CUSTODY ISSUE.

10              THE COURT:  WAS THAT IN SANTA CLARA COUNTY?

11              PROSPECTIVE JUROR:  I BELIEVE SO OR SAN JOAQUIN.

12              THE COURT:  AND IT SOUNDS LIKE YOU WEREN'T REALLY

13     INVOLVED IN THE CASE?

14              PROSPECTIVE JUROR:  NO.  I KNEW THE REASONS WHY AND

15     THINGS LIKE THAT BUT NOT SPECIFIC INFORMATION.

16              THE COURT:  OKAY.  THANK YOU.  ANY OTHER HANDS?

17          I SEE NO HANDS.

18          HAVE ANY OF YOU EVER SERVED AS A JUROR IN A CIVIL OR

19     CRIMINAL CASE OR AS A MEMBER OF A GRAND JURY IN EITHER FEDERAL

20     OR STATE COURT, ANY OTHER PRIOR EXPERIENCE?

21              PROSPECTIVE JUROR:  YES.  MR. SPENCER.  IT WAS A

22     LONG TIME AGO BUT THERE WAS SEVERAL CASES.  ONE WAS DUI AND THE

23     OTHER ONE WAS A -- I DON'T KNOW HOW TO EXPLAIN IT.  HE WAS A

24     MANAGER OF A STRIP JOINT AND THEY BOTH HAD HAD -- THAT ONE WAS

25     A HUNG JURY AND THAT ONE WAS A CONVICTION.
```

```
 1                    THE COURT:  ALL RIGHT.  THANK YOU.  YES,

 2     MS. VAN WINKLE, YOU'VE HAD JURY EXPERIENCE?

 3                    PROSPECTIVE JUROR:  I WAS ON A JURY IN SUPERIOR

 4     COURT.

 5                    THE COURT:  IN SANTA CLARA COUNTY?

 6                    PROSPECTIVE JUROR:  IN SANTA CLARA COUNTY.

 7                    THE COURT:  WAS IT CIVIL OR CRIMINAL?

 8                    PROSPECTIVE JUROR:  IT WAS CIVIL, I BELIEVE.  IT WAS

 9     ABOUT SOMEONE HAD GOTTEN SICK FROM SOME POTENTIALLY TAINTED

10     MEAT.

11                    THE COURT:  WAS THE JURY -- I'M SORRY.  WAS THE JURY

12     ABLE TO REACH A VERDICT IN THAT CASE?

13                    PROSPECTIVE JUROR:  YES.

14                    THE COURT:  AND HOW LONG AGO WAS THAT?

15                    PROSPECTIVE JUROR:  2010.

16                    THE COURT:  OKAY.  ANY OTHER JURY EXPERIENCE?

17        YES, MR. HO.

18                    PROSPECTIVE JUROR:  YEAH, I HAVE EXPERIENCE 15 YEARS

19     AGO IN OAKLAND, YES.

20                    THE COURT:  WAS IT A CRIMINAL OR A CIVIL?

21                    PROSPECTIVE JUROR:  CIVIL.  IT'S A CAR ACCIDENT.

22                    THE COURT:  I SEE.  AND WAS THE JURY ABLE TO REACH A

23     VERDICT IN THAT CASE?

24                    PROSPECTIVE JUROR: YES, YES.

25                    THE COURT:  OKAY.  THANK YOU.  ANYONE ELSE WITH JURY
```

```
1      EXPERIENCE?

2          I SEE NO HANDS.

3          HAVE ANY OF YOU EVER BEEN INVOLVED IN ANY COURT IN ANY

4      CRIMINAL MATTER OR IN ANY INVESTIGATION THAT CONCERNED

5      YOURSELF, ANY MEMBER OF YOUR FAMILY, OR A CLOSE FRIEND EITHER

6      AS A DEFENDANT, A WITNESS OR A VICTIM?

7          IF ANYONE WANTS TO SPEAK PRIVATELY ABOUT THIS QUESTION,

8      YOU CAN CERTAINLY DO THAT.

9          YES, MS. JOHANSON.

10             PROSPECTIVE JUROR:  CAN I SPEAK PRIVATELY?

11             THE COURT:  YES, OF COURSE.  ANYONE ELSE?

12             PROSPECTIVE JUROR:  IS IT CRIMINAL?

13             THE COURT:  YES.  MS. JOHANSON, LET'S TALK AT

14     SIDE-BAR.  COUNSEL.

15         (SIDE-BAR CONFERENCE ON THE RECORD.)

16             THE COURT:  ALL RIGHT.  WE'RE AT SIDE-BAR WITH

17     COUNSEL AND MS. JOHANSON.

18             PROSPECTIVE JUROR:  DID YOU SAY WITNESSES?

19             THE COURT:  YES, YES, SURE.

20             PROSPECTIVE JUROR:  I'M A REGISTERED NURSE, AND I

21     WAS A PART OF A LAWSUIT BACK IN 1981 THAT A PATIENT SUED

22     DOCTORS AND ALSO THE HOSPITAL -- I'M SORRY -- DOCTORS AND ME IN

23     A CASE THAT ENDED UP MY ATTORNEY AND I SETTLED OUT OF COURT

24     WITH THAT.

25             THE COURT:  OKAY.
```

1            PROSPECTIVE JUROR:  SO THAT WAS ONE CASE, AND THE

2    OTHER ONE WAS I WAS A WITNESS AS A REGISTERED NURSE WHERE A

3    PATIENT SUED THE HOSPITAL, AND I WAS ON THE WITNESS STAND FOR

4    THAT.

5            THE COURT:  WERE YOU CALLED BY THE HOSPITAL TO

6    REPRESENT THE --

7            PROSPECTIVE JUROR:  YES.

8            THE COURT:  OKAY.  HOW LONG AGO WAS THAT?

9            PROSPECTIVE JUROR:  TWENTY-FIVE YEARS --

10   TWENTY-SIX YEARS AGO.

11           THE COURT:  WAS THAT IN SANTA CLARA?

12           PROSPECTIVE JUROR:  NO, IT WAS IN DALLAS.

13           THE COURT:  DALLAS.  I SEE.  ANYTHING ABOUT THOSE

14   EXPERIENCES THAT YOU THINK WILL IMPAIR YOUR ABILITY TO BE FAIR

15   AND IMPARTIAL HERE?

16           PROSPECTIVE JUROR:  NO.  OKAY.

17           THE COURT:  ANY QUESTIONS, COUNSEL?

18           MR. ARCHER:  NO.

19           THE COURT:  THANK YOU VERY MUCH.

20           MR. SCHENK:  MAY WE GO --

21           THE COURT:  WE'RE JUST ABOUT TO MOVE INTO THE

22   PRESUMPTION OF INNOCENCE, AND THEN WE'LL TAKE ABOUT A TEN

23   MINUTE BREAK.  WILL YOU BE ALL RIGHT?

24           MR. SCHENK:  SURE.

25           THE COURT:  AND WE'LL HAVE THEM TAKE THEIR EXACT

1    SEATS.  IS THERE ANYTHING YOU WANT TO TALK ABOUT OUTSIDE OF THE

2    PRESENCE OF THE JURY OR ARE WE GOOD TO GO?

3              MR. SCHENK:  THAT'S FINE.

4              THE COURT:  ALL RIGHT.  GOOD.  THANK YOU.

5         THANK YOU, COUNSEL.

6         (END OF DISCUSSION AT SIDE-BAR.)

7              THE COURT:  LADIES AND GENTLEMEN, I WANT TO MOVE

8    INTO SOME OTHER TOPICS NOW.  WE'LL TAKE A BRIEF RECESS?  LET'S

9    TAKE ABOUT A 12 MINUTE RECESS.

10        FOLKS, WHEN YOU RETURN, THOSE OF YOU IN THE JURY BOX,

11   PLEASE REMEMBER YOUR SEATS.

12        AND IF YOU COULD RETURN TO YOUR SAME SEATS, WE'LL BE BACK,

13   AND WE'LL TAKE ABOUT A 12 MINUTE RECESS.  THANK YOU.

14        (RECESS FROM 10:14 A.M. UNTIL 10:30 A.M.)

15             THE COURT:  WE'RE BACK ON THE RECORD.  ALL COUNSEL

16   ARE PRESENT, AND THE DEFENDANT IS PRESENT.  OUR PROSPECTIVE

17   JURORS HAVE RETURNED.

18        LADIES AND GENTLEMEN, A DEFENDANT IN A CRIMINAL CASE IS

19   PRESUMED TO BE INNOCENT.  THIS PRESUMPTION REQUIRES THE

20   GOVERNMENT TO PROVE EACH ELEMENT OF A CRIME BEYOND A REASONABLE

21   DOUBT.  PROOF BEYOND A REASONABLE DOUBT IS PROOF THAT LEAVES

22   YOU FIRMLY CONVINCED THE DEFENDANT IS GUILTY.

23        IT IS NOT REQUIRED THAT THE GOVERNMENT PROVE GUILT BEYOND

24   ALL POSSIBLE DOUBT.  A REASONABLE DOUBT IS A DOUBT BASED UPON

25   REASON AND COMMON SENSE AND IS NOT BASED PURELY ON SPECULATION.

1          IT MAY ARISE FROM A CAREFUL AND IMPARTIAL CONSIDERATION OF

2     ALL OF THE EVIDENCE OR FROM LACK OF EVIDENCE.

3          IF AFTER A CAREFUL AND IMPARTIAL CONSIDERATION OF ALL OF

4     THE EVIDENCE, YOU ARE NOT CONVINCED BEYOND A REASONABLE DOUBT

5     THAT THE DEFENDANT IS GUILTY, IT IS YOUR DUTY TO FIND THE

6     DEFENDANT NOT GUILTY.

7          ON THE OTHER HAND, IF AFTER A CAREFUL AND IMPARTIAL

8     CONSIDERATION OF ALL OF THE EVIDENCE YOU ARE CONVINCED BEYOND A

9     REASONABLE DOUBT THAT THE DEFENDANT IS GUILTY, IT IS YOUR DUTY

10    TO FIND THE DEFENDANT GUILTY.

11         NOW, CAN YOU ALL APPLY THE LAW AS GIVEN BY THE COURT,

12    INCLUDING THE PRESUMPTION OF INNOCENCE AND THE GOVERNMENT'S

13    BURDEN OF PROOF BEYOND A REASONABLE DOUBT?

14         IS THERE ANYONE WHO CANNOT DO THIS OR WOULD HAVE

15    DIFFICULTY DOING THIS?

16         I SEE NO HANDS.

17         IN YOUR DELIBERATIONS YOU MUST NOT CONSIDER PUNISHMENT IN

18    ANY WAY.  THE QUESTION OF PUNISHMENT MUST NEVER ENTER YOUR

19    DISCUSSIONS.  ANY QUESTION OF PUNISHMENT IS SOLELY FOR THE

20    COURT.

21         WILL YOU PERFORM YOUR DUTIES AS JURORS IN THIS CASE

22    FOLLOWING THE LAW AS I GIVE IT TO YOU AND APPLY THAT LAW TO THE

23    FACTS AS YOU FIND THEM WITHOUT REGARD TO THE SUBJECT OF

24    PUNISHMENT?

25         IS THERE ANYONE WHO CANNOT DO THIS?

1          I SEE NO HANDS.

2          IS THERE ANYONE PRESENT WHO CANNOT PRESUME THE DEFENDANT

3     INNOCENT OF THE CHARGES, ANYONE WHO HAS DIFFICULTY WITH THAT

4     CONCEPT, THE PRESUMPTION OF INNOCENCE?

5          I SEE NO HANDS.

6          IS THERE ANYTHING ABOUT THE NATURE OF THE CHARGES OR YOUR

7     PERSONAL EXPERIENCE THAT YOU MAY NOT HAVE DISCLOSED HERETOFORE

8     THAT CAUSED YOU TO BELIEVE THAT YOU CANNOT BE FAIR AND

9     IMPARTIAL IN REACHING YOUR VERDICT IN THIS CASE?

10          I SEE NO HANDS.

11          DOES ANYONE FEEL THAT BECAUSE OF PHILOSOPHICAL, MORAL OR

12     RELIGIOUS REASONS THEY CANNOT SIT IN JUDGMENT ON AN INDIVIDUAL?

13          YES, THIS IS MR. TEO.  YES, WE'LL GET THE MICROPHONE TO

14     YOU.  YES, THANK YOU.  MR. TEO.

15          PROSPECTIVE JUROR:  YEAH.  I'M A CHRISTIAN SO I

16     BASICALLY I LOVE GOD AND LOVE MY NEIGHBOR, LOVE GOD AND LOVE MY

17     NEIGHBOR.  SO OTHER THAN THAT I WILL HAVE TO FOLLOW THE LAW,

18     THAT'S FOR SURE.

19          SO IF THERE'S A CONFLICT BETWEEN THE LAW AND WHAT I

20     BELIEVE, THEN I'LL FOLLOW GOD AND THE BIBLE.

21          THE COURT:  ALL RIGHT.  SO THANK YOU, SIR.

22          I'M PAUSING FOR A MOMENT TO THINK WHETHER OR NOT AT LEAST

23     IN MY INFORMATION THE FACTS IN THIS CASE AND FOLLOWING THE LAW

24     AS I GIVE IT TO YOU WOULD IN ANY WAY INTERSECT WITH YOUR

25     PERSONAL RELIGIOUS BELIEFS, AND I CAN'T THINK THAT THE FACTS

```
 1        WOULD ALLOW THAT TO OCCUR IN THIS CASE.

 2             THIS QUESTION IS, I SUPPOSE, DESIGNED, OR THERE ARE SOME

 3        INDIVIDUALS WHO FEEL THAT BECAUSE OF RELIGIOUS OR MORAL OR

 4        OTHER BELIEFS THAT THEY CANNOT SIT IN JUDGMENT ABOUT ANOTHER

 5        INDIVIDUAL.

 6                  PROSPECTIVE JUROR:  OKAY.

 7                  THE COURT:  BUT THAT'S NOT -- AND THAT'S NOT WHAT I

 8        HEAR YOU SAYING.  YOU'RE TELLING ME THAT YOU FOLLOW YOUR FAITH?

 9                  PROSPECTIVE JUROR:  CORRECT.

10                  THE COURT:  RIGHT.  AND -- BUT YOU CAN FOLLOW THE

11        LAW AS I GIVE IT TO YOU?

12                  PROSPECTIVE JUROR:  UH-HUH.

13                  THE COURT:  YOU'LL BE ABLE TO DO THAT?

14                  PROSPECTIVE JUROR:  YES.

15                  THE COURT:  OKAY.  ALL RIGHT.

16             THIS QUESTION IS REALLY DESIGNED TO, TO INFORM PROSPECTIVE

17        JURORS THAT, AGAIN, THEY'RE NOT TO CONSIDER PUNISHMENT IN ANY

18        WAY BECAUSE THE COURT, IF THEY'RE -- IF THAT SHOULD EVER BECOME

19        AN ISSUE, IT'S THE COURT'S DECISION AS TO WHETHER PUNISHMENT

20        AND WHAT TYPE OF PUNISHMENT.

21             BUT JURORS ARE NEVER, NEVER TO CONSIDER THAT.  THAT'S NOT

22        A JUROR'S JOB.  DO YOU UNDERSTAND?

23                  PROSPECTIVE JUROR:  YES.

24                  THE COURT:  DOES THAT HELP YOU?

25                  PROSPECTIVE JUROR:  YES.
```

1          THE COURT:  ANYTHING ELSE YOU WANT TO SAY ABOUT

2     THIS, SIR?

3          PROSPECTIVE JUROR:  NO.

4          THE COURT:  THANK YOU VERY MUCH.

5          PROSPECTIVE JUROR:  UH-HUH.

6        ANYONE ELSE WISH TO RESPOND TO THIS QUESTION?

7        I SEE NO HANDS.

8        EXCUSE ME.  IN OUR COURTS AN ACCUSED HAS THE RIGHT TO

9     REMAIN SILENT AND NOT TO TESTIFY.

10        AN INDIVIDUAL MAY CHOOSE TO RELY ON THE STATE OF THE

11    EVIDENCE AT THE CONCLUSION OF THE GOVERNMENT'S CASE AND PRESENT

12    NO AFFIRMATIVE DEFENSE.

13        NOW, DO ALL OF YOU ACCEPT MR. YORK'S RIGHT UNDER THE

14    CONSTITUTION TO REMAIN SILENT AND THUS NOT TO TESTIFY IN THE

15    CASE?  DO YOU ALL ACCEPT THAT CONCEPT?

16        LET ME ASK THIS, IS THERE ANYONE WHO DOES NOT ACCEPT THAT

17    CONCEPT?

18        I SEE NO HANDS.

19        IF MR. YORK RELIES ON HIS RIGHT NOT TO TESTIFY, WILL

20    ANYONE HOLD THAT AGAINST HIM?

21        I SEE NO HANDS.

22        IN OUR NATION AND STATE WE HAVE CITIZENS, RESIDENTS, AND

23    NONCITIZENS FROM MANY DIFFERENT RACES, ETHNIC AND CULTURAL

24    BACKGROUNDS.  IN THE JURISDICTION OF THIS COURT WE ENJOY A RICH

25    DIVERSITY OF INDIVIDUALS AND CULTURES AND UNDER THE LAW ALL

1    PEOPLE WHO APPEAR IN COURT REGARDLESS OF RACE, RELIGION, ETHNIC

2    HERITAGE, SEX, AGE OR SEXUAL ORIENTATION ARE ENTITLED TO DUE

3    PROCESS OF THE LAW, AND WE GUARANTEE EACH PERSON THE RIGHT TO A

4    FAIR AND IMPARTIAL TRIAL.

5        WE ARE TO JUDGE EACH INDIVIDUAL AS WE WOULD WANT TO BE

6    JUDGED, THAT IS, FAIRLY AND IMPARTIALLY.

7        NOW, IT MAY APPEAR THAT ONE OR MORE OF THE ATTORNEYS,

8    PARTIES OR ATTORNEYS OR WITNESSES COME FROM A PARTICULAR

9    NATIONAL RELIGIOUS GROUP OR MAY HAVE A PARTICULAR LIFESTYLE

10   DIFFERENT FROM YOUR OWN.

11       WOULD THIS IN ANY WAY AFFECT ANY OF YOUR JUDGMENTS OR

12   WEIGHT AND CREDIBILITY THAT YOU WOULD GIVE TO THE EVIDENCE IN

13   THE CASE?

14       ANYONE FEELS THAT THAT MIGHT AFFECT THEIR DELIBERATIONS?

15           PROSPECTIVE JUROR:  CAN I SPEAK PRIVATELY?

16           THE COURT:  OF COURSE.  YES, SIR.  CAN WE HAVE A

17   SIDE-BAR WITH MR. TEO, COUNSEL.

18       (SIDE-BAR CONFERENCE ON THE RECORD.)

19           THE COURT:  WE'RE AT SIDE-BAR WITH COUNSEL AND

20   MR. TEO.  MR. TEO, YOU CAN SPEAK INTO THIS (INDICATING).

21           PROSPECTIVE JUROR:  THANK YOU.

22           THE COURT:  YOU'RE WELCOME.

23           PROSPECTIVE JUROR:  YOU BROUGHT UP SEXUAL

24   ORIENTATION AND ALL OF THOSE THINGS.  AS A CHRISTIAN, I'M

25   AGAINST GAY RIGHTS AND SO I HAVE TO ADVISE.

```
 1              THE COURT:  OKAY.  I DON'T BELIEVE THAT'S AN ISSUE

 2    IN THIS CASE.  LET ME ASK COUNSEL, IS THERE ANY ISSUE ABOUT

 3    THIS THAT IS GOING TO COME UP IN THIS CASE?

 4              MR. ARCHER:  NOT TO MY KNOWLEDGE.  THAT'S FINE.  ALL

 5    RIGHT.

 6              THE COURT:  SO YOU WON'T BE CALLED UPON TO MAKE ANY

 7    DECISION ON THAT ISSUE?

 8              PROSPECTIVE JUROR:  OKAY.  ALL RIGHT.

 9              THE COURT:  THANK YOU.  ANYTHING FURTHER, COUNSEL?

10    THANK YOU VERY MUCH, SIR.

11         (END OF DISCUSSION AT SIDE-BAR.)

12              THE COURT:  THANK YOU, COUNSEL.  TO REACH A VERDICT

13    THE JURY MUST BE UNANIMOUS.  NOW, DO ALL OF YOU ACCEPT THE

14    REQUIREMENT THAT THE JURY'S VERDICT MUST BE UNANIMOUS?  ANYONE

15    WHO PARTS COMPANY WITH THAT?

16         I SEE NO HANDS.

17         IF YOU ARE SELECTED TO SIT ON THIS CASE, YOU WILL BE ASKED

18    TO RENDER A VERDICT SOLELY ON THE EVIDENCE PRESENTED AT THE

19    TRIAL AND IN THE CONTEXT OF THE LAW AS I WILL GIVE IT TO YOU IN

20    MY INSTRUCTIONS, DISREGARDING ANY OTHER IDEAS, NOTIONS OR

21    BELIEFS ABOUT THE LAW THAT YOU MAY HAVE ENCOUNTERED IN REACHING

22    YOUR VERDICT.  WILL YOU ALL BE ABLE TO DO THAT?  ANYONE WHO

23    CANNOT DO THAT?

24         I SEE NO HANDS.

25         CAN YOU THINK OF ANY OTHER REASON WHY YOU MAY NOT BE ABLE
```

```
1     TO TRY THIS CASE FAIRLY AND IMPARTIALLY FOR THE GOVERNMENT AND

2     THE DEFENSE OR WHY YOU SHOULD NOT BE ON THIS JURY?

3          I SEE NO HANDS.

4          LET ME CALL UPON THE GOVERNMENT AND INQUIRE WHETHER OR NOT

5     THE GOVERNMENT HAS VOIR DIRE.

6          MR. SCHENK:  YES, YOUR HONOR, JUST A FEW QUESTIONS.

7     THANK YOU.

8          THANK YOU.  GOOD MORNING AGAIN.  MY NAME IS JEFF SCHENK,

9     AND I'M ONE OF THE ATTORNEYS THAT REPRESENTS THE UNITED STATES

10    IN THIS MATTER.

11         BEFORE I BEGIN PRYING INTO YOUR LIVES, LET ME ASK A

12    QUESTION FOR YOU -- YES, I'M OLD ENOUGH TO TRY CASES IN COURT.

13         YOU WERE GIVEN THESE QUESTIONNAIRES THAT YOU FILL OUT IN

14    THE MORNING AND FROM THEM WE CREATE SOME KIND OF DOSSIER, SOME

15    KIND OF INFORMATION ABOUT YOU AND SOME OF YOU RAISED SOME GOOD

16    QUESTIONS, EVEN QUESTIONS ABOUT YOURSELVES.

17         AND IF YOU WOULDN'T MIND, I'D LIKE TO REVEAL WHAT YOU

18    WROTE PRIVATELY NOW TO EVERYONE IN THE COURTROOM.

19         I HOPEFULLY CHOSE ONES THAT HOPEFULLY ARE NOT TOO

20    OFFENDING AND YOU'LL SEE IN PARTICULAR THESE TWO, THERE ARE TWO

21    PEOPLE WHO ARE NOW SEATED HERE WHO WROTE ANSWERS THAT ARE QUITE

22    INTERESTING, AND I THINK THAT THEY ARE MR. JAMPANI; IS THAT

23    RIGHT?

24              PROSPECTIVE JUROR:  (HAND RAISED.)

25              MR. SCHENK:  AND MR. VENKATA?
```

```
 1                    PROSPECTIVE JUROR:  MS.

 2                    MR. SCHENK:  MS.  BOTH OF YOU EXPRESSED SOME CONCERN

 3       ABOUT YOUR ABILITIES TO MAKE DECISIONS AND PEOPLE CALL YOU

 4       INDECISIVE.  BEING ON A JURY IS ALL ABOUT MAKING DECISIONS.

 5       I'M CURIOUS TO HEAR FROM ALL OF YOU.  DO YOU HAVE SOME CONCERN

 6       ABOUT YOUR ABILITY TO MAKE DECISIONS WHEN YOU GO TO THE

 7       DELIBERATION ROOM AND ARE ASKED TO VOTE?  FIRST, MS. VENKATA?

 8                    PROSPECTIVE JUROR:  THIS IS THE FIRST TIME THAT I'M

 9       DOING THE JURY SERVICE.

10                    THE COURT:  WE'LL GET YOU A MICROPHONE.  THERE WE

11       GO.

12                    PROSPECTIVE JUROR:  THIS IS THE FIRST TIME I'M DOING

13       THE JURY SERVICE.  I DON'T KNOW WHAT TO EXPECT AND MAYBE BASED

14       ON THE CASE WHATEVER IS PROVIDED, I MAY BE ABLE TO DO IT, BUT

15       I'M NOT REALLY SURE AT THIS POINT IN TIME.

16                    MR. SCHENK:  OKAY.  WHAT ARE YOUR CONCERNS?  NOT

17       KNOWING WHAT YOU'RE FACING EITHER SITTING THROUGH SEVERAL DAYS

18       OF TESTIMONY OR DELIBERATING WITH YOUR FELLOW JURORS, WHAT ARE

19       THE KIND OF CONCERNS THAT YOU HAVE?

20                    PROSPECTIVE JUROR:  I GET INFLUENCED VERY EASILY.

21       THAT'S ONE OF THE CONCERNS THAT I HAVE.

22                    MR. SCHENK:  OKAY.

23                    PROSPECTIVE JUROR:  SO THAT MIGHT ACTUALLY ENTER THE

24       PROCESS.  THAT'S WHAT I FEEL.

25                    MR. SCHENK:  SO IF YOU'RE DISCUSSING THE CASE AT THE
```

1    END WHEN YOU'RE DELIBERATING AND YOUR JUROR SITTING NEXT TO YOU

2    SAYS I THINK A PARTICULAR PIECE OF EVIDENCE IS VERY STRONG OR

3    VERY WEAK.

4         PROSPECTIVE JUROR:  YEAH.  WHAT I'M TRYING TO SAY IS

5    THAT I CAN'T SAY BEFORE ME, YES, THIS IS WHAT I BELIEVE.  I

6    DON'T ANSWER ALL OF THE THINGS, BUT I REALLY DON'T KNOW HOW TO

7    SAY IT.

8         MR. SCHENK:  OKAY.  DOES ANYONE ELSE HAVE A CONCERN

9    SIMILAR OR THOUGHTS ON THAT SAME SUBJECT?

10     SIR, HOW ABOUT YOU?  WOULD YOU MIND SHARING?

11         THE COURT:  THIS IS MR. JAMPANI?

12         PROSPECTIVE JUROR:  YES.

13         THE COURT:  YES.

14         PROSPECTIVE JUROR:  SOMEHOW I THINK I'M NOT ABLE TO

15    JUDGE ANYONE BASED ON WHERE I COME FROM EVEN THOUGH I'M HERE AT

16    THIS TIME, BUT I THINK I MAY BE TOTALLY BIASSED OR I CAN SWAY

17    MY DECISION ANY WAY AT ANY TIME, AND I THINK I'M NOT ABLE TO

18    MAKE A DECISION.

19         MR. SCHENK:  OKAY.  YOU SAID THAT YOU'RE UNABLE TO

20    JUDGE.  DO YOU MEAN DETERMINE?

21         PROSPECTIVE JUROR:  DETERMINE WHETHER SOMEONE IS

22    GUILTY OR NOT.

23         MR. SCHENK:  OKAY.  WHY DO YOU SAY THAT?

24         PROSPECTIVE JUROR:  I THINK IN THE FAIRNESS OF WHAT

25    GOES ON, I MEAN, I ALREADY HEARD A LOT SO FAR AND FROM WHERE I

1    CAME FROM IT'S MOSTLY PEOPLE WHO ARE EDUCATED IN THAT FIELD

2    LIKE LAWYERS AND THEY MAKE RECOMMENDATIONS, NOT BEING ABLE TO

3    SEE PEOPLE AND SO IN THE PROCESS.

4         MR. SCHENK:  IN YOUR FORM YOU INDICATE THAT YOU'RE

5    FROM INDIA, AND THEY'RE TRAINED LAWYERS, AND THEY MAKE THE

6    DECISION AND NOT THE PUBLIC.

7         PROSPECTIVE JUROR:  THAT'S CORRECT.

8         MR. SCHENK:  AND IN THE UNITED STATES THERE'S A

9    SYSTEM THAT ARGUES THAT THERE'S WISDOM IN HAVING PEOPLE COME IN

10   AND DECIDE THE FACTS.

11        PROSPECTIVE JUROR:  YES.  SO I THINK THE SYSTEM

12   WORKS HERE, I ALREADY HAVE SOME PREJUDICE THAT THIS IS PROBABLY

13   NOT THE RIGHT WAY BECAUSE PEOPLE WHO DO NOT HAVE KNOWLEDGE OF

14   THE LAW, THEY TRY TO ACCOMMODATE THE GUILTY OR NOT GUILTY

15   VERDICT.  THAT MAY NOT BE THE RIGHT CHOICE I THINK.

16        MR. SCHENK:  YOU MEAN THEY MAY NOT MAKE THE RIGHT

17   CHOICE OR JUST THE --

18        PROSPECTIVE JUROR:  I THINK THE SYSTEM THE WAY IT IS

19   DESIGNED MAY NOT WORK WELL IN THE FAIRNESS OF ANYBODY.

20        MR. SCHENK:  FAIRNESS FOR EITHER SIDE?

21        PROSPECTIVE JUROR:  YEAH, YEAH.

22        MR. SCHENK:  DO YOU THINK YOU COULD PUT ASIDE YOUR

23   CONCERNS ABOUT THE WAY THE SYSTEM IS SET UP AND MAKE DECISIONS

24   WITHIN THIS SYSTEM, YOU KNOW, HAVE THE DISCUSSION ABOUT WHETHER

25   THE JURY SYSTEM IS THE RIGHT SYSTEM ANOTHER DAY BUT FOR THE

1    DAYS THAT YOU'RE SERVING ON THE JURY, MAKE THE DECISIONS THAT

2    THE JUDGE ASKS YOU TO MAKE?

3                PROSPECTIVE JUROR:  I THINK I MAY NOT BE ABLE TO

4    COMPREHEND WHAT GOES ON IN THE CASE BECAUSE I DON'T KNOW THE

5    ARGUMENTS THAT CAN GO ON BECAUSE I DON'T KNOW THE LAW AND I MAY

6    NOT BE ABLE TO DO MY PART AND MY PART ON THE JURY.

7                MR. SCHENK:  WHAT IF I SAID IT WAS THE LAWYER'S

8    FAULT THAT WE DIDN'T MAKE THE ARGUMENT WELL ENOUGH IN A WAY

9    THAT YOU CAN UNDERSTAND, THAT'S OUR JOB, WOULD YOU BE ABLE TO

10   MAKE A DECISION BASED ON THE EVIDENCE THAT YOU HAVE?

11               PROSPECTIVE JUROR:  NO.  BECAUSE I THINK LAWYERS

12   HAVE ALREADY PRACTICED THE LAW AND THEY KNOW HOW TO ARGUE A

13   CASE.  THEY'RE VERY MUCH EDUCATED UPON.

14               MR. SCHENK:  OKAY.  MR. JAMPANI RAISES A GOOD POINT

15   AND THAT IS IN OUR SYSTEM WE PLACE A LOT OF FAITH IN THE JURY

16   SYSTEM IN BRINGING PEOPLE IN FROM THE COMMUNITY WHO HAVE NO

17   TRAINING IN THE LAW AND WHO ARE ASKED TO DECIDE FACTS THAT ARE

18   PUT IN FRONT OF THEM.

19           DOES ANYONE ELSE HAVE ANY CONCERNS ABOUT EITHER THE WISDOM

20   OF THAT SYSTEM OR THEIR ABILITY TO WORK WITH IT?

21           YES, SIR.  WOULD YOU MIND REMINDING ME YOUR NAME?

22               PROSPECTIVE JUROR:  MY NAME IS RAFAEL YAHALOM AND

23   WHERE I COME FROM WE HAVE THE SAME SYSTEM LIKE IN INDIA SO I

24   SAW WHAT HE SAID AND I SHARE SOME OF THE CONCERNS.

25               MR. SCHENK:  AND ARE THE CONCERNS THE WISDOM OF THE

1    SYSTEM OR YOUR ABILITY TO MAKE DECISIONS IN THE SYSTEM?

2             PROSPECTIVE JUROR:  SOME OR BOTH.

3             MR. SCHENK:  WOULD YOU TELL ME ABOUT YOUR CONCERNS

4    ABOUT YOUR ABILITY TO MAKE DECISIONS?

5             PROSPECTIVE JUROR:  I THINK I CAN MAKE DECISIONS.

6             MR. SCHENK:  YOU THINK YOU CAN?

7             PROSPECTIVE JUROR:  YEAH.

8             MR. SCHENK:  SO IF THE JUDGE GIVES YOU INSTRUCTIONS

9    ON THE LAW AND YOU HEAR THE FACTS OF THE CASE DURING SEVERAL

10   DAYS OF TESTIMONY, YOU THINK YOU CAN APPLY THE LAW TO THOSE

11   FACTS?

12            PROSPECTIVE JUROR:  PROBABLY.

13            MR. SCHENK:  ANYONE ELSE WANT TO SHARE THEIR

14   THOUGHTS ABOUT THE JURY SYSTEM AND WHAT THEY'LL BE ASKED TO DO?

15        YES, SIR, MR. HO.

16            THE COURT:  WE'LL GET YOU THE MICROPHONE, MR. HO.

17            PROSPECTIVE JUROR:  YEAH, I UNDERSTAND WHAT HE SAYS.

18   I COME FROM TAIWAN, AND THERE'S NO JURY SERVICE IN TAIWAN.  SO

19   I DID HAVE A JURY EXPERIENCE 15 YEARS AGO, AND I REALLY WAS

20   CONFUSED WITH THE WHOLE PROCESS.  I FEEL LIKE I HAVE A LOT OF

21   BURDEN ON MYSELF TO DECIDE WHICH SIDE IS RIGHT OR WRONG OR

22   WHATEVER AND THE ATTORNEY ON BOTH SIDES IS SO GOOD SO I REALLY

23   CANNOT TELL, YOU KNOW, ON THIS SIDE, YEAH, IT MAKES SENSE AND

24   ON THAT SIDE IT ALSO MAKES SENSE.

25        SO EVEN THOUGH WE REACHED A VERDICT, BUT I'M NOT QUITE

```
1     SURE IF THAT'S FAIR TO THE OTHER SIDE SO.

2           MR. SCHENK:  WAS YOUR PRIOR JURY SERVICE REWARDING?

3     DID YOU ENJOY IT OR DID IT CREATE STRESS?

4           PROSPECTIVE JUROR:  I LEARNED A LOT, BUT LIKE I

5     SAID, BECAUSE OF MY BACKGROUND AND WHERE I COME FROM AND --

6           MR. SCHENK:  AND WHEN YOU SAY YOUR BACKGROUND, DO

7     YOU MEAN JUST HAVING A SYSTEM WHERE THE JURORS DON'T COME FROM

8     THE PUBLIC?

9           PROSPECTIVE JUROR:  THERE WAS NO SYSTEM IN TAIWAN.

10          MR. SCHENK:  SO IT'S NOT LANGUAGE OR UNDERSTANDING

11    THE CONCEPTS OR ANYTHING?

12          PROSPECTIVE JUROR:  YES.

13          MR. SCHENK:  IT'S JUST THE IDEA OF THE PUBLIC MAKING

14    THE DECISION?

15          PROSPECTIVE JUROR:  EXACTLY.

16          MR. SCHENK:  OKAY.  DO YOU THINK THAT IF GIVEN THE

17    LAW OF THE CASE BY THE JUDGE YOU COULD HEAR THE FACTS AS THE

18    WITNESSES PROVIDE THEM TO YOU AND APPLY THE LAW?

19          PROSPECTIVE JUROR:  YES, YES, I WILL TRY MY BEST,

20    BUT, AGAIN, LIKE I SAID, MY PREVIOUS EXPERIENCE IS THAT THE

21    LAWYER FROM BOTH SIDES, THEY'RE ALL GOOD.

22          MR. SCHENK:  AND LEFT YOU WITH A VERY HARD DECISION?

23          PROSPECTIVE JUROR:  EXACTLY, EXACTLY.

24          THE COURT:  SO EXCUSE ME, MR. SCHENK.  SO

25    MR. JAMPANI, MS. VENKATA, THAT IS ONE OF THE BEAUTIES OF OUR
```

1    AMERICAN JURISPRUDENCE SYSTEM, THE PRECIOUS RIGHT TO A JURY

2    TRIAL, THE TRIAL BY ONE'S PEERS, AND THIS IS THE SYSTEM THAT WE

3    HAVE, WE CALL ON OUR COMMUNITIES, ALL OF YOU COME FROM VERY

4    DIFFERENT PARTS OF OUR COMMUNITY AND YOU COME HERE AND YOU

5    HAVEN'T MET, AND YOU DON'T KNOW, YOU'RE STRANGERS, YOU'RE

6    STRANGERS TO THIS CASE AND IT'S NATURAL TO BE NOTICED FOR A

7    FIRST EXPERIENCE SITTING IN THE JURY.

8         YOU'VE NEVER EXPERIENCED THIS BEFORE.  MR. HO HAS.  OTHER

9    MEMBERS OF THE PROSPECTIVE PANEL HAVE.  SO IT'S VERY NATURAL TO

10   BE NERVOUS ON WHAT ARE CALLED UPON.  MY SENSE IS THAT

11   NERVOUSNESS COMES FROM THE FACT THAT YOU REALIZE WHAT A

12   PROFOUND THING A JURY TRIAL IS IN OUR SYSTEM IN THIS COUNTRY,

13   JUST HOW PROFOUND IT IS AND HOW ALMOST MAGICAL IT IS THAT WE

14   CALL CITIZENS, INDIVIDUALS FROM OUR COMMUNITY TO BE

15   PARTICIPANTS IN THEIR JUSTICE SYSTEM.  THIS IS THE PRIVILEGE

16   THAT YOU HAVE AND ALL OF US ENJOY TO PARTICIPATE IN OUR JUSTICE

17   SYSTEM.

18        AND IT'S VERY NORMAL TO BE NERVOUS ABOUT PARTICIPATING BUT

19   THE GOVERNMENT AND THE DEFENSE ARE ENTITLED, THEY'RE ENTITLED

20   TO EACH INDIVIDUAL JUROR'S INDIVIDUAL OPINION AND DELIBERATION,

21   AND THAT OCCURS WHEN THE CASE IS FINISHED AND YOU'VE HEARD ALL

22   OF THE EVIDENCE.  YOU'VE HEARD THE ARGUMENTS OF THE LAWYERS.

23   YOU GET THE INSTRUCTIONS, THAT IS, YOU WILL RECEIVE FROM ME THE

24   LAW THAT YOU WILL APPLY TO THE FACTS AS YOU FIND THEM.  THAT'S

25   YOUR JOB AS JURORS.  YOU ARE JUDGES.  YOU ARE JUDGES OF THE

1    FACTS.

2         YOU GET TO DETERMINE WHAT HAPPENED IN THE CASE.  AND TO

3    THOSE FACTS AS YOU FIND THEM AS JURORS, YOU WILL APPLY THE LAW

4    THAT I WILL GIVE TO YOU AND AT THE END OF THE CASE I WILL READ

5    THE LAW TO YOU HAD AND I WILL GIVE YOU -- EACH JUROR WILL HAVE

6    A COPY OF THE INSTRUCTIONS TO TAKE WITH YOU INTO THE JURY ROOM.

7    YOU'LL HAVE YOUR INDIVIDUAL COPY AND IN THE JURY ROOM THAT IS

8    WHERE THE DELIBERATING PROCESS BEGINS.  THEN YOU WILL DISCUSS

9    WITH YOUR FELLOW JURORS THE FACTS OF THE CASE AS YOU FIND THEM

10   AND YOU'LL DISCUSS THE LAW.

11        AND THROUGH THOSE DISCUSSIONS, MUCH LIKE GROUPS WHEN YOU

12   WORK IN OUR INDUSTRY, ELECTRONICS INDUSTRY IT'S DESIGNED IN

13   GROUPS TO BE MORE EFFICIENT TO RELEASE A PRODUCT OF DESIGN

14   SOFTWARE, THIS IS A GROUP EXERCISE, AND YOU'LL DISCUSS AND

15   SHARE EACH OF YOUR INDIVIDUAL OPINIONS AND BY THAT METHOD YOU

16   WILL, IF YOU'RE ABLE TO, REACH A VERDICT AND RETURN TO THE

17   COURT WITH A VERDICT.

18        SO IT'S NATURAL TO BE NERVOUS ABOUT THIS.  IT'S A

19   DIFFERENT SYSTEM.  IT'S SOMETHING THAT SOME OF YOU MAY NOT HAVE

20   PARTICIPATED IN, BUT I SUGGEST TO YOU IT IS YOUR CRIMINAL

21   JUSTICE SYSTEM, IT IS YOUR JUSTICE SYSTEM, AND IT'S, I BELIEVE,

22   A TRUE PRIVILEGE FOR YOU ALL TO PARTICIPATE IN THIS WONDERFUL

23   EXPERIENCE.  IT'S NATURAL AND NORMAL TO THINK THAT YOU'RE ABOUT

24   TO ENDEAVOR SOMETHING THAT SOME OF YOU HAVE NOT DONE

25   PREVIOUSLY, AND IT'S NORMAL TO BE NERVOUS ABOUT THAT.

1          BUT I THINK, AS MR. SCHENK SUGGESTS AND I THINK AS

2     MR. ARCHER MAY HAVE SUGGESTED ALSO, THE EXPERIENCE OF BEING A

3     JUROR IS A VERY SPECIAL ONE.

4          SO WHAT I'M SUGGESTING IS THE NERVOUSNESS IS NORMAL.  IF

5     YOU THINK ABOUT IT IN YOUR PERSONAL PRIVATE LIVES, YOU MAKE

6     DECISIONS EVERY DAY.  YOU DISCUSS DECISIONS AT YOUR WORKPLACE

7     AND YOUR FAMILY AND YOU MAKE THESE DECISIONS.

8          WE'RE ASKING YOU TO DO THAT SIMILAR THOUGHT PROCESS HERE

9     ON A BIT OF A HIGHER LEVEL, OF COURSE, AND YOU WILL DECIDE THE

10    FACTS AS YOU FIND THEM BECAUSE YOU'RE ENTITLED TO DO THAT AND

11    YOU'LL APPLY THE LAW THAT I GIVE TO YOU.

12          MR. JAMPANI, YES, SIR.

13          PROSPECTIVE JUROR:  SORRY.  I'M STILL NERVOUS.  I

14    THINK MY OPINION, IN FACT, IMPACTING SOMEBODY ELSE'S LIVES, I

15    KIND OF MYSELF AM FEELING GUILTY ALREADY.

16          THE COURT:  SURE.  AND LET ME TELL YOU -- PARDON ME.

17    THAT'S WHY THE JURY NEVER CONSIDERS PUNISHMENT OR ANY TYPE OF

18    PUNISHMENT.  THAT IS NOT YOUR JOB.  YOU'RE NOT TO CONSIDER

19    THAT.  YOU DON'T KNOW WHAT THE JUDGE IS GOING TO DO IN THIS

20    CASE.

21          PROSPECTIVE JUROR:  BUT MY ADDITIONAL SAYING

22    SOMEBODY IS GUILTY OR NOT GUILTY, I'M MAKING A DECISION FOR

23    SOMEBODY'S LIFE THAT MAY IMPACT, AND THAT IS ALREADY CAUSING ME

24    UNCOMFORTABLENESS.

25          THE COURT:  WELL, YOU DON'T KNOW THAT BECAUSE YOU'RE

1    NOT TO CONSIDER THE IMPACT IT MIGHT HAVE ON AN INDIVIDUAL.

2    THAT'S NOT YOUR DECISION.  THAT IS NOT SOMETHING THAT SHOULD

3    EVER AFFECT YOU AND MUST NOT AFFECT YOU.

4         PROSPECTIVE JUROR:  ONE OTHER THING IS THAT SOME

5    PEOPLE ARE PASSIONATE ABOUT MAKING LAWS AND BECAUSE THEY WANT

6    TO MAKE OTHER LIVES BETTER OR MAKE JUDGMENTS ABOUT OTHERS BUT

7    SOME PEOPLE ARE NOT REALLY INTO THAT KIND OF PROCESS.  MAYBE IN

8    THE SYSTEM WE SHOULD GIVE SOME LEEWAY.  PEOPLE WHO ARE

9    INTERESTED, THEY SHOULD BE GIVEN THIS JURY OPPORTUNITY RATHER

10   THAN RULING EVERYBODY WHO IS NOT IF YOU KNOW WHAT I MEAN.

11        THE COURT:  I THINK I DO.

12        PROSPECTIVE JUROR:  YEAH.

13        THE COURT:  I THINK I DO.  AND IF YOU'LL PARDON ME,

14   IF WE FOLLOW THE LOGICAL EXTENSION OF THAT IS THAT THEN WE

15   WOULD NEVER BE ABLE TO HAVE JURORS BECAUSE EVERYBODY WOULD BE

16   TOO BUSY FOR THEIR COURTS.

17        EVERYBODY HAS THINGS THAT ARE FAR MORE IMPORTANT THAN THE

18   JURY WHERE THEY'RE CALLED PERHAPS ONCE A YEAR OR ONCE EVERY

19   TWO YEARS, YOU SEE.  IT IS AN IMPOSITION.  IT IS AN

20   INCONVENIENCE, BUT FOR OUR PRECIOUS SYSTEM, IT'S A NECESSARY

21   INCONVENIENCE, AND I HOPE YOU ALL CONSIDER IT A PRIVILEGE TO

22   SERVE, TO SERVE HERE.

23        YOU KNOW, AROUND THE WORLD WE HAVE YOUNG WOMEN AND MEN WHO

24   ARE IN UNIFORM AND THEY ARE SERVING THE COUNTRY.  WE HAVE SOME

25   VETERANS IN THIS JURY BOX AND THEY DEFEND THE CONSTITUTION THAT

```
1     BRINGS US ALL TO THIS COURTROOM THIS MORNING.  THAT'S PROFOUND.
2     AND I THINK IF THOSE WOMEN AND MEN ARE ABLE TO DO THAT IN AN
3     EARLY PART IN THEIR LIVES, I DON'T THINK IT'S TOO MUCH OF AN
4     IMPOSITION TO ASK THOSE OF US HERE IN THE COMFORT AND
5     PRIVILEGES OF OUR EMPLOYMENTS OF OUR JOBS TO COME AND
6     PARTICIPATE IN THE SYSTEM OF JUSTICE THAT THOSE YOUNG WOMEN AND
7     MEN WHO SERVE OUR COUNTRY ARE PROTECTING.
8          SO, MR. SCHENK, I'LL ALLOW YOU TO CONTINUE.
9              MR. SCHENK:  NO FURTHER QUESTIONS.  THANK YOU.
10             MR. ARCHER:  GOOD MORNING, FOLKS.  MY NAME IS
11    GRAHAM ARCHER.  I DO HAVE A COUPLE OF QUESTIONS FOR A FEW OF
12    YOU, AND I DO HAVE SOME CONCEPTS I WANT TO GO BACK THROUGH.
13    THE JUDGE WENT THROUGH SOME OF THEM, BUT I WOULD LIKE TO GO
14    BACK INTO A LITTLE MORE DETAIL AND PRY, IF I CAN, A LITTLE BIT
15    MORE INTO YOUR LIVES.
16         I WANT TO START BY NOTING THAT WE HAVE MORE HIKERS IN OUR
17    PANEL THAN ANYONE ELSE WOULD NOTICE EVER.  WE WOULD EASILY HAVE
18    A HIKING CLUB AND APPARENTLY COULD ALSO FILL A LAW SCHOOL.
19         IN LAW SCHOOL THEY DON'T TEACH US WHAT THAT IS GOING TO
20    END UP IF YOU HAVE A PANEL FULL OF HIKERS, BUT I WOULD SAY
21    WE'RE PROBABLY AT ABOUT A 50, 60 PERCENT HIKING RATE RIGHT NOW
22    SO IF YOU LOOK AROUND THAT'S PROBABLY WHO YOU'RE SITTING WITH
23    AT THE MOMENT.
24         I HAVE A COUPLE OF QUESTIONS FOR FOLKS.
25         FIRST I WANT TO ASK IS THERE ANYONE WHO IS ACTUALLY
```

```
1       COMFORTABLE WITH PUBLIC SPEAKING?

2           OH, WE HAVE TWO.  OKAY.  AND A THIRD.

3           SO YOU'VE SORT OF VOLUNTEERED YOURSELF TO BE GUINEA PIGS

4       FOR SOME OF THE QUESTIONS THAT I'M GOING TO ASK, AND I PROBABLY

5       SHOULD HAVE WARNED YOU ABOUT THAT BEFOREHAND.

6           MR. LEE, IF I COULD START WITH YOU.  YOU SAID THAT YOU HAD

7       SOME SORT OF BACKGROUND IN -- RIGHT NOW YOU'RE WORKING IN AN

8       INVESTIGATIVE CAPACITY.  IS THAT ACCURATE?  AND CAN YOU TELL

9       US -- DO WE HAVE THE MICROPHONE FOR MR. LEE?  THANK YOU.

10          COULD YOU DESCRIBE WHAT, I MEAN, JUST IN A COUPLE OF

11      SENTENCES WHAT YOUR CURRENT JOB CAPACITY IS, WHAT YOU'RE

12      WORKING ON?

13              PROSPECTIVE JUROR:  I PRIMARILY DO ADMINISTRATIVE

14      INVESTIGATION FOR THE -- I PRIMARILY DO ADMINISTRATIVE TYPE OF

15      INVESTIGATIONS FOR THE NAVY AT THE SCHOOL ENVIRONMENT.  I LOOK

16      AT FRAUD WASTE ABUSE MISMANAGEMENT, ETHICAL VIOLATIONS,

17      STANDARDS OF CONDUCT VIOLATIONS, CONTRACTS, I DO FROM AN

18      INVESTIGATIVE INTERVIEWS ALLEGATIONS OF MISCONDUCT.  I LOOK

19      INTO THAT AND THEN MY JOB IS TO OUTLINE THE EVIDENCE, AND WE

20      HAVE THE STANDARD OF PREPONDERANCE OF THE EVIDENCE IS OUR

21      STANDARD OF CREDIBILITY I GUESS FROM THAT STANDPOINT.

22              MR. ARCHER:  AND CAN YOU TELL ME WHERE THESE

23      INVESTIGATIONS END UP?  IS IT AN ADMINISTRATIVE PROCEEDING?  DO

24      THEY END UP IN CRIMINAL COURTS AT THE END?

25              PROSPECTIVE JUROR:  NOT CRIMINALLY.  OUR CASES CAN
```

```
 1    GO TO A FEDERAL COURT IF THE SUBJECT OF THE INVESTIGATION WANTS

 2    TO CONTEST IT, IT CAN END UP IN FEDERAL LITIGATION, BUT

 3    PRIMARILY IT'S AT AN ADMINISTRATIVE LEVEL.  WE JUST MAKE AN

 4    ALLEGATION WHETHER SOMETHING IS SUBSTANTIATED OR NOT

 5    SUBSTANTIATED AND PRESENT THAT TO THE MANAGEMENT AND THAT TAKES

 6    CORRECTIVE ACTION.

 7            THE COURT:  OKAY.  AND SO YOU'VE ACTUALLY TOUCHED ON

 8    SOMETHING THAT I'D LIKE TO TALK TO EVERYBODY ABOUT.

 9        AND, MR. HO, I'M GOING TO ASK YOU A COUPLE OF QUESTIONS

10    ABOUT THIS AS WELL.

11        COULD YOU REPEAT WHAT YOU SAID THE STANDARD IS OF PROOF.

12            PROSPECTIVE JUROR:  THE STANDARD OF PROOF IN OUR

13    INVESTIGATIONS, PREPONDERANCE, WHICH IS 51 PERCENT.

14            MR. ARCHER:  OKAY.  SO YOU SAID 51 PERCENT.  CAN YOU

15    EXPLAIN TO EVERYBODY ELSE WHO IS HERE TODAY WHAT THAT MEANS?

16            PROSPECTIVE JUROR:  THAT THE EVIDENCE AND TOTALITY

17    IS WEIGHED ONE WAY OR ANOTHER.  THE EVIDENCE SAYS THAT THERE'S

18    A --

19            THE COURT:  MR. ARCHER, I DON'T THINK THIS IS --

20    THIS STANDARD DOESN'T APPLY.  IF YOU'RE TRYING TO DISTINGUISH A

21    CIVIL STANDARD VERSUS A STANDARD THAT APPLIES IN THE CASE.

22            MR. ARCHER:  THAT'S EXACTLY WHERE I'M HEADED, YOUR

23    HONOR.

24            THE COURT:  SO, LADIES AND GENTLEMEN, THIS IS A

25    CRIMINAL CASE AND THE STANDARD OF PROOF THAT I DESCRIBED, THE
```

```
 1        PRESUMPTION OF INNOCENCE, BEYOND A REASONABLE DOUBT, THAT'S

 2        ACTUALLY RIGHT OUT OF THE JURY INSTRUCTIONS AND YOU'LL GET THAT

 3        INSTRUCTION IF YOU'RE SEATED AS A JUROR IN THIS CASE.

 4             THE CIVIL STANDARD IS NOT SOMETHING THAT WE'RE GOING TO --

 5        WILL BE CONSIDERED IN THIS CASE.

 6             SO, MR. LEE, IF YOU'RE SEATED AS A JUROR IN THIS CASE,

 7        WILL YOU BE ABLE TO FOLLOW THE STANDARD OF THE LAW AS I GIVE IT

 8        TO YOU AND PUTTING ASIDE ANY OTHER CIVIL STANDARD OR OTHER

 9        STANDARD OF PROOF THAT YOU --

10             PROSPECTIVE JUROR:  YES, I'M FAMILIAR WITH THE

11        DIFFERENCE BETWEEN CRIMINAL AND CIVIL TYPE OF STANDARD.

12             THE COURT:  ALL RIGHT.  AND THOSE OF YOU WHO MAY

13        HAVE SAT ON CIVIL JURORS IN THE PAST, THE STANDARD THERE IS

14        DIFFERENT THAN IN A CIVIL CASE, AND I WILL GIVE YOU THE CIVIL

15        STANDARD OF PROOF BEYOND A REASONABLE DOUBT THAT APPLIES IN

16        THIS CASE.

17             SO I THINK YOU CAN MOVE ON, MR. ARCHER, TO ANOTHER TOPIC

18        IF YOU WOULD, PLEASE.

19             MR. ARCHER:  MAY I INQUIRE WITH MR. HO OF THE CIVIL

20        STANDARD VERSUS THE CRIMINAL STANDARD?

21             THE COURT:  WELL, MR. HO, YOU UNDERSTAND THE

22        DIFFERENT STANDARDS THAT I TALKED ABOUT?

23             PROSPECTIVE JUROR:  I THINK SO, YES.

24             THE COURT:  AND YOU'LL APPLY THE STANDARD --

25             MR. ARCHER:  YOUR HONOR, FEEL FREE TO INTERRUPT ME
```

1    IF YOU FEEL IT IS INAPPROPRIATE.

2              THE COURT:  THANK YOU.

3              MR. ARCHER:  BUT I DID WANT TO ASK YOU, MR. HO, YOU

4    SAID IT WAS A CLOSE CALL IN THE CASE YOU WERE SITTING ON

5    BEFORE; IS THAT CORRECT?

6              PROSPECTIVE JUROR:  YES.

7              MR. ARCHER:  AND SO IT WAS SOMEWHERE NEAR

8    50 PERCENT?

9              PROSPECTIVE JUROR:  WELL, I SHOULD PUT IT THIS WAY,

10   AT THE END THE JUDGE, THE PUNISHMENT FROM THE JUDGE TO ME, I

11   BELIEVE, AND SO THAT'S WHAT CONFUSED ME.

12             MR. ARCHER:  DID YOU SAY IT WAS A CLOSE CALL?  DID I

13   HEAR THAT?

14             PROSPECTIVE JUROR:  YEAH, I ALSO --

15             MR. ARCHER:  AND YOU UNDERSTAND THAT'S A CIVIL

16   STANDARD INSTEAD OF A CRIMINAL STANDARD?

17             PROSPECTIVE JUROR:  YES.

18             MR. ARCHER:  IF YOU HAVE SOMETHING THAT IS A CLOSE

19   CALL LIKE THAT AND ON ONE SIDE IT'S GUILTY AND ONE SIDE IT'S

20   NOT GUILTY, WHAT WOULD YOUR VOTE BE THEN?

21             THE COURT:  I'M NOT SURE THAT -- WITHOUT A

22   FOUNDATION ON THAT, I'M NOT SURE THAT'S -- I SUPPOSE THE

23   QUESTION IS YOU'LL CONSIDER ALL OF THE EVIDENCE IN THE CASE?

24   IN THIS CASE?

25             PROSPECTIVE JUROR:  YES, I'LL DO MY BEST.

```
 1                    THE COURT:  AND YOU'LL FOLLOW THE LAW AS I GIVE IT

 2       TO YOU?

 3                    PROSPECTIVE JUROR:  BASED ON THE INSTRUCTIONS.

 4                    THE COURT:  AND BEFORE YOU REACH A DECISION, YOU'LL

 5       DELIBERATE WITH YOUR FELLOW JURORS?

 6                    PROSPECTIVE JUROR:  YES, I WILL.

 7                    THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

 8                    MR. ARCHER:  MY QUESTION IS DESIGNED, FOLKS, AND

 9       THIS IS NOT JUST TO MR. HO, TO MAKE SURE THAT EVERYONE HERE

10       UNDERSTANDS THAT YOU'VE BEEN SELECTED AND IF YOU ARE SEATED AS

11       A JUROR YOU ARE GOING TO BE SELECTED FOR A DUTY THAT IS VERY

12       DIFFERENT FROM YOUR DAY-TO-DAY DECISION MAKING PROCESS.

13              AND THAT'S WHAT I'D LIKE TO INQUIRE ABOUT BECAUSE THIS IS

14       NOT A SIMPLE DAY-TO-DAY DECISION MAKING.  AND IN A DAY-TO-DAY

15       DECISION, YOU MAY HAVE TWO ROUTES, YOU HAVE A FORK IN THE ROAD

16       AND YOU HAVE TO CHOOSE ONE.  YOU WEIGH THE EVIDENCE AND YOU GO

17       BACK AND FORTH AND YOU LEAN TOWARD ONE SIDE OR THE OTHER.

18              IF YOU'RE ON THE FENCE IN THAT, YOU MAY TIP SLIGHTLY OVER.

19       THE STANDARD IN A CRIMINAL CASE IS MUCH HIGHER.  WHAT WE'VE

20       TALKED ABOUT IS A LITTLE BIT OF A PRESUMPTION OF INNOCENCE AND

21       PROOF BEYOND A REASONABLE DOUBT.

22              DOES ANYONE FEEL COMFORTABLE IN RAISING THEIR HAND AND

23       EXPLAINING WHAT THAT MEANS FROM THEIR PERSPECTIVE?

24              MR. ROJAS AS A PUBLIC SPEAKER?

25                    PROSPECTIVE JUROR:  I'LL GIVE IT A SHOT.
```

```
1                    MR. ARCHER:  SURE.

2                    THE COURT:  ARE WE ASKING THE JURORS TO DEFINE THE

3        LAW?  I THINK YOU SHOULD MOVE ON, MR. ARCHER.  I DON'T THINK

4        IT'S APPROPRIATE TO ASK THE JURORS TO DEFINE YOUR OPINION OF

5        THE LAW.

6                    MR. ARCHER:  YOUR HONOR, IT'S NOT SO MUCH MY

7        OPINION.  I'M CURIOUS AS TO WHETHER THE JURY -- AS INDIVIDUAL

8        JURORS THERE'S AN UNDERSTANDING OF EXACTLY WHAT THE PRESUMPTION

9        OF INNOCENCE IS AND HOW THAT APPLIES IN THEIR DELIBERATIONS.

10                    THE COURT:  MAYBE YOU SHOULD ASK THAT QUESTION.

11                    MR. ARCHER:  OKAY.  CAN ANYONE RAISE THEIR HAND AND

12       TELL ME WHO HAS TO PROVE MR. YORK GUILTY OR NOT GUILTY?

13          MR. ROJAS.

14                    PROSPECTIVE JUROR:  THE GOVERNMENT HERE IN THIS

15       CASE.  THEY'RE MAKING AN ACCUSATION, AND THEY HAVE TO HAVE ALL

16       OF THE EVIDENCE TO BACK UP AN ACCUSATION AND TO SHOW US THAT

17       THIS, IN FACT, THIS ACCUSATION, WHATEVER HE'S ACCUSED OF,

18       ACTUALLY OCCURRED.

19                    MR. ARCHER:  OKAY.  AND, MR. ROJAS, IF IT -- YOU

20       WERE CONCERNED AND WERE NOT CONVINCED BEYOND A REASONABLE DOUBT

21       OF WHETHER IT WAS NOT, WHAT WOULD YOUR VOTE BE?

22                    PROSPECTIVE JUROR:  IT WOULD BE -- THERE WOULD NOT

23       BE ENOUGH EVIDENCE TO SUPPORT THE ACCUSATION AND SO THE LAW AND

24       THE CONSTITUTION REQUIRES US, AS THE JUDGE HAS ALREADY POINTED

25       OUT, TO COME UP WITH A VERDICT THAT IS NOT GUILTY.
```

1        MR. ARCHER:  THANK YOU.  I HAVE A VERY QUICK

2   EXERCISE.  I'M GOING TO ASK FOR HANDS FROM EVERYONE THAT IS

3   SEATED HERE AND SO THAT MEANS AT SOME POINT YOU'RE GOING TO

4   HAVE TO RAISE YOUR HAND.  THERE ARE THREE OPTIONS I'M GOING TO

5   GIVE YOU.  YOU'RE LAUGHING ALREADY.

6        I'M GOING TO ASK YOU TO EITHER ANSWER GUILTY, NOT GUILTY,

7   OR WOULD NEED MORE INFORMATION.

8        AND SO I'M GOING TO ASK BASED ON WHERE WE ARE RIGHT NOW,

9   STANDING HERE IN THE COURTROOM IN THIS COURTROOM YOU'VE HEARD

10   THAT THERE'S AN ACCUSATION THAT'S BEEN FILED BY THE GOVERNMENT

11   AGAINST MR. YORK.

12        AND I'M GOING TO ASK YOU RIGHT NOW IF I COULD SEE A SHOW

13   OF HANDS FIRST BASED ON THE EVIDENCE THAT IS BEFORE YOU WHO

14   WOULD VOTE THAT MR. YORK IS GUILTY?

15        WE HAVE ONE HAND IN THE FRONT.

16        PROSPECTIVE JUROR:  I DON'T UNDERSTAND YOUR

17   QUESTION.

18        MR. ARCHER:  OKAY.  SURE.  I'M HAPPY TO CLARIFY.

19        WE'RE STANDING HERE RIGHT NOW AND WE'RE AT THE BEGINNING

20   OF THE CASE AND ALL YOU HAVE HEARD IS THAT THE GOVERNMENT HAS

21   ACCUSED MR. YORK OF TWO CRIMES.

22        I'M GOING TO ASK IF YOU WERE TO VOTE RIGHT NOW AS JURORS,

23   WHAT WOULD YOUR VOTE BE?  AND THE VOTE WOULD BE EITHER GUILTY,

24   NOT GUILTY OR YOU'D LIKE TO HEAR MORE INFORMATION BEFORE MAKING

25   A DECISION.

1              SORRY.  I SHOULD CLARIFY.  YOU HAVE TO HEAR MORE

2       INFORMATION BEFORE MAKING A DECISION.

3              SO IF I COULD HAVE A SHOW OF HANDS -- ACTUALLY WE'LL START

4       OFF WITH --

5                  THE COURT:  YOU KNOW, MR. ARCHER, I BEG YOUR PARDON.

6       IT SEEMS LIKE THE QUESTION IS DESIGNED TO EMPHASIZE TO THE JURY

7       THE FACT THAT THERE IS A PRESUMPTION OF INNOCENCE THAT I

8       MENTIONED EARLIER THAT AN INDIVIDUAL IS PRESUMED TO BE INNOCENT

9       AND UNTIL THE CONTRARY IS PROVEN.

10             IS THERE ANYONE THAT PARTS COMPANY WITH THAT CONCEPT?

11             I SEE NO HANDS.

12             IS THERE ANYONE WHO DOESN'T UNDERSTAND THAT CONCEPT?

13             I SEE NO HANDS.

14             YOU'VE HEARD NO EVIDENCE IN THE CASE.  YOU'VE HEARD

15      NOTHING OTHER THAN THE INDICTMENT THAT I'VE READ TO YOU AND

16      SUBSEQUENT TO ME READING THE INDICTMENT I INFORMED YOU THAT THE

17      INDICTMENT IS MERELY THE CHARGING DOCUMENT.  IT'S THE CHARGES.

18             AND I THINK I TOLD YOU THAT THE INDICTMENT IN AND OF

19      ITSELF WAS NOT PROOF OF ANYTHING.  IT'S THE ACCUSATION.  IT'S

20      THE CHARGING DOCUMENT THAT THE GOVERNMENT USES TO BRING THE

21      CHARGE AGAINST AN INDIVIDUAL.

22             IS THERE ANYONE WHO FEELS THAT JUST BECAUSE THE GOVERNMENT

23      HAS MADE THE CHARGE THAT MR. YORK IS GUILTY?

24             I SEE NO HANDS.

25             IS THERE ANYONE HERE WHO WOULD NOT HOLD THE GOVERNMENT TO

1    THEIR BURDEN OF PROOF IN THIS CASE IN PROVING THIS CASE TO YOU?

2        I SEE NO HANDS.

3        MR. ARCHER.

4            MR. ARCHER:  THANK YOU, YOUR HONOR.  MR. LEE, YOU

5    SAID THAT YOU, IN THE COURSE OF YOUR INVESTIGATIONS, YOU DEALT

6    WITH PEOPLE WHO TAKE AN OATH TO INVESTIGATE CRIMES.

7        IS THAT ACCURATE?

8            PROSPECTIVE JUROR:  I'M NOT SURE WHAT YOUR QUESTION

9    IS.

10           MR. ARCHER:  MY QUESTION IS SO WHEN YOU WERE

11   DISCUSSING EARLIER YOUR INTERACTIONS WITH A POTENTIAL WITNESS

12   AND IN THE SENSE THAT IF SOMEONE IS UP ON THE STAND AND THEY'RE

13   A LAW ENFORCEMENT OFFICER, HOW YOU VIEW THEIR CREDIBILITY.

14       IF I CAN ASK YOU IF EVERYTHING IS EQUAL AND ONE WITNESS IS

15   SAYING ONE THING AND ANOTHER WITNESS IS SAYING ANOTHER AND ONE

16   IS A LAW ENFORCEMENT OFFICER, WOULD YOU TILT TOWARDS THE LAW

17   ENFORCEMENT OFFICER?

18           PROSPECTIVE JUROR:  IN MY REPORT I WOULD GIVE

19   GREATER WEIGHT OF TESTIMONY TOWARDS THAT PERSON IN PROBABLY A

20   FASHION OF A HIGHER TRUST.

21           MR. ARCHER:  OKAY.

22           PROSPECTIVE JUROR:  I DON'T DO CRIMINAL

23   INVESTIGATIONS SO -- THEY'RE MORE ADMINISTRATIVE SO IT'S A

24   DIFFERENT LEVEL OR STANDARD.

25           MR. ARCHER:  MY QUESTION IS IF THERE'S A WITNESS ON

1          THE STAND AND THERE ARE TWO WITNESSES THAT ARE SAYING

2     ABSOLUTELY POLAR OPPOSITE THINGS AND ONE OF THOSE WITNESSES --

3     AND EVERYTHING IS EQUAL, ONE IS A LAW ENFORCEMENT OFFICER AND

4     THE OTHER ONE IS A CIVILIAN, WOULD YOU BE MORE INCLINED TO

5     BELIEVE THE LAW ENFORCEMENT OFFICER, EVERYTHING ELSE EQUAL?

6               PROSPECTIVE JUROR:  I WOULD GIVE THEM A GREATER

7     CREDIBILITY AND WEIGHT OF EVIDENCE.  SO I WOULD WEIGH IT

8     SLIGHTLY MORE BECAUSE I WOULD FEEL LIKE I HOLD THEM TO A HIGHER

9     STANDARD.

10              MR. ARCHER:  THANK YOU.

11         MR. POLINI, I THINK WAS YOUR HEAD NODDING EARLIER WAS

12    CORRECT IN RESPONSE TO A SIMILAR QUESTION FROM THE COURT IN

13    TERMS OF THE -- I MAY BE WRONG BUT IN TERMS OF THE CREDIBILITY

14    OF ONE WITNESS BEING A LAW ENFORCEMENT OFFICER VERSUS NOT?

15              PROSPECTIVE JUROR:  YOU KNOW, I'M KIND OF ON THE

16    FENCE WITH THAT BECAUSE THAT'S WHAT THEY'RE TRAINED TO DO WHERE

17    I WAS A CABINET MAKER SO I WOULDN'T ASK A LAW ENFORCEMENT GUY

18    ON HOW TO BUILD A CABINET.

19         SO I JUST FELT THAT I WOULD HOLD THEIR OPINION HIGHER.

20              MR. ARCHER:  UNDERSTOOD.  SO IF ALL OTHER THINGS

21    WERE EQUAL IN TERMS OF HOW YOU'RE WEIGHING SOMEONE'S

22    CREDIBILITY IF THEY'RE A LAW ENFORCEMENT OR NOT A LAW

23    ENFORCEMENT OFFICER, YOU WOULD GIVE MORE CREDIBILITY TO THE

24    CREDENCE OF A LAW ENFORCEMENT OFFICER?

25              PROSPECTIVE JUROR:  YES.

```
1              MR. ARCHER:  IF I COULD SEE A SHOW OF HANDS, DOES

2     ANYONE ELSE FEEL THAT WAY AS WELL?

3          MR. HO?

4              PROSPECTIVE JUROR:  YEAH, I FEEL THE SAME WAY.

5              MR. ARCHER:  OKAY.

6              THE COURT:  WHAT IF THE INSTRUCTIONS ARE THAT YOU'RE

7     NOT TO DO THAT BUT YOU'RE TO WEIGH EVERY WITNESS'S TESTIMONY

8     AND GIVE IT WHATEVER CREDIBILITY YOU THINK IT IS APPROPRIATE

9     AND NOT WEIGH THE TESTIMONY GREATER BECAUSE OF THE PERSON'S

10    GENDER, BECAUSE THEY HAVE -- THEY WEAR GLASSES, BECAUSE THEY

11    HAVE FACIAL HAIR?  DO YOU SEE?

12         NOW, THAT'S A LITTLE DIFFERENT THAN WHAT WE'RE EXAMINING

13    HERE.  BUT THIS QUESTION IS REALLY DESIGNED TO SEE IF EVERYBODY

14    CAN HAVE A FAIR START AT THE TRIAL?

15         DOES MR. ARCHER'S SIDE START OFF BEHIND THE LINE, 20 YARDS

16    BEHIND THE LINE IN A 100 YARD DASH BECAUSE CERTAIN JURORS

17    BELIEVE THAT THEY'RE GOING TO GIVE GREATER WEIGHT TO LAW

18    ENFORCEMENT TESTIMONY AND NO MATTER WHAT IT IS, JUST BECAUSE

19    THEY'RE LAW ENFORCEMENT OFFICERS, I'M GOING TO GIVE THEM

20    GREATER CREDIBILITY AND CONSIDER THEIR TESTIMONY HIGHER RIGHT

21    FROM THE START SUCH THAT THE DEFENSE IS 20 YARDS BEHIND IN A

22    100 YARD RACE?  THAT'S REALLY THE QUESTION, I GUESS, THAT WE'RE

23    ASKING HERE.  DOES HE START 20 YARDS BEHIND IN 100 YARD DASH

24    HERE SIMPLY BECAUSE THE OTHER SIDE HAS GOVERNMENT WITNESSES?

25         MR. LEE?
```

```
1              PROSPECTIVE JUROR:  I WOULD VIEW IT FROM THE

2    STANDPOINT THAT IF A DOCTOR WERE TO TESTIFY IN A MEDICAL CASE

3    AND THERE WAS SOMEBODY ELSE THAT WOULD GIVE THEM A MEDICAL

4    OPINION, I WOULD GIVE THEM GREATER WEIGHT OF CREDIBILITY TO

5    THAT PHYSICIAN BECAUSE THAT'S THE PROFESSION OF THE LAW

6    ENFORCEMENT PROFESSION I WOULD HAVE IN MY MIND, YOU KNOW,

7    BECAUSE FROM MY EXPERIENCE AND THE LINE OF WORK I'VE BEEN IN

8    FOR QUITE A WHILE, I DO GIVE THE, THE GREATER WEIGHT TO, TO

9    WHAT THEY'RE SAYING BUT, YOU KNOW --

10             THE COURT:  NO MATTER WHAT THEY SAY.

11             PROSPECTIVE JUROR:  WELL, IT DEPENDS ON WHAT THEY'RE

12   SAYING BECAUSE IF IT'S THEM ON THE OTHER SIDE, YOU KNOW, AN

13   ACCUSATION AGAINST THE DEFENSE, THEN I WOULD HAVE TO APPLY, YOU

14   KNOW, WHATEVER INSTRUCTIONS THAT THE COURT APPLIES TO THAT.

15        YOU KNOW, IT'S ONE OF THOSE THINGS IN MY PROFESSION THAT

16   IT DEPENDS BECAUSE THAT'S THE NATURE OF THE BUSINESS I'M IN.

17        BUT IF YOU WANT TO, I COULD SET ASIDE WHAT YOU'RE SAYING

18   AND SET ASIDE AND TO GIVE EQUAL CREDIBILITY TO ALL OF THE

19   EVIDENCE.

20             THE COURT:  THAT'S WHAT I'M ASKING YOU TO DO.  AND

21   I'M NOT ASKING --

22             PROSPECTIVE JUROR:  I COULD DO THAT, BUT I'M JUST

23   LETTING YOU KNOW YOU ASKED A QUESTION THAT CONSCIOUSLY I APPLY

24   THAT INITIALLY.

25             THE COURT:  I'M NOT AND NEITHER COUNSEL ARE ASKING
```

1    TO CHANGE PERSONAL BELIEFS OR FROM YOUR WORKPLACE OR ANY OTHER

2    PERSON'S PERSONAL BELIEFS EXCEPT AS TO THIS TRIAL THE QUESTION

3    IS WHETHER OR NOT YOU'RE ABLE TO PUT ASIDE, AS YOU SUGGEST,

4    MR. LEE, PUT ASIDE THOSE PERSONAL FEELINGS, BELIEFS, BIASES,

5    WHATEVER YOU WANT TO CALL THEM, AND GIVE EVERY WITNESS'S

6    TESTIMONY HERE EQUAL WEIGHT REGARDLESS OF THEIR EMPLOYMENT AS A

7    LAW ENFORCEMENT AGENT.

8         CAN YOU DO THAT?

9              PROSPECTIVE JUROR:  I COULD DO THAT.

10             THE COURT:  YOU COULD DO THAT.  IF A LAW ENFORCEMENT

11   OFFICER TESTIFIED AND HAD GREAT CREDENTIALS AND THIS AND THAT,

12   YOU COULD GIVE THAT -- YOU COULD JUDGE THAT WITNESS'S TESTIMONY

13   AT AN EVEN LEVEL WITH OTHER WITNESSES?

14             PROSPECTIVE JUROR:  I CAN.

15             THE COURT:  NOT GIVING THEM GREATER CREDIBILITY.  I

16   THINK YOU TOLD US I'M GOING TO GIVE THEM GREATER CREDIBILITY

17   JUST BECAUSE OF THEIR STATURE, THEIR EMPLOYMENT?

18             PROSPECTIVE JUROR:  YES.

19             THE COURT:  CAN YOU DO THAT?

20             PROSPECTIVE JUROR:  I BELIEVE I COULD.

21             THE COURT:  OKAY.  LET'S HAND THE MICROPHONE DOWN.

22   I THINK, MR. POLINI, YOU HAD A COMMENT ON THIS ALSO, SIR?

23             PROSPECTIVE JUROR:  I THOUGHT I ANSWERED HIS

24   QUESTION.

25             MR. ARCHER:  I AGREE.

```
1              PROSPECTIVE JUROR:  IT'S A LOT OF PRESSURE ON

2    EVERYBODY TO MAKE THE RIGHT DECISION, GUILTY OR NOT GUILTY, SO

3    WE'RE ALL ON THE FENCE.

4              THE COURT:  YOU HAVEN'T HEARD ANY EVIDENCE YET.

5              PROSPECTIVE JUROR:  EXACTLY.  THAT'S WHY HIS

6    QUESTION WAS WHO COULD SAY GUILTY AND WHO COULD SAY INNOCENT,

7    AND I HAVEN'T HEARD ONE SPEC OF THE CASE.

8              THE COURT:  THAT'S WHEN I SAW YOU NODDING SAYING WE

9    HAVEN'T HEARD ANYTHING.

10             PROSPECTIVE JUROR:  BUT HE DID ALSO ASK THE QUESTION

11   I NEED MORE EVIDENCE, TOO, AND THAT WAS ONE OF THE CHOICES THAT

12   WE HAD.

13             THE COURT:  SO, MR. POLINI, AS TO GIVING GREATER

14   WEIGHT TO A WITNESS JUST BECAUSE THEY'RE LAW ENFORCEMENT, IS

15   THAT SOMETHING THAT YOU WOULD DO IN THIS CASE?

16             PROSPECTIVE JUROR:  I ANSWERED YES BUT NOW AFTER

17   HEARING THIS I DON'T KNOW IF IT'S CREDIBILITY, IT JUST MAY BE

18   MORE ACCURATE TESTIMONY, THAT THE FACTS MIGHT BE MORE ACCURATE

19   BECAUSE OF THEIR JOB AND STUFF.

20             THE COURT:  OKAY.  ALL RIGHT.

21        WELL, WE COULD BE TALKING ABOUT THE SAME TYPE OF TESTIMONY

22   BUT JUST IN THE REVERSE, AS I SAID EARLIER, SOMEBODY MIGHT SAY

23   I'LL NEVER BELIEVE A POLICE OFFICER OR LAW ENFORCEMENT AND

24   BECAUSE I JUST DON'T BELIEVE THEM OR TRUST THEM OR WHATEVER.

25        THIS IS KIND OF THE MIRROR IMAGE OF THAT, YOU SEE.  I'M
```

1       ALWAYS GOING TO BELIEVE THEM BECAUSE OF THEIR TRAINING, THEY'VE

2       GONE TO ACADEMIES AND THEY'VE DONE THESE THINGS, AND SO I'M

3       ALWAYS GOING TO BELIEVE THEM.

4            IS THAT SOMETHING THAT YOU THINK YOU WOULD DO IN THIS

5       CASE?

6            YOU SEE, THERE MAY BE LAW ENFORCEMENT THAT TESTIFIES IN

7       THIS CASE.  THEY'LL BE CALLED BY THE GOVERNMENT, I EXPECT, TO

8       GIVE WHAT IS CALLED DIRECT, DIRECT TESTIMONY.

9            AND WHEN THEY'RE FINISHED, IF MR. ARCHER FINISHES HE CAN

10      ASK THEM QUESTIONS AND THAT'S CALLED CROSS-EXAMINATION, AND HE

11      MIGHT RAISE SOME ISSUES THAT MAYBE YOU HADN'T THOUGHT ABOUT.

12           IT MIGHT CAUSE SOMEBODY TO THINK, GEE, THAT'S A GOOD POINT

13      OR IT MIGHT MAKE THEM THINK, NO, I DON'T BELIEVE THAT, BUT IT'S

14      WHAT WE CALL TESTING THE EVIDENCE, I SUPPOSE.

15           AND IF SOMEBODY HAS A PRECONCEIVED IDEA THAT THEY'RE

16      ALWAYS GOING TO BELIEVE NO MATTER WHAT ONE PARTICULAR WITNESS,

17      THEN ONE SIDE STARTS 20 YARDS BEHIND IN A 100 YARD RACE, AND I

18      THINK YOU ALL RECOGNIZE THE FAIRNESS OF THAT.

19                  PROSPECTIVE JUROR:  YEAH.

20                  THE COURT:  MR. HO, I GUESS YOU'RE KIND OF INVOLVED

21      IN THIS ALSO.

22                  PROSPECTIVE JUROR:  I JUST HOPE TO GOD I CAN MAKE

23      THE RIGHT DECISION.

24                  PROSPECTIVE JUROR:  FROM MY PREVIOUS EXPERIENCE,

25      YEAH, I DO HAVE TO LOOK AT THE EVIDENCE AND TESTIMONY AND --

```
 1      BUT BY THE END OF THE TESTIMONY IF I FEEL LIKE 50/50 GUILTY,

 2      NOT GUILTY, I PROBABLY WILL LEAN TOWARDS LAW ENFORCEMENT.

 3                  THE COURT:  OKAY.

 4                  PROSPECTIVE JUROR:  THAT'S WHAT I'M TRYING TO SAY.

 5                  MR. ARCHER:  TOWARD WHAT?

 6                  PROSPECTIVE JUROR:  LAW ENFORCEMENT.

 7                  THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

 8          MR. ARCHER.

 9                  MR. ARCHER:  THANK YOU, YOUR HONOR.  MS. HOANG, IF

10      WE CAN PASS THE MICROPHONE TO YOU.

11          GOOD MORNING.  YOU MENTIONED YOU HAVE SOME FAMILY IN LAW

12      ENFORCEMENT.  IS IT TWO YOUNGER BROTHERS?

13                  PROSPECTIVE JUROR:  YES.

14                  MR. ARCHER:  AND YOU ALSO MENTIONED THAT YOU FELT

15      LIKE THAT MIGHT CAUSE YOU TO BE BIASSED A LITTLE BIT TOWARD THE

16      POLICE, SOME OF THE THINGS THAT WE HAVE BEEN TALKING ABOUT; IS

17      THAT RIGHT?

18                  PROSPECTIVE JUROR:  YEAH, BECAUSE THEY GO THROUGH

19      THE TRAINING, AND, YOU KNOW, THEY HAVE CERTAIN STANDARDS TO

20      FOLLOW.

21                  MR. ARCHER:  AND SO IF YOU WERE CONSIDERING TWO

22      WITNESSES WHO OTHERWISE YOU VIEWED AS EQUAL AND ONE OF THEM WAS

23      A LAW ENFORCEMENT OFFICER, WOULD YOU BE MORE LIKELY SETTING

24      ASIDE TRAINING AND THAT SORT OF THING, JUST BASED ON THE FACT

25      THAT THEY'RE A LAW ENFORCEMENT OFFICER, WOULD YOU BE MORE
```

```
1        LIKELY TO BELIEVE THEM THAN ANY OTHER WITNESS?

2                    PROSPECTIVE JUROR:  MAYBE.

3                    MR. ARCHER:  YES OR?

4                    PROSPECTIVE JUROR:  YES.

5                    MR. ARCHER:  OKAY.  MR. TEO, IF YOU DON'T MIND, IF

6        WE CAN PASS THE MICROPHONE DOWN TO YOU.

7             THANK YOU.  MR. TEO, YOU MENTIONED THAT YOU'RE A RELIGIOUS

8        PERSON; CORRECT?

9                    PROSPECTIVE JUROR:  CORRECT.

10                   MR. ARCHER:  YOU MENTIONED THAT THERE'S A

11       CONFLICT -- IF THERE'S A CONFLICT BETWEEN THE BIBLE AND THE LAW

12       THAT -- COULD YOU TELL ME WHICH ONE YOU WOULD FOLLOW?

13                   PROSPECTIVE JUROR:  I WOULD FOLLOW THE BIBLE.

14                   MR. ARCHER:  I THINK THAT'S ALL I HAVE, YOUR HONOR.

15                   THE COURT:  OKAY.  THANK YOU.  MR. SCHENK, DO YOU

16       PASS FOR CAUSE?

17                   MR. SCHENK:  YES.

18                   THE COURT:  MR. ARCHER, DO YOU PASS FOR CAUSE?

19                   MR. ARCHER:  COULD WE MOVE AT SIDE-BAR?

20                   THE COURT:  YES.

21            (SIDE-BAR CONFERENCE ON THE RECORD.)

22                   THE COURT:  WE'RE AT SIDE-BAR WITH COUNSEL.

23       MR. ARCHER.

24                   MR. ARCHER:  I WOULD MOVE TO CHALLENGE MR. LEE FOR

25       CAUSE, JUROR NUMBER 6, ON THE BASIS THAT HE'S -- WHILE HE WAS
```

```
1      REHABILITATED A LITTLE BIT, HE REPEATEDLY STATED THAT HE HAS A

2      BIAS TOWARDS LAW ENFORCEMENT.

3          HE ANSWERED THE QUESTION DIFFERENTLY THAN WHEN I ASKED HIM

4      AND THEN WHEN THE COURT ASKED HIM.

5              THE COURT:  MR. SCHENK.

6              MR. SCHENK:  I HAVE IN MY NOTES THAT I CAN BE FAIR

7      TO BOTH SIDES AND IT SEEMS TO ME THAT'S PROPER REHABILITATION.

8              THE COURT:  AS TO -- ANYTHING FURTHER AS TO LEE,

9      MR. ARCHER?

10             MR. ARCHER:  NO.

11             THE COURT:  AS TO MR. LEE, I DID FOLLOW UP WITH HIM.

12     I SPENT A LOT OF TIME WITH HIM, AND I DID ASK HIM DURING YOUR

13     VOIR DIRE, MR. ARCHER, SOME HYPOTHETICALS AND OTHER QUESTIONS

14     AND MY NOTES REFLECT THAT AT THE END OF THE CONVERSATION I

15     ASKED HIM CAN YOU BE FAIR?  AND HE SAID, YES, I CAN BE FAIR.

16     AND SO I'M GOING TO OVERRULE THE OBJECTION AS TO HIM FOR CAUSE.

17             MR. ARCHER:  I WOULD CHALLENGE MS. HOANG FOR CAUSE,

18     JUROR NUMBER 10, BECAUSE SHE SAID SHE IS BIASSED AND WHEN ALL

19     OTHER THINGS BEING EQUAL, SHE WOULD BELIEVE THE LAW ENFORCEMENT

20     OFFICER OVER THE SIBLING WITNESS.

21             THE COURT:  OKAY.

22             MR. SCHENK:  MY NOTES REFLECT THE SAME REHAB FOR HER

23     AS TO MR. LEE.

24             MR. ARCHER:  I DON'T RECALL THAT REHAB.

25             THE COURT:  WELL, I ASKED HER QUESTIONS AND I DIDN'T
```

1    ASK FOLLOW-UP QUESTIONS AFTER MR. ARCHER DID, BUT I DID ASK HER

2    FOLLOW-UP QUESTIONS INITIALLY AND SHE HAD TALKED TO US ABOUT

3    HER BROTHERS AND SHE TOLD ME INITIALLY THAT AFTER OUR

4    DISCUSSIONS THAT SHE COULD BE FAIR TO BOTH SIDES IN THAT CASE.

5        LET ME SEE, DO YOU HAVE OTHERS THAT YOU'RE SEEKING TO

6    CHALLENGE FOR CAUSE?

7            MR. ARCHER:  MR. TEO.

8            THE COURT:  MR. TEO.

9            MR. ARCHER:  HE'S BEEN CLEAR THAT THE LOVE OF THE

10    BIBLE IS HIGHER THAN THE LAW INSTRUCTED BY THE COURT.

11        AND SO I THINK IT WOULD BE INCREDIBLY DANGEROUS FOR US TO

12    FORESEE THAT THERE WOULD BE NO CONFLICT WITH THE BIBLE AND

13    ANYTHING INSTRUCTED BY THE COURT.

14        HE'S INDICATED THAT THAT IS HIS PRIMARY STANDARD AND NOT

15    THE LAW THAT THE COURT INSTRUCTS HIM.

16            MR. SCHENK:  DURING THE COURT'S VOIR DIRE THE COURT

17    ASKED HIM IF THE COURT GAVE HIM THE LAW AND HE WOULD FOLLOW THE

18    LAW, AND MY RECOLLECTION IS THAT HE SAID, YES.  AND ALSO THE

19    COURT, I THINK CORRECTLY, PREDICTED THAT THIS COURT WAS

20    UNLIKELY TO HAVE ANY CONFLICT THAT WOULD REQUIRE HIM TO PUT HIS

21    FAITH ASIDE.

22            MR. ARCHER:  WE HAVEN'T DELVED INTO WHETHER HE'S

23    MORE A FOLLOWER OF THE NEW TESTAMENT OR OLD TESTAMENT.  I DON'T

24    KNOW EITHER OF THOSE BOOKS FRONT TO BACK, AND I DON'T KNOW WHAT

25    STANDARDS UNEQUIVOCAL THAT HE WOULD HOLD THAT TO BE A LAW THAT

1       IS HIGHER THAN THE COURT.

2              SO HOW WE CAN SIT HERE NOW AND PREDICT THAT SOMETHING IN

3       HIS BELIEF SYSTEM THAT HE CLEARLY WOULD FOLLOW INSTEAD OF THE

4       COURT WOULD NOT COME UP IN THIS I DON'T KNOW.  IT SEEMS LIKE AN

5       UNNECESSARILY DANGEROUS PROPOSITION.

6              THE COURT:  WELL, THANK YOU.  IT COULD BE A

7       DIFFICULT SITUATION IF COUNSEL WERE TO INVOKE THE BIBLE EITHER

8       IN EVIDENCE OR IN ARGUMENT.

9              FOR HIM THAT MIGHT BE A SITUATION WHERE HE COULD PERHAPS

10      APPEAL TO IN SOME MANNER, BUT I DON'T SEE THAT HAPPENING IN THE

11      CASE.  THAT'S WHY I ASKED THAT QUESTION WHETHER OR NOT THERE

12      WERE ANY TYPE OF RELIGIOUS INTONATIONS IN THIS CASE.

13             I FOLLOWED UP WITH HIM AND ASKED HIM ABOUT JUDGING ANOTHER

14      INDIVIDUAL, AND MY SENSE WAS THAT I SHOULD SAY I RECEIVED A

15      LEVEL OF COMFORT FROM HIS RESPONSE THAT HE IS A RELIGIOUS

16      PERSON, NOT UNLIKE MANY, BUT HE'S A DEVOUT CHRISTIAN, BUT I

17      HAVEN'T HEARD ANYTHING FROM HIM THAT SUGGESTS THAT THAT IS

18      GOING TO MEAN THAT HE CAN'T BE A FAIR AND IMPARTIAL JUROR IN

19      THE CASE.

20             MR. ARCHER:  YOUR HONOR, I RESPECTFULLY DISAGREE ON

21      THE GROUNDS THAT HE -- CERTAINLY I DON'T THINK THERE'S ANYTHING

22      THAT JUST BEING A DEVOUT CHRISTIAN WOULD DISQUALIFY YOU FROM

23      JURY SERVICE, BUT HE SAID THERE'S A CODE THAT HE FOLLOWS ABOVE

24      AND BEYOND THE LAWS AND IF PRESENTED WITH CONFLICT, WHICH IS

25      SOMETHING THAT I DON'T THINK IS PROPERLY FORESEEABLE AT THIS

1    STAGE, HE WOULDN'T FOLLOW THE LAW GIVEN TO HIM BY THE COURT.

2    HE'S NOT EQUIVOCAL ABOUT THAT.

3         SO I DON'T THINK THERE'S GOING TO BE A FUTURE OPPORTUNITY

4    TO INQUIRE AS TO HIS PERSPECTIVE ON THAT.  THERE'S NO

5    OPPORTUNITY TO INQUIRE EITHER IN A PRE-DELIBERATION OR DURING

6    DELIBERATION WHETHER HE'S FOLLOWING SOMETHING ELSE THAT IS

7    CONFLICTED WITH THE LAWS GIVEN TO HIM BY THE COURT OR WHETHER

8    HE'S FOLLOWING THAT WHICH IS GIVEN TO HIM BY THE COURT.

9         SO I THINK THAT DISQUALIFIES -- I THINK HIS REFUSAL TO PUT

10   THE LAW OF THE COURT ABOVE A SEPARATE CODE OF LAW IS NOT JUST

11   GENERAL PERSONAL BELIEFS BUT PUT THOSE LAWS ABOVE THE LAWS IS A

12   DIRECT CONFLICT.

13             THE COURT:  OKAY.

14             MR. SCHENK:  THE ONLY THING I WOULD ADD IS I DON'T

15   THINK THERE'S ANYTHING UNIQUE ABOUT MR. TEO.  HE HAS EXPRESSED

16   THAT HE HAS RELIGIOUS BELIEFS, AND, THEREFORE, LIVES BY THE

17   CODE OF THE LAWS, AND, THEREFORE, WHAT HIS RELIGION TEACHES

18   HIM, AND, THEREFORE, WHERE DOES THAT END?  I THINK MOST HONEST

19   DEVOUTLY RELIGIOUS PEOPLE WOULD TELL YOU THAT IN THE FACE OF A

20   CONFLICT THEY'RE GOING TO PICK A RELIGION, AND I DON'T THINK

21   HE'S GIVEN US ANY INDICATION TO BELIEVE THAT HE WON'T FOLLOW

22   THE LAWS OF THE COURT IN THIS CASE.

23             MR. ARCHER:  HE SAID EXPLICITLY THAT HE WOULD NOT IF

24   IT CAME IN CONFLICT WITH HIS BELIEF.  THAT'S EXACTLY THE

25   INDICATION THAT WOULD CAUSE HIM TO BE SUBJECT TO A CHALLENGE

1        FOR CAUSE.

2                THE COURT:  WHAT IS IT ABOUT HIS BELIEFS THAT YOU

3        BELIEVE ARE IN CONFLICT RIGHT NOW?

4                MR. ARCHER:  I HAVE NO IDEA.  NOTHING RIGHT NOW.

5                THE COURT:  BECAUSE WE KNOW HE'S GOING TO FOLLOW THE

6        PRESUMPTION OF INNOCENCE.  HE TOLD US HE WOULD DO THAT.

7            HE -- HE FOLLOWED UP WITH HIM ABOUT THAT, AND I WAS

8        CONCERNED WITH HIM ABOUT PUNISHMENT AND THAT'S REALLY WHERE THE

9        CONVERSATION THAT I WAS CONCERNED ABOUT WAS WHETHER OR NOT HE

10       HAD SOME PRECONCEPTION THAT HE COULDN'T JUDGE ANOTHER HUMAN

11       BEING BECAUSE HIS RELIGIOUS DEITY IS THE PERSON WHO DOES THAT

12       OR COULD DO THAT AND SO I DID FOLLOW UP WITH HIM ABOUT THAT.

13           AND HE DID SEEM TO ME TO INDICATE THAT HE DID UNDERSTAND

14       THAT DISTINCTION THAT HE'S NOT TO CONSIDER PUNISHMENT IN ANY

15       WAY.  THAT'S NOT SOMETHING THAT HE WOULD ENTER INTO, THAT

16       THAT'S THE COURT'S DUTY.

17           NOW, HE DID SAY THAT HE FOLLOWS THE BIBLE AND I ASKED THE

18       QUESTION IF ANYONE HERE COULD NOT FOLLOW THE LAW THAT THE COURT

19       INSTRUCTS AND HE DID NOT RAISE HIS HAND.

20           I ASKED THAT ABOUT THREE TIMES, I THINK.  AT LEAST TWICE,

21       BUT I THINK THREE TIMES, AND HE NEVER RAISED HIS HAND

22       INDICATING THAT HE COULD NOT AND WOULD NOT FOLLOW THE LAW.

23                MR. ARCHER:  IF I COULD OFFER A HYPOTHETICAL.  IF WE

24       HAD SOMEONE WHO BELIEVES THAT MOROCCAN LAW, THE LAW OF THE

25       COUNTRY OF MOROCCO, WAS SUPERIOR TO THE UNITED STATES LAW, I

1    COULDN'T SIT HERE AND TELL THE COURT THAT I UNDERSTAND ALL OF

2    MOROCCAN LAW OR WHAT THE POTENTIAL CONFLICTS MIGHT BE GIVEN THE

3    JURY INSTRUCTIONS HERE.

4        BUT IF WE HAD SOMEONE IN THE JURY BOX THAT SAID I WOULD

5    FOLLOW ANOTHER CODE OF LAWS AND OTHER THAN THE CODE OF LAWS IN

6    THE UNITED STATES, IF THERE'S A CONFLICT IN THAT, IT SEEMS LIKE

7    THAT'S A CONFLICT THAT WOULD PRESENT FOR SOMEONE SITTING ON A

8    JURY BECAUSE THERE'S NO OPPORTUNITY FOR THAT JUROR TO LATER

9    RAISE THAT ISSUE, OH, YOUR HONOR, WE'RE HALFWAY THROUGH THE

10   TRIAL AND SOMETHING HAS COME UP OR NOW THAT THE CHARGE HAS BEEN

11   GIVEN TO ME I NEED TO RAISE MY HAND AND BE REPLACED BECAUSE I'M

12   POTENTIALLY IN CONFLICT.  THE JURORS ARE NOT GIVEN THAT

13   OPPORTUNITY, AND I'VE NEVER SEEN IT HAPPEN BEFORE.

14           THE COURT:  WELL, IN YOUR HYPOTHETICAL, AGAIN, THE

15   QUESTION THE COURT ASKED IS, IS THERE ANYONE WHO CANNOT FOLLOW

16   THE LAW?  AND I ASSUME THAT PERSON WOULD RAISE THEIR HAND AND

17   SAY I CAN'T BECAUSE I BELIEVE IN MOROCCAN LAW.

18       HE TOLD US I FOLLOW THE LAW, BUT I BELIEVE IN THE BIBLE.

19           MR. ARCHER:  AND HE SAID THAT IF THE LAW OF THE

20   BIBLE -- I THINK THAT'S AN ACCURATE WAY TO DESCRIBE IT BUT IF

21   THE RULES GIVEN TO HIM BY THE BIBLE WERE IN CONFLICT WITH U.S.

22   LAW, HE WOULD FOLLOW THE LAW OF THE BIBLE OVER THE U.S. LAW.

23           THE COURT:  OKAY.  WELL, I'M GOING TO OVERRULE THE

24   OBJECTION AS TO HIM.  I THINK HE WAS PROPERLY REHABILITATED OR

25   AT LEAST HE INDICATED TO US THAT HE WOULD FOLLOW THE LAW IN

```
 1        THIS CASE.  HE DOES HAVE RELIGIOUS BELIEFS, AND I BELIEVE BASED

 2    ON WHAT COUNSEL HAVE TOLD ME THAT IF THERE'S ANYTHING IN THIS

 3    CASE AND EVIDENCE THAT IS GOING TO ENGAGE ANY OF THOSE

 4    RELIGIOUS BELIEFS IN ANY WAY, AND, AGAIN, I SUPPOSE THE WAY

 5    THAT COULD HAPPEN IS THAT IF COUNSEL WERE TO RAISE THAT IN

 6    ARGUMENT OR IN A QUESTION AND SOMEHOW SOME OTHER RELIGIOUS

 7    ASPECTS, I THINK COUNSEL CAN REFRAIN FROM DOING THAT IN THE

 8    CASE.

 9        SO I'LL OVERRULE THE OBJECTION AS TO MR. TEO.

10        ANYTHING ELSE?

11            MR. ARCHER:  NO, YOUR HONOR.

12            THE COURT:  AS TO MS. HO -- OR EXCUSE ME.  LET'S

13    SEE, I THINK YOU HAD HOANG I THINK IT WAS.

14            MR. ARCHER:  CORRECT, JUROR NUMBER 10.

15            THE COURT:  MS. HOANG, THERE WASN'T -- I DIDN'T

16    FOLLOW UP WITH HER ABOUT THE -- HER BROTHERS BEING IN LAW

17    ENFORCEMENT.  SHE DID RAISE THE ISSUE INITIALLY WITH US.

18            MR. SCHENK:  MY RECOLLECTION IS THAT THE COURT ASKED

19    IF SHE FOUND THE DEFENDANT NOT GUILTY COULD SHE FACE HER

20    BROTHERS, I THINK WAS THE PHRASE, THAT SHE HAD NO PROBLEM.

21            MR. ARCHER:  I THINK SHE SAID MAYBE.

22            THE COURT:  I ASKED HER IF I THINK IT WAS THE

23    QUESTION I ASKED DIRECTLY IF THE EVIDENCE SO FOUND THAT SHE

24    COULD VOTE NOT GUILTY COULD SHE DO THAT AND STILL FACE HER

25    BROTHERS I THINK IT WAS AND I THINK SHE SAID -- I THINK SHE
```

1    ANSWERED IN THE AFFIRMATIVE, I DON'T REMEMBER EXACTLY WHAT IT

2    WAS, BUT SHE COULD DO THAT.

3        YOU ASKED SOME FOLLOW-UP QUESTIONS, MR. ARCHER, ABOUT HER

4    AND THEN IN RESPONSE TO ONE OF YOUR QUESTIONS SHE SAID, I

5    THINK, I MIGHT HAVE PROBLEMS WITH DOING THAT, THAT IS, I MIGHT

6    BE BIASSED I THINK WAS THE GIST OF IT BECAUSE OF HER BROTHER'S

7    FEELING.

8        SHE ALSO TOLD US SHE HAS DOCTOR'S APPOINTMENTS AND OTHER

9    THINGS.  I'M GETTING THE SENSE THAT AS A COUPLE OF OTHER

10   INDIVIDUALS SHE IS UNCOMFORTABLE BEING HERE SO I'M GOING TO

11   STRIKE HER.  I THINK IT MAKES SENSE TO EXCUSE HER.

12       AND SO, MS. GARCIA, WE'LL EXCUSE MS. HOANG, AND WE'LL HAVE

13   ANOTHER JUROR FILL IN, THE NEXT JUROR FILL IN, AND THEN WE'LL

14   DO EXAMINATION OF THAT JUROR AND SEE WHERE WE ARE AT.

15           MR. SCHENK:  COULD I ASK A QUESTION ON THE USE OF

16   THE PREEMPTORIES, AND I'M SORRY, I SHOULD HAVE ASKED THIS AT

17   OUR FIRST PRETRIAL.

18       IF THE GOVERNMENT HAS REMAINING PREEMPTORIES AND WE DON'T

19   USE THEM ALL BUT THERE'S NO ONE LEFT IN THE BOX THAT WE WANT TO

20   USE A CHALLENGE ON, DOES PASS CAUSE US TO NOT USE IT IN THE

21   FUTURE?

22           THE COURT:  PASS IS NOT A SELECTION, RIGHT?  A PASS

23   IS NOT UNLESS THERE'S TWO PASSES THEN YOU KNOW WHAT HAPPENS

24   THEN.

25       AND AS WE GO THROUGH THE PROCESS, IT MAY BE, AGAIN, I

1      DON'T KNOW WHAT WILL HAPPEN, BUT YOU'LL CHALLENGE OUT OF THE

2      FIRST 8 THE FIRST 12 AND THEN I SUPPOSE VIRTUALLY YOU CAN FILL

3      IN OR WE'LL GET TO A POINT WHERE WE MAY GET TO A POINT WHERE

4      WE'LL NEED TO RECHARGE AND REFILL AND IF THAT COMES, YOU CAN

5      JUST LET ME KNOW AND THEN WE'LL RECHARGE.

6          THE NEXT QUESTION IS DO WE MOVE EVERYBODY MUSICAL CHAIRS

7      OR DO WE JUST FILL IN?

8                  MR. SCHENK:  IN THE VIRTUAL MOVE 13 BECOMES 1 AND --

9                  THE COURT:  RIGHT, RIGHT.  DOES THAT MAKE SENSE?

10                 MR. SCHENK:  UH-HUH.

11                 THE COURT:  OKAY.  ALL RIGHT.

12         (END OF DISCUSSION AT SIDE-BAR.)

13                 THE COURT:  THANK YOU, COUNSEL.  ALL RIGHT.  THANK

14     YOU, COUNSEL.

15         MS. HOANG, I'M GOING TO EXCUSE YOU, MS. HOANG.  THANK YOU.

16     YOU CAN GO DOWNSTAIRS AND THANK YOU VERY MUCH.

17         AND, MS. GARCIA, IF YOU COULD CALL A NAME, PLEASE.

18                 THE CLERK:  CARRIE SPROCH.

19                 THE COURT:  GOOD MORNING, MA'AM.  IS IT SPROCH.

20                 PROSPECTIVE JUROR:  IT'S SPROCH.

21                 THE COURT:  YES.  THANK YOU.  GOOD MORNING.  WELL,

22     NOW YOU CAN APPRECIATE WHY I SAID PAY ATTENTION, LADIES AND

23     GENTLEMEN.

24                 PROSPECTIVE JUROR:  UH-HUH.

25                 THE COURT:  AND WELCOME.  LET ME ASK YOU, IS THERE,

 1    FIRST OF ALL, MS. SPROCH, IS THERE ANYTHING ABOUT THE DURATION

 2    OF THIS TRIAL THAT CAUSES ANY MAJOR INCONVENIENCE?

 3              PROSPECTIVE JUROR:  YES.  I'M MOVING TO ARIZONA, AND

 4    I'M CLOSING ON MY HOUSE ON FRIDAY AND ALL NEXT WEEK I'M MOVING

 5    FURNITURE.

 6              THE COURT:  I SEE.  WELL, IT SOUNDS LIKE YOU HAVE A

 7    DESIRE TO LEAVE CALIFORNIA, WHICH I CAN'T UNDERSTAND, ALTHOUGH

 8    ARIZONA IS A LOVELY PLACE.

 9        WELL, THANK YOU.

10              PROSPECTIVE JUROR:  THANK YOU.

11              THE COURT:  YOU CAN JUST LEAVE THE MICROPHONE THERE

12    BECAUSE I THINK MS. VICKIE VILLARREAL WILL BE JOINING US.

13              PROSPECTIVE JUROR:  CAN I LEAVE?

14              THE COURT:  OH, YES.

15        GOOD MORNING, MS. VILLARREAL.

16              PROSPECTIVE JUROR:  GOOD MORNING.

17              THE COURT:  LET ME ASK YOU THE THRESHOLD QUESTION.

18        IS THERE ANYTHING ABOUT THE DURATION, THE SHORT DURATION

19    OF THIS TRIAL THAT WILL CAUSE ANY MAJOR INCONVENIENCE?

20              PROSPECTIVE JUROR:  NO.

21              THE COURT:  THANK YOU.  WERE YOU ABLE TO HEAR AND

22    UNDERSTAND THE QUESTIONS, MY QUESTIONS TO THE OTHER PROSPECTIVE

23    JURORS?

24              PROSPECTIVE JUROR:  YES.

25              THE COURT:  AND THE ANSWERS OF THE OTHER PROSPECTIVE

1          JURORS?

2                    PROSPECTIVE JUROR:  YES.

3                    THE COURT:  HAVE ANY OF THE QUESTIONS OR ANSWERS

4     THAT YOU HAVE HEARD RAISED ANY DOUBT IN YOUR MIND AS TO WHETHER

5     OR NOT YOU COULD BE FAIR AND IMPARTIAL TO BOTH SIDES IN THIS

6     CASE IF YOU WERE SEATED AS A JUROR?

7                    PROSPECTIVE JUROR:  NO.

8                    THE COURT:  YOU HEARD ME TALK ABOUT THE PRESUMPTION

9     OF INNOCENCE.  DO YOU QUARREL WITH THAT?  DO YOU HAVE ANY

10    QUARREL?

11                   PROSPECTIVE JUROR:  NO PROBLEM.

12                   THE COURT:  YOU HEARD ME TALK ABOUT THE BURDEN OF

13    PROOF ON THE GOVERNMENT.  YOU'VE HEARD US ALL TALK ABOUT THAT.

14    ANY QUARREL WITH THAT?

15                   PROSPECTIVE JUROR:  NO.

16                   THE COURT:  DO YOU KNOW ANY OF THE LAWYERS OR THE

17    WITNESSES OR ANY OF THE PARTIES WHO I'VE MENTIONED EARLIER?

18                   PROSPECTIVE JUROR:  NO, I DO NOT.

19                   THE COURT:  AND DO YOU HAVE A SHEET ON YOUR CHAIR?

20                   PROSPECTIVE JUROR:  NO.

21                   THE COURT:  MS. SPROCH TOOK THAT AS A CALIFORNIA

22    SOUVENIR.

23         YOU HAVE A LIST OF WITNESSES.  DO YOU KNOW ANY OF THE

24    WITNESSES?

25                   PROSPECTIVE JUROR:  NO, I DON'T.

1          THE COURT:  HAVE YOU EVER SERVED ON A JURY BEFORE?

2          PROSPECTIVE JUROR:  I WAS AN ALTERNATE, BUT IT WAS

3     SETTLED.

4          THE COURT:  I SEE.  SO YOU NEVER HEARD EVIDENCE IN

5     THE CASE?

6          PROSPECTIVE JUROR:  NO.

7          THE COURT:  WAS IT A CIVIL CASE?

8          PROSPECTIVE JUROR:  ALTHOUGH I DID HEAR EVIDENCE.

9          THE COURT:  IT RESOLVED IN THE MIDDLE OF TRIAL?

10         PROSPECTIVE JUROR:  YES.

11         THE COURT:  I SEE.  WELL, WAS IT A CIVIL OR A

12    CRIMINAL CASE?

13         PROSPECTIVE JUROR:  CIVIL.

14         THE COURT:  AND HOW LONG AGO WAS THAT?

15         PROSPECTIVE JUROR:  MAYBE FIVE YEARS.

16         THE COURT:  HERE IN SANTA CLARA COUNTY?

17         PROSPECTIVE JUROR:  YES.

18         THE COURT:  DO YOU HAVE ANY FRIENDS, RELATIVES WHO

19    ARE EMPLOYED IN LAW ENFORCEMENT?

20         PROSPECTIVE JUROR:  NO, NO LAW ENFORCEMENT BUT

21    ATTORNEY, YES.

22         THE COURT:  THAT WAS MY NEXT QUESTION.

23         PROSPECTIVE JUROR:  UH-HUH.

24         THE COURT:  SO TELL US ABOUT THAT.

25         PROSPECTIVE JUROR:  MY DAUGHTER, BUT SHE'S NOT

1          PRACTICING.

2                    THE COURT:  SHE'S A LAWYER?

3                    PROSPECTIVE JUROR:  YES.

4                    THE COURT:  AND -- BUT SHE'S NOT PRACTICING LAW NOW?

5                    PROSPECTIVE JUROR:  NO.

6                    THE COURT:  HAS SHE PRACTICED PREVIOUSLY?

7                    PROSPECTIVE JUROR:  YES.

8                    THE COURT:  IN WHAT CAPACITY?

9                    PROSPECTIVE JUROR:  IT WAS IN EMPLOYMENT LAW.

10                   THE COURT:  I SEE.  AND DO YOU KNOW WHETHER SHE WAS

11         REPRESENTING EMPLOYEES OR THE EMPLOYER?

12                   PROSPECTIVE JUROR:  THE EMPLOYEES.

13                   THE COURT:  I SEE.  AND HOW LONG AGO DID SHE LEAVE

14         PRACTICE?

15                   PROSPECTIVE JUROR:  TWELVE YEARS AGO.

16                   THE COURT:  OKAY.  DID SHE PRACTICE HERE IN SAN JOSE

17         DO YOU KNOW?

18                   PROSPECTIVE JUROR:  NO.

19                   THE COURT:  WHERE WAS SHE?

20                   PROSPECTIVE JUROR:  SAN FRANCISCO.

21                   THE COURT:  AH.  I SEE.  AND DID SHE TALK TO YOU

22         ABOUT HER WORK?

23                   PROSPECTIVE JUROR:  UH-HUH, THAT'S --

24                   THE COURT:  AND ANYTHING ABOUT THE NATURE OF THOSE

25         CONVERSATIONS OR THE FACT THAT YOUR DAUGHTER IS A LAWYER THAT

```
1    YOU THINK WOULD IMPAIR YOUR ABILITY TO BE FAIR AND IMPARTIAL IN

2    THIS CASE?

3              PROSPECTIVE JUROR:  NO.

4              THE COURT:  IS THERE ANYTHING ABOUT, ANYTHING ABOUT

5    THIS CASE SUCH THAT YOU KNOW THE FACTS THAT -- AND YOU DON'T

6    KNOW ANY FACTS YET, BUT I'VE READ THE CHARGES TO YOU.

7        IS THERE ANYTHING ABOUT THE NATURE OF THE CHARGES THAT YOU

8    THINK WOULD AFFECT YOUR ABILITY TO BE FAIR AND IMPARTIAL TO

9    BOTH SIDES?

10             PROSPECTIVE JUROR:  NO.

11             THE COURT:  DO YOU HAVE ANY QUARREL WITH THE CONCEPT

12   THAT THE JURY MUST BE UNANIMOUS IN THE CASE?

13             PROSPECTIVE JUROR:  NO.

14             THE COURT:  NOW, YOU HEARD US TALK, I ENJOYED A

15   CONVERSATION WITH SOME OF OUR PROSPECTIVE JURORS ABOUT

16   WITNESSES WHO MIGHT BE LAW ENFORCEMENT OR EMPLOYEES OF THE

17   GOVERNMENT INVESTIGATIVE AGENCIES.

18       CAN YOU TELL US -- TELL ME WHETHER OR NOT YOU WOULD GIVE

19   GREATER OR LESSER WEIGHT TO A WITNESS WHO IS EMPLOYED BY ONE OF

20   THOSE AGENCIES SIMPLY AND SOLELY BECAUSE OF THE NATURE OF THAT

21   EMPLOYMENT?

22             PROSPECTIVE JUROR:  NO, I WOULDN'T.

23             THE COURT:  OKAY.  IS THERE ANYTHING ELSE THAT YOU

24   WOULD LIKE TO RAISE TO US, TO ME NOW, THAT YOU THINK IS

25   IMPORTANT TO CONSIDER AS TO WHETHER OR NOT YOU COULD BE A FAIR
```

```
 1        AND IMPARTIAL JUROR IN THIS CASE?

 2                    PROSPECTIVE JUROR:  NO.

 3                    THE COURT:  OKAY.  THANK YOU VERY MUCH.

 4            I'LL ASK COUNSEL, MR. SCHENK, DO YOU HAVE ANY QUESTIONS?

 5                    MR. SCHENK:  NO, YOUR HONOR.  THANK YOU.

 6                    THE COURT:  MR. ARCHER?

 7                    MR. ARCHER:  NO, YOUR HONOR.  THANK YOU.

 8                    THE COURT:  PASS FOR CAUSE?

 9                    MS. PENNA:  YES, YOUR HONOR.

10                    MR. ARCHER:  YES, YOUR HONOR.

11                    THE COURT:  ALL RIGHT.  THANK YOU.  LADIES AND

12        GENTLEMEN, WE'RE NOW GOING TO HAVE THE LAWYERS DISCUSS BETWEEN

13        THEMSELVES AND AMONGST THEMSELVES JURY SELECTION, AND THEY WILL

14        NOW MAKE THOSE SELECTIONS.  THIS WILL TAKE A FEW MINUTES I

15        BELIEVE.

16            AND, MS. GARCIA, IF YOU COULD HAND THE FORM TO THE

17        GOVERNMENT, PLEASE.  THIS WILL TAKE A COUPLE OF MINUTES.

18            SO, FOLKS, IF YOU WOULD LIKE TO TAKE A STANDING BREAK, YOU

19        CAN'T LEAVE THE COURTROOM, BUT IF YOU COULD -- IS THIS MR. CHU?

20                    PROSPECTIVE JUROR:  CAN I GO TO THE BATHROOM?

21                    THE COURT:  OKAY.  GIVE ME JUST A SECOND.  PARDON

22        ME.  EXCUSE ME.  JUST A SECOND.

23                    PROSPECTIVE JUROR:  OH.

24                    THE COURT:  COUNSEL, I AM GOING TO ALLOW MR. CHU TO

25        LEAVE JUST FOR A MOMENT TO GO TO THE RESTROOM.
```

1           PROSPECTIVE JUROR:  YES.

2           THE COURT:  ALL RIGHT.  BUT EVERYONE ELSE CAN

3    REMAIN.  YOU CAN STAND.  GO AHEAD, MR. CHU, AND EVERYONE ELSE

4    COME RIGHT BACK, PLEASE.

5           (PAUSE IN PROCEEDINGS.)

6           (SIDE-BAR CONFERENCE ON THE RECORD.)

7           THE COURT:  WE'RE AT SIDE-BAR WITH COUNSEL.  AND IT

8    LOOKS LIKE WE HAVE SEVEN CHALLENGES SO FAR; IS THAT RIGHT?

9           MR. SCHENK:  YES, YOUR HONOR.  THE GOVERNMENT PASSED

10   AT ITS EIGHTH.

11          THE COURT:  SO WE CAN RECHARGE.  WE'LL ANNOUNCE AND

12   EXCUSE AND THEN WE'LL RECHARGE THE JURY.

13      LET ME ASK COUNSEL YOUR THOUGHTS ABOUT HOW WE SHOULD

14   RESEAT THE NEW PROSPECTIVE JURORS.

15      THE QUESTION IS DO WE WANT TO PLAY MUSICAL CHAIRS AND MOVE

16   EVERYONE OVER?

17          MR. SCHENK:  THAT WOULD BE MY PREFERENCE.

18          MR. ARCHER:  KEEPING UP WITH THE SEQUENCE OF THE

19   LIST AS THEY REMAIN AND SEATING THEM INDIVIDUALLY.

20          THE COURT:  SO LET'S DO THIS, LET'S EXCUSE OUR

21   JURORS.  IT'S ABOUT FIVE TO NOON NOW.  WHY DON'T WE EXCUSE

22   THESE JURORS, AND WE'LL HAVE EVERYBODY MOVE.  WE'LL RECHARGE

23   WITH THE NEW PANEL, AND THEN WE'LL TAKE OUR NOON RECESS.

24          MR. ARCHER:  PERFECT.

25          MR. SCHENK:  OKAY.

1          THE COURT:  CAN WE GET ALL OF THAT DONE, MS. GARCIA?

2      (END OF DISCUSSION AT SIDE-BAR.)

3          THE COURT:  ALL RIGHT.  THANK YOU.  LADIES AND

4  GENTLEMEN, THE ATTORNEYS HAVE MADE SOME OF THEIR DECISIONS.

5      WHAT WE'RE GOING TO DO NOW IS MS. GARCIA WILL ANNOUNCE THE

6  NAMES OF THOSE INDIVIDUALS WHO WILL BE EXCUSED.  SO IF YOUR

7  NAME IS CALLED, YOU WILL BE EXCUSED, AND I'M GOING TO IN

8  ADVANCE OF THIS THANK YOU, THANK YOU FOR COMING TO COURT AND

9  THANK YOU FOR YOUR SERVICE TO YOUR COMMUNITY.

10     WE'LL HAVE THOSE JURORS WHOSE NAMES ARE CALLED, YOU CAN

11  LEAVE AND GO BACK DOWNSTAIRS AND CHECK IN WITH THE JURY

12  COMMISSIONER AND INDICATE WHAT HAS OCCURRED.  THE REST OF YOU

13  WILL REMAIN SEATED FOR JUST A MOMENT.

14     FOLLOWING THAT, WE'LL PROBABLY PLAY SOME MUSICAL CHAIRS,

15  AND WE'LL MOVE ALL OF YOU OVER, AND THEN WE'LL RECHARGE THE

16  JURY BOX.

17     SO, MS. GARCIA, IF YOU COULD PLEASE ANNOUNCE THE NAMES OF

18  THOSE PROSPECTIVE JURORS WHO HAVE BEEN EXCUSED.

19          THE CLERK:  LAKSHMAMMA VENKATA.

20          THE COURT:  IS THAT JUROR NUMBER 4?

21          THE CLERK:  YES.

22          THE COURT:  THANK YOU, MA'AM.

23          THE CLERK:  JUROR NUMBER 5, RAFAEL YAHALOM.

24          THE COURT:  THANK YOU, SIR.  AND YOU CAN JUST LEAVE

25  THE CALENDARS ON THERE.  IF YOU HAVEN'T ALREADY, JUST LEAVE IT

```
 1        ON THE CHAIR OR YOU CAN LEAVE IT THERE, MA'AM.  WE'LL TAKE CARE
 2    OF IT.
 3              PROSPECTIVE JUROR:  THANK YOU.
 4              THE COURT:  THANK YOU.  YOU'RE WELCOME.
 5              THE CLERK:  JUROR NUMBER 6, PETER LEE; JUROR NUMBER
 6    7, JONATHAN DILLER; JUROR NUMBER 12, KIMBERLY LINDSAY; JUROR
 7    NUMBER 15, GANESH JAMPANI; AND JUROR NUMBER 16, MICHAEL ROJAS.
 8              THE COURT:  YOU CAN LEAVE YOUR SCHEDULE THERE,
 9    MR. ROJAS.  THANK YOU.
10        DOES THAT EXHAUST ALL OF OUR JURORS?
11              THE CLERK:  YES.
12              MR. ARCHER:  YOUR HONOR, MAY WE APPROACH BRIEFLY?
13              THE COURT:  YEAH.
14        (SIDE-BAR CONFERENCE ON THE RECORD.)
15              THE COURT:  WE'RE AT SIDE-BAR.
16              MR. ARCHER:  WE'RE AT SIDE-BAR.  I HAD A CHALLENGE
17    BUT FAILED TO WRITE MR. -- MR. POLINI'S NAME.
18              THE COURT:  SO HE WAS JUROR NUMBER 13.
19              MR. ARCHER:  HE WAS DEFENSE CHALLENGE NUMBER 7.
20              THE COURT:  IS THAT REFLECTED IN THE NOTES THERE?
21              MR. ARCHER:  OKAY.
22              THE COURT:  YOU'VE GOT THAT.
23              MR. ARCHER:  THAT'S ALL.
24              THE COURT:  AND SO NOW WE'LL JUST HAVE EVERYBODY
25    MOVE OVER IN A CENTIPEDE FASHION, AND WE'LL RECHARGE FROM THAT.
```

1       ALL RIGHT.  THANK YOU.

2              (END OF DISCUSSION AT SIDE-BAR.)

3                    THE CLERK:  AND JUROR NUMBER 13, GLENN POLINI.

4                    THE COURT:  YOU CAN LEAVE THE CALENDAR ON THE CHAIR,

5       MR. POLINI.  THANK YOU VERY MUCH, SIR.

6              ALL RIGHT.  AND WHAT WE'D LIKE TO DO NOW IS ENGAGE IN SOME

7       MUSICAL CHAIRS.  SO, MS. STOLZ, COULD I ASK YOU TO MOVE OVER TO

8       MS. SALAMIDA, PLEASE.

9              AND, OF COURSE, THAT MEANS, MS. CHENG, IF YOU COULD MOVE

10      OVER NEXT TO MR. STOLZ.

11             AND, MS. VILLARREAL, WE'RE GOING TO ASK YOU TO MOVE TO

12      CENTIPEDE FASHION, YOU CAN COME BACK THIS WAY.  IT MIGHT BE

13      EASIER TO COME BACK THIS WAY (INDICATING).

14             YES, MS. MCGUIRE.  AND MR. GUZMAN.

15             AND THIS FRONT ROW IS JUST GOING TO MOVE BACK, AREN'T YOU?

16             SO, MS. JOHANSON, COULD YOU PLEASE TAKE SEAT NUMBER 9

17      THAT'S DIRECTLY BEHIND YOU, PLEASE.

18             MS. VAN WINKLE, IT'S PROBABLY EASIER TO WALK AROUND THIS

19      WAY.

20             AND, MS. ROMITO, MR. HO, AND, MR. BAUGHMAN, MR. MCNAMARA,

21      MR. CHU, AND MR. TEO.

22             THANK YOU FOR THAT, FOLKS.  I APPRECIATE IT.

23             AND, MS. GARCIA, CAN YOU CALL OUT ADDITIONAL NAMES?

24             AND, LADIES AND GENTLEMEN, WHAT WE'RE GOING TO DO HERE IS

25      FILL OUR FRONT ROW, AND THEN WE'RE GOING TO TAKE OUR NOON

```
 1        RECESS.

 2                THE CLERK:  NADINE DOHERTY.

 3                THE COURT:  MS. DOHERTY, SEAT NUMBER 15 IN FRONT OF

 4        MS. JOHANSON.

 5                THE CLERK:  ANNABELLE RAMIREZ; KONG LAW; TIMOTHY

 6        WOOD; BAOHUONG PHAN; ROSEMARY NUNES; PAULA CRIVELLO; RAMON

 7        PEREZ.

 8                PROSPECTIVE JUROR:  WOULD IT BE POSSIBLE FOR ME TO

 9        SIT ON THE END?  I MAY HAVE A NEED TO STAND.

10                THE COURT:  SURE.  THAT'S FINE.  YOU'D LIKE TO SIT

11        IN SEAT NUMBER 24?

12                PROSPECTIVE JUROR:  UH-HUH.

13                THE COURT:  MS. CRIVELLO.  RIGHT, YOU CAN DO THAT.

14            ANY OBJECTION, COUNSEL?

15                MR. ARCHER:  NO, YOUR HONOR.

16                THE COURT:  ALL RIGHT.  THANK YOU.  WHAT WE'LL DO,

17        LADIES AND GENTLEMEN, IS WE'LL TAKE OUR NOON RECESS AT THIS

18        TIME.

19            WE'LL GIVE YOU, WE'LL GIVE YOU -- WE'LL REPLENISH THE

20        MAPS -- OR EXCUSE ME -- THE CALENDARS AND WITNESS LISTS, WE'LL

21        REPLENISH THOSE.  IF YOU CAN JUST LEAVE THE DOCUMENTATION ON

22        THE SEAT WHEN YOU LEAVE, WE'LL FILL IN THOSE SEATS THAT ARE

23        BLANK.  SO WE'LL TAKE OUR NOON RECESS NOW.

24            WOULD YOU PLEASE COLLECT YOURSELVES DOWNSTAIRS IN THE JURY

25        ASSEMBLY ROOM.  I'M SPEAKING TO THOSE OF YOU IN THE AUDIENCE AS
```

1    WELL, DOWNSTAIRS SUCH THAT WE CAN BEGIN AT -- I'D LIKE TO BEGIN

2    AT 1:30, HAVE YOU UP HERE AT 1:30.

3         BUT WHEN YOU COME BACK FROM LUNCH, IF YOU CAN RETURN TO

4    THE JURY ASSEMBLY ROOM SUCH THAT MS. GARCIA CAN GO DOWN AND

5    PROBABLY COLLECT YOU AT ABOUT 1:20, 1:25.  DO HAVE A GOOD

6    LUNCH.  LET ME SAY ONE THING TO YOU BEFORE YOU LEAVE, AND THIS

7    IS FOR ALL OF YOUR BENEFITS.

8         THERE ARE -- I'M GOING TO -- ONCE WE HAVE A JURY, I'LL

9    PRE-INSTRUCT YOU AND I'LL GIVE YOU SOME PRE-INSTRUCTIONS BEFORE

10   WE BEGIN EVIDENCE.

11        ONE OF THE THINGS THAT I DO TYPICALLY MENTION THEN, BUT I

12   THINK IT APPROPRIATE TO MENTION NOW, IS THE JURORS ARE NOT TO

13   HAVE CONTACT WITH THE LAWYERS OR ANY OF THE PARTIES OR ANYONE

14   ATTACHED TO THE CASE.  THAT'S VERY IMPORTANT.

15        NOW, IN AN INTIMATE COURTHOUSE LIKE THIS IT MAY BE THAT

16   YOU'LL GET IN AN ELEVATOR WITH ONE OF THE PARTIES, THE

17   ATTORNEYS, AND IT MAY BE THAT YOU'LL SEE THEM IN THE HALLWAY

18   WALKING OUTSIDE IN THE COURTYARD OR SOMETHING AND YOU MIGHT NOD

19   IN A VERY POLITE WAY AND NOD YOUR HEAD TO THEM AND ACKNOWLEDGE

20   THEM AND THEY MIGHT NOD THEIR HEAD BACK BUT THEY WON'T SPEAK TO

21   YOU.

22        AND I WANT YOU TO KNOW THAT'S NOT BECAUSE THEY'RE

23   ILL-MANNERED OR THEIR MOTHERS DID NOT RAISE THEM PROPERLY.  THE

24   REASON THEY DO THAT IS BECAUSE THEY KNOW THE RULES AND THEY

25   KNOW THEY'RE NOT TO HAVE CONTACT WITH YOU AND SO THEY CAN

```
 1    RESPECT YOUR PRESENCE AS JURORS HERE.

 2         SO PLEASE DO NOT TAKE OFFENSE IF ANY OF THESE GOOD LAWYERS

 3    AND SOMEHOW DON'T RESPOND TO THEIR GOOD MORNINGS AND THINGS IN

 4    A MANNER THAT YOU FEEL IS APPROPRIATE.  THEY KNOW THE RULES.

 5    THEY ARE ALL GOOD LAWYERS, AND I'VE ENJOYED PRACTICING WITH

 6    THEM, AND THEY KNOW THEY'RE NOT TO HAVE CONTACT WITH YOU.

 7         SO ON THEIR BEHALF I WANT TO PARDON ANYTHING THAT YOU

 8    MIGHT FEEL UNTOWARD IN THAT REGARD.

 9         SO WE'LL TAKE OUR NOON RECESS AND DO HAVE A GOOD LUNCH AND

10    WE'LL SEE YOU BACK.

11         (JURY OUT AT 12:05 P.M.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              **AFTERNOON SESSION**

2        (JURY IN AT 1:31 P.M.)

3              THE COURT:  WE'RE BACK ON THE RECORD IN THE UNITED

4   STATES VERSUS YORK.  ALL COUNSEL AND THE DEFENDANT ARE PRESENT,

5   AND OUR PROSPECTIVE JURY PANEL IS PRESENT.

6        GOOD AFTERNOON, LADIES AND GENTLEMEN.  I DO WANT TO ASK

7   SOME QUESTIONS OF THE NEW MEMBERS OF OUR PROSPECTIVE PANEL,

8   THOSE OF YOU IN THE FRONT ROW.  SO THESE QUESTIONS WILL BE

9   DIRECTED TOWARDS YOU.

10        LET ME FIRST ASK, IS THERE ANYBODY THAT KNOWS ANYTHING

11   ABOUT THIS CASE, ANYBODY KNOW ANY OF THE FACTS AND ANY

12   CIRCUMSTANCES IN THE CASE?

13        I SEE NO HANDS.

14        ANYBODY KNOW THE PARTIES, EITHER THE LAWYERS OR THE

15   PARTICIPANTS OR ANY OF THE WITNESSES THAT I MENTIONED, AND

16   HOPEFULLY YOU FOUND ON YOUR SEAT AS WELL?

17        I SEE NO HANDS.

18        WOULD ANY OF YOU -- I WANT TO FOLLOW UP ON A QUESTION YOU

19   PROBABLY HEARD US DISCUSS AT THE END OF THE MORNING SESSION,

20   AND THAT'S A QUESTION ABOUT LAW ENFORCEMENT OR AGENTS WHO MIGHT

21   BE EMPLOYED WITH LAW ENFORCEMENT AGENCIES, THEIR TESTIMONY AND

22   WHETHER OR NOT -- THE QUESTION WAS WHETHER OR NOT ANY OF YOU

23   WOULD GIVE GREATER OR LESSER CREDENCE TO THAT PERSON'S

24   TESTIMONY JUST BECAUSE -- SOLELY BECAUSE OF THE FACT THAT THEY

25   ARE AN EMPLOYEE.

1          AND IS THAT, MR. LAW?  DID YOU RAISE YOUR HAND, SIR?

2          PROSPECTIVE JUROR:  YES.

3          THE COURT:  WE'LL GET A MICROPHONE TO YOU.

4          PROSPECTIVE JUROR:  YES.  I'M ALWAYS WITH THE LAW

5    ENFORCEMENT, AND THEY DO THEIR JOB, AND I APPRECIATE WHAT

6    THEY'RE DOING.

7          THE COURT:  ALL RIGHT, SIR.  AND DID YOU HEAR OUR

8    DISCUSSION, THE LAWYER'S DISCUSSION?

9          PROSPECTIVE JUROR:  YEAH, I DO BELIEVE THEIR JOB

10   RESPONSIBILITY IS TO DO THE RIGHT THING.

11         THE COURT:  I BEG YOUR PARDON.

12         PROSPECTIVE JUROR:  I JUST FEEL THEY DO THE RIGHT

13   THING BECAUSE IT IS THEIR JOB RESPONSIBILITY.

14         THE COURT:  I SEE.  HAVING THAT BELIEF, LET ME JUST

15   ASK YOU, CAN YOU BE FAIR TO THE DEFENSE IN THIS CASE DO YOU

16   THINK?

17         PROSPECTIVE JUROR:  I WOULD SAY I WOULD TRY TO BUT

18   SOMETIMES I MAY BE BIASED.

19         THE COURT:  YOU HEARD ME USE THE EXAMPLE, AND

20   PERHAPS IT'S A RATHER INAPPROPRIATE ONE, TALKING ABOUT A

21   HUNDRED YARD DASH RACE AND IF SOMEONE BELIEVES IT IS GOING AT

22   THE START OF THE RACE BELIEVES THAT THE OTHER SIDE'S WITNESSES

23   HAVE GREATER CREDIBILITY OR THEY SHOULD BE BELIEVED, I THINK I

24   SAID 20 YARDS BEHIND.

25         PROSPECTIVE JUROR:  RIGHT.  I UNDERSTAND THAT.

```
 1                    THE COURT:  RIGHT.  IS THAT WOULD HAPPEN WITH

 2      YOU DO YOU THINK?

 3                    PROSPECTIVE JUROR:  MAYBE.

 4                    THE COURT:  ALL RIGHT.  THANK YOU FOR THAT.  ANYONE

 5      ELSE IN THE FRONT ROW?  ALL RIGHT.  THANK YOU.

 6           DOES ANY ONE OF YOU HAVE RELATIVES WHO ARE EMPLOYED IN LAW

 7      ENFORCEMENT?  AND LET'S SEE, MR. KONG, IF YOU COULD PASS THE

 8      MICROPHONE TO MS. DOHERTY?

 9                    PROSPECTIVE JUROR:  MY BROTHER-IN-LAW IS A SERGEANT

10      INSPECTOR WITH THE SAN FRANCISCO POLICE DEPARTMENT.

11                    THE COURT:  OKAY.  AND DO YOU SEE HIM REGULARLY?

12                    PROSPECTIVE JUROR:  YES.

13                    THE COURT:  DO YOU TALK ABOUT HIS WORK WITH HIM OR

14      DOES HE TALK TO YOU ABOUT HIS WORK?

15                    PROSPECTIVE JUROR:  ON OCCASION THINGS COME UP, JUST

16      THINGS THAT HAVE BEEN IN THE NEWS AND THINGS HE HAS WORKED WITH

17      BUT NOT SPECIFICALLY.

18                    THE COURT:  IS THERE ANYTHING ABOUT THAT, YOUR

19      BROTHER-IN-LAW'S EMPLOYMENT, THAT YOU THINK WOULD IMPAIR YOUR

20      ABILITY TO BE FAIR AND IMPARTIAL TO BOTH SIDES HERE?

21                    PROSPECTIVE JUROR:  NO, I DON'T BELIEVE SO.

22                    THE COURT:  CAN YOU BE FAIR TO BOTH SIDES?

23                    PROSPECTIVE JUROR:  I BELIEVE I CAN.

24                    THE COURT:  THANK YOU.  ANYONE ELSE?  YES, THAT'S

25      MS. RAMIREZ.
```

1          PROSPECTIVE JUROR:  YES.  MY BROTHER IS A POLICE

2     OFFICER IN STANISLAS COUNTY?

3          THE COURT:  AND HOW LONG HAS HE BEEN A POLICE

4     OFFICER THERE?

5          PROSPECTIVE JUROR:  TWENTY-PLUS YEARS.

6          THE COURT:  DO YOU SEE HIM FREQUENTLY?

7          PROSPECTIVE JUROR:  YES, OFTEN.

8          THE COURT:  AND DO YOU TALK ABOUT HIS WORK OR DOES

9     HE TALK ABOUT HIS WORK WITH YOU?

10          PROSPECTIVE JUROR:  VERY LITTLE.  HE'LL SHARE SOME

11     STORIES BUT NOT TOO MUCH DETAIL.

12          THE COURT:  OKAY.  THANK YOU.  IS THERE ANYTHING

13     ABOUT THAT RELATIONSHIP THAT WILL IMPAIR YOUR ABILITY TO BE

14     FAIR AND IMPARTIAL TO BOTH SIDES?

15          PROSPECTIVE JUROR:  NO, I DON'T THINK SO.

16          THE COURT:  CAN YOU BE FAIR TO THE DEFENSE IN THIS

17     CASE?

18          PROSPECTIVE JUROR:  YEAH.

19          THE COURT:  ALL RIGHT.  THANK YOU.  IS THIS

20     MR. WOOD -- I'M SORRY.  MS. PHAN?

21          PROSPECTIVE JUROR:  MY BROTHER-IN-LAW IS EMPLOYED

22     WITH THE SHERIFF'S DEPARTMENT.

23          THE COURT:  OKAY.  AND IT'S YOUR BROTHER-IN-LAW?

24          PROSPECTIVE JUROR:  YES.

25          THE COURT:  AND WHEN YOU SEE HIM DOES HE TALK TO YOU

```
 1    ABOUT HIS WORK?

 2              PROSPECTIVE JUROR:  VERY LITTLE.

 3              THE COURT:  AND ANYTHING ABOUT THAT THAT WILL IMPAIR

 4    YOUR ABILITY TO BE FAIR TO BOTH SIDES IN THIS CASE?

 5              PROSPECTIVE JUROR:  NO.

 6              THE COURT:  CAN YOU BE FAIR TO BOTH SIDES?

 7              PROSPECTIVE JUROR:  YES.

 8              THE COURT:  OKAY.  THANK YOU.  ANYONE ELSE IN THE

 9    FRONT ROW WITH THEIR RELATIVES IN LAW ENFORCEMENT?

10         ANY OF YOU HAVE FRIENDS, FAMILY, RELATIVES WHO ARE

11    INVOLVED IN THE PRACTICE OF LAW?

12         YES, MS. VILLARREAL.

13              PROSPECTIVE JUROR:  YES.  MY NEPHEW IS A LAWYER IN

14    THE NORTH BAY, MARIN COUNTY.

15              THE COURT:  MARIN COUNTY.  WHAT TYPE OF LAW?

16              PROSPECTIVE JUROR:  REAL ESTATE.

17              THE COURT:  AND DOES HE TALK TO YOU ABOUT HIS WORK?

18              PROSPECTIVE JUROR:  SOMETIMES.  GENERALLY SPEAKING,

19    NO.

20              THE COURT:  AND IS THERE ANYTHING ABOUT THAT --

21              PROSPECTIVE JUROR:  I DON'T THINK SO.

22              THE COURT:  -- THAT WILL AFFECT YOUR ABILITY TO BE

23    FAIR?

24              PROSPECTIVE JUROR:  NO.

25              THE COURT:  ANYONE ELSE?  LAWYERS, PARALEGALS OR
```

```
 1     PEOPLE WHO WORK IN A LAW FIRM?

 2          I THINK MR. STOLZ HAS HIS HAND UP.  LET'S PASS THAT BACK

 3     UP TO MR. STOLZ.

 4               PROSPECTIVE JUROR:  TWO OF MY UNCLES ARE LAWYERS.

 5     THERE IS A THIRD CRIMINAL LAWYER.  THREE OF MY COUSINS ARE

 6     WORKER'S COMP LAWYERS, MY MOM IS A WORKER'S COMP LAWYER, AND MY

 7     MOM'S UNCLE IS A JUDGE.

 8               THE COURT:  OKAY.  WELL, WHERE SHOULD WE START?

 9          SO IS THERE ANYTHING ABOUT THOSE RELATIONSHIPS THAT IS

10     GOING TO AFFECT YOUR ABILITY TO BE FAIR TO BOTH SIDES HERE?

11               PROSPECTIVE JUROR:  NO.

12               THE COURT:  DO THEY TALK TO YOU ABOUT YOUR WORK?

13               PROSPECTIVE JUROR:  YES.

14               THE COURT:  WITH SOME REGULARITY?  IT SOUNDS LIKE

15     YOU HAVE AN INTERESTING THANKSGIVING DINNER.

16               PROSPECTIVE JUROR:  I MEAN, YEAH.  I WORK WITH THEM.

17               THE COURT:  IN THE WORKER'S COMP AREA?

18               PROSPECTIVE JUROR:  YEAH.

19               THE COURT:  AND DID YOU TELL US THAT ONE OF YOUR

20     RELATIVES IS A CRIMINAL DEFENSE LAWYER?

21               PROSPECTIVE JUROR:  YES.

22               THE COURT:  AND WHERE DOES THAT PERSON PRACTICE?

23               PROSPECTIVE JUROR:  PORTERVILLE, I THINK.

24               THE COURT:  DOWN IN TULARE COUNTY.

25               PROSPECTIVE JUROR:  YEAH.
```

1          THE COURT:  AND HOW LONG -- HE OR SHE.

2          PROSPECTIVE JUROR:  HE.

3          THE COURT:  HOW LONG HAS HE BEEN IN THAT PRACTICE?

4          PROSPECTIVE JUROR:  I DON'T KNOW.  I WOULD WAGER 30

5    LONG YEARS PROBABLY.

6          THE COURT:  IS HE IN THE PUBLIC DEFENDER'S OFFICE

7    THERE DO YOU KNOW?

8          PROSPECTIVE JUROR:  NO.

9          THE COURT:  PRIVATE PRACTICE?

10          PROSPECTIVE JUROR:  YEAH, YEAH, PRIVATE PRACTICE.

11          THE COURT:  OKAY.  DOES HE, WHEN YOU SEE HIM, DOES

12    HE TALK TO YOU ABOUT HIS WORK?

13          PROSPECTIVE JUROR:  I MEAN NOT -- WELL, NOT ANYTHING

14    TO --

15          THE COURT:  YES.  THANK YOU.  AND THEN THERE'S THE

16    JUDGE.

17          PROSPECTIVE JUROR:  YES.

18          THE COURT:  AND TELL US ABOUT THAT?

19          PROSPECTIVE JUROR:  WELL, I THINK HE'S DEAD AT THIS

20    POINT, BUT I, AGAIN, I THINK HE WAS DOWN IN SANTA BARBARA.

21          THE COURT:  AND I'M SORRY, HE'S DECEASED DID YOU

22    SAY?

23          PROSPECTIVE JUROR:  YES.

24          THE COURT:  AND DID YOU TALK TO HIM ABOUT HIS WORK

25    AS WELL?

1          PROSPECTIVE JUROR:  I MEAN, I WAS PRETTY YOUNG WHEN

2     I DID, BUT HE WOULD TALK ABOUT IT WITH THE FAMILY.

3          THE COURT:  OKAY.  AND YOU SOMEHOW FOUND AN

4     OPPORTUNITY TO AVOID LEGAL EDUCATION?

5          PROSPECTIVE JUROR:  WELL, IT'S STILL ON THE TABLE.

6     I'M A SENIOR.

7          THE COURT:  SENIOR IN?

8          PROSPECTIVE JUROR:  COLLEGE.

9          THE COURT:  COLLEGE.  AND WHAT IS YOUR MAJOR?

10         PROSPECTIVE JUROR:  PHILOSOPHY AND PHYSICS.

11         THE COURT:  WELL, THAT SOUNDS LIKE A PERFECT ENTRE

12    TO THE LAW.

13         WELL, IS THERE ANYTHING ABOUT YOUR FAMILY'S INVOLVEMENT IN

14    THE LEGAL PRACTICE THAT YOU THINK WILL IMPAIR YOUR ABILITY TO

15    BE FAIR AND IMPARTIAL TO BOTH SIDES IN THIS CASE?

16         PROSPECTIVE JUROR:  NO.

17         THE COURT:  CAN YOU BE FAIR TO BOTH SIDES?

18         PROSPECTIVE JUROR:  YEAH.

19         THE COURT:  OKAY.  THANK YOU.  ANYONE ELSE?

20         I SEE NO HANDS.

21         NOW, I'M PRESUMING YOU ALL HEARD ME, THOSE IN THE FRONT

22    ROW HEARD ME SPEAK ABOUT THE PRESUMPTION OF INNOCENCE AND THAT

23    IS THE LAW OF OUR COUNTRY AND THE ACCUSED IS PRESUMED TO BE

24    INNOCENT UNTIL THE CONTRARY IS PROVEN AND PROOF MUST BE BEYOND

25    A REASONABLE DOUBT.

1        IS THERE ANYONE HERE WHO HAS A QUARREL OR PARTS COMPANY

2   WITH THOSE CONCEPTS?

3        I SEE NO HANDS.

4        DO YOU UNDERSTAND THAT -- LET ME ASK THIS, IS THERE ANYONE

5   WHO DOES NOT UNDERSTAND THOSE TWO CONCEPTS?

6        I SEE NO HANDS.

7        YOU HEARD ME TALK ABOUT THE RIGHT OF AN ACCUSED NOT TO

8   TESTIFY BECAUSE OF THOSE BURDENS, BECAUSE THE GOVERNMENT HAS

9   THE BURDEN, THE DEFENSE MAY RELY ON THE STATE OF THE EVIDENCE

10  AS THE GOVERNMENT PRESENTS IT -- BECAUSE IT'S THEIR BURDEN AND

11  THE DEFENSE MAY RELY ON THE STATE OF THAT EVIDENCE AND NEED NOT

12  PRESENT ANY EVIDENCE.

13       DO YOU ALL UNDERSTAND -- IS THERE ANYONE WHO DOES NOT

14  UNDERSTAND THAT AN INDIVIDUAL DOES NOT HAVE TO TESTIFY IN A

15  CASE?  DOES ANYONE QUARREL WITH THAT CONCEPT?

16       I SEE NO HANDS.

17       YOU HEARD ME TALK ABOUT THE ISSUE OF PUNISHMENT AND WE HAD

18  SOME DISCUSSION WITH OTHER PROSPECTIVE JURORS ABOUT THE ISSUE

19  OF PUNISHMENT.

20       DO YOU ALL UNDERSTAND THAT PUNISHMENT MUST NEVER BE

21  CONSIDERED BY THE JURY IN THEIR DELIBERATIONS?  IS THERE ANYONE

22  WHO DOES NOT UNDERSTAND THAT?

23       I SEE NO HANDS.

24       IS THERE ANY ONE OF YOU THAT BECAUSE OF ANY MORAL,

25  PERSONAL OR RELIGIOUS BELIEFS FEELS THAT YOU CANNOT PARTICIPATE

1    IN A JURY WHERE YOU'RE CALLED UPON TO MAKE DECISIONS ABOUT

2    EVIDENCE THAT MIGHT RELATE TO AN INDIVIDUAL?

3        I SEE NO HANDS.

4        IF YOU ARE SEATED AS JURORS IN THIS CASE, WOULD ALL OF YOU

5    BE ABLE TO FOLLOW THE LAW AS THE COURT GIVES IT TO YOU AND

6    APPLY THAT LAW TO THE FACTS AS YOU FIND THEM IN THIS CASE?  IS

7    THERE ANYONE WHO CANNOT DO THAT?

8        I SEE NO HANDS.

9        IS THERE ANYTHING BY ANY OF THE QUESTIONS THAT I'VE ASKED

10   OR COUNSEL HAVE ASKED AND/OR THE ANSWERS OF THE OTHER

11   PROSPECTIVE JURORS THAT GIVES RISE IN ANY OF YOUR MINDS RIGHT

12   NOW TO AN ISSUE THAT YOU THINK MIGHT AFFECT YOUR ABILITY TO SIT

13   AS A FAIR AND IMPARTIAL JUROR IN THIS CASE?

14       AND LET'S SEE, LET'S START WITH MS. DOHERTY.  I'LL GET THE

15   MICROPHONE BACK TO YOU, MA'AM.

16       YES.

17           PROSPECTIVE JUROR:  SO I WORK FOR AN ACCOUNTING

18   FIRM, AND I WORK FAIRLY CLOSELY WITH THE I.R.S. AND SO I KNOW

19   THAT JUST BASED ON THE ORIGINAL, I CAN'T THINK OF THE WORD, THE

20   CASE.

21           THE COURT:  THE CHARGE?

22           PROSPECTIVE JUROR:  THE CHARGE.  I MAY BE IMPARTIAL

23   BECAUSE OF THE AMOUNT OF -- REGARDING THAT THE I.R.S. AS WELL

24   AS MY CLIENTS AND THEIR INFORMATION RELATED TO THE I.R.S.

25           THE COURT:  OKAY.  ALL RIGHT.  WELL, THANK YOU.  I

1    APPRECIATE YOU SHARING THAT WITH US.

2         SO YOU HEARD THE CHARGE.  YOU HEARD ME RECITE WHAT THE

3    CHARGE IS, AND, AGAIN, IT'S AN ALLEGATION.  THE GOVERNMENT HAS

4    TO PROVE IT.

5              PROSPECTIVE JUROR:  RIGHT.

6              THE COURT:  BUT I GUESS WHAT YOU'RE TELLING ME IS

7    BECAUSE YOU WORK SOMEWHAT INTIMATELY WITH THE INTERNAL REVENUE

8    SERVICE, THAT MIGHT GIVE YOU SOME --

9              PROSPECTIVE JUROR:  I MIGHT HAVE A BIAS.

10             THE COURT:  A BIAS?

11             PROSPECTIVE JUROR:  YEAH.

12             THE COURT:  OKAY.  WELL, I DON'T KNOW IF THERE'S --

13   I DON'T KNOW WHAT THE EVIDENCE IS GOING TO BE IN THE CASE.

14             PROSPECTIVE JUROR:  I DON'T EITHER.

15             THE COURT:  AND ARE YOU SUGGESTING THAT IF YOU -- IF

16   AN EMPLOYEE OF THE INTERNAL REVENUE SERVICE TESTIFIED IN THE

17   CASE, YOU MIGHT GIVE THAT WITNESS'S TESTIMONY GREATER WEIGHT

18   BECAUSE OF YOUR EXPERIENCE WITH THE I.R.S.?

19        IS THAT WHAT YOU'RE SAYING?

20             PROSPECTIVE JUROR:  NOT NECESSARILY.  I JUST THINK

21   THAT I JUST HOLD THE I.R.S. TO A CERTAIN LEVEL OF RESPECT FOR

22   WHAT THEY DO IN COMPLIANCE WITH WHAT I DO WITH MY CLIENTS.

23             THE COURT:  YES.

24             PROSPECTIVE JUROR:  AND SO I JUST MIGHT HAVE A BIAS.

25   I DON'T KNOW BUT IT WOULD REALLY DEPEND ON WHAT WAS --

1       THE COURT:  I DON'T THINK -- WHAT I KNOW OF THE CASE

2    IS THAT I DON'T THINK THERE IS GOING TO BE QUESTION ABOUT THE

3    I.R.S. AND THE I.R.S., THEIR FUNCTIONING, THEIR CAPABILITIES, I

4    DON'T THINK THERE'S GOING TO BE ANYTHING ABOUT WHETHER OR NOT

5    THE I.R.S. DID SOMETHING INCORRECTLY, INAPPROPRIATELY, THAT

6    TYPE OF THING.

7       AM I RIGHT IN THAT, COUNSEL?  POSSIBLY NOT.

8       MR. SCHENK:  YES, SIR.

9       THE COURT:  OKAY.  DO YOU WISH TO COMMENT ON THIS,

10   MR. ARCHER?

11       MR. ARCHER:  I DON'T, YOUR HONOR.  THANK YOU.

12       THE COURT:  I DON'T KNOW WHETHER OR NOT THERE WILL

13   BE -- WHETHER OR NOT THE CREDIBILITY OF THE I.R.S. AGENCY

14   ITSELF WILL BE AT ISSUE.

15       PROSPECTIVE JUROR:  RIGHT, RIGHT.

16       THE COURT:  BUT LET ME SUGGEST TO YOU THIS, WHENEVER

17   WITNESSES TESTIFY IN A CASE, THEIR CREDIBILITY IS ALWAYS AT

18   ISSUE AND BECAUSE AS JURORS, AS I TOLD THE OTHER PROSPECTIVE

19   JURORS, THE JOB OF A JUROR IS ACTUALLY TO BE A JUDGE, A JUDGE

20   OF THE FACTS AND TO DO THAT YOU GET -- IT'S IN YOUR, IT'S IN

21   YOUR STRIKE ZONE, SO TO SPEAK, TO JUDGE THE CREDIBILITY OF

22   WITNESSES.  SO YOU GET TO DO THAT, NOT THE AGENCY.

23       SO I THINK IN THIS CASE THERE MAY BE WITNESSES THAT

24   TESTIFY FROM AN AGENCY, BUT THE AGENCY'S CREDIBILITY PER SE IS

25   I DON'T THINK GOING TO BE AN ISSUE BUT THE CREDIBILITY OF THE

1    INDIVIDUAL WITNESS IS ALWAYS -- ANY TIME A WITNESS TESTIFIES,

2    THEIR CREDIBILITY IS AN ISSUE BECAUSE IT'S UP TO THE JURY TO

3    DECIDE WHETHER OR HOW MUCH TO BELIEVE AND WHAT TO BELIEVE AND

4    WHAT NOT TO BELIEVE, AND I WILL GIVE YOU PRE-INSTRUCTIONS AND

5    FINAL INSTRUCTIONS ON THOSE THINGS THAT YOU MAY CONSIDER AS

6    JURORS AS TO WITNESS'S TESTIMONY.

7        DOES THAT HELP YOU AT ALL, MA'AM?

8              PROSPECTIVE JUROR:  SURE.

9              THE COURT:  SO LET ME ASK YOU THE SEMINAL QUESTION,

10    CAN YOU BE FAIR TO BOTH SIDES IN THIS CASE?

11              PROSPECTIVE JUROR:  I BELIEVE I CAN.

12              THE COURT:  THANK YOU.  MS. RAMIREZ, DID YOU HAVE AN

13    ANSWER TO THIS QUESTION?

14              PROSPECTIVE JUROR:  NO.  BUT I DID NOTICE THAT THE

15    OTHER -- THE FIRST TIME YOU ASKED ABOUT SCHEDULE CONFLICTS.

16              THE COURT:  YES.

17              PROSPECTIVE JUROR:  AND I HAVEN'T HEARD THAT

18    QUESTION YET.

19              THE COURT:  OH, WELL, NOW IS THE TIME.

20              PROSPECTIVE JUROR:  I AM FLYING TO MIAMI ON

21    SEPTEMBER 3RD AT 5:30, AND I PURCHASED MY TICKET ABOUT

22    THREE MONTHS AGO.

23              THE COURT:  YOU'RE TELLING ME THAT'S THE CURRENT

24    PLAN?

25              PROSPECTIVE JUROR:  THAT IS THE PLAN.

1           THE COURT:  AND I'M SORRY, YOUR PLANE LEAVES WHEN?

2           PROSPECTIVE JUROR:  5:30 P.M. ON SEPTEMBER 3RD OUT

3      OF SAN JOSE.

4           THE COURT:  OKAY.  THANK YOU FOR LETTING ME KNOW

5      THAT.

6         ANYONE ELSE AS TO ANY OTHER ISSUE IN THE FRONT ROW HERE,

7      ANY OTHER ISSUE AS TO YOUR ABILITY TO SERVE AS A JUROR IN THIS

8      CASE?

9         I SEE NO HANDS.

10        MR. SCHENK, DO YOU HAVE QUESTIONS?

11             MR. SCHENK:  NO, YOUR HONOR.  THANK YOU.

12             THE COURT:  MR. ARCHER.

13             MR. ARCHER:  YES, YOUR HONOR.  THANK YOU.

14        GOOD AFTERNOON, FOLKS.

15        MR. LAW, IF I COULD START WITH YOU.  IF YOU COULD GRAB THE

16     MICROPHONE THERE.  AND ON YOUR WRITTEN JUROR QUESTIONNAIRE YOU

17     STATED THAT YOU HAD CONCERNS ABOUT BEING FAIR AND IMPARTIAL

18     BECAUSE YOU BELIEVE THAT LAW ENFORCEMENT OFFICERS ARE ALWAYS

19     RIGHT AND CORRECT WHEN THEY'RE PROSECUTING CERTAIN TYPE OF

20     CRIMINALS.

21             PROSPECTIVE JUROR:  YES.

22             MR. ARCHER:  AND YOUR OPINION HAS NOT CHANGED ABOUT

23     THAT SINCE YOU WROTE THIS?

24             PROSPECTIVE JUROR:  NO.

25             MR. ARCHER:  OKAY.  IT SEEMS LIKE A PRETTY ABSOLUTE

```
 1        BELIEF.  IS THAT FAIR TO SAY?

 2                  PROSPECTIVE JUROR:  WELL, 80 PERCENT.

 3                  MR. ARCHER:  OKAY.  BUT IS IT FAIR TO SAY THAT IF

 4        YOU WERE PRESENTED, AND YOU MAY HAVE HEARD ME ASK THIS OF OTHER

 5        JURORS PREVIOUSLY, BUT IF YOU HAVE TWO WITNESSES WHO PRESENT TO

 6        YOU AND THERE IS NOTHING DISTINGUISHING THEM OTHER THAN ONE IS

 7        A POLICE OFFICER AND THEY'RE SAYING THINGS COMPLETELY OPPOSITE

 8        OF THE OTHER, WHOSE TESTIMONY WOULD YOU BELIEVE?

 9                  PROSPECTIVE JUROR:  THE LAW ENFORCEMENT OFFICER.

10                  MR. ARCHER:  OKAY.  IT SOUNDS LIKE THAT'S -- AND

11        THERE'S NO REAL HESITATION THERE?

12                  PROSPECTIVE JUROR:  NO.

13                  MR. ARCHER:  OKAY.  THANK YOU.  I'D LIKE TO ASK THIS

14        TO THE FOLKS IN THE FRONT ROW BUT IF ANYONE ELSE WANTS TO SPEAK

15        UP AS WELL.

16            IS THERE ANYONE HERE THAT HAS QUESTIONS ABOUT A

17        DEFENDANT'S RIGHT NOT TO TESTIFY?

18            SO LET'S SAY THAT MR. YORK IN THIS CASE DOES NOT TESTIFY

19        TO EXPLAIN THINGS.  IS THAT GOING TO BOTHER ANYBODY?  DO THEY

20        WANT TO HEAR BOTH SIDES OF THE STORY AND THAT SORT OF THING?

21        DOES THAT RAISE ANY QUESTIONS FOR ANYBODY?

22            EVERYONE UNDERSTANDS WHAT THE JUDGE IS EXPLAINING IS THAT

23        IT'S NOT HIS BURDEN TO DO SO?

24            OKAY.  THAT'S ALL, YOUR HONOR.  THANK YOU FOR YOUR TIME.

25                  THE COURT:  MR. ARCHER, DO YOU PASS FOR CAUSE?
```

```
 1              MR. ARCHER:  NO, YOUR HONOR.

 2              THE COURT:  ALL RIGHT.  I'LL SEE COUNSEL AT THE

 3     SIDE-BAR.

 4          (SIDE-BAR CONFERENCE ON THE RECORD.)

 5              THE COURT:  WE'RE AT SIDE-BAR WITH COUNSEL.

 6              MR. ARCHER:  I WOULD CHALLENGE MR. LAW FOR CAUSE.

 7     HE HAS MADE AN UNEQUIVOCAL STATEMENT THAT HE BELIEVES LAW

 8     ENFORCEMENT OFFICERS OVER OTHER PEOPLE AND IN ADDITION, AS I

 9     STATED ON THE RECORD BEFORE, HE SAYS THAT LAW ENFORCEMENT

10     OFFICERS ARE ALWAYS RIGHT AND CORRECT WHEN THEY PROSECUTE ANY

11     TYPE OF CRIMINALS.

12              THE COURT:  DO YOU WISH TO BE HEARD?

13              MR. SCHENK:  NO OBJECTION.

14              THE COURT:  OKAY.  I'LL EXCUSE HIM, MR. LAW.

15          LET ME SPEAK TO MS. RAMIREZ.  SHE HAS A 5:30 FLIGHT ON THE

16     3RD.  I KNOW -- I THINK IT'S MS. CHENG HAS JOB INTERVIEWS ON

17     THE 3RD IN THE MORNING AND AT 3:00 P.M.

18              MR. ARCHER:  BOTH OF THEM SEEM, FROM OUR

19     PERSPECTIVE, IT SEEMS PROBLEMATIC.  IF WE HAVE TWO JURORS THAT

20     ARE POTENTIALLY GONE EITHER ON THE 3RD OR AFTER THE 3RD, I

21     THINK WE RUN INTO DANGER, NOT IF THE EVIDENCE IS STILL GOING AT

22     THAT POINT BUT DELIBERATIONS.

23              THE COURT:  WELL, WE DON'T KNOW HOW -- IT SOUNDS

24     LIKE THE 3RD WOULD -- WHAT I UNDERSTAND THE 3RD THEY WOULD BE

25     IN DELIBERATIONS AS OPPOSED TO EVIDENCE.
```

```
1                    MR. ARCHER:  I WOULD AGREE.

2                    MR. SCHENK:  YES, IF THEY'RE STILL IN DELIBERATIONS.

3                    THE COURT:  SO AS TO MS. CHENG, THEY CAN ADJUST

4     THEIR SCHEDULES TO ACCOMMODATE HER IF SHE REMAINS AS A JUROR TO

5     ACCOMMODATE HER AND MS. RAMIREZ LEAVING AT 5:30.

6          SO I WILL THANK AND EXCUSE MR. LAW, AND MS. GARCIA WILL

7     FILL HIS SEAT, AND WE'LL DO QUESTIONING FOR THIS NEW PERSON AND

8     ABSENT ANYTHING ELSE WE'LL START THE PROCESS AGAIN.

9                    MR. ARCHER:  ALL RIGHT.

10                   THE COURT:  THANK YOU.

11         (END OF DISCUSSION AT SIDE-BAR.)

12                   THE COURT:  MR. LAW, I'M GOING TO EXCUSE YOU.  THANK

13    YOU.  LEAVE THE MICROPHONE AND THE SCHEDULE THERE.

14         AND, MS. GARCIA, IF YOU COULD CALL OUT ANOTHER NAME.

15                   THE CLERK:  FOLAHAN AKINDELE.

16                   THE COURT:  GOOD AFTERNOON, MS. AKINDELE.

17                   PROSPECTIVE JUROR:  YES, AKINDELE.

18                   THE COURT:  THANK YOU.  GOOD AFTERNOON.

19         WERE YOU ABLE TO HEAR THE QUESTIONS THAT I POSED AND

20    COUNSEL POSED AND THE ANSWERS OF THE OTHER PROSPECTIVE JURORS?

21                   PROSPECTIVE JUROR:  YES.

22                   THE COURT:  IS THERE ANYTHING ABOUT THE DURATION OF

23    THIS TRIAL THAT WOULD CAUSE YOU EXTREME DIFFICULTY TO SIT AS A

24    JUROR?

25                   PROSPECTIVE JUROR:  NO.
```

```
 1                    THE COURT:  ALL RIGHT.  DO YOU KNOW ANY OF THE

 2      PARTIES IN THIS CASE, THE LAWYERS, WITNESSES?

 3                    PROSPECTIVE JUROR:  NO.

 4                    THE COURT:  DO YOU KNOW ANYTHING ABOUT THIS CASE,

 5      READ ANYTHING?

 6                    PROSPECTIVE JUROR:  OKAY.  THANK YOU.

 7                    THE COURT:  YOU HEARD ME TALK ABOUT THE PRESUMPTION

 8      OF INNOCENCE.

 9                    PROSPECTIVE JUROR:  YES.

10                    THE COURT:  DO YOU HAVE ANY QUARREL WITH THAT

11      CONCEPT?

12                    PROSPECTIVE JUROR:  NOT AT ALL.

13                    THE COURT:  YOU HEARD ME TALK ABOUT THE BURDEN THAT

14      THE GOVERNMENT HAS TO OVERCOME THAT PRESUMPTION AND THAT MEANS

15      THAT THEY GO FIRST, THEY MUST PUT EVIDENCE ON, AND IT ALSO

16      MEANS CONCURRENT WITH THAT IS THAT THE ACCUSED NEED NOT TESTIFY

17      IF HE OR SHE DECIDES NOT TO DO THAT.

18         DO YOU UNDERSTAND THAT?

19                    PROSPECTIVE JUROR:  ABSOLUTELY.

20                    THE COURT:  DO YOU HAVE ANY QUARREL WITH THOSE

21      CONCEPTS.

22                    PROSPECTIVE JUROR:  NO.

23                    THE COURT:  AND DO YOU HAVE ANY RELATIVES OR FRIENDS

24      THAT ARE EMPLOYED IN LAW ENFORCEMENT OR ANY TYPE OF LAW

25      ENFORCEMENT AGENCY?
```

1                    PROSPECTIVE JUROR:  NO, SIR.

2                    THE COURT:  WOULD YOU GIVE GREATER OR LESSER

3       CREDENCE TO A WITNESS'S TESTIMONY JUST BECAUSE THEY MIGHT BE

4       EMPLOYED WITH LAW ENFORCEMENT OR A LAW ENFORCEMENT ACTION?

5                    PROSPECTIVE JUROR:  THEY'RE JUST LIKE ME, NO.

6                    THE COURT:  OKAY.  DO YOU HAVE ANY FAMILY, FRIENDS,

7       RELATIVES, WHO ARE EMPLOYED IN THE LAW, THAT IS, AS LAWYERS,

8       PARALEGALS, ASSISTANTS?

9                    PROSPECTIVE JUROR:  NO.

10                    THE COURT:  HAVE YOU HAD ANY PRIOR JURY EXPERIENCE?

11                    PROSPECTIVE JUROR:  THIS IS MY FIRST TIME.

12                    THE COURT:  HAVE YOU EVER BEEN CALLED UPON IN ANY

13       TYPE OF A CASE TO SERVE AS A WITNESS, AS A VICTIM OR A

14       PARTICIPANT IN A CASE EITHER CRIMINAL OR CIVIL?

15                    PROSPECTIVE JUROR:  NO, SIR.

16                    THE COURT:  IS THERE ANYTHING THAT COMES TO YOUR

17       MIND THAT YOU THINK YOU WOULD LIKE ME TO KNOW THAT MIGHT BEAR

18       ON YOUR ABILITY TO BE FAIR AND IMPARTIAL AND SIT AS A JUROR IN

19       THIS CASE?

20                    PROSPECTIVE JUROR:  CAN YOU REPEAT THAT ONE MORE

21       TIME, PLEASE.

22                    THE COURT:  SURE.  IS THERE ANYTHING THAT COMES TO

23       YOUR MIND THAT YOU WOULD LIKE ME TO KNOW THAT MIGHT AFFECT, IN

24       YOUR OPINION, YOUR ABILITY TO SIT AS A FAIR AND IMPARTIAL JUROR

25       IN THIS CASE?

```
 1                    PROSPECTIVE JUROR:  NOT THAT I CAN THINK OF RIGHT

 2     NOW.

 3                    THE COURT:  CAN YOU BE FAIR TO BOTH SIDES?

 4                    PROSPECTIVE JUROR:  ABSOLUTELY.

 5                    THE COURT:  OKAY.  THANK YOU.  COUNSEL, ANY

 6     QUESTIONS?

 7                    MS. PENNA:  NO, YOUR HONOR.

 8                    THE COURT:  MR. ARCHER?

 9                    MR. ARCHER:  NO, YOUR HONOR.

10                    THE COURT:  OKAY.  YOU PASS FOR CAUSE?

11                    MS. PENNA:  YES.

12                    MR. ARCHER:  YES.

13                    THE COURT:  OKAY.  SO, FOLKS, THE LAWYERS ARE GOING

14     TO ENGAGE IN THE PROCESS AGAIN OF FINALIZING OR MAKING THE

15     SELECTIONS AS TO THE JURY.

16         AGAIN, YOU CAN TAKE A STANDING BREAK IF YOU WOULD LIKE TO

17     STAND AND STRETCH FOR A MOMENT.

18         MS. AKINDELE, OUR COURTROOM DEPUTY WILL COLLECT THE

19     MICROPHONE.

20                    PROSPECTIVE JUROR:  THANK YOU.

21         (PAUSE IN PROCEEDINGS.)

22                    THE COURT:  CAN I SEE COUNSEL FOR JUST A SEC.

23         OKAY.  WE'RE AT SIDE-BAR WITH COUNSEL.  IT APPEARS WE HAVE

24     A JURY OF 12.  I'LL ASK MS. GARCIA TO ANNOUNCE THE NAMES OF

25     THOSE WHO HAVE BEEN SELECTED.  WE'LL HAVE THEM SWORN AND GET
```

1    THE JURY PROPERLY SWORN, AND THEN WE'LL SELECT TWO ALTERNATES

2    SO EACH OF YOU WILL HAVE ONE CHALLENGE.

3         SO THAT LEAVES, THEN, FOUR PEOPLE AVAILABLE, THAT WOULD BE

4    MR. MCNAMARA, MR. WOOD, PHAN, AND NUNES I THINK WOULD BE THE

5    FOUR PEOPLE THAT WE NEXT ADDRESS.

6         I'LL KEEP EVERYBODY ELSE, AND WE'LL SEE WHAT HAPPENS BUT

7    THOSE ARE THE FOUR THAT YOU WOULD CHOOSE FROM AND OUT OF THE

8    FOUR WOULD BE THE ALTERNATES.

9         DOES THAT MAKE SENSE?

10         MR. SCHENK:  YES.

11         THE COURT:  SO, MS. GARCIA, IF YOU COULD ANNOUNCE

12    THE NAMES.

13         THANK YOU, COUNSEL.

14         (END OF DISCUSSION AT SIDE-BAR.)

15         THE COURT:  SO, LADIES AND GENTLEMEN, THE LAWYERS

16    HAVE REACHED AGREEMENT AS TO WHO THE 12 MEMBERS OF OUR JURY

17    WILL BE.  EXCUSE ME.

18         I'LL ASK MS. GARCIA TO PLEASE SING OUT THOSE NAMES.

19    SHE'LL ANNOUNCE THOSE NAMES NOW SO DO LISTEN CLOSELY TO THESE

20    NAMES AS THEY ARE CALLED.

21         MS. GARCIA, IF YOU COULD CALL OUT THOSE INDIVIDUALS WHO

22    HAVE BEEN SELECTED TO SIT AS JURORS IN THIS CASE.

23         THE CLERK:  BRADLEY DUVERNAY; ALONZO SPENCER;

24    BAMBI SALAMIDA; JOSEPH STOLZ; DINAH CHENG; VICKEY VILLARREAL;

25    YVONNE MCGUIRE; LUIS GUZMAN; MARGARET JOHANSON;

```
1        BARBARA VAN WINKLE; PHYLLIS ROMITO; CHARLES BAUGHMAN.

2             (PAUSE IN PROCEEDINGS.)

3                  THE COURT:  LET ME ASK OF THOSE INDIVIDUALS WHOSE

4        NAMES WERE CALLED, IF YOU COULD PLEASE STAND AND RAISE YOUR

5        RIGHT HAND, MS. GARCIA WILL ADMINISTER THE OATH FOR THE JURORS.

6                  THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

7             (SELECTED JURORS WERE GIVEN THE OATH.)

8                  SELECTED JUROR:  I DO.

9                  THE COURT:  THANK YOU.  PLEASE BE SEATED.

10        NOW I AM ALSO GOING TO THANK AND EXCUSE THE FOLLOWING

11        INDIVIDUALS:  MR. HO, THANK YOU, SIR;

12        MR. CHU, THANK YOU, SIR;

13        MR. TEO, THANK YOU, SIR.

14                 PROSPECTIVE JUROR:  TAKE THE CARD WITH ME?

15                 THE COURT:  YES, YOU CAN LEAVE.  THANK YOU.

16        MS. DOHERTY, THANK YOU;

17        MS. RAMIREZ; AND,

18        MS. AKINDELE.

19                 PROSPECTIVE JUROR:  AKINDELE.

20                 THE COURT:  AKINDELE, THANK YOU.

21        MR. WOOD, MS. PHAN, MS. NUNES, MR. PEREZ, AND

22        MS. CRIVELLO, OR PARDON ME, MR. MCNAMARA, OH, YOU CAN STAY.

23        NO, NO.

24        BUT WHAT YOU CAN DO, MR. MCNAMARA, WHY DON'T YOU COME DOWN

25        AND SIT NEXT TO MR. WOOD.
```

1        AS I TOLD YOU AT THE BEGINNING, WE'RE GOING TO SELECT TWO

2    ALTERNATES FOR THIS JURY, AND I RECOGNIZE THAT THIS IS, AS I'VE

3    INDICATED TO YOU, IT'S A BRIEF, A BRIEF TRIAL, BUT I THINK OUT

4    OF AN ABUNDANCE OF CAUTION WE'RE GOING TO SELECT TWO ALTERNATES

5    TO SIT.

6        NOW, YOU HEARD ME TALK A LITTLE BIT ABOUT THE ALTERNATE

7    EARLY ON AND I'M GOING TO SPEAK ABOUT THREE MINUTES, AND I DO

8    THIS BY TAKING US BACK TO JUNE 2, 1925, AND THE IMPORTANCE OF

9    THAT DATE IS THAT THERE WAS A BASEBALL GAME, AND IT INVOLVED

10   THE NEW YORK YANKEES.

11       AND THE MANAGER THEN WAS A MANAGER, HIS NAME IS MILLER

12   HUGGINS.  AND THIS HAS OFTEN BEEN REFERRED TO AS "THE FAMOUS

13   HEADACHE OF SPORTS."  YOU SEE, WALLY PIPP WAS THE FIRST BASEMAN

14   FOR THAT TEAM, AND WALLY PIPP WAS A PRETTY GOOD BASEBALL

15   PLAYER.

16       NOW, ON JUNE 2ND, 1925, HE GOT A HEADACHE AND HE TOLD THE

17   MANAGER I GOT A HEADACHE AND I JUST DON'T FEEL LIKE PLAYING

18   TODAY.  SO MILLER HUGGINS LOOKED DOWN HIS BENCH AND HE SAW A

19   YOUNG MAN, A RECENT GRAD OF COLUMBIA UNIVERSITY, AND HE POINTED

20   HIS FINGER AT HIM, I'M TOLD, HE SAID GEHRIG, GET IN THERE.  AND

21   SO LOU GEHRIG WENT IN THERE AND PLAYED FIRST BASE.

22       WALLY PIPP NEVER PLAYED FIRST BASE AGAIN FOR THE

23   NEW YORK YANKEES.  HE WAS TRADED A YEAR OR TWO LATER TO

24   CINCINNATI.  AND HE PLAYED 2,137 CONSECUTIVE GAMES, THE IRON

25   MAN.  I THINK IN 1995 A YOUNG-UP STARTED NAMED CAL RIPKEN WHO

1       PLAYED FOR BALTIMORE AND BROKE THAT RECORD.

2           BUT IT STOOD FOR ALL OF THAT TIME FOR ALL OF THOSE YEARS

3       FROM 1925 UNTIL MAY 2ND, 1930, WHEN LOU GEHRIG FINALLY RETIRED.

4       AND, OF COURSE, WE KNOW LOU GEHRIG -- THE REASONS FOR HIS

5       RETIREMENT.

6           SO I TELL YOU THAT LITTLE VIGNETTE JUST TO EMPHASIZE THE

7       IMPORTANCE OF BEING AN ALTERNATE.  WHEN I CALL IT BEING THE

8       LOU GEHRIG, IT MAY BE THAT YOU WILL SIT, YOU WILL SIT AS AN

9       ALTERNATE THROUGH THE TRIAL, AND YOU'LL HEAR THE EVIDENCE, AND

10      YOU'LL SIT IN THE BOX, AND YOU'LL HEAR THE EVIDENCE.

11          IF DURING THE COURSE OF THE TRIAL ONE OF OUR SEATED 12 IS

12      UNABLE TO PARTICIPATE FOR WHATEVER REASON, THE ALTERNATES WOULD

13      ASSUME THAT ROLE AND THEN WOULD TAKE THAT PLACE.

14          AT THE CONCLUSION OF THE CASE, THE 12 MEMBERS OF THE JURY

15      WOULD RETIRE TO DELIBERATE THE CASE.  THE ALTERNATES WOULD NOT

16      GO IN.  THE ALTERNATE WOULD ONLY REPLACE A SITTING JUROR IF AND

17      WHEN THAT JUROR IS, FOR WHATEVER REASON, IS UNABLE TO

18      PARTICIPATE AND THEN HE WOULD SUBSTITUTE THE ALTERNATE JUROR

19      FOR THE SITTING JUROR AND THE DELIBERATIONS WOULD START ANEW.

20          NOW, HAVING DESCRIBED THE JOB OF AN ALTERNATE, I'M LOOKING

21      AT OUR JURORS IN THE FRONT ROW HERE BECAUSE THIS IS THE JOB

22      TITLE AND THE DESCRIPTION THAT YOU'RE BEING INTERVIEWED FOR, IF

23      YOU WILL.  DO ALL OF YOU ACCEPT THOSE DUTIES AND OBLIGATIONS OF

24      AN ALTERNATE JUROR?  IS THERE ANYONE WHO WOULD NOT DO THAT?

25          I SEE NO HANDS.

1          ANY QUESTIONS, MR. SCHENK?

2              MS. PENNA:  NO, YOUR HONOR.

3              THE COURT:  MR. ARCHER?

4              MR. ARCHER:  NO, YOUR HONOR.

5              THE COURT:  DO WE HAVE THE --

6          (SIDE-BAR CONFERENCE ON THE RECORD.)

7              MR. ARCHER:  I THINK WE'VE AGREED ON SOMETHING.

8      WE'LL TAKE THE ORDER.

9              THE COURT:  SO IT'S MR. MCNAMARA AND MR. WOOD?

10             MR. ARCHER:  YES.

11             THE COURT:  OKAY.  THANK YOU.  THANK YOU, COUNSEL.

12         (END OF DISCUSSION AT SIDE-BAR.)

13             THE COURT:  LADIES AND GENTLEMEN, I'VE BEEN INFORMED

14     THAT THE LAWYERS HAVE REACHED AGREEMENT AS TO WHO THOSE

15     ALTERNATE JURORS SHOULD BE AND THOSE ALTERNATE JURORS ARE

16     MR. MCNAMARA AND MR. WOOD; IS THAT CORRECT, COUNSEL?

17             MS. PENNA:  YES, YOUR HONOR.

18             MR. SCHENK:  YES, YOUR HONOR.

19             MR. ARCHER:  YES.

20             THE COURT:  AND SO YOU GENTLEMEN WILL BE THE

21     ALTERNATE JURORS IN THE CASE, AND WE HAVE A SPECIAL OATH FOR

22     YOU SO IF YOU WOULD STAND AND RAISE YOUR RIGHT HAND, PLEASE.

23         (ALTERNATE JURORS WERE GIVEN THE OATH.)

24             PROSPECTIVE JUROR:  I DO.

25             THE COURT:  SO, LADIES AND GENTLEMEN, WE DO HAVE OUR

1    JURY, AND WE HAVE OUR ALTERNATES.  I'M LOOKING AT -- IN JUST A

2    MOMENT I'M GOING TO TAKE A RECESS, BUT I'M LOOKING OUT AT THOSE

3    PROSPECTIVE JURORS WHO REMAIN IN THE AUDIENCE, AND I SEE

4    GRIMACES.  I SEE LOOKS OF DISAPPOINTMENT BECAUSE YOU WERE --

5    I'M SERIOUS ABOUT THIS.  THAT'S WHAT I SEE IN YOU.  I SEE

6    DISAPPOINTMENT THAT YOU WERE NOT CALLED FORWARD TO PARTICIPATE

7    TODAY IN A MANNER THAT THESE OTHER JURORS ARE IN YOUR JUSTICE

8    SYSTEM.

9        I WANT TO THANK YOU FOR COMING IN AND SPENDING THE BETTER

10   PART OF THE DAY WITH US.  I HOPE YOU ENJOYED THE EXPERIENCE,

11   AND I HOPE YOU LEARNED SOMETHING FROM THIS EXPERIENCE.  I HOPE

12   YOUR TAKEAWAY FROM THIS EXPERIENCE IS TO RECOGNIZE JUST HOW

13   CHERISHED OUR JUDICIAL SYSTEM IS AND HOW ADMIRED IT IS AROUND

14   THE WORLD.

15       SO I WANT TO THANK YOU VERY MUCH FOR COMING IN.  YOU ARE

16   EXCUSED.  THOSE OF YOU IN THE AUDIENCE, YOU'RE EXCUSED AND YOU

17   MAY GO.  THANK YOU.

18       NOW, WHAT WE'RE GOING TO DO -- AND I'M ADDRESSING OUR

19   JURORS AND ALTERNATE JURORS.  WE'LL TAKE ABOUT A 15 MINUTE

20   RECESS NOW.  WE'LL TRY TO DO SOME REORGANIZING.

21       AND MS. GARCIA WILL BRING YOU UP SHORTLY.  SHE MAY HAVE A

22   CONVERSATION WITH YOU ABOUT SEATING ARRANGEMENTS AND THOSE

23   TYPES OF THINGS.

24       PLEASE BE SEATED, COUNSEL.  THANK YOU.

25       WHAT I'D LIKE TO DO THIS AFTERNOON, AS I INDICATED, IS I

1    WOULD LIKE TO PRE-INSTRUCT YOU, GIVE YOU SOME PRELIMINARY

2    INSTRUCTIONS AS TO WHAT IS GOING TO HAPPEN.

3         I SEE THAT MS. PHAN, MS. NUNES, MR. PEREZ, AND

4    MS. CRIVELLO IS WONDERING WHY AM I HERE.  YOU ALSO WILL BE FREE

5    TO GO IN JUST A MOMENT, AND I DO WANT TO THANK YOU ALSO FOR

6    YOUR PARTICIPATION.

7         SO WE'LL TAKE A RECESS.

8         MS. GARCIA WILL COLLECT YOU, THOSE OF YOU WHO ARE

9    REMAINING IN OUR JURY, DOWNSTAIRS AGAIN IN THE JURY ASSEMBLY

10   ROOM, PLEASE, AND SHE'LL COLLECT YOU DOWN THERE, AND WE DON'T

11   HAVE TIME TO HAVE SEATING ARRANGEMENTS.

12        AND I WILL PRE-INSTRUCT AND IT'S QUITE LIKELY THAT WE'LL

13   ENGAGE OPENING STATEMENTS.  SO WE'LL BE IN RECESS.  THANK YOU

14   VERY MUCH.

15        (JURY OUT AT 2:19 P.M.)

16            THE COURT:  PLEASE BE SEATED, COUNSEL.  THANK YOU.

17   ALL RIGHT.  THE RECORD SHOULD REFLECT THAT THE JURY AND

18   ALTERNATES HAVE LEFT THE COURTROOM.  WE'RE IN RECESS NOW.

19        WHAT I JUST WANTED TO GO OVER WITH IS THE SCHEDULE FOR THE

20   REST OF THE DAY.  IT'S ABOUT 2:20 NOW.  I EXPECT THAT WE'LL

21   COME BACK AND HOPEFULLY START ABOUT 2:40.  I'LL PRE-INSTRUCT.

22   THAT TAKES ABOUT 20 MINUTES MAYBE, NOT EVEN.

23        AND THEN MY PLAN IS TO MOVE INTO OPENING STATEMENTS.  ARE

24   WE READY TO DO THAT?

25            MR. ARCHER:  YES, YOUR HONOR.

```
1              MS. PENNA:  YES, YOUR HONOR.

2              THE COURT:  OKAY.  I DON'T KNOW HOW LONG.  DO YOU

3     HAVE AN ESTIMATE ABOUT TIME WISE AS TO --

4              MS. PENNA:  TEN MINUTES.

5              MR. ARCHER:  SOMEWHERE BETWEEN FIVE MINUTES AND A

6     COUPLE HOURS BUT PROBABLY CLOSER TO FIVE MINUTES.

7              THE COURT:  SO DOES THE GOVERNMENT HAVE A WITNESS,

8     THEN, TO BEGIN WITH TODAY?

9              MS. PENNA:  YES, YOUR HONOR.

10             THE COURT:  OKAY.  GREAT.  ANYTHING ELSE ANYONE

11    WANTS TO PUT ON THE RECORD?

12             MR. ARCHER:  NO, YOUR HONOR.

13             MR. SCHENK:  NO.

14             THE COURT:  SO AT THE END OF THE DAY TODAY WE'RE

15    STILL LEFT WITH OUR THURSDAY DILEMMA AS TO WHAT I SHOULD INFORM

16    THE JURY.

17         RECOGNIZING THAT WE'LL PROBABLY START THE TESTIMONY OF THE

18    WITNESS BY 3:30 I WOULD ASSUME, IT SOUNDS LIKE, 3:30.  WILL WE

19    CAPTURE ALL OF THIS WITNESS'S TESTIMONY TODAY DO YOU THINK?

20             MR. SCHENK:  I'M NOT SURE ABOUT CROSS, BUT I WOULD

21    THINK THAT WE COULD DO -- THE COURT GOES UNTIL 4:30 OR 5:00?

22             THE COURT:  RIGHT.  OKAY.

23             MR. ARCHER:  I'M NOT SURE.  I THINK IT DEPENDS ON

24    HOW LONG, OF COURSE, THE DIRECT IS, BUT I DON'T EXPECT IT TO BE

25    A PARTICULARLY PROLONGED EXAMINATION SO I THINK IT'S POSSIBLE.
```

```
 1                THE COURT:  WE'LL JUST SEE.  OKAY.  GREAT.  ALL

 2   RIGHT.  THANK YOU.  WE'LL BE IN RECESS.

 3           (RECESS FROM 2:21 P.M. UNTIL 2:56 P.M.)

 4                THE COURT:  THANK YOU.  PLEASE BE SEATED.  THANK YOU

 5   AGAIN FOR YOUR COURTESY.

 6           WE'RE BACK ON THE RECORD IN THE YORK MATTER.  COUNSEL ARE

 7   PRESENT AND THE JURY AND THE ALTERNATES ARE PRESENT.  GOOD

 8   AFTERNOON, LADIES AND GENTLEMEN.  IT IS MY INTENTION TO

 9   PRE-INSTRUCT YOU AT THIS TIME.

10           LADIES AND GENTLEMEN, YOU ARE NOW THE JURY IN THIS CASE,

11   AND I WANT TO TAKE A FEW MINUTES TO TELL YOU SOMETHING ABOUT

12   YOUR DUTIES AS JURORS AND TO GIVE YOU SOME PRELIMINARY

13   INSTRUCTIONS.

14           AT THE END OF THE TRIAL I WILL GIVE YOU MORE DETAILED

15   INSTRUCTIONS THAT WILL CONTROL YOUR DELIBERATIONS, AND AS I

16   PREVIOUSLY INDICATED, EACH OF YOU WILL HAVE A COPY OF THE JURY

17   INSTRUCTIONS TO TAKE INTO THE JURY ROOM WITH YOU.

18           WHEN YOU DELIBERATE, IT WILL BE YOUR DUTY TO WEIGH AND TO

19   EVALUATE ALL OF THE EVIDENCE RECEIVED IN THE CASE AND IN THAT

20   PROCESS TO DECIDE THE FACTS.

21           TO THE FACTS AS YOU FIND THEM YOU WILL APPLY THE LAW AS I

22   GIVE IT TO YOU, WHETHER YOU AGREE WITH THE LAW OR NOT.  YOU

23   MUST DECIDE THE CASE SOLELY ON THE EVIDENCE AND THE LAW BEFORE

24   YOU AND MUST NOT BE INFLUENCED BY ANY PERSONAL LIKES OR

25   DISLIKES, OPINIONS, PREJUDICES OR SYMPATHY.
```

1          PLEASE DO NOT TAKE ANYTHING THAT I MAY SAY OR DO DURING

2     THE TRIAL AS INDICATING WHAT I THINK OF THE EVIDENCE OR WHAT

3     YOUR VERDICT SHOULD BE.  THAT IS ENTIRELY UP TO YOU.

4          THIS IS A CRIMINAL CASE BROUGHT BY THE UNITED STATES

5     GOVERNMENT.  THE GOVERNMENT CHARGES THE DEFENDANT IN COUNT 1

6     WITH A VIOLATION OF 18 UNITED STATES CODE SECTION 912, FALSE

7     IMPERSONATION OF AN EMPLOYEE OF THE UNITED STATES; AND IN COUNT

8     2 WITH A VIOLATION OF 47 UNITED STATES CODE SECTION

9     223(A)(1)(C), TELECOMMUNICATIONS DEVICE HARASSMENT.

10          THE CHARGES AGAINST THE DEFENDANT ARE CONTAINED IN AN

11     INDICTMENT.  THE INDICTMENT SIMPLY DESCRIBES THE CHARGES THAT

12     THE GOVERNMENT BRINGS AGAINST THE DEFENDANT.  THE INDICTMENT IS

13     NOT EVIDENCE AND DOES NOT PROVE ANYTHING.

14          THE DEFENDANT HAS PLEADED NOT GUILTY TO THE CHARGES AND IS

15     PRESUMED INNOCENT UNLESS AND UNTIL THE GOVERNMENT PROVES THE

16     DEFENDANT GUILTY BEYOND A REASONABLE DOUBT.

17          IN ADDITION, THE DEFENDANT HAS THE RIGHT TO REMAIN SILENT

18     AND NEVER HAS TO PROVE INNOCENCE OR TO PRESENT ANY EVIDENCE.

19          NOW, IN ORDER TO HELP YOU FOLLOW THE EVIDENCE, I JUST WANT

20     TO GIVE YOU A BRIEF SUMMARY OF THE ELEMENTS OF THE OFFENSES

21     WHICH THE GOVERNMENT MUST PROVE TO MAKE ITS CASE.

22          AND, LADIES AND GENTLEMEN, AGAIN, THIS IS A SUMMARY.  IN

23     THE FINAL INSTRUCTIONS, YOU WILL -- I WILL INSTRUCT YOU AGAIN

24     AS TO THE ELEMENTS AND AS TO THE ELEMENTS AND THE THINGS THAT

25     THE GOVERNMENT HAS TO PROVE.

1      MR. YORK IS CHARGED IN COUNT 1 WITH FRAUD WHILE

2  IMPERSONATING A FEDERAL EMPLOYEE IN VIOLATION OF TITLE 18

3  UNITED STATES -- SECTION 912 OF THE UNITED STATES CODE.

4      NOW, IN ORDER FOR MR. YORK TO BE FOUND GUILTY OF THIS

5  CHARGE, THE GOVERNMENT MUST PROVE EACH OF THE FOLLOWING

6  ELEMENTS BEYOND A REASONABLE DOUBT:

7      FIRST, THAT MR. YORK FALSELY PRETENDED TO BE AN EMPLOYEE

8  ACTING UNDER THE AUTHORITY OF THE UNITED STATES INTERNAL

9  REVENUE SERVICE, AND THAT MR. YORK ACTED IN SUCH A MANNER AS AN

10  EMPLOYEE OF THE INTERNAL REVENUE SERVICE.

11      MR. YORK IS CHARGED IN COUNT 2 IN THE INDICTMENT WITH

12  INTERSTATE TELECOMMUNICATIONS, HARASSMENT, IN VIOLATION OF 47

13  UNITED STATES CODE SECTION 223(A)(1)(C).

14      IN ORDER TO BE FOUND GUILTY OF THAT CHARGE THE GOVERNMENT

15  MUST PROVE EACH OF THE FOLLOWING ELEMENTS BEYOND A REASONABLE

16  DOUBT:

17      THE DEFENDANT, ONE, IN INTERSTATE OR FOREIGN

18  COMMUNICATIONS; TWO, MADE A TELEPHONE CALL OR UTILIZED A

19  TELECOMMUNICATIONS DEVICE; THREE, WITHOUT DISCLOSING HIS

20  IDENTITY; AND, FOUR, INTENDING TO ABUSE, THREATEN OR HARASS ANY

21  PERSON AT THE CALL NUMBER OR WHO RECEIVED THE COMMUNICATIONS.

22      THE EVIDENCE YOU ARE TO CONSIDER IN DECIDING WHAT THE

23  FACTS ARE CONSISTS OF:

24      THE SWORN TESTIMONY OF ANY WITNESS;

25      THE EXHIBITS WHICH ARE RECEIVED IN EVIDENCE; AND,

1      ANY FACTS TO WHICH THE PARTIES AGREE.

2      THE FOLLOWING THINGS ARE NOT EVIDENCE, AND YOU MUST NOT

3  CONSIDER THEM AS EVIDENCE IN DECIDING THE FACTS OF THE CASE:

4      STATEMENTS AND ARGUMENTS OF ATTORNEYS;

5      QUESTIONS AND OBJECTIONS OF THE ATTORNEYS;

6      TESTIMONY THAT I INSTRUCT YOU TO DISREGARD; AND,

7      ANYTHING THAT YOU MAY SEE OR HEAR WHEN THE COURT IS NOT IN

8  SESSION, EVEN IF WHAT YOU SEE OR HEAR IS DONE OR SAID BY ONE OF

9  THE PARTIES OR BY ONE OF THE WITNESSES.

10      EVIDENCE MAY BE DIRECT OR CIRCUMSTANTIAL.  DIRECT EVIDENCE

11  IS DIRECT PROOF OF A FACT SUCH AS TESTIMONY BY A WITNESS ABOUT

12  WHAT THAT WITNESS PERSONALLY SAW OR HEARD OR DID.

13      CIRCUMSTANTIAL EVIDENCE IS INDIRECT EVIDENCE; THAT IS, IT

14  IS PROOF OF ONE OR MORE FACTS FROM WHICH ONE CAN FIND ANOTHER

15  FACT.

16      YOU ARE TO CONSIDER BOTH DIRECT AND CIRCUMSTANTIAL

17  EVIDENCE.  EITHER CAN BE USED TO PROVE ANY FACT.

18      THE LAW MAKES NO DISTINCTION BETWEEN THE WEIGHT TO BE

19  GIVEN TO EITHER DIRECT OR CIRCUMSTANTIAL EVIDENCE.  IT IS FOR

20  YOU TO DECIDE HOW MUCH WEIGHT TO GIVE TO ANY EVIDENCE.

21      NOW, BY WAY OF EXAMPLE, IF YOU WAKE UP IN THE MORNING AND

22  SEE THAT THE SIDEWALK IS WET, YOU MAY FIND FROM THIS FACT THAT

23  IT RAINED DURING THE NIGHT.

24      HOWEVER, OTHER EVIDENCE SUCH AS A TURNED ON GARDEN HOSE

25  MAY PROVIDE AN EXPLANATION FOR THE WATER ON THE SIDEWALK.

1        THEREFORE, BEFORE YOU DECIDE THAT A FACT HAS BEEN PROVED

2    BY CIRCUMSTANTIAL EVIDENCE, YOU MUST CONSIDER ALL OF THE

3    EVIDENCE IN THE LIGHT OF REASON, EXPERIENCE, AND COMMON SENSE.

4        THERE ARE RULES OF EVIDENCE THAT CONTROL WHAT CAN BE

5    RECEIVED IN EVIDENCE.  WHEN A LAWYER ASKS A QUESTION OR OFFERS

6    AN EXHIBIT IN EVIDENCE AND A LAWYER ON THE OTHER SIDE THINKS IT

7    IS NOT PERMITTED BY THE RULES OF EVIDENCE, THAT LAWYER MAY

8    OBJECT.

9        IF I OVERRULE THE OBJECTION, THE QUESTION MAY BE ANSWERED

10   OR THE EXHIBIT RECEIVED.

11       IF I SUSTAIN THE OBJECTION, THE QUESTION CANNOT BE

12   ANSWERED OR THE EXHIBIT CANNOT BE RECEIVED.

13       WHENEVER I SUSTAIN AN OBJECTION TO A QUESTION, YOU MUST

14   IGNORE THE QUESTION AND MUST NOT GUESS WHAT THE ANSWER WOULD

15   HAVE BEEN.

16       SOMETIMES I MAY ORDER THAT EVIDENCE BE STRICKEN FROM THE

17   RECORD AND THAT YOU DISREGARD OR IGNORE THE EVIDENCE.  THAT

18   MEANS THAT WHEN YOU ARE DECIDING THE CASE, YOU MUST NOT

19   CONSIDER THE EVIDENCE THAT I TOLD YOU TO DISREGARD.

20       IN DECIDING THE FACTS IN THIS CASE, YOU MAY HAVE TO DECIDE

21   WHICH TESTIMONY TO BELIEVE AND WHICH TESTIMONY NOT TO BELIEVE.

22   YOU MAY BELIEVE EVERYTHING A WITNESS SAYS OR PART OF IT OR NONE

23   OF IT.

24       IN CONSIDERING THE TESTIMONY OF ANY WITNESS, YOU MAY TAKE

25   INTO ACCOUNT THE WITNESS'S OPPORTUNITY AND ABILITY TO SEE OR

1    HEAR OR KNOW THE THINGS TESTIFIED TO; THE WITNESS'S MEMORY; THE

2    WITNESS'S MANNER WHILE TESTIFYING; THE WITNESS'S INTEREST IN

3    THE OUTCOME OF THE CASE, IF ANY; THE WITNESS'S BIAS OR

4    PREJUDICE, IF ANY; WHETHER OTHER EVIDENCE CONTRADICTED THE

5    WITNESS'S TESTIMONY; THE REASONABLENESS OF THE WITNESS'S

6    TESTIMONY IN LIGHT OF ALL OF THE EVIDENCE, AND ANY OTHER

7    FACTORS THAT BEAR ON BELIEVABILITY.

8         THE WEIGHT OF THE EVIDENCE AS TO A FACT DOES NOT

9    NECESSARILY DEPEND ON THE NUMBER OF WITNESSES WHO TESTIFY ABOUT

10    IT.

11         I WILL NOW SAY A FEW WORDS ABOUT YOUR CONDUCT AS JURORS.

12    FIRST, KEEP AN OPEN MIND THROUGHOUT THE TRIAL AND DO NOT DECIDE

13    WHAT THE VERDICT SHOULD BE UNTIL YOU AND YOUR FELLOW JURORS

14    HAVE COMPLETED YOUR DELIBERATIONS AT THE END OF THE CASE.

15         SECOND, BECAUSE YOU MUST DECIDE THIS CASE BASED ONLY ON

16    THE EVIDENCE RECEIVED IN THE CASE AND ON MY INSTRUCTIONS AS TO

17    THE LAW THAT APPLIES, YOU MUST NOT BE EXPOSED TO ANY OTHER

18    INFORMATION ABOUT THE CASE OR TO THE ISSUES IT INVOLVES DURING

19    THE COURSE OF YOUR JURY DUTY.

20         THUS, UNTIL THE END OF THE CASE OR UNLESS I TELL YOU

21    OTHERWISE, DO NOT COMMUNICATE WITH ANYONE IN ANY WAY AND DO NOT

22    LET ANYONE ELSE COMMUNICATE WITH YOU IN ANY WAY ABOUT THE

23    MERITS OF THE CASE OR ANYTHING TO DO WITH IT.

24         THIS INCLUDES DISCUSSING THE CASE IN PERSON, IN WRITING,

25    BY PHONE OR ELECTRONIC MEANS VIA E-MAIL, TEXT MESSAGING OR ANY

 1    INTERNET CHAT ROOM, BLOG, WEBSITE OR OTHER FEATURE.

 2         THIS APPLIES TO COMMUNICATING WITH YOUR FELLOW JURORS

 3    UNTIL I GIVE YOU THE CASE FOR DELIBERATION, AND IT APPLIES TO

 4    COMMUNICATING WITH EVERYONE ELSE, INCLUDING YOUR FAMILY

 5    MEMBERS, YOUR EMPLOYER, THE MEDIA, OR PRESS AND THE PEOPLE

 6    INVOLVED IN THE TRIAL, ALTHOUGH YOU MAY NOTIFY YOUR FAMILY AND

 7    YOUR EMPLOYER THAT YOU HAVE BEEN SEATED AS A JUROR IN THE CASE.

 8         IF YOU ARE ASKED OR APPROACHED IN ANY WAY ABOUT YOUR JURY

 9    SERVICE OR ANYTHING ABOUT THIS CASE, YOU MUST RESPOND THAT YOU

10    HAVE BEEN ORDERED NOT TO DISCUSS THE MATTER AND TO REPORT THE

11    CONTACT TO THE COURT.

12         BECAUSE YOU WILL RECEIVE ALL OF THE EVIDENCE AND LEGAL

13    INSTRUCTION THAT YOU PROPERLY MAY CONSIDER TO RETURN A VERDICT:

14    DO NOT READ, WATCH OR LISTEN TO ANY NEWS OR MEDIA ACCOUNTS OR

15    COMMENTARY ABOUT THE CASE OR ANYTHING TO DO WITH IT; DO NOT DO

16    ANY RESEARCH, SUCH AS CONSULTING DICTIONARIES, SEARCHING THE

17    INTERNET OR USING OTHER REFERENCE MATERIALS; AND DO NOT MAKE

18    ANY INVESTIGATION OR IN ANY OTHER WAY TRY TO LEARN ABOUT THE

19    CASE ON YOUR OWN.

20         THE LAW REQUIRES THESE RESTRICTIONS TO ENSURE THE PARTIES

21    HAVE A FAIR TRIAL BASED ON THE SAME EVIDENCE THAT EACH PARTY

22    HAS HAD AN OPPORTUNITY TO ADDRESS.  A JUROR WHO VIOLATES THESE

23    RESTRICTIONS JEOPARDIZES THE FAIRNESS OF THESE PROCEEDINGS AND

24    A MISTRIAL COULD RESULT THAT WOULD REQUIRE THE ENTIRE TRIAL

25    PROCESS TO START OVER.  IF ANY JUROR IS EXPOSED TO ANY OUTSIDE

1    INFORMATION, PLEASE NOTIFY THE COURT IMMEDIATELY.

2        AT THE END OF THE TRIAL YOU WILL HAVE TO MAKE YOUR

3    DECISION BASED ON WHAT YOU RECALL OF THE EVIDENCE.  YOU WILL

4    NOT HAVE A WRITTEN TRANSCRIPT OF THE TRIAL.  I URGE YOU TO PAY

5    CLOSE ATTENTION TO THE TESTIMONY AS IT IS GIVEN.

6        IF YOU WISH, YOU MAY TAKE NOTES TO HELP YOU REMEMBER THE

7    EVIDENCE.  IF YOU DO TAKE NOTES, PLEASE KEEP THEM TO YOURSELF

8    UNTIL YOU AND YOUR FELLOW JURORS GO TO THE JURY ROOM TO DECIDE

9    THE CASE.  DO NOT LET NOTE-TAKING DISTRACT YOU FROM BEING

10   ATTENTIVE.

11       WHEN YOU LEAVE COURT FOR RECESSES, YOUR NOTES SHOULD BE

12   LEFT IN THE JURY ROOM, AND MS. GARCIA WILL HELP YOU WITH THAT.

13   NO ONE WILL READ YOUR NOTES.

14       WHETHER OR NOT YOU TAKE NOTES, YOU SHOULD RELY ON YOUR OWN

15   MEMORY OF THE EVIDENCE.  NOTES ARE ONLY TO ASSIST YOUR MEMORY.

16   YOU SHOULD NOT BE OVERLY INFLUENCED BY YOUR NOTES OR THOSE OF

17   YOUR FELLOW JURORS.

18       THE NEXT PHASE OF THE TRIAL WILL NOW BEGIN.  FIRST, EACH

19   SIDE MAY MAKE AN OPENING STATEMENT.  AN OPENING STATEMENT IS

20   NOT EVIDENCE.  IT IS SIMPLY AN OUTLINE TO HELP YOU UNDERSTAND

21   WHAT THE PARTY EXPECTS THE EVIDENCE WILL SHOW.

22       A PARTY IS NOT REQUIRED TO MAKE AN OPENING STATEMENT.  THE

23   GOVERNMENT WILL THEN PRESENT EVIDENCE, AND COUNSEL FOR THE

24   DEFENSE MAY CROSS-EXAMINE.

25       THEN, IF THE DEFENDANT CHOOSES TO OFFER EVIDENCE, COUNSEL

1     FOR THE GOVERNMENT MAY CROSS-EXAMINE.

2         AFTER THE EVIDENCE HAS BEEN PRESENTED AND THE ATTORNEYS

3     HAVE MADE CLOSING ARGUMENTS I WILL INSTRUCT YOU ON THE LAW THAT

4     APPLIES TO THE CASE.  AFTER THAT YOU WILL GO TO THE JURY ROOM

5     TO DELIBERATE ON YOUR VERDICT.

6         THAT CONCLUDES THE PRELIMINARY INSTRUCTIONS.  LADIES AND

7     GENTLEMEN, I JUST WANTED TO MENTION ONE OTHER THING AND THAT'S

8     THE QUESTION OF TIME, AND I TELL YOU THAT BECAUSE EVEN THOUGH

9     THIS WILL BE A BRIEF TRIAL -- I SHOULD TELL YOU SOMETIMES I

10    THINK STEPHEN HAWKING HAS DONE HIS STUDY IN A COURTROOM BECAUSE

11    TIME IS VERY DIFFERENT IN COURTS THAN THEY ARE IN REAL LIFE.

12        WE MAY TAKE RECESSES, AND I'LL SUGGEST TO YOU THAT WE'LL

13    TAKE A 12 MINUTE OR 15 MINUTE RECESS AND YOU'LL BE ENJOYING

14    THAT TIME AND THEN YOU'LL LOOK AT THE CLOCK AND REALIZE

15    30 MINUTES HAVE GONE BY AND YOU HAVEN'T BEEN SUMMONED.

16        I SHOULD TELL YOU THAT IT DOES OCCUR FREQUENTLY THAT I'LL

17    NEED TO SPEAK WITH THE LAWYERS TO GET THEIR HELP ON AN ISSUE,

18    AND I NEED TO DO THAT OUTSIDE OF YOUR PRESENCE.

19        AND IT ALSO COMES TO PASS THAT SOMETIMES I'M CALLED UPON

20    TO DO OTHER OBLIGATIONS AND DUTIES THAT COME TO MY DESK, AND I

21    MAY HAVE TO DEFER FOR A MOMENT TO TAKE CARE OF THOSE THINGS.

22        SO I APOLOGIZE IN ADVANCE FOR ANY INCONVENIENCE IN REGARDS

23    TO WAITING.

24        I KNOW THAT THESE LAWYERS AND MYSELF WILL DO EVERYTHING WE

25    CAN TO MAKE ANY BREAKS -- MAKE THIS TRIAL AS SEAMLESS AS

1    POSSIBLE WITHOUT TOO MUCH WAITING FOR YOU.

2         BUT I JUST WANT TO GIVE YOU ADVANCED NOTICE.  THIS

3    SOMETIMES HAS HAPPENED.  I HAVEN'T BEEN ENGAGED IN A TRIAL

4    WHERE THERE WASN'T -- HOW SHALL I SAY? -- A NORMAL BREAK FOR

5    WHATEVER REASON, BUT WE'LL TRY TO LIMIT THOSE AS BEST WE CAN.

6         SO THANK YOU VERY MUCH.

7         LET ME ASK THE GOVERNMENT, DO YOU HAVE AN OPENING

8    STATEMENT?

9              MS. PENNA:  YES, YOUR HONOR.

10             THE COURT:  PLEASE PROCEED.

11        **(COUNSEL FOR GOVERNMENT GAVE THEIR OPENING STATEMENT.)**

12             MS. PENNA:  LADIES AND GENTLEMEN OF THE JURY, WE'RE

13   HERE TODAY BECAUSE ON THE AFTERNOON OF FEBRUARY 23RD, 2012, THE

14   DEFENDANT, DOUGLAS YORK, MADE A PHONE CALL AND LEFT A VOICE

15   MESSAGE FOR A MAN NAMED ALLAN HESSENFLOW.

16        YOU WILL HEAR A RECORDING OF THAT VOICE MESSAGE ON WHICH

17   THE DEFENDANT REPRESENTS HIMSELF TO BE AN INTERNAL REVENUE

18   SERVICE, AN I.R.S. AGENT, THAT WAS CONDUCTING A TAX AUDIT AND

19   INVESTIGATING MR. HESSENFLOW'S TAX RECORDS.

20        BY MAKING THIS CALL AND CHOOSING TO LEAVE THIS SPECIFIC

21   VOICE MESSAGE, THE DEFENDANT COMMITTED TWO SEPARATE CRIMES:

22        FIRST, THIS PHONE CALL WAS A CRIME BECAUSE THE DEFENDANT

23   FALSELY IMPERSONATED A GOVERNMENT OFFICER OR EMPLOYEE, AND THIS

24   IS A VIOLATION OF TITLE 18 UNITED STATES CODE SECTION 912:

25             A CRIME TO PRETEND TO BE A GOVERNMENT OFFICER OR EMPLOYEE

1       THAT IS ACTING UNDER THE AUTHORITY OF THE UNITED STATES AND TO

2       THEN ACT IN THAT CHARACTER.

3               THE EVIDENCE HERE WILL SHOW THAT THE DEFENDANT WAS NOT AND

4       HAS NEVER BEEN AN EMPLOYEE OF THE INTERNAL REVENUE SERVICE BUT

5       ON THIS VOICEMAIL HE REPRESENTED THAT HE WAS, IN FACT, AN

6       EMPLOYEE OF THE I.R.S.

7               BEYOND THIS THE EVIDENCE WILL SHOW THAT THE GOVERNMENT --

8       THAT THE DEFENDANT TOOK THIS A STEP FARTHER AND ACTED IN THE

9       CHARACTER OF AN I.R.S. AGENT WHEN HE LEFT THE MESSAGE STATING

10      THAT THE I.R.S. WOULD BE INVESTIGATING MR. HESSENFLOW'S TAX

11      RECORDS AND ALSO REQUESTING CONFIDENTIAL AND PERSONAL TAX

12      INFORMATION FROM MR. HESSENFLOW.

13              THE EVIDENCE WILL ALSO SHOW THAT THE DEFENDANT USED A

14      TELEPHONE SPOOFING SERVICE IN ORDER TO LEAVE THIS VOICE MESSAGE

15      AND TO LEAVE THE MESSAGE.

16              NOW, A TELEPHONE SPOOFING SERVICE IS A SERVICE THAT IS RUN

17      BY A COMPANY CALLED TELETCH INDUSTRIES, AND THEY'RE RUN OUT OF

18      NEW JERSEY.  THIS SERVICE ALLOWS A CALLER TO DISGUISE THEIR

19      VOICE WHEN THEY'RE MAKING A PHONE CALL, AND IT ALSO ALLOWS THEM

20      TO SELECT ANY PHONE NUMBER THAT THEY WANT TO APPEAR ON THE

21      RECIPIENT'S CALLER ID.

22              HERE THE EVIDENCE WILL SHOW THAT THE DEFENDANT DISGUISED

23      HIS VOICE ON THIS VOICE MESSAGE THAT HE LEFT FOR

24      MR. HESSENFLOW.

25              THE EVIDENCE WILL ALSO SHOW THAT THE DEFENDANT SELECTED A

1     PARTICULAR NUMBER TO APPEAR ON MR. HESSENFLOW'S VOICE MESSAGE,

2     AND THIS NUMBER MATCHED THE LAST FOUR DIGITS OF THE I.R.S.

3     PERSONAL INCOME TAX HELP LINE.

4         NOW, THERE IS MORE TO THIS STORY THAN JUST THIS ONE PHONE

5     CALL AND THROUGH THAT WE LEARNED WHY MR. YORK TARGETED

6     MR. HESSENFLOW SPECIFICALLY.  THE REASON THAT THE DEFENDANT

7     SPECIFICALLY TARGETED MR. HESSENFLOW WAS BECAUSE HE SUSPECTED

8     THAT MR. HESSENFLOW WAS IN A RELATIONSHIP WITH HIS THEN

9     ESTRANGED WIFE.

10        NOW, THIS IS NOT A CASE ABOUT A BAD DIVORCE, AND WE'RE NOT

11    HERE TO REOPEN OLD MARITAL DISPUTES.

12        THE REASON THAT WE ARE HERE IS BECAUSE OF THE DEFENDANT'S

13    CONDUCT ON FEBRUARY 23RD, 2012.

14        NOW, A MOMENT AGO I TOLD YOU THAT THE DEFENDANT'S PHONE

15    CALL CAUSED HIM TO COMMIT TWO SEPARATE CRIMES.  THAT FIRST

16    CRIME WAS FALSE IMPERSONATION OF A GOVERNMENT OFFICER OR

17    EMPLOYEE AND THE SECOND CRIME IS INTERSTATE TELECOMMUNICATIONS

18    DEVICE HARASSMENT.

19        NOW, THAT CRIME -- THAT STATUTE REQUIRES THAT A PERSON,

20    THAT THE PERSON MAKE AN INTERSTATE TELEPHONE CALL WITH THE

21    INTENT TO ABUSE, HARASS OR TO THREATEN THE PERSON AT -- IN

22    RECEIPT OF THAT CALL.

23        AND THE STATUTE ALSO REQUIRES THAT THE CALLER DOES NOT

24    REVEAL HIS OR HER NAME.

25        THE EVIDENCE HERE WILL SHOW THAT ON THAT VERY SAME VOICE

1    MESSAGE ON FEBRUARY 23RD, 2012, THE DEFENDANT USING THAT

2    SPOOFING SERVICE DISGUISED HIS VOICE AND SELECTED A FEATURE OF

3    THE SPOOFCARD SERVICE THAT ALLOWED HIM TO DISGUISE HIS VOICE AS

4    APPEARING TO SOUND LIKE A WOMAN AND HE STATED THAT HIS NAME WAS

5    NOT DOUGLAS YORK BUT THAT HE WAS JUDY SMITH WITH THE I.R.S.

6         YOU WILL HEAR EVIDENCE THAT THIS VOICE MESSAGE WAS NOT THE

7    ONLY INSTANCE OF CONTACT FROM THE DEFENDANT TO MR. HESSENFLOW.

8    IN FACT, YOU WILL HEAR DIRECTLY FROM MR. HESSENFLOW WHO, DUE TO

9    THE INCESSANT NATURE OF THE CONTACT THAT HE HAD FROM THE

10   DEFENDANT, BEGAN KEEPING A VERY DETAILED PERSONAL LOG OF EACH

11   AND EVERY ENCOUNTER AND INSTANCE OF CONTACT THAT HE HAD WITH

12   THE DEFENDANT.

13        THE GOVERNMENT HERE HAS THE BURDEN TO PROVE BEYOND A

14   REASONABLE DOUBT THAT THE DEFENDANT COMMITTED THOSE TWO CRIMES.

15        IN SUPPORT OF OUR CASE, YOU WILL BE HEARING FROM A VARIETY

16   OF DIFFERENT WITNESSES, AND WE WILL BE PRESENTING TO YOU A

17   VARIETY OF PIECES OF EVIDENCE IN SUPPORT OF OUR CASE.

18        OVER THE NEXT FEW DAYS YOU WILL HEAR THE VOICEMAIL LEFT ON

19   FEBRUARY 23RD, 2012;

20        YOU WILL HEAR FROM MR. HESSENFLOW, THE MAN WHO RECEIVED

21   THAT VOICE MESSAGE.  MR. HESSENFLOW WILL TELL YOU ABOUT HIS

22   INSTANCES OF CONTACT WITH THE DEFENDANT;

23        MR. HESSENFLOW WILL DISCUSS WITH YOU WHAT STEPS HE TOOK

24   AFTER HE RECEIVED THAT VOICE MESSAGE AND HOW HE CONTACTED LAW

25   ENFORCEMENT;

1       MR. HESSENFLOW WILL ALSO DESCRIBE EXAMPLES OF THE PATTERN

2   OF HARASSMENT THAT -- THE PATTERN OF THE DEFENDANT'S HARASSMENT

3   OF HIM.

4       FOR EXAMPLE, HE WILL TESTIFY TO THE NUMEROUS AND INCESSANT

5   PHONE CALLS AND TEXT MESSAGES THAT HE RECEIVED FROM THE

6   DEFENDANT SOMETIMES IN THE MIDDLE OF THE NIGHT.

7       YOU WILL HEAR ABOUT THE DEFENDANT SOMETIMES PRETENDING TO

8   BE MR. HESSENFLOW WHEN HE POSTED MR. HESSENFLOW'S CAR FOR SALE

9   FOR $1 ON CRAIGSLIST AND LISTED MR. HESSENFLOW'S HOME ADDRESS

10  SUBJECTING MR. HESSENFLOW TO POTENTIAL BUYERS SHOWING UP AT HIS

11  HOUSE.

12      MR. HESSENFLOW, WILL ALSO DISCUSS OTHER INSTANCES OF

13  CONTACT WITH THE DEFENDANT.

14      YOU WILL HEAR FROM A WITNESS NAMED NATHAN COOPER WHO WORKS

15  FOR A COMPANY CALLED TELETCH INDUSTRIES OR SPOOFCARD.

16  NATHAN COOPER WILL EXPLAIN TO YOU HOW THIS SPOOFCARD SERVICE

17  WORKS, AND HE WILL ALSO DISCUSS RECORDS THAT WERE PROVIDED BY

18  THE COMPANY.

19      THROUGH HIS TESTIMONY YOU WILL LEARN THAT THE DEFENDANT

20  CREATED AN ACCOUNT SPOOFCARD USING HIS NAME, HIS CELL PHONE

21  NUMBER, HIS ADDRESS AND OTHER IDENTIFYING INFORMATION.

22      ON FEBRUARY 23RD, 2012, THE DEFENDANT USED HIS SPOOFCARD

23  ACCOUNT TO MAKE THE PHONE CALL AND LEAVE THE VOICE MESSAGE FOR

24  MR. HESSENFLOW.

25      MR. COOPER WILL TELL YOU ABOUT SOME OF THE SPOOFCARD

 1    FEATURES THAT THE DEFENDANT ELECTED AND SELECTED TO USE ON THAT

 2    VOICEMAIL.

 3         MR. COOPER WILL ALSO TESTIFY TO THE LOCATION OF SPOOFCARD

 4    SERVERS, AND HE WILL EXPLAIN TO YOU HOW THE CALL ORIGINATED AND

 5    ENDED UP IN CALIFORNIA ACTUALLY DID CROSS STATE LINES.

 6         THE EVIDENCE WILL SHOW THAT THE IP ADDRESS THAT WAS USED

 7    TO CREATE THE SPOOFCARD ACCOUNT MATCHED THE IP ADDRESS THAT

 8    POSTED THE CRAIGSLIST AD THAT WE JUST DISCUSSED.

 9         LAST, YOU WILL HEAR FROM SPECIAL AGENT DONNA AGUIRRE.

10    SHE'S AN AGENT WITH THE UNITED STATES TREASURY INSPECTOR

11    GENERAL FOR TAX ADMINISTRATION.  YOU MAY HEAR THIS BEING

12    REFERRED TO AS TIGTA.  SHE WILL DESCRIBE TO YOU WHAT SHE

13    LEARNED DURING HER INVESTIGATION OF THE VOICEMAIL ONCE HER

14    AGENCY WAS CONTACTED.

15         AFTER YOU HAVE HEARD FROM ALL OF THESE WITNESSES AND WE

16    HAVE PRESENTED THE EVIDENCE IN SUPPORT OF OUR CASE, I WILL HAVE

17    A CHANCE TO ARGUE TO YOU IN CLOSING THAT THIS TESTIMONY AND

18    THIS EVIDENCE HAS ESTABLISHED WHAT WE, AS THE GOVERNMENT, ARE

19    REQUIRED TO PROVE.

20         AT THE END OF THE TRIAL, WE WILL ASK THAT YOU FIND THAT

21    THE EVIDENCE PROVED BEYOND A REASONABLE DOUBT THAT ON

22    FEBRUARY 23RD, 2012, THE DEFENDANT COMMITTED THE CRIME OF FALSE

23    IMPERSONATION OF A GOVERNMENT OFFICIAL OR EMPLOYEE AND THE

24    CRIME OF INTERSTATE TELECOMMUNICATIONS DEVICE HARASSMENT.

25         BASED ON THIS EVIDENCE, WE ASK THAT YOU WILL FIND THE

1        DEFENDANT DOUGLAS YORK GUILTY OF BOTH COUNTS.

2            THANK YOU, YOUR HONOR.

3                THE COURT:  THANK YOU, COUNSEL.

4        DOES THE DEFENSE HAVE AN OPENING STATEMENT?

5                MR. ARCHER:  YES, YOUR HONOR.  THANK YOU.

6        **(COUNSEL FOR DEFENDANT GAVE THEIR OPENING STATEMENT.)**

7                MR. ARCHER:  THAT'S RIGHT, FOLKS, WE ARE HERE

8    BECAUSE IN 2012 MR. ALLAN HESSENFLOW RECEIVED A SINGLE

9    VOICEMAIL, A RIDICULOUS CRANK CALL THAT HE BELIEVES WAS LEFT BY

10   MR. YORK, AND THE GOVERNMENT THREE YEARS LATER HAS FILED

11   CHARGES AGAINST MR. YORK ALLEGING HIM BEING GUILTY OF

12   IMPERSONATING AN I.R.S. AGENT AND THEN ACTING AS AN I.R.S.

13   AGENT AND ALSO OF HARASSING MR. HESSENFLOW BY LEAVING THAT

14   VOICEMAIL.  THAT'S IT.  YOU'RE ALSO GOING TO HEAR EVIDENCE, OF

15   COURSE, THAT MR. YORK AND MR. HESSENFLOW WERE NOT EXACTLY GOOD

16   FRIENDS.

17       MR. YORK'S CHILDREN WERE STAYING OVER MR. HESSENFLOW'S

18   HOUSE WITH HIS ESTRANGED WIFE, AND THERE WERE COMMUNICATIONS

19   BACK AND FORTH.

20       NO ONE IS UNDER ANY ILLUSION THAT THERE IS ANY LOVE LOST

21   BETWEEN THOSE FOLKS BUT THAT'S NOT A FEDERAL CASE.

22       WHAT HE'S ACCUSED OF IN FEDERAL COURT, THE REASON THE

23   GOVERNMENT IS BRINGING CHARGES HERE IS THAT SINGLE VOICEMAIL,

24   ONE SINGLE CRANK CALL VOICEMAIL, WHICH YOU'LL HEAR IN A COUPLE

25   OF MINUTES.  IT'S NOT A GOOD IMPERSONATION OF MINNIE MOUSE BUT

1      IT'S SOMETHING LIKE THAT.  YOU'LL ALSO HEAR THE WITNESS TESTIFY

2      THAT HE IMMEDIATELY KNEW IT WASN'T REAL.  MR. HESSENFLOW WILL

3      TESTIFY HE IMMEDIATELY KNEW IT WASN'T REAL.  ONE SINGLE PRANK

4      VOICEMAIL IS WHY WE'RE HERE IN FEDERAL COURT AND MR. YORK IS

5      CHARGED WITH TWO FEDERAL FELONIES.

6           AT THE END OF THIS TRIAL I WILL BE STANDING RIGHT HERE

7      AGAIN EXPLAINING TO YOU WHY NOTHING YOU HEARD CONSTITUTES A

8      FEDERAL CRIME, CERTAINLY NOT THE TWO CHARGED COUNT 1 OR COUNT

9      2, A PRANK VOICEMAIL THAT THEY ACCUSE MR. YORK OF LEAVING FROM

10     CALIFORNIA TO CALIFORNIA, NOT A FEDERAL CRIME.  THE GOVERNMENT

11     CANNOT PROVE THAT MR. YORK IS GUILTY OF EITHER OF THESE TWO

12     COUNTS.

13          THANK YOU.

14              THE COURT:  THANK YOU, COUNSEL.

15     DOES THE GOVERNMENT HAVE A WITNESS TO CALL?

16              MS. PENNA:  YES, YOUR HONOR.

17     THE UNITED STATES CALLS ALLAN HESSENFLOW.

18              THE COURT:  ALL RIGHT.  THANK YOU.

19     GOOD AFTERNOON, SIR.  WOULD YOU PLEASE COME FORWARD.  AND

20     IF YOU WOULD STAND HERE AND FACE OUR COURTROOM DEPUTY AND WHILE

21     YOU RAISE YOUR RIGHT HAND, SHE HAS A QUESTION FOR YOU.

22          **(GOVERNMENT'S WITNESS, ALLAN HESSENFLOW, WAS SWORN.)**

23              THE WITNESS:  I DO.

24              THE COURT:  LET ME INVITE YOU TO HAVE A SEAT HERE,

25     SIR.  FEEL FREE TO ADJUST THE CHAIR AND THE MICROPHONE AS YOU

1    NEED.  THERE'S ALSO SOME WATER THERE I THINK FOR YOUR

2    REFRESHMENT.

3         I'LL ENCOURAGE YOU TO SPEAK DIRECTLY INTO THE MICROPHONE.

4    AND WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME

5    AND THEN SPELL IT PLEASE.

6              THE WITNESS:  ALLAN HESSENFLOW.  IT'S

7    H-E-S-S-E-N-F-L-O-W.

8              THE COURT:  AND IS ALLAN WITH TWO L'S?

9              THE WITNESS:  YES.

10             THE COURT:  AND AN E?

11             THE WITNESS:  AN A.

12             THE COURT:  ALL RIGHT.  THANK YOU.  AND LET ME ASK

13   YOU TO GET CLOSE TO THAT MICROPHONE.  COUNSEL.

14                        **DIRECT EXAMINATION**

15   BY MS. PENNA:

16   Q.   GOOD AFTERNOON, MR. HESSENFLOW.  WHERE DO YOU LIVE?

17   A.   IN THE SANTA CRUZ MOUNTAINS.

18   Q.   HOW LONG HAVE YOU LIVED IN THE SANTA CRUZ MOUNTAINS?

19   A.   SINCE 1993.

20   Q.   WHAT DO YOU DO FOR WORK?

21   A.   I'M AN ENGINEER.

22   Q.   WHAT TYPE OF ENGINEER?

23   A.   I DO HARDWARE AND FIRMWARE DESIGN.

24   Q.   HOW LONG HAVE YOU WORKED AS AN ENGINEER?

25   A.   SINCE I GOT OUT OF SCHOOL.

1    Q.   SO ABOUT HOW MANY YEARS IS THAT?

2    A.   SINCE THE '80S.

3    Q.   DO YOU KNOW A PERSON NAMED DOUGLAS YORK?

4    A.   YES, I DO.

5    Q.   IS THAT PERSON IN THE COURTROOM TODAY?

6    A.   YES, HE IS.

7    Q.   COULD YOU TELL US WHERE HE'S SITTING AND MAYBE IDENTIFY

8    HIM BY SOMETHING THAT HE'S WEARING?

9    A.   YES.  HE'S SWEARING THE GREY SUIT OVER AT THE TABLE BEHIND

10   YOU.

11             THE COURT:  DOES HE HAVE GLASSES ON?

12             THE WITNESS:  NO.

13             THE COURT:  THANK YOU.

14             MS. PENNA:  LET THE RECORD REFLECT THAT THE WITNESS

15   HAS IDENTIFIED THE DEFENDANT DOUGLAS YORK?

16             THE COURT:  THANK YOU.  THE RECORD WILL SO REFLECT.

17   BY MS. PENNA:

18   Q.   WHEN DID YOU FIRST MEET THE DEFENDANT?

19   A.   IN 2011.

20   Q.   COULD YOU DESCRIBE THE CIRCUMSTANCES OF HOW YOU MET HIM?

21   A.   WELL, I WAS WITH HIS EX-WIFE AT THE TIME, SEPARATED WIFE.

22   Q.   AND WHAT IS HIS EX-WIFE OR ESTRANGED WIFE'S NAME?

23   A.   ANDREA YORK.

24   Q.   ANDREA YORK.  AND HOW DID YOU KNOW ANDREA YORK?

25   A.   I HAD KNOWN HER PROBABLY TEN YEARS PRIOR TO THAT AND JUST

1    MET RECENTLY AT A MUTUAL FRIEND'S HOUSE.

2    Q.   AND WERE YOU IN A RELATIONSHIP WITH ANDREA YORK?

3    A.   NOT PRIOR TO THAT.

4    Q.   DID YOU HAVE A FRIENDSHIP?

5    A.   YES.

6    Q.   WHEN DID THE DEFENDANT FIRST START CONTACTING YOU

7    SPECIFICALLY?

8    A.   WELL, THE FIRST PHONE CALLS WERE IN FEBRUARY 2012.

9    Q.   OKAY.  COULD YOU DESCRIBE THAT CONTACT?

10   A.   WELL, WITHOUT REFERRING TO MY LOG, I --

11   Q.   IS THERE SOMETHING THAT WOULD REFRESH YOUR RECOLLECTION?

12   A.   YES, THERE IS.

13   Q.   OKAY.

14       PERMISSION TO APPROACH?

15           THE COURT:  YES.

16   BY MS. PENNA:

17   Q.   COULD YOU ELABORATE ON WHAT TYPE OF CONTACT YOU HAD WITH

18   THE DEFENDANT DURING THIS TIME?

19   A.   WELL, HE STARTED CALLING AND ASKING THINGS LIKE WHERE --

20   WHAT MY ADDRESS IS AND JUST A NUMBER OF SIMILAR CALLS LIKE

21   THAT.

22   Q.   AND YOU SAY THAT THIS CONTACT WAS OVER THE TELEPHONE.  DO

23   YOU KNOW WHEN OR HOW THE DEFENDANT RECEIVED YOUR PHONE NUMBER?

24   A.   NO, I DON'T.

25   Q.   WHAT IS YOUR PHONE NUMBER?

1    A.   IT'S 408-353-6292.

2    Q.   AND DO YOU HAVE MORE THAN ONE PHONE NUMBER?

3    A.   YES, I ALSO HAVE A CELL PHONE.

4    Q.   AND COULD YOU TELL US THAT NUMBER?

5    A.   408-761-2742.

6    Q.   AND WOULD THE DEFENDANT CALL OR TEXT YOU ON BOTH OF THOSE

7    NUMBERS?

8    A.   YES, HE DID.

9    Q.   WHAT NUMBER WOULD THE DEFENDANT CALL YOU FROM?

10   A.   HE CALLED FROM 408-710-9450.

11   Q.   HOW DO YOU KNOW THAT NUMBER?

12   A.   I SAW IT NUMEROUS TIMES ON MY CALLER ID.

13   Q.   AND HOW OFTEN WOULD YOU GET PHONE CALLS FROM THE DEFENDANT

14   IN EARLY FEBRUARY 2012?

15   A.   THERE WERE SEVERAL A DAY.

16   Q.   WHAT TIMES OF DAYS WOULD YOU RECEIVE PHONE CALLS?

17   A.   ALL DAY LONG.

18   Q.   DID YOU EVER GET PHONE CALLS AT NIGHTTIME?

19   A.   YES.

20   Q.   HOW MANY TEXT MESSAGES WOULD YOU RECEIVE FROM THE

21   DEFENDANT IN EARLY FEBRUARY 2012?

22   A.   A FEW.

23   Q.   OKAY.  DID YOU RECEIVE A MEMORABLE VOICEMAIL ON FEBRUARY

24   23RD, 2012?

25   A.   YES, I DID.

1    Q.   CAN YOU DESCRIBE THIS VOICEMAIL?

2    A.   IT WAS A CALL CLAIMING TO BE FROM AN I.R.S. AGENT, AND

3    THEY SAID THAT THEY WERE LOOKING INTO MY RECORDS FOR SEVERAL

4    YEARS AND ASKED ME TO CALL BACK.

5         MS. PENNA:  PERMISSION TO APPROACH, YOUR HONOR?

6         THE COURT:  YES.

7    BY MS. PENNA:

8    Q.   I WOULD LIKE TO SHOW YOU WHAT HAS BEEN MARKED AS

9    GOVERNMENT'S EXHIBIT 4.  DO YOU RECOGNIZE THIS?

10        THE COURT:  COUNSEL, YOU HAVE SEEN THIS?

11        MR. ARCHER:  I HAVE.

12        THE WITNESS:  THIS IS A DISK.

13   BY MS. PENNA:

14   Q.   AND WHAT IS THIS DISK?

15   A.   I BELIEVE THIS IS A RECORDING OF THE PHONE CALL IN

16   QUESTION.

17   Q.   AND HOW DO YOU KNOW THAT IT IS THAT RECORDING?

18   A.   I LISTENED TO IT IN YOUR OFFICE AND INITIALED THE DISK.

19   Q.   OKAY.  THANK YOU.

20        YOUR HONOR, THE GOVERNMENT MOVES TO ADMIT GOVERNMENT'S

21   EXHIBIT 4 INTO EVIDENCE.

22        THE COURT:  ANY OBJECTION?

23        MR. ARCHER:  NO, YOUR HONOR.

24        THE COURT:  IT'S RECEIVED.

25        (GOVERNMENT'S EXHIBIT 4 WAS RECEIVED IN EVIDENCE.)

1          MS. PENNA:  YOUR HONOR, PERMISSION TO PUBLISH THE

2     EXHIBIT?

3          THE COURT:  YOU'RE GOING TO PLAY THE RECORDING?

4          MS. PENNA:  YES, YOUR HONOR.

5          THE COURT:  ALL RIGHT.  IS THERE A TRANSCRIPT OF

6     THIS?

7          MS. PENNA:  THERE IS ON EXHIBIT 4-A, AND IT WILL

8     ALSO BE PLAYING ON THE SCREEN FOR THE JURY.

9          (DIGITAL RECORDING PLAYED.)

10    BY MS. PENNA:

11    Q.   MR. HESSENFLOW, IS THIS THE VOICEMAIL THAT YOU RECEIVED ON

12    FEBRUARY 3RD, 2012?

13    A.   YES, IT IS.

14    Q.   WHAT TIME DID YOU RECEIVE THIS PHONE CALL OR THIS VOICE

15    MESSAGE?

16    A.   AROUND 1:30.

17    Q.   HOW DO YOU KNOW THAT WAS THE TIME THAT YOU RECEIVED IT?

18    A.   WELL, THAT WAS THE TIME THAT WAS RECORDED ON MY ANSWERING

19    MACHINE.

20    Q.   OKAY.  DO YOU REMEMBER WHAT NUMBER APPEARED ON THE CALLER

21    ID?

22    A.   YES.

23    Q.   WHAT NUMBER --

24    A.   ACTUALLY, I REMEMBER THE LAST FOUR DIGITS.

25    Q.   WHAT WERE THE LAST FOUR DIGITS?

1    A.    1040.

2    Q.    AND DOES THAT NUMBER HAVE ANY SIGNIFICANCE TO YOU?

3    A.    YES, IT'S A STANDARD FEDERAL INDIVIDUAL INCOME TAX RETURN.

4    Q.    INCOME TAX RETURN.  ARE YOU REFERRING TO A PHONE NUMBER?

5    A.    NO, THE FORM.

6    Q.    OH, THE FORM.  OKAY.  SO DID YOU RECOGNIZE THE NUMBER AS A

7    WHOLE?

8    A.    I DID NOT.

9    Q.    WHAT DID YOU DO WITH THAT PHONE NUMBER AFTER YOU RECEIVED

10   THE VOICE MESSAGE?

11   A.    I SEARCHED FOR IT WITH GOOGLE.

12   Q.    WHAT DID YOU FIND?

13   A.    I DIDN'T FIND ANYTHING.

14   Q.    AT THIS TIME DID YOU KNOW ONE WAY OR ANOTHER WHETHER, IN

15   FACT, YOU WERE UNDER INVESTIGATION OR AUDIT BY THE I.R.S.?

16   A.    NO.

17   Q.    WHAT DID YOU DO IN RESPONSE TO RECEIVING THE VOICE

18   MESSAGE?

19   A.    WELL, AFTER I FOUND NO INFORMATION ON THE NUMBER SO I WAS

20   FAIRLY CERTAIN IT WASN'T AN I.R.S. OFFICE, I SEARCHED ONLINE

21   FOR WHO TO REPORT THE IMPERSONATION TO.

22   Q.    AND WHO DID YOU FIND?

23   A.    TIGTA.

24   Q.    AND DO YOU KNOW WHAT TIGTA STANDS FOR?

25             MR. ARCHER:  OBJECTION.  RELEVANCE.

DIRECT HESSENFLOW BY MS. PENNA

```
 1                    THE COURT:  OVERRULED.  YOU CAN ANSWER THE QUESTION,

 2       SIR.

 3                    THE WITNESS:  TREASURY INSPECTOR GENERAL TAX

 4       ADMINISTRATION.

 5       BY MS. PENNA:

 6       Q.   THANK YOU.  HOW DID YOU CONTACT THEM?

 7       A.   I SENT AN E-MAIL.

 8       Q.   AND WHEN DID YOU CONTACT THEM?

 9       A.   I BELIEVE IT WAS THE DAY AFTER I RECEIVED THE MESSAGE.

10       Q.   MR. HESSENFLOW, THERE IS A BINDER IN FRONT OF YOU.  COULD

11       YOU PLEASE TURN TO WHAT HAS BEEN MARKED AS GOVERNMENT'S

12       EXHIBIT 5.

13            DO YOU RECOGNIZE THIS DOCUMENT?

14       A.   YES.

15       Q.   AND WHAT IS IT?

16       A.   THIS IS THE E-MAIL THAT I SENT TO TIGTA.

17       Q.   HOW WERE YOU ABLE TO TRACK IT?

18       A.   IT HAS MY NAME AND ADDRESS AT THE TOP, AND I RECOGNIZE THE

19       CONTENT.

20                    MS. PENNA:  YOUR HONOR, THE GOVERNMENT MOVES TO

21       ADMIT THIS EXHIBIT INTO EVIDENCE.

22                    MR. ARCHER:  OBJECTION, HEARSAY AND RELEVANCE.

23                    MS. PENNA:  YOUR HONOR, THIS IS AN E-MAIL FROM THE

24       WITNESS THAT HE CAN TESTIFY TO AND IT GOES TO HIS NEXT STEPS

25       AFTER HE SENT THIS E-MAIL.
```

1          THE COURT:  ARE YOU SEEKING TO ADMIT THIS FOR THE

2     TRUTH OF THE MATTER ASSERTED IN THE E-MAIL OR IS THIS --

3          MS. PENNA:  NO, YOUR HONOR.  WE'RE SEEKING TO ADMIT

4     IT TO SHOW THE NEXT STEPS THAT MR. HESSENFLOW MADE AFTER THIS

5     E-MAIL.

6          THE COURT:  HIS SUBSEQUENT CONDUCT?

7          MS. PENNA:  YES, YOUR HONOR.

8          MR. ARCHER:  YOUR HONOR, CAN WE ADDRESS THIS AT

9     SIDE-BAR?

10          THE COURT:  YES.

11          MR. ARCHER:  THANK YOU.

12       (SIDE-BAR CONFERENCE ON THE RECORD.)

13          THE COURT:  WE'RE AT SIDE-BAR WITH COUNSEL.

14          MR. ARCHER:  SO, YOUR HONOR, WE HAVE EXHIBIT

15     NUMBER 5 HAS MR. HESSENFLOW'S TRANSCRIPT OF THIS.  HE CAN

16     TESTIFY THAT HE CONTACTED TIGTA, HE JUST DID, INTRODUCING

17     HEARSAY ALONG WITH HIS TRANSCRIPT OF THE RECORDING EVEN IF IT'S

18     PURPORTEDLY JUST TO SHOW THAT HE ACTUALLY DID CONTACT SOMEBODY.

19     I DON'T KNOW THAT'S IN DISPUTE.  HE REPORTED THIS THE DAY

20     AFTER.

21        PERHAPS IF I WERE TO UNDERMINE THAT ON CROSS THAT THIS

22     COULD BE USED TO REBUT AND ATTACK HIS CREDIBILITY BUT WHY IT

23     WAS INTRODUCED SOME HEARSAY E-MAIL THAT HE WROTE IN 2012 TO

24     ESTABLISH THAT HE TESTIFIED -- I'M SORRY -- TO ESTABLISH THAT

25     HE CONTACTED TIGTA WHEN, IN FACT, HE JUST TESTIFIED TO THAT ON

1    DIRECT, I DON'T SEE THE RELEVANCE OF THAT.  I DON'T SEE THE

2    RELEVANCE OF THIS IF IT'S NOT BEING OFFERED FOR THE TRUTH.  IT

3    CONTAINS A NUMBER OF FACTUAL ASSERTIONS.

4        HE JUST TESTIFIED THAT HE CONTACTED TIGTA, AND WE'RE ALL

5    HERE.

6            MR. SCHENK:  NOT IN DISPUTE IS NOT THE STANDARD THAT

7    WE USE TO DETERMINE WHETHER EVIDENCE SHOULD BE ADMITTED OR NOT.

8        THE FACT THAT AFTER MR. HESSENFLOW RECEIVED HIS VOICE

9    MAIL, AS HE TESTIFIED, ARE THE PROCEDURES THAT HE FOUND ONLINE

10   HOW TO REPORT IMPERSONATIONS.  THIS IS EVIDENCE THAT HE DID

11   THAT, AND, THEREFORE, IT'S CERTAINLY RELEVANT EVIDENCE.

12       THEN THE QUESTION IS IS IT HEARSAY OR IS IT AN

13   OUT-OF-COURT STATEMENT THAT IS OFFERED FOR THE TRUTH AND IF IT

14   ISN'T OFFERED FOR THE TRUTH, IT CERTAINLY ISN'T ADMISSIBLE.

15       THE FACT THAT IT SUPPORTS SOMETHING THAT HE JUST SAID

16   DOESN'T MAKE IT HEARSAY.  IT ONLY BECOMES HEARSAY BECAUSE

17   MR. ARCHER SAYS, "IT'S NOT IN DISPUTE" OR THE WITNESS TESTIFIED

18   TO THESE FACTS, IN FACT, THIS IS ALL INFORMATION THAT

19   MR. ARCHER CAN CROSS-EXAMINE THIS WITNESS AS TO WHETHER THIS

20   COMES IN OR NOT AND THE FACT THAT HE TESTIFIES TO IT.

21           MR. ARCHER:  SO LET'S TAKE THE GOVERNMENT'S PREMISES

22   THAT THE PURPOSE IS TO ESTABLISH THAT HE CONTACTED SOMEBODY.

23   THAT, IN FACT, WOULD BE OFFERED FOR THE TRUTH OF THE MATTER.

24   THE BALANCE OF THIS WOULD BE IRRELEVANT.  THE TRUTH OF THE

25   MATTER BEING ASSERTED HERE IS THAT THIS IS AN E-MAIL THAT SAYS

1    THAT SOMEONE IS CONTACTING SOMEBODY ELSE; RIGHT?  IT'S NOT FOR

2    THE EFFECT ON THE HEARER.

3         WHAT ELSE WOULD IT BE OFFERED TO SHOW IF IT IS NOT FOR

4    SOMETHING ESTABLISHED BY THE CONTENTS OF THIS E-MAIL?

5         WHAT WOULD THE NON-HEARSAY PURPOSE BE IS WHAT MY QUESTION

6    WOULD BE.

7              THE COURT:  I UNDERSTAND.  SO THIS IS A DOCUMENT

8    THAT ON ITS FACE COULD BE HEARSAY AS WE'VE DESCRIBED.  WE'VE

9    BOTH DISCUSSED THE ESSENCE OF HEARSAY IS REGARDING RELIABILITY,

10   AND THAT'S ONE OF THE FACTORS OF THE HEARSAY OBJECTION.  IT

11   GOES TO RELIABILITY OF THE STATEMENT AND AS YOU POINT OUT,

12   MR. ARCHER, THE WITNESS TESTIFIED THAT HE IS -- DID THESE

13   THINGS.

14        WE'VE HEARD THE, WE'VE HEARD THE PHONE CALL.  THERE WAS A

15   CONCURRENT TRANSCRIPT SHOWN TO THE JURY.  THIS IS HIS WRITING,

16   AND I PRESUME THIS IS HIS WRITING AS TO WHAT HE BELIEVES THE

17   PHONE CALL WAS.  PRESUMABLY HE WROTE THIS DOWN.

18        I'M GOING TO ALLOW IT TO COME IN.  I DON'T THINK IT'S -- I

19   THINK IT CORROBORATES HIS TESTIMONY SUCH THAT AND YOU WILL

20   CERTAINLY HAVE AN OPPORTUNITY TO CROSS-EXAMINE ON THIS.  I

21   DON'T THINK THAT THIS IN ANY WAY PRESENTS ANY PREJUDICE, UNFAIR

22   PREJUDICE TO YOUR CLIENT THAT BASICALLY AS YOU POINT OUT IT

23   CORROBORATES WHAT HE DID.

24              MR. ARCHER:  OKAY.  SO THAT HIS -- I APOLOGIZE.  I

25   UNDERSTAND THAT THE COURT HAS JUST INDICATED THE RULING, BUT WE

1    HAVE HERE IN THE E-MAIL THAT HE'S SAYING IF THIS FOLLOWS A

2    GENERAL PATTERN OF HARASSMENT, HOW THIS WOULD COME IN FOR A

3    NON-HEARSAY PURPOSE.  IT'S HOW THE JURY IS GOING TO CONSIDER

4    THIS AND NOT BE PREJUDICED BY THIS.

5        BUT I UNDERSTAND THE COURT'S LIMITING INSTRUCTION, BUT,

6    FRANKLY, IT'S GOING TO BE HARD FOR A JURY TO LOOK AT THIS AND

7    NOT SAY, OH, WELL, THIS IS THE GENERAL PATTERN OF HARASSMENT.

8            THE COURT:  THAT PART OF IT -- AND THANK YOU FOR

9    RAISING IT -- THAT PART OF IT I THINK IT HAS SOME PROBLEMS

10   WITHOUT A FOUNDATION, AND I DON'T KNOW IF THERE'S GOING TO BE A

11   FOUNDATION RAISED.  HE DID INDICATE THAT, HE, THE WITNESS,

12   INDICATED RECEIVING NUMEROUS PHONE CALLS ALREADY.

13       NOW, I THINK, COUNSEL, IF YOU WANT TO ASK ADDITIONAL

14   FOUNDATIONAL QUESTIONS, AND THEN IF HE'S -- IF THAT'S THE

15   GENERAL PATTERN, IF THAT'S WHAT HE DESCRIBES AS HIS GENERAL

16   PATTERN OF HARASSMENT OR HIS OPINION OF WHAT HARASSMENT WAS TO

17   HIM, THEN I THINK IT'S HIS OPINION OF WHAT THE PHONE CALLS

18   WERE, YOU CAN CERTAINLY CROSS-EXAMINE ON THAT.

19       BUT THIS IS BASICALLY HIS REPORT OF RECEIVING THESE CALLS.

20   SO --

21           MR. ARCHER:  RIGHT.  I MEAN, IT'S AN OUT-OF-COURT

22   STATEMENT.  I MEANT --

23           THE COURT:  SURE, SURE.  COUNSEL COULD ASK HIM TO

24   BASICALLY RECITE THIS AND TESTIFY ABOUT AUDIBLY WHAT DID YOU

25   REPORT AND HE COULD READ THIS AND IT WOULD BE IN FRONT OF THE

1    JURY.  I UNDERSTAND THE DIFFERENCE IS THAT THE HARD COPY IS IN

2    FRONT OF THEM AS OPPOSED TO JUST THE PURPLE COPY, BUT I DON'T

3    THINK THERE'S ANY UNFAIR PREJUDICE AS TO JUST ALLOWING THE

4    DOCUMENTS TO COME IN BUT I THINK YOU SHOULD, IF YOU CAN, LAY A

5    FOUNDATION.  I'M NOT GOING TO ADMIT IT JUST YET ABSENT THAT

6    FOUNDATIONAL AS TO GENERAL PATTERN.

7         OKAY?  ALL RIGHT.  THANK YOU.

8         (END OF DISCUSSION AT SIDE-BAR.)

9         THE COURT:  THANK YOU, COUNSEL.

10    SO, COUNSEL, IF YOU HAVE ANY OTHER ADDITIONAL FOUNDATIONAL

11    QUESTIONS.

12         MS. PENNA:  THANK YOU, YOUR HONOR.

13   Q.   MR. HESSENFLOW, YOU'VE TOLD US THAT THERE WERE NUMEROUS

14    PHONE CALLS AND TEXT MESSAGES THAT YOU RECEIVED FROM THE

15    DEFENDANT AT AROUND THIS TIME.  WERE THERE OTHER INTERACTIONS

16    OR OTHER CONTACT THAT YOU HAD WITH THE DEFENDANT AROUND THIS

17    DATE?

18   A.   LET'S SEE.

19         THE COURT:  SIR, ARE YOU REFERRING TO SOMETHING TO

20    REFRESH YOUR RECOLLECTION?

21         THE WITNESS:  YES.

22         THE COURT:  ALL RIGHT.  THANK YOU.

23         THE WITNESS:  RIGHT AROUND THAT DATE, THE FOLLOWING

24    DAY THERE WAS A CRAIGSLIST POSTING I BELIEVE WAS COMING IN.

25         MS. PENNA:  OKAY.

DIRECT HESSENFLOW BY MS. PENNA

```
 1      Q.   COULD YOU DESCRIBE THIS CRAIGSLIST POSTING?

 2      A.   IT WAS A POSTING LISTING A 1985 PORSCHE FOR SALE FOR A

 3      DOLLAR AND IT GAVE MY ADDRESS.

 4      Q.   HOW DID YOU SEE THIS POST?

 5      A.   I WAS TOLD ABOUT IT BY A NEIGHBOR WHO HAD SEEN SOMEONE ON

 6      MY ROAD LOOKING FOR MY PLACE AND THAT PERSON HAD A COPY OF THE

 7      CRAIGS AD WITH THEM.

 8      Q.   OKAY.  AND YOU DID NOT MAKE THIS POST?

 9      A.   NO, I DID NOT.

10      Q.   WAS YOUR HOME ADDRESS LISTED?

11      A.   YES, IT WAS.

12      Q.   AND WHAT IS THAT ADDRESS?

13      A.   23097 SUMMIT ROAD.

14      Q.   DID ANYONE SHOW UP TO BUY YOUR CAR?

15              MR. ARCHER:  OBJECTION, RELEVANCE.

16              THE COURT:  OVERRULED.  THAT IS, IF YOU HAD CONTACT

17      WITH.

18              THE WITNESS:  WELL, I SAW ONE PERSON HAD BEEN TO MY

19      HOUSE THAT I SAW ON SURVEILLANCE VIDEO.

20              MR. ARCHER:  OBJECTION, YOUR HONOR.  MAY WE GO

21      SIDE-BAR?

22              THE COURT:  THIS IS IN RELATION TO THE PORSCHE AD?

23              THE WITNESS:  YES.  THERE WAS ANOTHER THAT MY

24      NEIGHBOR HAD TURNED AWAY THAT I DID NOT SEE HIM, AND THERE WAS

25      A THIRD THAT I SAW AT THE MAILBOXES THAT I TURNED AWAY.
```

1             MR. ARCHER:  I WITHDRAW THE OBJECTION.

2     BY MS. PENNA:

3     Q.   MR. HESSENFLOW, DID YOU KEEP TRACK OF YOUR CONTACT THAT

4     YOU HAD WITH THE DEFENDANT?

5     A.   YES, I DID.

6     Q.   WHY DID YOU DECIDE TO DO THAT?

7             MR. ARCHER:  OBJECTION, RELEVANCE.

8             THE COURT:  OVERRULED.

9             THE WITNESS:  BECAUSE EARLIER IN THE AFTERNOON WITH

10    HIM HE WAS AGGRESSIVE.

11    BY MS. PENNA:

12    Q.   WHEN WOULD YOU WRITE DOWN THESE ENTRIES?

13    A.   AS SOON AS I WAS ABLE TO.

14    Q.   CAN YOU DESCRIBE SOME OF THE INSTANCES THAT WOULD SPUR YOU

15    TO MAKE AN ENTRY IN THAT LOG?

16            MR. ARCHER:  OBJECTION, RELEVANCE.

17            THE COURT:  OVERRULED.

18            THE WITNESS:  WELL, I PUT ENTRIES IN FOR EACH OF THE

19    PHONE CALLS THAT I RECEIVED AND EACH TIME SOMETHING ELSE

20    HAPPENED I BELIEVED HE WAS BEHIND SUCH AS THE CRAIGSLIST AD AND

21    THE CALL FROM THE I.R.S. AGENT.

22    BY MS. PENNA:

23    Q.   AND BASED ON THIS, IS THAT THE REASON THAT WHEN YOU

24    RECEIVED THE I.R.S. PHONE CALL YOU -- WHEN YOU SENT AN E-MAIL

25    TO LAW ENFORCEMENT WAS THERE A REASON THAT YOU SPECIFICALLY

1     SENT -- REACHED OUT TO THEM?

2     A.   WELL, YES, I BELIEVED THAT THE CALL WAS -- I DIDN'T KNOW

3     IT WAS HIM AT THE TIME, BUT I BELIEVED IT WAS ORIGINATED BY

4     MR. YORK.

5     Q.   AND WHY DID YOU THINK THAT?

6     A.   BECAUSE IT FOLLOWED THE SAME PATTERN OF HARASSMENT THAT

7     HAD BEEN THE PREVIOUS WEEK OF PHONE CALLS THAT HE HAD BEEN

8     ENGAGED IN.

9     Q.   SO THE PATTERN OF HARASSMENT HAD BEEN GOING ON FOR HOW

10    LONG PRIOR TO YOUR RECEIVING THAT PHONE CALL?

11              MR. ARCHER:  OBJECTION, ASKED AND ANSWERED.

12              THE COURT:  OVERRULED.

13              THE WITNESS:  WELL, THE PHONE CALLS I'D HAVE TO LOOK

14    AT MY LOG TO SEE.

15              THE COURT:  AND ARE YOU REFERRING TO YOUR LOG NOW TO

16    REFRESH YOUR RECOLLECTION?

17              THE WITNESS:  YES, I AM.

18              THE COURT:  PLEASE GO RIGHT AHEAD.  THANK YOU.

19              THE WITNESS:  AND IT LOOKS LIKE THE PHONE CALLS

20    BEGAN IN MID-FEBRUARY.

21              MS. PENNA:  YOUR HONOR, AT THIS TIME THE GOVERNMENT

22    WOULD MOVE TO PUBLISH EXHIBIT 5, WHICH IS THE E-MAIL THAT WE'VE

23    PREVIOUSLY DISCUSSED.

24              MR. ARCHER:  OBJECTION, HEARSAY.

25              THE COURT:  THANK YOU.  I'LL OVERRULE THE OBJECTION,

1    AND I'LL ADMIT IT NOTING THE OBJECTION.  IT IS ADMITTED, AND IT

2    MAY BE PUBLISHED.

3         (GOVERNMENT'S EXHIBIT 5 WAS RECEIVED IN EVIDENCE.)

4    BY MS. PENNA:

5    Q.   MR. HESSENFLOW, THIS IS EXHIBIT 5 IN THE BINDER IF YOU CAN

6    READ THAT BETTER.

7         WHO IS THIS E-MAIL FROM?

8    A.   THIS IS FROM ME.

9    Q.   AND WHEN WAS IT SENT?

10   A.   FEBRUARY 24TH.

11   Q.   AND HOW LONG AFTER YOU RECEIVED THE VOICEMAIL WAS THIS

12   DISCUSSED AND SENT?

13   A.   THE NEXT DAY.

14   Q.   AND WHO WAS THIS SENT TO?

15   A.   TIGTA.

16   Q.   AND WHAT WAS THE SUBJECT OF THIS E-MAIL?

17   A.   IMPERSONATING I.R.S. PERSONNEL.

18   Q.   AND DID YOU CREATE THAT SUBJECT LINE?

19   A.   YES, I DID.

20   Q.   COULD YOU READ THIS E-MAIL TO THE JURY?

21   A.   IT SAYS, "HELLO, ON THURSDAY, FEBRUARY 23, 2012, AT 1:25

22   P.M. I RECEIVED A MESSAGE ON MY HOME PHONE ANSWERING MACHINE

23   CLAIMING TO BE FROM THE I.R.S.  I HAVE KEPT THE RECORDING.  THE

24   NUMBER ON THE CALLER ID WAS 708-565-1040, AND I BELIEVE THAT

25   NUMBER WAS SPOOFED, AND I BELIEVE I KNOW WHO IS BEHIND IT,

1    DOUGLAS YORK OF MORGAN HILL, CALIFORNIA, AS THIS FOLLOWS A

2    GENERAL PATTERN OF HARASSMENT FROM HIM."

3        A TRANSCRIPT IS HERE.

4        "HELLO, ALLAN.  MY NAME IS GIGI SMITH.  I'M WITH THE

5    I.R.S., INTERNAL REVENUE SERVICE, AND I'M CALLING YOU (GARBLED)

6    TAX AUDIT SOME INFORMATION (GARBLED) AND WE WOULD LIKE TO CHECK

7    YOUR RECORDS FOR THE FOLLOWING YEARS 2005, 2006, 2007, AND IF

8    YOU COULD PLEASE RETURN MY CALL AT THE NUMBER LISTED ON YOUR

9    CALLER ID THAT WOULD BE APPRECIATED.  AND, ONCE AGAIN, IF WE

10   CANNOT REACH YOU, WE WILL DEFINITELY BE CHECKING INTO YOUR

11   PAST, AND I'LL BE LOOKING INTO YOUR RECORDS.  THANKS A LOT AND

12   WE'LL CALL YOU BACK TOMORROW."

13   Q.   THANK YOU, MR. HESSENFLOW.  DID SOMEONE CONTACT YOU FROM

14   TIGTA IN RESPONSE?

15   A.   YES.

16   Q.   AND WHO WAS THAT?

17   A.   AGENT JOHN HARTMAN.

18   Q.   AND WHAT DID YOU DO IN RESPONSE TO BEING CONTACTED BY THAT

19   PERSON?

20        MR. ARCHER:  RELEVANCE, YOUR HONOR.  OBJECTION.

21        THE COURT:  OVERRULED.

22        THE WITNESS:  HE REQUESTED A COPY OF THE RECORDING

23   WHICH I SENT HIM.

24   BY MS. PENNA:

25   Q.   AND HOW WERE YOU ABLE TO SEND HIM A RECORDING?

1    A.   I HAD USED THE HANDHELD DIGITAL RECORDER TO RECORD A COPY

2    OF IT FROM THE ANSWERING MACHINE AND TRANSFERRED A FILE FROM

3    THAT ONTO MY COMPUTER AND E-MAILED IT TO HIM.

4    Q.   OKAY.  THAT TRANSCRIPT THAT WAS AT THE BOTTOM OF THE

5    MESSAGE, IS THAT SOMETHING THAT YOU WROTE?

6    A.   YES, IT IS.

7    Q.   AND WHEN DID YOU MAKE THAT TRANSCRIPT?

8    A.   EITHER THE END OF EVENING OF THE 23RD OR THE MORNING OF

9    THE 24TH.

10   Q.   AND AT WHAT TIME DID YOU STATE THAT YOU RECEIVED THE

11   VOICEMAIL MESSAGE?

12   A.   1:25 P.M.

13   Q.   YOU WROTE THAT THE NUMBER ON THE CALLER ID WAS A NUMBER

14   STARTING IN 708.  IS THAT THE NUMBER THAT WE DISCUSSED EARLIER?

15   A.   YES, IT IS.

16   Q.   WHY IN THIS E-MAIL DID YOU USE THE WORD "SPOOFED"?

17   A.   I HAD HAD A PREVIOUS INCIDENT WHERE SOMEONE HAD USED A

18   CREDIT CARD, MY CREDIT CARD, TO SEND MONEY TO WESTERN UNION,

19   AND WESTERN UNION TOLD ME THAT THE TRANSMISSION WAS FROM MY

20   HOME PHONE, AND I RESEARCHED HOW THAT WAS POSSIBLE AND FOUND

21   SPOOFING.

22   Q.   AND WHEN WAS THAT?

23   A.   I DON'T RECALL.  IT WAS AT LEAST A YEAR EARLIER THAN THIS.

24   Q.   OKAY.  ARE YOU AWARE OF A FACEBOOK POST THAT PERTAINED TO

25   YOU DURING THIS TIMEFRAME?

1      A.   YES, I AM.

2      Q.   AND CAN YOU DESCRIBE THIS POST?

3           MR. ARCHER:  OBJECTION, RELEVANCE.

4           THE COURT:  OVERRULED.

5           THE WITNESS:  DOUG POSTED MY -- A MESSAGE SAYING

6      THAT HIS GIRLS ARE AT MY PLACE AND IMPLYING I'M A DANGER TO

7      THEM AND GAVE MY ADDRESS.

8      BY MS. PENNA:

9      Q.   COULD YOU PLEASE TURN TO WHAT HAS BEEN MARKED AS

10     GOVERNMENT'S EXHIBIT 8.

11          DO YOU RECOGNIZE THIS DOCUMENT, MR. HESSENFLOW?

12     A.   YES, THAT IS THE FACEBOOK POST.

13     Q.   AND HOW ARE YOU ABLE TO RECOGNIZE IT?

14     A.   IT SHOWS THAT IT IS DOUGLAS YORK'S FACEBOOK PAGE, AND I

15     RECOGNIZE THE POST ITSELF.

16          MR. ARCHER:  OBJECTION, FOUNDATION.

17     BY MS. PENNA:

18     Q.   MR. HESSENFLOW?

19          THE COURT:  I'M SORRY.  I NEED TO RULE ON IT.

20          MS. PENNA:  SORRY.

21          THE COURT:  OVERRULED.  YOU CAN ASK ANOTHER

22     QUESTION.

23          MS. PENNA:  THANK YOU.  SORRY, YOUR HONOR.

24     Q.   MR. HESSENFLOW, HOW DID YOU FIRST SEE THIS POST?

25     A.   I WAS NOTIFIED OF IT BY A FRIEND.

1    Q.   WERE YOU ABLE TO -- HOW DID YOU FIRST SEE THE POST ITSELF?

2    A.   HE PROVIDED A PRINTOUT.

3    Q.   AND DOES THIS DOCUMENT REFLECT THAT PRINTOUT THAT YOU

4    REVIEWED?

5    A.   YES, IT DOES.

6             MS. PENNA:  YOUR HONOR, THE GOVERNMENT MOVES TO

7    ADMIT THIS EXHIBIT.

8             MR. ARCHER:  OBJECTION, HEARSAY AND FOUNDATION.

9             THE COURT:  IT WILL BE ADMITTED NOTING YOUR

10   OBJECTION.

11            MS. PENNA:  AND PERMISSION TO PUBLISH IT, YOUR

12   HONOR?

13            THE COURT:  IT MAY BE PUBLISHED.

14       (GOVERNMENT'S EXHIBIT 8 WAS RECEIVED IN EVIDENCE.)

15   BY MS. PENNA:

16   Q.   MR. HESSENFLOW, CAN YOU READ THIS POST TO THE JURY?

17   A.   "MY EX-WIFE TOOK MY GIRLS UP TO HIS PLACE ON THE SUMMIT

18   OFF OF HIGHWAY 17.  MY GIRLS SHOULD HAVE CALLED ME.  EVERY TIME

19   I CALLED MY EX IT WAS RINGING TO THE E-MAIL.  NOW JUST THE

20   VOICEMAIL AND NO REPLY IN TEXTS OR CALLS.  HE ANSWERED THE

21   HOUSE PHONE BUT HUNG UP WHEN I ASKED FOR MY GIRLS.  THEY ALWAYS

22   CALL TO SAY GOODNIGHT.  IF ANYONE IS BY TRAIL RIDGE DRIVE, THE

23   ADDRESS IS 23097 SUMMIT ROAD, LOS GATOS."

24   Q.   THANK YOU.  WHAT DATE DID YOU SEE THIS POST?

25   A.   IT WAS IN MARCH.  I'D HAVE TO LOOK UP THE EXACT DATE.

```
 1      Q.   COULD YOU DO THAT.

 2      A.   I SAW IT ON MARCH 17TH.

 3      Q.   DO YOU REMEMBER IF THE DEFENDANT HAD CALLED YOU ON THAT

 4      DATE?

 5      A.   HE HAD CALLED THE NIGHT BEFORE.

 6      Q.   DO YOU REMEMBER WHAT HAPPENED?  DID YOU SPEAK TO HIM?

 7      A.   ONLY VERY BRIEFLY.

 8      Q.   OKAY.  WERE HIS DAUGHTERS AT YOUR HOUSE?

 9      A.   THEY WERE NOT.

10      Q.   IS THAT YOUR HOME ADDRESS THAT IS LISTED ON THE POSTING?

11      A.   YES, IT IS.

12      Q.   IS THAT THE SAME ADDRESS THAT WAS LISTED PUBLICLY ON THE

13      CRAIGSLIST POSTING?

14      A.   YES, IT IS.

15      Q.   HAD THE DEFENDANT MADE OTHER ALLEGATIONS ABOUT YOU BEING A

16      DANGER TO HIS CHILDREN?

17              MR. ARCHER:  OBJECTION, RELEVANCE.

18              THE COURT:  SUSTAINED.

19           SO YOU TOLD US MARCH 17TH.  WHAT YEAR WAS THAT?

20              THE WITNESS:  2012.

21              MS. PENNA:  NO OBJECTION, YOUR HONOR.  WE'LL MOVE

22      ON.  THANK YOU.

23      Q.   MR. HESSENFLOW, HAD YOU EVER HAD THE CHANCE TO SEE THE

24      DEFENDANT'S PHONE BILL OR OTHER RECORDS?

25      A.   YES, I HAVE.
```

1    Q.   AND HOW WERE YOU ABLE TO SEE THEM?

2    A.   THEY WERE PROVIDED BY ANDREA YORK.

3    Q.   AND WHEN WAS THIS?

4    A.   I'M NOT SURE OF THE EXACT TIME.  IT WAS APRIL OR MAY OF

5    2012.

6    Q.   AND DID YOU SEE THE PHONE BILL FOR THE MONTH OF FEBRUARY

7    2012?

8                MR. ARCHER:  OBJECTION, RELEVANCE.

9                THE WITNESS:  YES, I DID.

10               THE COURT:  I'M SORRY?

11               MR. ARCHER:  OBJECTION, RELEVANCE.

12               THE COURT:  OVERRULED.  THE ANSWER CAN REMAIN.

13               THE WITNESS:  YES, I DID.

14   BY MS. PENNA:

15   Q.   WOULD YOU PLEASE TURN TO GOVERNMENT'S EXHIBIT 3 WHICH HAS

16   BEEN ADMITTED INTO EVIDENCE AND PLEASE TURN TO PAGE 310.

17               MR. ARCHER:  YOUR HONOR, TO CLARIFY, GOVERNMENT'S

18   EXHIBIT 3 HAS NOW BEEN ADMITTED INTO EVIDENCE?

19               THE COURT:  IT HAS BEEN ADMITTED.

20               MS. PENNA:  IT HAS BEEN ADMITTED.

21               THE COURT:  LET'S HAVE A SIDE-BAR, PLEASE.

22        (SIDE-BAR CONFERENCE ON THE RECORD.)

23               THE COURT:  WE'RE AT SIDE-BAR OUTSIDE OF THE

24   PRESENCE OF THE JURY.  I THINK THIS REFERENCES THE CONVERSATION

25   THAT WE HAD ABOUT AN AGREEMENT THAT FOUNDATIONAL WITNESSES

1    WOULD NOT BE REQUIRED.

2         MR. ARCHER:  IT IS AS TO THE ELEMENTS LAID OUT AND

3    THE CERTIFICATES PROVIDED BY THE GOVERNMENT FOR THE DOCUMENTS

4    BUT BEYOND THAT THEM BEING BUSINESS RECORDS OR ANY RELEVANCE,

5    YOU KNOW, THAT COULD POTENTIALLY BE HEARSAY.

6         THE COURT:  SO MY RECOLLECTION OF OUR CONVERSATION

7    DURING OUR PRETRIAL DISCUSSION WAS THAT THERE WAS SOME

8    AGREEMENT ABOUT THE FOUNDATIONAL ISSUE AND THAT I THINK THE

9    DEFENSE AGREED THAT WITNESSES WOULD NOT NEED TO BE CALLED OUT

10   FOR BUSINESS RECORD PURPOSES.

11        MR. ARCHER:  UNDERSTOOD.

12        THE COURT:  MY RECOLLECTION WAS THAT THERE WAS STILL

13   A RESERVATION AS TO ANY OF THE SPECIFICS AS TO THE RECORDS.

14   MAYBE I'M WRONG ABOUT THAT, BUT THAT WAS MY --

15        MR. SCHENK:  A COUPLE OF THINGS.  FIRST, THERE

16   COULDN'T BE A HEARSAY OBJECTION ANY LONGER.  THAT'S THE

17   EXCEPTION OF THE BUSINESS RECORDS.  THEY WOULD COME IN IF WE

18   GET OVER THE RELEVANCE HURDLE.  THE RELEVANCE IS THAT THESE

19   RECORDS SHOW THAT THEY ARE FROM THE TIMEFRAME WHEN THEY SHOW

20   THE PHONE CALL AND THAT THEY'RE CLOSE IN TIME AND WHEN THEY

21   SHOW THE PHONE CALLS, THE PATTERN OF THE HARASSING PHONE CALLS

22   THAT THE WITNESS TESTIFIED TO.

23        MR. ARCHER:  IS THE INTENTION TO THEN -- I APOLOGIZE

24   FOR GRABBING AT THE COURT'S COPY BUT IF WE CAN TAKE A LOOK

25   HERE, WE'RE LOOKING AT --

DIRECT HESSENFLOW BY MS. PENNA

1          THE COURT:  YOU SEE, MY QUESTION WAS WHETHER OR

2    NOT -- AND YOU'RE ABSOLUTELY CORRECT THAT THE FOUNDATION LAID

3    IS THAT THIS IS A BUSINESS RECORD AND IT'S OTHERWISE

4    ADMISSIBLE.  IT HASN'T, I GUESS, TECHNICALLY BEEN MOVED INTO

5    EVIDENCE BUT AT THE PRETRIAL CONFERENCE, AND I HATE TO FORMALLY

6    DO IT ON THE RECORD, I THINK.

7        BUT THE OTHER QUESTION IS WHETHER OR NOT THERE WERE OTHER

8    PHONE NUMBERS ON HERE THAT ARE RELEVANT TO THIS CASE.  I DON'T

9    KNOW THE ANSWER TO THAT QUESTION.

10          MR. SCHENK:  I'M CERTAIN THAT THEY ARE BUT NOT IN

11    THE WAY THAT MAKES THE EXHIBIT IRRELEVANT.  ALTHOUGH NUMBERS,

12    IT'S A BANK RECORDS CASE, YOU CAN MOVE THE BANK RECORDS IN EVEN

13    IF THE TRANSACTION IS INVOLVED.

14          THE COURT:  SURE.

15          MR. ARCHER:  OUR QUESTION IS THAT ARE WE INTENDING

16    TO MOVE THEM UP TO MARCH 16TH?  MY QUESTION IS IS IT THE

17    GOVERNMENT'S INTENTION TO MOVE ALL OF THE PHONE RECORDS FROM

18    EVERY PHONE CALL MADE BY MS. BEALE OR HER SON PER THE

19    GOVERNMENT'S THEORY?

20          THE COURT:  WELL, THE DOCUMENT COMES IN BUT THE

21    DISCUSSION WOULD BE ABOUT THE SPECIFIC NUMBERS, I PRESUME.  I

22    DON'T KNOW IF THERE'S GOING TO BE A QUESTION ABOUT NUMBERS THAT

23    ARE NOT RELATED TO THIS CASE.  I'D SUSTAIN A RELEVANCE

24    OBJECTION TO THAT.

25          MS. PENNA:  THERE'S NOT.

DIRECT HESSENFLOW BY MS. PENNA

```
1                THE COURT:  BUT IF THERE'S OTHER -- IF THERE ARE

2      PHONE CALLS THAT ARE ATTACHED TO THAT THEN IT COMES IN AS A

3      BUSINESS RECORD EXCEPTION AND THE WHOLE DOCUMENT COMES IN, THEN

4      THE QUESTION IS WHETHER OR NOT THESE OTHER INDIVIDUAL LINES OF

5      QUESTIONING AS TO NUMBERS THAT MIGHT NOT BE RELEVANT TO THIS

6      CASE ARE APPROPRIATE FOR THE CASE.

7                MR. ARCHER:  OKAY.

8                MR. SCHENK:  THANK YOU.

9                THE COURT:  ANYTHING FURTHER?

10               MR. ARCHER:  NO.

11               THE COURT:  ALL RIGHT.  THANK YOU.

12          (END OF DISCUSSION AT SIDE-BAR.)

13               THE COURT:  THANK YOU, COUNSEL.  SO LET'S SEE,

14     EXHIBIT 3, YOU'RE MOVING EXHIBIT 3 INTO EVIDENCE?

15               MS. PENNA:  YES, YOUR HONOR.  THANK YOU.

16               THE COURT:  ANY OBJECTION?

17               MR. ARCHER:  NO, YOUR HONOR.

18               THE COURT:  IT'S ADMITTED.

19          (GOVERNMENT'S EXHIBIT 3 WAS RECEIVED IN EVIDENCE.)

20               MS. PENNA:  PERMISSION TO PUBLISH THIS EXHIBIT, YOUR

21     HONOR?

22               THE COURT:  YOU HAVE CERTAIN PORTIONS OF THE

23     EXHIBIT?

24               MS. PENNA:  YES, YOUR HONOR.  AT THIS TIME WE WILL

25     BE PUBLISHING PAGE 310.
```

1                    THE COURT:  ALL RIGHT.

2       BY MS. PENNA:

3       Q.   MR. HESSENFLOW, DO YOU RECOGNIZE THESE RECORDS?

4       A.   YES, I DO.

5       Q.   AND WHAT ARE THEY?

6       A.   IT'S A PHONE BILL.

7       Q.   IS THIS THE PHONE BILL THAT YOU DISCUSSED THAT YOU

8       PREVIOUSLY REVIEWED?

9       A.   YES, IT IS.

10      Q.   COULD YOU PLEASE TURN TO PAGE 311.

11           ARE THESE RECORDS IN THE DEFENDANT'S NAME?

12      A.   NO, THEY'RE IN HIS MOTHER'S NAME.

13      Q.   WHAT IS HIS MOTHER'S NAME?

14      A.   PAMELA BEALE.

15      Q.   AND HOW DO YOU KNOW THAT THIS IS THE DEFENDANT'S CELL

16      PHONE RECORDS?

17      A.   IT'S FOR HIS PHONE NUMBER.

18           MR. ARCHER:  OBJECTION, FOUNDATION.  ASSUMES FACTS

19      NOT IN EVIDENCE.

20           THE COURT:  DO YOU WANT TO LAY A FOUNDATION AS TO

21      THAT, AS TO WHETHER OR NOT THIS IS HIS CELL PHONE.

22           MS. PENNA:  I THINK WE HAVE ESTABLISHED THAT EARLIER

23      IN THE TESTIMONY BUT I'M HAPPY TO REDISCUSS.

24           THE COURT:  WHY DON'T YOU.

25      BY MS. PENNA:

1    Q.   MR. HESSENFLOW, DO YOU KNOW MR. YORK'S PHONE NUMBER?

2    A.   YES.

3    Q.   AND WHAT IS THAT PHONE NUMBER?

4    A.   408-710-9450.

5    Q.   AND HOW DO YOU KNOW THAT PHONE NUMBER?

6    A.   HE CALLED ME NUMEROUS TIMES FROM THAT NUMBER.

7    Q.   AND WHEN SOMEONE WOULD CALL YOU FROM THAT PHONE NUMBER AND

8    YOU WOULD PICK UP, WHO WOULD BE ON THE OTHER END?

9    A.   MR. YORK.

10   Q.   AT ANY TIME DID HE TELL YOU THAT WAS HIS CELL PHONE

11   NUMBER?

12   A.   I BELIEVE A TEXT MESSAGE THAT HE SENT ME SAID THAT.

13   Q.   MR. HESSENFLOW, WHAT DID YOU LOOK FOR ON THAT BILL?

14   A.   I --

15           MR. ARCHER:  OBJECTION, RELEVANCE.

16           THE COURT:  OVERRULED.

17           THE WITNESS:  I LOOKED FOR CALLS ON FEBRUARY 23RD

18   AROUND 1:25 P.M.

19   BY MS. PENNA:

20   Q.   WHY AT THAT TIME AND ON THAT DAY?

21   A.   BECAUSE THAT WAS THE TIME OF THE I.R.S. IMPERSONATION

22   CALL.

23   Q.   OKAY.  WHAT DID YOU FIND?

24   A.   I FOUND THAT THERE HAD BEEN TWO CALLS AT THAT TIME BOTH TO

25   AN 866 NUMBER.

1    Q.   AND COULD WE PLEASE TURN TO PAGE 313.

2         COULD YOU IDENTIFY WHERE ON THIS PAGE THE TWO PHONE CALLS

3    ARE THAT YOU JUST MENTIONED?

4    A.   ON 315?  IT WOULD HAVE TO BE EARLIER THAN THAT.

5    Q.   315?

6    A.   YES.  THEY ARE NEAR THE TOP.

7    Q.   MR. HESSENFLOW, ON PAGE 313?

8    A.   YES, SIXTH AND SEVENTH LINES ON PAGE 313.

9    Q.   THANK YOU.  AND COULD YOU READ THE DATE AND TIME AND THE

10   PHONE NUMBER ON THE FIRST PHONE CALL?

11   A.   2:23 AND 1:24 P.M.

12   Q.   AND WHAT WAS THE PHONE NUMBER CALLED?

13   A.   866-967-6594.

14   Q.   WHAT ABOUT THE SECOND PHONE CALL?

15   A.   THAT'S TO THE SAME NUMBER AT 1:25 P.M.

16   Q.   WHAT TIME DID YOU RECEIVE THE VOICEMAIL?

17   A.   AT 1:25 P.M.

18   Q.   AND DO YOU RECOGNIZE THIS NUMBER HERE?

19   A.   I DO BECAUSE I SEARCHED FOR IT AT THE TIME.

20   Q.   AND WHAT DID YOU FIND FROM THAT SEARCH?

21   A.   I FOUND THAT IT BELONGS TO SPOOFCARD.

22   Q.   AND WHAT IS SPOOFCARD?

23   A.   IT'S A SERVICE THAT ALLOWS YOU TO SPOOF YOUR PHONE NUMBER.

24   Q.   AND COULD YOU DESCRIBE WHAT SPOOF MEANS?

25   A.   IT MEANS --

DIRECT HESSENFLOW BY MS. PENNA

```
 1            MR. ARCHER:  OBJECTION, FOUNDATION.

 2            THE COURT:  DO YOU WANT TO ASK HIM HIS UNDERSTANDING

 3     OF SPOOF?

 4     BY MS. PENNA:

 5     Q.   COULD YOU TELL US YOUR KNOWLEDGE ABOUT WHAT THE WORD

 6     "SPOOF" MEANS IN THE CONTEXT OF THIS COMPANY?

 7     A.   IT MEANS CALLING SOMEONE WITH -- IT WAS SELECT A NUMBER

 8     THAT YOU WANT TO SHOW UP ON THE CALLER ID.

 9     Q.   OKAY.  HOW DID YOU KNOW ABOUT THIS COMPANY?

10     A.   I BELIEVE I ENCOUNTERED IT IN THE PREVIOUS SEARCH IN THE

11     WESTERN UNION CASE, BUT I IMMEDIATELY, WHEN I SEARCHED THE

12     NUMBER THIS TIME, IT TURNED UP THE SPOOFCARD, AND I LOOKED UP

13     THEIR WEBSITE.

14     Q.   OKAY.  WHAT DID YOU DO NEXT?

15     A.   I SET UP AN ACCOUNT FROM SPOOFCARD MYSELF AND EXPERIMENTED

16     WITH IT.

17     Q.   AND CAN YOU DESCRIBE WHAT IT MEANS THE STEPS OF MAKING AN

18     ACCOUNT ON SPOOFCARD?

19            MR. ARCHER:  OBJECTION, RELEVANCE.

20            THE COURT:  OVERRULED.

21            THE WITNESS:  I CREATED AN ACCOUNT ON THE WEBSITE

22     AND IT REQUESTED AN E-MAIL ADDRESS AND CREDIT CARD NUMBER TO

23     PAY FOR IT.

24     BY MS. PENNA:

25     Q.   DID YOU MAKE ANY CALLS ON THAT SERVICE?
```

1    A.   YES.

2    Q.   AND WHAT KIND OF CALLS?

3    A.   I CALLED MYSELF AND FIRST VERIFIED WHAT IT EXPLAINED THE

4    SPOOFING OF CALLER ID, WHICH IT DID, AND AFTER THAT I TRIED

5    USING THEIR VOICE CHANGING OPTIONS AND PLAYED A RECORDING OF

6    ANOTHER MESSAGE THAT I HAD FROM MR. YORK THROUGH IT.

7    Q.   AND YOU DESCRIBED A VOICE CHANGING OPTION.  CAN YOU

8    DESCRIBE THAT MORE?

9    A.   YES.  THEY OFFERED TWO VOICE CHANGE OPTIONS, ONE FOR MALE

10   AND ONE FOR FEMALE VOICES.

11   Q.   OKAY.  COULD YOU ELABORATE ON -- YOU SAID YOU PLAYED A

12   VOICEMAIL MESSAGE THAT YOU HAD OF THE DEFENDANT?

13   A.   YES, I USED ONE OF THE OTHER RECORDINGS THAT THEY LEFT ON

14   MY ANSWERING MACHINE, AND I CALLED SPOOFCARD THROUGH MY CELL

15   PHONE, CALLED MY HOME PHONE AND PLAYED THE RECORDING OF HIS

16   VOICE THROUGH IT.

17   Q.   AND WHAT HAPPENED NEXT?

18   A.   I LISTENED TO THE RESULT ON MY OWN NUMBER AND WHICH

19   SOUNDED EXACTLY LIKE THE VOICE OF THE I.R.S. AGENT.

20   Q.   MR. HESSENFLOW, COULD YOU NOW TURN TO PAGE 312 OF THESE

21   RECORDS.  IS THIS WHERE THE RECORDS START FOR THE CALLS MADE ON

22   FEBRUARY 23RD, 2012?

23   A.   YES, IT IS.

24   Q.   AND DO YOU SEE OTHER CALLS THAT WERE MADE TO EITHER OF

25   YOUR PHONE NUMBERS?

1    A.   YES, I DO.

2    Q.   WOULD YOU REMIND US WHAT YOUR PHONE NUMBERS ARE,

3    MR. HESSENFLOW?

4    A.   408-761-2742 AND 408-353-6292.

5    Q.   WILL YOU WALK US THROUGH THE RECORDS FOR THIS ONE DAY

6    FEBRUARY 2012, AND HIGHLIGHT FOR US THE TIME THAT THE DEFENDANT

7    DIALLED ONE OF YOUR NUMBERS?

8    A.   IT IS ONE 12:28 A.M., 12:30 A.M., 12:43 A.M., 10:34 A.M.,

9    10:37 A.M., 10:39 A.M., 10:51, 10:52 A.M., 10:56 A.M.

10   Q.   ARE WE TURNING THE PAGE?

11   A.   YES, THE NEXT PAGE.

12   Q.   PAGE 313.

13   A.   3:05 P.M., 5:29 P.M.  I THINK THAT'S IT FOR THAT PAGE.

14   Q.   ARE WE -- OKAY.

15        ON PAGE 314 ARE THERE ANY PHONE CALLS -- I THINK THAT'S

16   WHERE WE WRAP UP ON THE DATE OF FEBRUARY 23RD.

17   A.   NOT ON THE 23RD.

18   Q.   WHAT TIME WAS THE EARLIEST OR THE FIRST TIME THAT THE

19   DEFENDANT DIALED YOUR NUMBER ON FEBRUARY 23RD, 2012?

20   A.   OH, THIS WAS JUST A LITTLE AFTER MIDNIGHT.

21   Q.   DURING THIS TIMEFRAME DID THE DEFENDANT OFTEN CONTACT YOU

22   MULTIPLE TIMES THROUGHOUT THE DAY AND NIGHT?

23   A.   YES.

24   Q.   MANY OF THESE PHONE CALLS SEEM TO BE ONE OR TWO MINUTES.

25   DID YOU ALWAYS ANSWER HIS CALLS?

1     A.    NO, I VERY RARELY ANSWERED THEM.

2     Q.    AND WHY WAS THAT?

3     A.    BECAUSE THEY WERE JUST HARASSING CALLS.

4           MR. ARCHER:  OBJECTION.  MOVE TO STRIKE.

5           THE COURT:  DID YOU WANT TO ASK HIM TO DEFINE WHAT

6     HE MEANT BY "HARASSING"?

7           MS. PENNA:  THANK YOU, YOUR HONOR.

8           THE COURT:  SUSTAIN THE OBJECTION.

9     BY MS. PENNA:

10    Q.    MR. HESSENFLOW, COULD YOU ELABORATE ON WHAT YOU MEANT BY

11    HARASSING?

12    A.    THEY WERE THINGS LIKE TRYING TO LOCATE HIS EX, WHICH I

13    WASN'T WILLING TO GIVE HIM THAT INFORMATION.

14    Q.    IS THERE ANY OTHER REASON WHY YOU WOULD DEFINE THEM AS

15    HARASSING?

16          MR. ARCHER:  OBJECTION, ASKED AND ANSWERED.

17          THE COURT:  OVERRULED.  YOU CAN ANSWER THE QUESTION.

18          THE WITNESS:  I'D HAVE TO LOOK THROUGH THE CONTENT

19    OF THE ACTUAL MESSAGES TO SEE WHAT HE LEFT TO SEE.

20    BY MS. PENNA:

21    Q.    WOULD YOU SAY THIS WAS BASED ON THE CONTENT OF THE CALLS

22    OR THE TIMES OF THE CALLS?

23    A.    BOTH.

24    Q.    BOTH.

25          COULD I HAVE A FEW MOMENTS, YOUR HONOR.

1          THE COURT:  YES.

2          (PAUSE IN PROCEEDINGS.)

3          MS. PENNA:  NO FURTHER QUESTIONS FOR THE WITNESS AT

4     THIS TIME.

5          THE COURT:  CROSS-EXAMINATION.

6          MR. ARCHER:  THANK YOU, YOUR HONOR.

7                       **CROSS-EXAMINATION**

8     BY MR. ARCHER:

9     Q.   GOOD AFTERNOON, YOUR HONOR.  GOOD AFTERNOON,

10    MR. HESSENFLOW.  MY NAME IS GRAHAM ARCHER, AND I'M MR. YORK'S

11    ATTORNEY.

12         I'D LIKE TO START BACK AT THE BEGINNING OF YOUR TESTIMONY.

13    YOU HAD MENTIONED THAT YOU KNEW ANDREA YORK FOR ABOUT

14    TEN YEARS; IS THAT CORRECT?

15    A.   I KNEW HER, LIKE, TEN YEARS PREVIOUSLY.

16    Q.   TEN YEARS PRIOR TO 2012?

17    A.   YES.

18    Q.   OKAY.  I WANTED TO CLARIFY, AT THE TIME THAT THIS INCIDENT

19    OCCURRED, YOU WERE IN A RELATIONSHIP WITH MS. YORK; IS THAT

20    CORRECT?

21    A.   YOU MEAN BEYOND FEBRUARY 23RD?

22    Q.   CORRECT.

23    A.   I BELIEVE SO, YES.

24    Q.   HAD HER KIDS ACTUALLY BEEN TO YOUR HOUSE AT THAT POINT OR

25    ANY TIME AROUND THAT TIME?

CROSS HESSENFLOW BY MR. ARCHER

1     A.    THEY HAD VISITED BRIEFLY.

2     Q.    SO WE'RE TALKING SPECIFICALLY ABOUT FEBRUARY 23RD, YOU HAD

3     RECEIVED OTHER MESSAGES FROM MR. YORK THAT DAY?

4     A.    YES.

5     Q.    AND THE MESSAGES WERE -- HE MENTIONED THAT HE WANTED TO

6     CONTACT HIS EX-WIFE AND HE WAS TRYING TO SERVE HER WITH

7     PAPERWORK RELATED TO THEIR SEPARATION; IS THAT CORRECT?

8     A.    YES.

9               MS. PENNA:  OBJECTION, RELEVANCE, YOUR HONOR.

10              THE COURT:  WELL, I'LL ALLOW THE ANSWER TO REMAIN.

11    YOU CAN MOVE ON.

12    BY MR. ARCHER:

13    Q.    THE OTHER VOICEMAILS YOU RECEIVED THAT DAY WEREN'T

14    THREATENING TO YOU; IS THAT CORRECT?

15    A.    NO, THEY WEREN'T.

16    Q.    OKAY.  THIS VOICEMAIL THAT YOU SAY YOU PLAYED BACK INTO

17    THE SYSTEM.  YOU NEVER TURNED THAT OVER TO THE I.R.S.

18    INVESTIGATOR?

19    A.    I WAS NOT ASKED FOR IT.

20    Q.    OKAY.  YOU WERE INTERVIEWED BY IS IT AGENT AGUIRRE AS

21    WELL?

22    A.    YES.

23    Q.    OKAY.  AND WHEN YOU TALKED TO AGENT AGUIRRE, YOU TOLD HER

24    THAT WHEN YOU GOT THE VOICEMAIL, THAT YOU KNEW IT WAS NOT

25    ACTUALLY FROM THE I.R.S.; CORRECT?

Case 5:15-cr-00226-EJD  Document 86  Filed 10/02/15  Page 182 of 189

1    A.   YES.

2    Q.   OKAY.  AND WAS THAT BECAUSE IN PART BECAUSE OF THE ACTUAL

3    TONE OF THE VOICE ON THE VOICEMAIL?

4    A.   THE TONE DIDN'T MAKE ME SUSPICIOUS BUT IT WAS MORE FROM

5    FAILING TO FIND AN I.R.S. OFFICE WITH THAT NUMBER.

6    Q.   DID THE LANGUAGE USED IN THE VOICEMAIL MAKE IT OBVIOUS TO

7    YOU THAT THIS WAS NOT FROM THE I.R.S.?

8    A.   IT MADE ME SUSPICIOUS.

9    Q.   OKAY.  AMONG YOUR SUSPICIONS, WERE YOU SUSPICIOUS THAT

10   THERE WERE OTHER PEOPLE HELPING MR. YORK DEAL WITH, SHALL WE

11   SAY, THE NASTINESS OF THE BREAKUP WITH HIS WIFE?

12            MS. PENNA:  OBJECTION, RELEVANCE, YOUR HONOR.

13            THE COURT:  SUSTAINED.

14   BY MR. ARCHER:

15   Q.   DID YOU HAVE ANY CONTACT WITH ANYBODY ELSE WHO YOU

16   BELIEVED WAS ACTING ON MR. YORK'S BEHALF DURING THIS TIME

17   PERIOD?

18            MS. PENNA:  OBJECTION, RELEVANCE.

19            THE COURT:  OVERRULED.  YOU CAN ANSWER THAT

20   QUESTION, SIR.

21            THE WITNESS:  DURING WHAT TIMEFRAME?

22   BY MR. ARCHER:

23   Q.   DURING THE TIMEFRAME OF YOUR CONTACT WITH MS. YORK AND

24   MR. YORK?  I'M LEAVING IT PRETTY BROAD.

25   A.   I'VE SEEN SOME OF HIS FRIENDS.  I'M NOT SURE I WOULD CALL

1    IT CONTACT.

2    Q.   OKAY.

3         (PAUSE IN PROCEEDINGS.)

4              MR. ARCHER:  IF I MAY HAVE A MOMENT, YOUR HONOR?

5              THE COURT:  YES.

6         (PAUSE IN PROCEEDINGS.)

7    BY MR. ARCHER:

8    Q.   SO YOU RECEIVED A NUMBER OF VOICEMAILS ON THE 23RD.  DO

9    YOU RECALL IF YOU RECEIVED ANY OF MR. YORK'S VOICEMAILS THAT

10   DAY?

11   A.   I DON'T RECALL WITHOUT REFERRING TO MY LOG.

12   Q.   AND OKAY.  DO YOU WANT TO REFER TO YOUR LOG TO REFRESH

13   YOUR RECOLLECTION?

14        (PAUSE IN PROCEEDINGS.)

15             THE WITNESS:  I WOULD SAY I DID NOT ANSWER ANY OF

16   THEM.

17   BY MR. ARCHER:

18   Q.   IS IT FAIR TO SAY THAT THE VOICEMAILS THAT YOU DESCRIBED

19   YOU RECEIVED THAT DAY FROM MR. YORK AS INQUIRIES REGARDING

20   CUSTODY MATTERS WITH HIS DAUGHTER OR ATTEMPTS TO COMMUNICATE

21   WITH MS. YORK?

22   A.   ONCE HE LEFT MESSAGES ON, I THINK YOU COULD SAY THAT FOR

23   SEVERAL OF THEM.

24             MR. ARCHER:  NOTHING FURTHER, YOUR HONOR.  THANK

25   YOU.

1          THE COURT:  REDIRECT?

2          MS. PENNA:  NO, YOUR HONOR.

3          THE COURT:  MAY THIS WITNESS BE EXCUSED?

4          MS. PENNA:  YES, YOUR HONOR.

5          MR. ARCHER:  YES, YOUR HONOR.

6          THE COURT:  ALL RIGHT.  IS THIS THE TIME THAT WE

7     SHOULD TAKE OUR AFTERNOON RECESS?

8          MS. PENNA:  YES.

9          MR. SCHENK:  YES, YOUR HONOR.

10         THE COURT:  ALL RIGHT.  LET ME JUST SEE COUNSEL.  I

11    WANT TO TALK WITH -- I THINK WE FINISHED WITH OUR EVIDENCE FOR

12    THE DAY, LADIES AND GENTLEMEN.  I JUST WANT TO TALK WITH

13    COUNSEL ABOUT OUR SCHEDULING.

14        (SIDE-BAR CONFERENCE ON THE RECORD.)

15         THE COURT:  I'M AT SIDE-BAR WITH COUNSEL.

16        SO WE'VE EXHAUSTED THE WITNESSES FOR THE GOVERNMENT TODAY?

17         MR. SCHENK:  YES.

18         THE COURT:  OKAY.  SO WE'RE NOT IN SESSION THURSDAY.

19    IT SOUNDS LIKE IT'S -- SHOULD WE BE DARK ALSO THEN?

20         MR. SCHENK:  YES.

21         THE COURT:  WE'LL BRING THEM BACK ON THE 28TH AT

22    9:00?

23         MR. SCHENK:  YES.

24         THE COURT:  IT SOUNDS LIKE YOUR CASE SHOULD BE

25    FINISHED?

1          MS. PENNA:  YES.

2          MR. ARCHER:  SO WE'LL BE CLOSING WHENEVER THE

3    DEFENSE CASE IS DONE.

4          THE COURT:  WELL, I DON'T KNOW WHEN THAT WILL BE.

5    IT SOUNDS LIKE THERE'S A POSSIBILITY IT COULD BE ON THE 28TH,

6    BUT LET'S DO THIS, LET'S -- WHY DON'T WE PLAN ON MEETING THE

7    AFTERNOON OF THE 26TH.  SHOULD WE DO THAT?  YEAH, THAT IS

8    TOMORROW.  SO WE'VE GOT THIS LOVELY PATENT CASE I THINK IT IS

9    IN THE MORNING.  I DON'T KNOW WHETHER IT WILL TAKE US INTO THE

10   AFTERNOON OR NOT.

11        CAN I HAVE MS. GARCIA CALL YOU TO LET YOU KNOW WHAT TIME

12   IS GOOD?  WOULD THAT BE ALL RIGHT?

13         MR. ARCHER:  I'M ON SALARY THESE DAYS SO THAT'S

14   FINE.

15         THE COURT:  GREAT.  AND THEN WHAT WE CAN'T

16   ACCOMPLISH ON THE 26TH, WE CAN ACCOMPLISH ON THE 27TH, ON

17   THURSDAY.

18         MR. ARCHER:  AND I THINK WE'RE GOING TO FILE AN

19   AMENDED PROPOSED JURY INSTRUCTION.  IT'S NOT MUCH DIFFERENT.

20         THE COURT:  OKAY.

21         MR. ARCHER:  IT'S AS TO COUNT 2.

22         THE COURT:  SO I'LL GO ON THE RECORD -- I'LL EXCUSE

23   OUR JURY AND HAVE THEM COME BACK ON FRIDAY THE 28TH, AND THEN I

24   NEED TO GO ON THE RECORD.

25        I'VE BEEN CONTACTED BY MAGISTRATE JUDGE COUSINS WHO HAS A

1    10:00 A.M. DATE, DO YOU KNOW ABOUT THIS, 10:00 A.M. TOMORROW

2    MORNING?

3            MR. ARCHER:  I UNDERSTAND SOMETHING IS COMING.

4            THE COURT:  RIGHT, SOMETHING ABOUT A BAIL HEARING OR

5    SOMETHING AT THE HALFWAY HOUSE OR SOMETHING IS WHAT THE E-MAIL

6    SAID.  SO I'LL PUT THAT ON THE RECORD.

7            MR. ARCHER:  OKAY.

8            THE COURT:  THANK YOU.

9        (END OF DISCUSSION AT SIDE-BAR.)

10           THE COURT:  THANK YOU, COUNSEL.

11       AND, LADIES AND GENTLEMEN, SO AS FAR AS SCHEDULE GOES, WE

12   WILL NOT BE IN SESSION TOMORROW, WEDNESDAY THE 26TH.  I THINK I

13   TOLD YOU THAT.

14       IT APPEARS THAT WE WILL NOT BE IN SESSION ON THURSDAY THE

15   27TH.  SO THE NEXT TIME THAT WE WILL ASK YOU TO RETURN WOULD BE

16   FRIDAY THE 28TH.

17       AND IF YOU COULD PLEASE COLLECT YOURSELVES, AGAIN,

18   DOWNSTAIRS IN THE JURY ASSEMBLY ROOM.

19       I'M HOPING THAT WE CAN START WITH TRIAL AT 9:00 O'CLOCK.

20   SO IF YOU COULD COLLECT YOURSELVES DOWNSTAIRS IN THE JURY

21   ASSEMBLY ROOM PRIOR TO 9:00 O'CLOCK SUCH THAT WE CAN BEGIN HERE

22   AT 9:00 A.M., I WOULD BE GRATEFUL.

23       SO YOU HAVE TWO DAYS OFF, AND WE'LL HAVE YOU COME BACK ON

24   FRIDAY.

25       I SHOULD TELL YOU I THINK WE'RE WELL ON SCHEDULE AND I

1    THINK -- WELL, WE'RE ON SCHEDULE, AS I SAID, NOTWITHSTANDING

2    THIS BREAK.

3        I DO WANT TO REMIND YOU OF THE ADMONITION, THAT IS THE

4    PRE-INSTRUCTIONS THAT I GAVE YOU, THE PRELIMINARY INSTRUCTIONS

5    ABOUT NOT DISCUSSING THE CASE WITH ANYONE AND NOT COMMUNICATING

6    OR DOING ANYTHING AND DOING ANY RESEARCH ON YOUR OWN IN THIS

7    MATTER.

8        PLEASE RECALL MY ADMONITION AND WITH THAT WE'LL BE IN

9    RECESS FOR THE DAY AND WE'LL SEE YOU FRIDAY MORNING.

10       THANK YOU.

11       (JURY OUT AT 4:19 P.M.)

12           THE COURT:  ALL RIGHT.  THE RECORD SHOULD REFLECT

13   THAT THE JURY HAS LEFT FOR THE DAY.  PLEASE BE SEATED, COUNSEL.

14       ALL COUNSEL AND THE DEFENDANT ARE PRESENT.  WE WILL --

15   I'LL HAVE MS. GARCIA CONTACT COUNSEL TOMORROW AS TO OUR MEETING

16   TIME WHETHER IT WOULD BE AT 1:30 SOME TIME TOMORROW AFTERNOON.

17       WE NOW HAVE THURSDAY AVAILABLE TO US ALSO FOR USE FOR OUR

18   CHARGING DISCUSSIONS.

19       ANOTHER ISSUE THAT CAME UP THAT I DID WANT TO INFORM

20   MR. ARCHER AND HIS CLIENT ABOUT, I RECEIVED COMMUNICATION FROM

21   MAGISTRATE JUDGE COUSINS WHO APPARENTLY WAS CONTACTED BY

22   PRETRIAL SERVICES AND HE, MAGISTRATE COUSINS, HAS SET A HEARING

23   DATE TOMORROW MORNING, I BELIEVE, AT 10:00 A.M. AT HIS

24   DEPARTMENT HERE IN SAN JOSE, MR. ARCHER, FOR YOUR CLIENT IN

25   REGARDS TO I THINK IT'S A BAIL REVOCATION HEARING IS WHAT I

CROSS HESSENFLOW BY MR. ARCHER

1        SEE.

2             SO THAT'S AT 10:00 A.M., 10:00 A.M. TOMORROW IN

3        JUDGE COUSINS'S DEPARTMENT IN THIS BUILDING AND YOUR CLIENT IS

4        ORDERED TO BE PRESENT AT THAT TIME.

5             DO YOU UNDERSTAND THAT, SIR?

6                  THE DEFENDANT:  ME?

7                  THE COURT:  YES.

8                  THE DEFENDANT:  YEAH, CLEARLY.

9                  THE COURT:  ALL RIGHT.  ANYTHING FURTHER?

10                  MR. SCHENK:  NO, YOUR HONOR.

11                  MR. ARCHER:  THANK YOU.

12                  THE COURT:  THANK YOU.

13             (COURT CONCLUDED AT 4:21 P.M.)

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                        CERTIFICATE OF REPORTER

4

5

6

7        I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8    STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9    280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10   CERTIFY:

11       THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16        IRENE RODRIGUEZ, CSR, RMR, CRR
          CERTIFICATE NUMBER 8074

17

18

19        DATED:  OCTOBOER 2, 2015

20

21

22

23

24

25