```
 1                    UNITED STATES DISTRICT COURT
 2               FOR THE NORTHERN DISTRICT OF CALIFORNIA
                         SAN JOSE DIVISION
 3

 4        UNITED STATES OF AMERICA,

 5              PLAINTIFF,             CASE NO.  CR-15-0226-EJD

 6        VS.                         SAN JOSE, CALIFORNIA

 7     DOUGLAS STROMS YORK,           AUGUST 28, 2015

 8              DEFENDANT.            VOLUME 4

 9                                    PAGES 241 - 398

10
                       TRANSCRIPT OF TRIAL
11            BEFORE THE HONORABLE EDWARD J. DAVILA
              UNITED STATES DISTRICT JUDGE AND A JURY
12

13                  A-P-P-E-A-R-A-N-C-E-S

14

       FOR THE PLAINTIFF:    OFFICE OF THE UNITED STATES ATTORNEY
15                           BY:   BRIANNA PENNA
                                   JEFFREY SCHENK
16                           50 ALMADEN BOULEVARD, SUITE 900
                             SAN JOSE, CALIFORNIA 95113
17

18     FOR THE DEFENDANT:    OFFICE OF THE FEDERAL PUBLIC DEFENDER
                             BY:   GRAHAM ARCHER
19                           55 S. MARKET STREET, SUITE 820
                             SAN JOSE, CALIFORNIA 95113
20

21     OFFICIAL COURT REPORTER:    IRENE L. RODRIGUEZ, CSR, RMR, CRR
                                   CERTIFICATE NUMBER 8074
22

23         PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY,
       TRANSCRIPT PRODUCED WITH COMPUTER.
24

25
```

1
                        INDEX OF PROCEEDINGS
2

3       FOR THE GOVERNMENT:

4

5       **NATHAN COOPER**
        DIRECT EXAM BY MR. SCHENK              P. 259, 279
        CROSS-EXAM BY MR. ARCHER              P. 270, 303
6

7       **DONNA AQUIRRE**
        DIRECT EXAM MS. PENNA                 P. 309
        CROSS-EXAM BY MR. ARCHER             P. 331
8

        GOVERNMENT'S CLOSING ARGUMENT        P. 361
9

        DEFENDANT'S CLOSING ARGUMENT         P. 367
10

        GOVERNMENT'S REBUTTAL ARGUMENT       P. 274
11

12                        INDEX OF EXHIBITS

13

14                                  IDENT.         EVIDENCE
        GOVERNMENT'S
15
        2                                          284
16      1                                          323
        7                                          237
17

18

19

20

21

22

23

24

25

```
 1        SAN JOSE, CALIFORNIA                    AUGUST 28, 2015

 2                      P R O C E E D I N G S

 3             (JURY IN AT 9:13 A.M.)

 4             THE COURT:  WE'RE BACK ON THE RECORD.  ALL COUNSEL

 5   ARE PRESENT, AND THE DEFENDANT AND THE JURY IS PRESENT AND THE

 6   ALTERNATES ARE PRESENT.  GOOD MORNING, LADIES AND GENTLEMEN.

 7             LADIES AND GENTLEMEN, I'M GOING TO ASK YOU TO GO BACK TO

 8   THE JURY ROOM FOR JUST A MOMENT, PLEASE, AND WE'LL CALL YOU OUT

 9   IN JUST A SECOND.  THANK YOU.

10             (JURY OUT AT 9:13 A.M.).

11             THE COURT:  PLEASE BE SEATED.  THE RECORD SHOULD

12   REFLECT THAT THE JURY HAS LEFT.

13             MS. GARCIA INFORMED ME, MR. ARCHER, YOU WANTED TO SAY

14   SOMETHING OR PUT SOMETHING ON THE RECORD OUTSIDE OF THE

15   PRESENCE OF THE JURY?

16             MR. ARCHER:  YES, YOUR HONOR.  I APOLOGIZE FOR

17   BRINGING IT UP.  I WAS IN THE RESTROOM WHEN THE COURT CAME OUT

18   BEFORE, AND SO I APOLOGIZE THAT THE JURY CAME OUT BEFORE THAT.

19             MY UNDERSTANDING IS THAT THE GOVERNMENT IS GOING TO CALL

20   NATHAN COOPER AS THEIR NEXT WITNESS, AND HE'S LISTED AS A

21   CUSTODIAN OF RECORDS.  BUT FROM THE GOVERNMENT'S OPENING

22   STATEMENT IT APPEARS THAT THE GOVERNMENT INTENDS TO OFFER HIM

23   ABOUT THE INTERSTATE NATURE OF THE PHONE CALL AND FROM WHAT HAS

24   BEEN DISCLOSED, WHICH IS EFFECTIVELY NOTHING, THE TWO -- I'M

25   SORRY -- THE ONE RECORDED INTERVIEW WITH MR. COOPER, AS WELL AS
```

1    ONE E-MAIL FROM HIM, I DON'T THINK ANY OF THAT IS APPROPRIATE

2    TESTIMONY.

3         I'D LIKE THE OPPORTUNITY, IF THAT'S THE GOVERNMENT'S

4    PROFFER, TO VOIR DIRE MR. COOPER ABOUT HIS QUALIFICATIONS AND

5    HIS PERSONAL KNOWLEDGE OF THIS SUBJECT OUTSIDE OF THE PRESENCE

6    OF THE JURY.

7              MR. SCHENK:  YOUR HONOR, MR. COOPER WILL TESTIFY

8    THAT THE PHONE CALL MADE ON FEBRUARY 23RD CROSSED STATE LINES

9    AND HIS JOB TITLE IS CUSTODIAN OF RECORD, AND I'M FORGETTING

10   BUT HE HAS A SECOND JOB TITLE THERE AND HE WORKED FOR TELETECH,

11   THE PARENT COMPANY OF SPOOFCARD, IN A PRIOR CAPACITY IN TECH

12   SUPPORT.  SO HE HAS KNOWLEDGE ON HOW IT WOULD BE THAT IN 2012 A

13   CALL WOULD HAVE USED -- WHAT HE WILL TESTIFY IS THAT WE USED A

14   COMPANY CALLED FLOWROUTE, F-L-O-W, AND THEY HAD A DATA SERVER

15   THAT CAUSED THE CALL TO GO TO JERSEY CITY, NEW JERSEY AND HE

16   WILL ALSO TESTIFY THAT SPOOFCARD'S OWN RECORDS ARE HELD IN

17   SOUTHAMBOY, I BELIEVE, NEW JERSEY, AND IN ADDITION TO THE CALL

18   ITSELF, PASSING THROUGH JERSEY CITY, NEW JERSEY, THE MAKING OF

19   THE CALL CAUSED RECORDS TO BE CREATED AT SPOOFCARD'S OWN

20   SERVERS, THEIR OWN DATA SERVER WHICH IS AGAIN IN NEW JERSEY.

21              THE COURT:  LET ME STOP YOU FOR A SECOND.  IS THE

22   WITNESS IN THE COURTROOM NOW?

23              MR. SCHENK:  NO.

24              THE COURT:  I'M SORRY, MR. ARCHER.

25              MR. ARCHER:  HIS BACKGROUND -- FIRST OF ALL, I HAVE

1    NOT RECEIVED A CV FROM HIM BUT HIS BACKGROUND, I DON'T

2    BELIEVE -- I'VE DONE MY OWN INVESTIGATION.  HE'S NOT COMPETENT

3    TO TESTIFY TO THESE MATTERS.  HE'S NOT COMPETENT TO -- IT

4    APPEARS THAT HE HAS NO PERSONAL KNOWLEDGE, AND I'M BASING THIS

5    ON A COUPLE OF THINGS:  ONE ARE STATEMENTS THAT HE MADE IN A

6    JULY 10TH, 2015, INTERVIEW WITH AGENT AGUIRRE WHERE, AMONG

7    OTHER THINGS, HE SAID THAT HE DIDN'T KNOW EXACTLY HOW THIS

8    WORKED.  HE ORIGINALLY SAID THAT ALL OF THE SERVERS ARE

9    OVERSEAS AND THEN HE SAID AMAZON HOSTS ALL OF OUR STUFF, NOT

10   FLOWROUTE.

11        HE ALSO SAID THAT -- IT'S KIND OF A LONG LIST, AND I'M

12   HAPPY TO GO THROUGH IT WITH HIM.  HE SAID HE'S NOT THE PERSON

13   TO TESTIFY ABOUT THAT SOMETHING HE TOLD THE AGENT BACK IN JULY

14   AND HE TOLD HER PERHAPS THE CEO WOULD KNOW BETTER.

15        AND THEN THE NEXT COMMUNICATION WE HAVE WITH HIM IS AN

16   AUGUST 20TH E-MAIL ADDRESSED TO AGENT AGUIRRE THAT WAS

17   FORWARDED TO ME BY MR. SCHENK THAT SAID, HI DONNA, AND ACTUALLY

18   I THINK IT'S PROBABLY APPROPRIATE, TOO, IF I MAY APPROACH?

19              THE COURT:  YES.

20              MR. ARCHER:  IT SAYS, HI DONNA, I WAS ABLE TO MEET

21   WITH OUR CTO THIS MORNING, AND I BROUGHT UP THE CONCERNS

22   MENTIONED AS WELL AS THE DISCREPANCIES IN THE CARD REPORT.

23   HERE ARE SOME QUALIFICATIONS, THE CALL FROM FEBRUARY 23RD,

24   2012, WAS MADE USING A TOLL FREE ACCESS NUMBER AND THAT ACCESS

25   NUMBER IS A --

1           THE COURT:  EXCUSE ME.  DO YOU HAVE A COPY FOR OUR

2     REPORTER?

3           MR. ARCHER:  I APOLOGIZE.  WHAT IT SAYS, IN ESSENCE,

4     YOUR HONOR, IS THAT IT'S PROVIDED BY FLOWROUTE IN WASHINGTON.

5      NOW, MY OWN INVESTIGATION HAS REVEALED THAT IN 2012, THAT

6     FLOWROUTE ACTUALLY NOW TODAY IS LOCATED IN SEATTLE, WASHINGTON

7     AND IN 2012 THEY WERE LOCATED IN IRVINE, CALIFORNIA.

8      WHAT IS APPARENT FROM THE E-MAIL, ASIDE FROM WHATEVER

9     INVESTIGATION HAS BEEN DONE, IS THAT ANYTHING THAT NATE COOPER

10     WOULD TESTIFY TODAY AT A MINIMUM IS SOMETHING HE LEARNED FROM

11     THEIR CTO.  HOW THAT WOULDN'T BE A CONFRONTATION CLAUSE

12     VIOLATION TO SAY THAT HE'S GOING TO TESTIFY ABOUT SOME

13     TELEPHONE CALL TRAVELLING IN INTERSTATE COMMERCE, I MEAN, AN

14     ELEMENT IN THE SECOND COUNT.

15           THE COURT:  I REALIZE THAT'S WHAT IT IS.

16           MR. ARCHER:  OKAY.  SO I'M HAPPY TO GO THROUGH

17     CROSSING HIM AND WE CAN TALK ABOUT HIS LACK OF EXPERIENCE IN

18     COMPUTERS.  HE WAS TRAINED -- HE WENT TO COLLEGE FOR MUSIC

19     PERFORMANCE.  HE WAS A -- YOU KNOW, HE WAS A MANAGER AT A

20     THEATRE FOR FIVE OR SIX YEARS.  HE DIDN'T, IN FACT, WORK FOR

21     TELETCH IN 2012.  HE SIMPLY DIDN'T WORK FOR THE COMPANY IN

22     2012.

23      I'VE NOT BEEN PROVIDED ANY RECORDS IN DISCOVERY THAT SAY

24     THAT THIS CROSSED STATE LINES, PERIOD.

25           MR. SCHENK'S PROFFER THAT BECAUSE SOME RECORD WAS CREATED

1    OUTSIDE OF CALIFORNIA BASED ON A PHONE CALL THAT CANNOT BE

2    PROVEN TO HAVE EXITED THE STATE WITH COMPETENT TESTIMONY DOES

3    NOT MEAN THAT A TELECOMMUNICATIONS CALL WAS MADE IN INTERSTATE

4    OR FOREIGN COMMUNICATION.  THAT'S -- IT IS NOT A -- YOU KNOW,

5    BY COMPARISON IT'S NOT A CHILD PORNOGRAPHY CASE.  IT'S NOT THAT

6    ANY OF THE DEVICES TRAVELLED IN INTERSTATE COMMERCE AT ANY

7    POINT.

8         TO ALLOW HIM TO COME IN AND TESTIFY TO THE JURY THAT,

9    FIRST OF ALL, IT'S JUST WRONG.  WHAT HE HAS SUGGESTED HERE HE'S

10   RELYING ON A CTO.  FLOWROUTE, THIS COMPANY THAT NEITHER OF THEM

11   WORK FOR, NEITHER OF THEM HAVE ANY PERSONAL KNOWLEDGE OF

12   FLOWROUTE'S BUSINESS OPERATIONS.  I HAVE AN ARTICLE THAT I'M

13   HAPPY TO PROVIDE THAT IS A FEBRUARY 5TH, 2013, ARTICLE FROM

14   GEEKWIRE.COM THAT TALKS ABOUT FLOWROUTE'S MOVE.

15              THE COURT:  WHAT IS THE ATTRIBUTION OF THE ARTICLE?

16              MR. ARCHER:  GEEKWIRE.COM.

17              THE COURT:  I DON'T THINK I'VE EVER HAD GEEKWIRE

18   CITED AS A REFERENCE BEFORE.

19              MR. ARCHER:  AND I DON'T PLAN ON READING FROM IT

20   BUT --

21              THE COURT:  YOU HAVE THIS, COUNSEL?

22              MR. SCHENK:  NOW WE DO.

23              MR. ARCHER:  THE GIST IS THAT THIS COMPANY THAT

24   THEY'RE SAYING WAS IN SEATTLE IN 2012, AND, IN FACT, THERE WAS

25   AN ARTICLE FROM FEBRUARY 5TH, 2013, THAT SAID THAT WE'RE MOVING

1      TO SEATTLE BECAUSE THE TAX BREAKS ARE BETTER UP THERE.  WE WERE

2      LOCATED IN IRVINE, CALIFORNIA.

3           SO NOT ONLY IS NATHAN COOPER RELYING ENTIRELY ON STUFF

4      THAT HE'S BEING TOLD BY OTHER PEOPLE.  IN HIS TESTIMONY, IF YOU

5      WERE TO TRY TO ESTABLISH AN ELEMENT IN THIS CASE BASED ON

6      INFORMATION, IT WOULD BE HEARSAY TO START WITH AND A DIRECT

7      VIOLATION OF THE CONFRONTATION CLAUSE OF THE UNITED STATES

8      CONSTITUTION BUT APPARENTLY INCORRECT.

9           BUT NOT ONLY INCORRECT, BUT INCONSISTENT WITH HIS PRIOR

10     STATEMENTS TO AGENT AGUIRRE.  SO I DON'T UNDERSTAND HOW WE CAN

11     BEGIN WITH HIS TESTIMONY, AND I'M HAPPY TO VOIR DIRE HIM ABOUT

12     ALL OF THIS INFORMATION.

13               THE COURT:  MR. SCHENK.

14               MR. SCHENK:  YOUR HONOR, JUST TWO THOUGHTS.  FIRST,

15     THIS WAS PERFECT TO FILE A MOTION IN LIMINE SO THAT THE COURT

16     COULD ADDRESS THE ISSUE IF, IN PARTICULAR, THE DEFENSE FEELS

17     THAT AN ELEMENT OF THE OFFENSE IS NOT MET.  THEY COULD HAVE

18     DONE IT IN THAT CASE AND THEY COULD ALSO RAISE THIS ON

19     CROSS-EXAMINATION OF THE WITNESS.

20          THERE'S NO REASON WHY THIS HAS TO BE DONE IN VOIR DIRE

21     BEFORE THE WITNESS TESTIFIES OR WHY THIS NEEDED TO BE BROUGHT

22     UP IN THE MORNING WHEN WE TOLD OUR WITNESS ORDER OVER A WEEK

23     AGO.

24          SO IT WAS KNOWN THAT MR. COOPER WAS GOING TO TESTIFY.  I

25     MEAN, IN FACT, ALMOST TO THE MINUTE MR. ARCHER KNEW WHEN

1      MR. COOPER WAS GOING TO TESTIFY, AND THE IDEA THAT HE'S NOW

2      TRYING TO ASK THE COURT TO HOLD THE JURY EVEN LONGER SO THAT HE

3      CAN HAVE AN OPPORTUNITY TO VOIR DIRE MR. COOPER IS JUST NOT

4      APPROPRIATE.

5          MR. COOPER SHOULD TESTIFY AND IF MR. ARCHER WANTS TO CROSS

6      HIM ON THIS, THAT'S FINE.  BUT THE IDEA THAT YOU'RE GOING TO

7      PREVENT MR. COOPER FROM TESTIFYING OR REWARD THE DEFENSE FOR

8      THIS TYPE OF SANDBAGGING JUST DOESN'T SEEM TO BE APPROPRIATE.

9              MR. ARCHER:  YOUR HONOR, MY NOTICE WAS THAT HE WAS A

10     CUSTODIAN OF RECORDS AND HE WAS TESTIFYING TO BUSINESS

11     PRACTICES OF THE COMPANY; RIGHT?

12         I MEAN, FOR THE GOVERNMENT TO COME IN AND SAY THAT I'M

13     SANDBAGGING SOMEHOW BY INVESTIGATING THEIR WITNESS AFTER THEY

14     COME IN AND IN OPENING SAY ALL OF A SUDDEN THAT A CUSTODIAN OF

15     RECORDS IS GOING TO BE EFFECTIVELY AN EXPERT WITNESS BECAUSE

16     HOW ELSE WOULD HE BE SUMMARIZING INFORMATION THAT IT'S

17     CERTAINLY -- IT'S NOT LAY OPINION THAT A PHONE CALL TRAVELLED

18     THROUGH CLOUD SERVERS, THROUGH A DID, THROUGH FLOWROUTE OR SOME

19     OTHER COMPANY.  THAT'S NOT A LAY OPINION.  THAT'S EXPERT

20     OPINION.

21         TO SUGGEST IT'S SANDBAGGING WHEN WE HAVE NO EXPERT NOTICE

22     IS RIDICULOUS.

23         AND, AGAIN, I'VE HEARD OF NO PROFFER FROM THE GOVERNMENT

24     AS TO WHAT ADMISSIBLE EVIDENCE, WHAT NONHEARSAY RELIABLE

25     PERSONAL KNOWLEDGE ADMISSIBLE EVIDENCE MR. COOPER COULD OFFER

```
 1        THIS COURT AND THIS JURY ABOUT THE INTERSTATE COMMERCE.

 2            I'M STILL WAITING FOR IT.  I'VE HEARD ACCUSATIONS OF

 3        SANDBAGGING AND I DON'T KNOW WHAT -- OTHER THAN TO BRING IN,

 4        HE'S, HE'S NOTICED AS THE CUSTODIAN OF RECORDS AND I'M GIVING

 5        HIM DISCOVERY, FIVE PAGES OF DISCOVERY OF TELETCH RECORDS AND

 6        THEN I'M -- I'M SUPPOSED TO MOVE IN LIMINE AHEAD OF TIME TO SAY

 7        I DON'T KNOW IF THIS IS WHAT YOU'RE PLANNING ON DOING, BUT I

 8        HOPE YOU DON'T.

 9            IT'S NOT THE DEFENSE'S RESPONSIBILITY AT ALL.  IT'S THE --

10                THE COURT:  I NOTICE THAT YOUR GEEKWIRE AD HAS A

11        PRINT DATE OF AUGUST 27, 2015, AT 11:04 P.M.

12                MR. ARCHER:  I WAS UP LATE LAST NIGHT, YOUR HONOR.

13        THAT IS NOT WHEN I WENT TO SLEEP EITHER.

14                THE COURT:  SO I'M CURIOUS WHETHER YOU CAN HELP ME

15        AND TELL ME, MR. ARCHER, WHETHER THESE ARGUMENTS ARE BETTER

16        PLACED AS A DIRECTED VERDICT MOTION AT THE END OF THE

17        GOVERNMENT'S CASE?

18                MR. ARCHER:  ABSOLUTELY NOT, YOUR HONOR.  THEY

19        CERTAINLY -- IF THEY ARE ABLE TO INTRODUCE THESE AS EVIDENCE,

20        THOSE WOULD BE EXCELLENT ARGUMENTS FOR A DIRECTED VERDICT, BUT

21        IT WOULD BE A DIRECT VIOLATION OF MR. YORK'S RIGHT TO

22        CROSS-EXAMINE AND CONFRONT WITNESSES AGAINST HIM BECAUSE WHAT

23        WE HAVE HERE -- AND IT'S UNEQUIVOCAL FROM THIS AUGUST 20TH

24        E-MAIL IS, HEY, YOU GUYS SAID THAT YOU HAD CONCERNS, RIGHT, AND

25        I WANT TO ADDRESS THOSE CONCERNS THAT YOU HAD AND PRESUMABLY
```

```
1     IT'S NOT HARD TO FIGURE OUT WHAT THE CONCERNS ARE.

2          THE CONCERNS ARE, AMONG OTHER THINGS, DID THIS CALL

3     ACTUALLY TRAVEL IN INTERSTATE OR FOREIGN COMMUNICATION AND IT

4     SEEMS TO BE WHAT HE'S RESPONDING TO IN THE FIRST LINE THERE.

5          AND HIS RESPONSE IS THAT I TALKED TO THE CTO TO CLEAR THIS

6     UP.  SO HE'S ACKNOWLEDGING THAT PRIOR TO HIS COMMUNICATION WITH

7     THEM ON AUGUST 20TH THAT HE DIDN'T KNOW THE ANSWER TO THESE

8     THINGS; HE'S GONE AND GOTTEN THE INFORMATION FROM THE CTO.

9          IT'S NOT A CREDIBILITY CONTEST HERE.  WHERE IS THE

10    DEFENSE'S OPPORTUNITY TO CROSS-EXAMINE THE CTO?

11         IF THE CTO -- I HAVE NO IDEA WHAT THE CTO'S NAME IS.  IT

12    HASN'T BEEN DISCLOSED TO ME.

13             THE COURT:  I THINK I CAN UNDERSTAND.  YOU CAN RELAX

14    FOR JUST A MOMENT.

15         I COULD SEE THE E-MAIL THAT YOU PROVIDED HERE TO US.  IT'S

16    FROM NATE JOEL.  THE DATE IT WAS SENT WAS THURSDAY, AUGUST 20,

17    2015, AT 10:03 A.M., AND IT'S TO AGENT AGUIRRE IT APPEARS.  THE

18    SUBJECT MATTER IS CLARIFICATION.  HE DOES INDICATE THAT HE MET

19    WITH OUR CTO THIS MORNING.  IT SAYS, I BROUGHT UP THE CONCERNS

20    THAT WERE MENTIONED.  I DON'T KNOW IF THAT'S IN THEIR

21    CONVERSATION IF THAT'S WHAT THAT REFERENCES OR NOT BUT THIS

22    WITNESS AND THE AGENT AS WELL AS THE DISCREPANCIES ON THE CARD

23    REPORT.  AND HERE ARE THE REFERENCES AND THERE ARE THREE

24    CLARIFICATIONS.

25         SO I THINK WHAT I HEAR YOU SAYING IS THAT THIS IS NOT
```

1      KNOWLEDGE OF THE WITNESS, BUT THIS IS INFORMATION HE OBTAINED

2      FROM THE CTO OF THIS COMPANY, AND, THEREFORE, TO ALLOW HIM TO

3      TESTIFY AS TO THE CTO'S KNOWLEDGE IS INAPPROPRIATE.

4            MR. ARCHER:  ABSOLUTELY.

5            MR. SCHENK:  YOUR HONOR, INTERSTATE COMMUNICATION IS

6      NOT SOMETHING THAT ANYONE IS A PERCIPIENT WITNESS TO.

7            THE IDEA THAT THE CTO WATCHED THE ELECTRONIC WIRE BE

8      CREATED WHEN A CALL FROM A 408 NUMBER TO A 408 NUMBER IS A

9      BETTER WITNESS BECAUSE THE CTO HAS FIRST-HAND KNOWLEDGE OF IT

10     IS NOT CORRECT.

11           IT'S COMPLETELY APPROPRIATE FOR A CUSTODIAN OR A WITNESS

12     IN A COMPANY TO LEARN THINGS FROM OTHER INDIVIDUALS AT THE

13     COMPANY.

14           THAT DOESN'T SUGGEST THAT IT'S INADMISSIBLE TESTIMONY.

15     MR. ARCHER IS -- CAN CROSS BASED ON THE WEIGHT THAT THE JURY

16     SHOULD GIVE THAT EVIDENCE.

17           BUT THE CTO HIMSELF LEARNS IT THROUGH KNOWLEDGE THAT HE

18     GAINS.  SO IT ISN'T LIKE WE'RE INTRODUCING DOUBLE HEARSAY HERE

19     OR AN OUT-OF-COURT STATEMENT.  THE CUSTODIAN, MR. COOPER,

20     LEARNS ALL OF THE INFORMATION THAT HE TESTIFIES THROUGH EITHER

21     FROM OBSERVING RECORDS AT THE COMPANY THAT WERE CREATED FROM

22     OTHER STATEMENTS OR OTHER INFORMATION THAT WAS MADE.  IT IS

23     PRECISELY THE KIND OF TESTIMONY THAT IS APPROPRIATE TO HAVE

24     ONE PERSON FROM A COMPANY FLY OUT AND PROVIDE.

25           MR. ARCHER CAN CROSS-EXAMINE HIM ON THE BASIS FOR THAT.

1    BUT TO SUGGEST THAT IT'S INAPPROPRIATE FOR MR. COOPER TO

2    TESTIFY ABOUT THE INTERSTATE PHONE CALL BECAUSE HE'S NOT A

3    PERCIPIENT WITNESS TO IT -- WELL, THE GOVERNMENT COULDN'T EVER

4    CALL A WITNESS, THEN.

5              THE COURT:  WELL, I DON'T THINK THAT'S WHAT HE'S

6    SAYING.  I THINK WHAT HE'S SAYING IS THAT THIS WITNESS DID NOT

7    HAVE ANY BACKGROUND INFORMATION ABOUT HOW THIS PROCESS WORKED,

8    AND HE OBTAINED THAT INFORMATION FROM SOMEBODY ELSE SUBSEQUENT

9    TO HIS INTERVIEW WITH THE AGENT AND CLOSER IN TIME TO THE

10   TRIAL, AND, THEREFORE, HE SHOULDN'T BE PERMITTED TO TESTIFY

11   ABOUT HIS KNOWLEDGE OF HOW THE SYSTEM WORKS BASED ON THAT

12   INFORMATION.

13        IS THAT WHAT YOU'RE SAYING, MR. ARCHER?

14             MR. ARCHER:  IT IS, YOUR HONOR.  AND I THINK WHAT

15   MR. SCHENK JUST TOLD THE COURT IS THAT IT SEEMS LIKE IT WOULD

16   BE DIFFICULT FOR THE GOVERNMENT TO SHOW THAT IT ACTUALLY WENT

17   ACROSS INTERSTATE LINES BECAUSE IT'S HARD TO HAVE A PERCIPIENT

18   WITNESS.

19        NOW, I'M NOT THE PROSECUTION.  IT'S NOT MY JOB TO PUT THE

20   EVIDENCE ON, BUT IF I WERE, PERHAPS I WOULD GET AN EXPERT WHO

21   COULD REVIEW RECORDS AND WHO MIGHT BE ABLE TO REVIEW RECORDS,

22   FOR INSTANCE, FROM FLOWROUTE TO VERIFY THAT THEY'RE NOT IN

23   IRVINE AND TO VERIFY RECORDS THAT THEY'RE NOT IN THE CLOUD

24   PROVIDER.  AND CENTURY LINK, I CAN PROFFER TO THE COURT, IS A

25   NATIONAL COMPANY.  I'M CURIOUS WHETHER MR. COOPER KNOWS THAT

```
1        THEY HAVE FIVE GIGANTIC DATA CENTERS IN THE BAY AREA ALONE.

2             FIRST OF ALL, THEY'RE TALKING ABOUT THEIR CTO IS WRONG,

3        AND THEY'RE TALKING ABOUT A COMPANY THAT WAS ACTUALLY IN

4        CALIFORNIA IN 2012.

5             SECOND, THEY'RE TALKING ABOUT A CLOUD PROVIDER THAT THEY

6        DIDN'T WORK FOR.  THEY HAVE NO PERSONAL KNOWLEDGE OF.

7             IF THE GOVERNMENT -- I JUST DON'T -- IF THE GOVERNMENT HAS

8        A PROVISION OF THE EVIDENCE CODE THAT SAYS THAT SOMEONE WHO IS

9        A CUSTODIAN OF RECORDS GETS TO PUT ON A MAGIC CUSTODIAN OF

10       RECORDS CROWN AND SAY I WAIVE ALL EVIDENTIARY OBJECTIONS

11       BECAUSE I HAVE THIS CROWN ON; I GET TO COLLECT ALL INFORMATION

12       FROM MY COMPANY BECAUSE IT'S CONVENIENT FOR THE GOVERNMENT; I

13       DON'T NEED TO BE DISCLOSED AS AN EXPERT WITNESS; I GET TO

14       RENDER ALL SORTS OF IMPROPER OPINIONS WITHOUT PROPER EXPERT

15       WITNESS DISCLOSURE BECAUSE THAT'S A CONVENIENT WAY FOR THE

16       GOVERNMENT TO ESTABLISH THEIR CASE, THAT'S NOT WHAT IS

17       APPROPRIATE.  IT'S NOT WHAT THE EVIDENCE CODE CALLS FOR.

18            THERE'S NO CUSTODIAN OF RECORDS EXCEPTION THAT ALLOWS

19       SOMEONE TO JUST BRING IN -- I THINK ALL OF THE PATENT TRIALS

20       WOULD BE MUCH MORE INTERESTING IF YOU COULD BRING IN ONE

21       CUSTODIAN OF RECORDS WHO GOT TO TESTIFY ABOUT EVERYTHING THAT

22       WENT ON IN A COMPANY.

23            THE COURT:  THE WITNESSES -- THANK YOU.  THE

24       WITNESSES LISTED ON THE WITNESS LIST AS A CUSTODIAN OF RECORD

25       FROM TELETCH SYSTEMS, IS THAT THIS WITNESS?
```

1          MR. SCHENK:  YES, SIR.

2          THE COURT:  AND THE WITNESS LIST INDICATES HE'LL

3     TESTIFY TO SUBPOENAED RECORDS AND THAT'S WHAT HE'S -- THAT'S

4     WHAT'S GOING TO HAPPEN THIS MORNING, HE'S GOING TO TESTIFY

5     ABOUT CERTAIN RECORDS.

6          MR. SCHENK:  YES, SIR.

7          THE COURT:  AND IT MAY BE, MR. ARCHER, THAT THAT

8     TESTIMONY ABOUT THOSE RECORDS DOESN'T REACH THE ISSUES THAT

9     YOU'RE RAISING.  I APPRECIATE THE FACT THAT YOU'RE RAISING

10    THESE AS SOMEWHAT PROPHYLACTIC OBJECTIONS THAT YOU MAY MAKE,

11    BUT WHAT YOU'RE TELLING ME AND TELLING THE PROSECUTION IS THAT

12    IF THIS WITNESS IS ELICITED QUESTIONS SUCH THAT THEY GO BEYOND

13    THE -- TESTIFYING ABOUT SUBPOENAED RECORDS, YOU'RE GOING TO

14    OBJECT.

15         MR. ARCHER:  I WILL, YOUR HONOR.  AND I THINK IT

16    WOULD BE -- I'M, I'M VERY CONCERNED THAT THE -- THAT ELICITING

17    TESTIMONY ABOUT THE COMPANY GENERALLY BEING IN NEW JERSEY IS

18    SOMETHING THAT MAY MISLEAD THE JURY AND I CAN TRY TO CORRECT IT

19    ON CROSS.

20         BUT THE GOVERNMENT, IF THEY WERE TO ASK THAT -- IF THEY

21    WERE TO SUGGEST BASED ON THAT -- YOU KNOW, I WITHDRAW THAT LINE

22    OF ARGUMENT.

23         I AGREE, YOUR HONOR, I WOULD ASK THAT THE GOVERNMENT BE

24    PRECLUDED FROM ASKING QUESTIONS AS TO ANYTHING THAT THEY HAVE

25    NOT PROFFERED AT THIS POINT BEYOND THE NOTICE OF THE SUBPOENAED

```
 1    RECORDS.

 2              THE COURT:  DO YOU HAVE RECORDS?

 3              MR. ARCHER:  I THINK I HAVE FIVE OR SIX PAGES THAT

 4    IS GOVERNMENT'S EXHIBIT NUMBER -- I APOLOGIZE, YOUR HONOR, BUT

 5    THEY'RE FIVE OR SIX RECORDS THAT ARE PURPORTED TO BE RECORDS

 6    FROM TELETCH.

 7              MR. SCHENK:  IT'S EXHIBIT 2, YOUR HONOR.

 8              MR. ARCHER:  EXHIBIT 2, YOUR HONOR.  NONE OF THEM

 9    MENTION NEW JERSEY AND NONE OF THEM MENTION ANYTHING

10    INTERSTATE.  THEY REFERENCE TWO 408 NUMBERS AND A TOLL FREE 226

11    NUMBER, AND THE DEFENSE DID NOT OBJECT TO THEM BEING ADMITTED

12    BASED ON THE CERTIFICATIONS SUBMITTED.

13              THE COURT:  SO I SEE THAT IN EXHIBIT 2 AND THE LIST

14    OF PHONE CALLS AND PHONE NUMBERS AND THAT TYPE OF THING.  THE

15    WITNESS CAN COME IN AND TALK ABOUT THESE THINGS.

16        SO, MR. SCHENK, IT MAY BE THAT THE WITNESS DOESN'T HAVE

17    OTHER KNOWLEDGE ABOUT THESE RECORDS.  AS A CUSTODIAN OF

18    RECORDS, HE CAN CERTAINLY TALK ABOUT THESE RECORDS, BUT IF

19    YOU'RE GOING TO ASK HIM QUESTIONS BEYOND ABOUT THE COMPANY,

20    MAYBE YOU INTEND HIM TO BE PROFFERED AS AN EXPERT WITNESS.

21              MR. SCHENK:  NO, WE CERTAINLY DON'T INTEND TO

22    PROFFER HIM AS AN EXPERT WITNESS, BUT IT'S ON PAGE 2-4 WHERE

23    THE ISSUE IS LIKELY TO ARISE THE LINE OF QUESTIONING ON 2-4

24    WILL INCLUDE THE SECOND AND FOURTH COLUMN, ONE IS REAL CALLER

25    ID, THAT'S THE SECOND COLUMN, AND THE FOURTH COLUMN IS
```

```
1        DESTINATION NUMBER.

2            AND WHAT MR. COOPER WILL EXPLAIN TO THE JURY IS REAL

3        CALLER ID IS MR. YORK'S TELEPHONE NUMBER WHEN HE PLACED A CALL;

4        DESTINATION NUMBER IS WHO MR. YORK CALLED OR IN THIS CASE

5        MR. HESSENFLOW.

6            AND WHILE THOSE BOTH HAVE THE SAME 408 AREA CODE, THE

7        ACCESS NUMBER THAT IS THE FIRST COLUMN, WHICH IS THE NUMBER

8        THAT MR. YORK DIALED TO BEGIN THE SPOOFED CALL, HIT A SERVER IN

9        JERSEY CITY AND HE KNOWS THAT THROUGH HIS KNOWLEDGE OF THE

10       COMPANY.

11           AND IF THE COURT AND MR. ARCHER HAVE RAISED CONCERNS ABOUT

12       THAT, WHAT THE COURT SHOULD DO IS TAKE A RECESS AND LET US CALL

13       OUT THE CTO TO TESTIFY TO THAT ISSUE.

14               THE COURT:  WELL, THAT WOULD CERTAINLY SOLVE YOUR

15       CONFRONTATION ISSUE.

16               MR. ARCHER:  YOUR HONOR, THIS IS -- THE TESTIMONY

17       THAT MR. SCHENK IS PROFFERING RIGHT NOW SHOULD BE EXCLUDED AND

18       NO CONTINUANCE SHOULD BE GRANTED DURING THIS TRIAL.

19               THE COURT:  EXCUSE ME.  THIS WITNESS SHOULDN'T BE

20       PERMITTED TO TESTIFY ABOUT THE TWO NUMBERS?

21               MR. ARCHER:  SHOULD NOT BE ABLE TO TESTIFY THAT

22       THESE THINGS HIT A SERVER IN JERSEY CITY.  THAT'S WELL OUTSIDE

23       OF WHAT IS IN THE RECORD HERE.

24               THE COURT:  UNLESS A FOUNDATION CAN BE SHOWN THAT HE

25       HAS KNOWLEDGE OF THAT.
```

```
 1              MR. ARCHER:  NOTHING HAS BEEN PROFFERED TO THE

 2    DEFENSE AS TO WHAT HIS FOUNDATION WOULD BE OTHER THAN BEING

 3    TOLD BY THE CTO.

 4         AND IF THAT'S A FOUNDATION, THAT'S WHAT I'D LIKE TO GET

 5    OUT RIGHT NOW BECAUSE I DON'T WANT THE JURY TO BE MISLED.  WHY

 6    WOULDN'T WE FIGURE THAT OUT RIGHT NOW WHETHER HE HAS THAT

 7    PERSONAL KNOWLEDGE, INSTEAD OF HAVING THE JURY MISLED WHILE

 8    HE'S UP THERE ON THE STAND IN FRONT OF THEM?

 9              THE COURT:  CAN YOU ANSWER THAT QUESTION,

10    MR. SCHENK?

11              MR. SCHENK:  IF THE QUESTION WAS WHY SHOULD THE JURY

12    BE ALLOWED TO BE MISLED BY HIM --

13              THE COURT:  NOT THAT QUESTION.

14              MR. SCHENK:  OH.

15              THE COURT:  THE QUESTION ABOUT WHETHER OR NOT THIS

16    WITNESS WILL TESTIFY ABOUT THE JERSEY, I'LL CALL IT, SERVER AND

17    HIS PERSONAL KNOWLEDGE OF THAT OR WHETHER WE'LL NEED TO CALL

18    THE CTO?

19              MR. SCHENK:  WELL, I SUPPOSE IT DEPENDS ON THE

20    RULING FROM THE COURT WHETHER THERE'S SUFFICIENT FOUNDATION FOR

21    MR. COOPER TO MAKE THAT TESTIMONY, TO MAKE THAT STATEMENT.

22         BUT HE'S CERTAINLY PREPARED TO SAY THAT COLUMN 1, COLUMN

23    2, COLUMN 4 TAKEN TOGETHER AND WHAT HE KNOWS ABOUT SPOOFCARD

24    AND TELETCH SUGGEST THAT CALL TOUCH NEW JERSEY.

25              THE COURT:  WHY DON'T WE BRING HIM IN.  MAYBE IT'S
```

1    JUST BETTER NOW TO BRING HIM IN NOW, AND WE CAN RESOLVE THIS

2    THROUGH A FOUNDATIONAL HEARING.

3           MR. ARCHER:  THANK YOU, YOUR HONOR.

4           THE COURT:  AND, MR. SCHENK, IF YOU WANT TO LAY A

5    FOUNDATION TO SEE WHAT HIS KNOWLEDGE IS ABOUT THIS ISSUE.

6           MR. SCHENK:  YES.

7           THE COURT:  GOOD MORNING, SIR.  IF YOU WANT TO COME

8    FORWARD AND IF YOU'LL STAND IN FRONT OF OUR COURTROOM DEPUTY

9    AND RAISE YOUR RIGHT HAND, AND SHE'LL PLACE YOU UNDER OATH.

10          **(GOVERNMENT'S WITNESS, NATHAN COOPER, WAS SWORN.)**

11          THE WITNESS:  I DO.

12          THE COURT:  PLEASE HAVE A SEAT HERE AND ADJUST THE

13   CHAIR AND MICROPHONE AS YOU NEED AND WHEN YOU ARE COMFORTABLE,

14   WOULD YOU PLEASE STATE YOUR NAME AND SPELL IT PLEASE.

15          THE WITNESS:  SURE.  NATHAN JOEL COOPER.  IT'S

16   N-A-T-H-A-N, J-O-E-L, C-O-O-P-E-R.

17          THE COURT:  THANK YOU.  MR. SCHENK.

18                      **DIRECT EXAMINATION**

19   BY MR. SCHENK:

20   Q.   YES.  GOOD MORNING, MR. COOPER.  HOW ARE YOU?

21   A.   DOING WELL.

22   Q.   WHERE ARE YOU CURRENTLY EMPLOYED?

23   A.   I'M EMPLOYED AT TELETCH SYSTEMS IN SOUTHAMBOY, NEW JERSEY.

24   Q.   AND WHAT DO YOU DO FOR TELETCH SYSTEMS?

25   A.   I'M A CUSTODIAN OF RECORDS, AND I'M A TEAM LEADER FOR OUR

1   TECHNICAL SUPPORT SYSTEMS.

2             THE COURT:  COULD YOU TELL ME HOW TO SPELL THE CITY.

3             THE WITNESS:  SOUTHAMBOY, S-O-U-T-H-A-M-B-O-Y.

4             THE COURT:  THANK YOU.

5   BY MR. SCHENK:

6   Q.   YOU SAID A CUSTODIAN OF RECORDS.  AND I'M SORRY, THE

7   SECOND JOB TITLE?

8   A.   TEAM LEADER FOR OUR TECHNICAL SUPPORT DEPARTMENT.

9   Q.   AND HOW LONG HAVE YOU WORKED AT TELETCH?

10  A.   I BELIEVE TWO AND A HALF YEARS.

11  Q.   AND ARE THOSE THE ONLY TWO JOB TITLES THAT YOU HAVE HELD

12  WHILE YOU'VE BEEN EMPLOYED AT TELETCH?

13  A.   YES.

14  Q.   AND WOULD YOU FIRST DESCRIBE TO US WHAT YOUR

15  RESPONSIBILITIES AS A CUSTODY OF RECORDS INCLUDE?

16  A.   A CUSTODIAN OF RECORDS BASICALLY MAINTAIN AND HAVE ACCESS

17  TO ALL OF THE RECORDS IN OUR DATABASE, ALL OF OUR CUSTOMERS AND

18  TRANSACTION INFORMATION SORTED IN OUR DATABASE, AND I HAVE

19  ACCESS TO THAT.

20  Q.   DID YOU HAVE TRAINING ON HOW TO ANALYZE THE RECORDS THAT

21  YOU ARE REFERRING TO?

22  A.   I DID.

23  Q.   WHAT DID THAT TRAINING INVOLVE?

24  A.   IT WAS A SIX-MONTH TRAINING, AND IT WAS PART OF A TIER

25  PROGRAM IN OUR TECHNICAL SUPPORT TEAM, AND I BASICALLY TRAINED

```
 1    UNDER OUR LEGAL DEPARTMENT MANAGER, AND SHE BASICALLY

 2    INSTRUCTED ME ON WHAT TO LOOK FOR, HOW TO PREPARE REPORTS, HOW

 3    TO ANALYZE INFORMATION.

 4        SO IT WAS SIX MONTHS THAT I TRAINED WITH HER, WHICH SHE

 5    PROVIDED ME THE KNOW-HOW TO DO THAT.

 6    Q.   DID YOUR TRAINING INCLUDE HOW THE INFORMATION IN THE

 7    RECORDS THAT YOU'RE REFERRING TO GETS POPULATED OR GETS

 8    INCLUDED IN THE RECORD?

 9    A.   YES.

10    Q.   AND WOULD YOU DESCRIBE THAT?

11    A.   SURE.  SO IN OUR DATABASE WE HAVE ACCESS TO CREATE CARD

12    REPORTS AND A CARD REPORT BASICALLY ENTAILS ALL OF THE ACCOUNT

13    INFORMATION, TRANSACTION INFO, CALLS, THE ACCOUNT SUMMARY WHEN

14    THE ACCOUNT WAS CREATED, AND THAT BASICALLY CREATES A

15    SPREADSHEET WITH ALL OF THAT INFORMATION AND DIFFERENT TASKS

16    AND DIRECT USE OF THE APPROPRIATE INFORMATION.

17    Q.   ARE YOU SAYING CARD, C-A-R-D?

18    A.   CARD, YES.

19    Q.   CARD REPORT.

20    A.   UH-HUH.

21    Q.   AND WHEN INFORMATION IN THE CARD REPORT IS CREATED, DO YOU

22    HAVE KNOWLEDGE ON HOW THAT INFORMATION GETS INTO THE CARD

23    REPORT?

24    A.   YES.  IT'S A DATABASE THAT PULLS THE INFORMATION TOGETHER

25    FROM THE -- FROM WHAT WE ALREADY HAVE IN OUR SYSTEM AND IT JUST
```

1    CREATES A CSV FILE, WHICH IS ESSENTIALLY AN EXCEL SPREADSHEET,

2    AND IT JUST POPULATES ALL OF THAT INFORMATION INTO THE

3    SPREADSHEET WHICH WE CAN MATCH AGAINST OUR DATABASE.

4    Q.   OKAY.  AND YOU -- IF WE BACK UP, YOU SAID THAT IN ADDITION

5    TO A CUSTODIAN OF RECORDS YOU'RE ALSO A TEAM LEADER?

6    A.   CORRECT.

7    Q.   AND THERE'S A SECOND PART TO TEAM LEADER FOR?

8    A.   OUR TECHNICAL SUPPORT DEPARTMENT.

9    Q.   AND WHAT IS THAT?

10   A.   WE HAVE A TECHNICAL SUPPORT TEAM SET UP TO ASSIST

11   CUSTOMERS WITH TECHNICAL ISSUES, THAT ARE HAVING AN ISSUE WITH

12   ANY OF OUR SERVICES OR APPLICATIONS, THEY'RE TRAINED TO ASSIST

13   THEM IN RESOLVING THE PROBLEM.

14   Q.   AND WHAT TYPE OF TRAINING DID YOU HAVE BEFORE YOU BECAME A

15   TEAM LEADER FOR TECHNICAL SUPPORT?

16   A.   SO I'VE BEEN IN THE TECHNICAL SUPPORT TEAM SINCE I'VE

17   STARTED BUT IN BEING APART OF THAT TEAM, WE HAVE A TIER SYSTEM

18   SET UP WITH DIFFERENT DEPARTMENTS SUCH AS THE LEGAL DEPARTMENT

19   WHICH I AM THE CUSTODIAN OF RECORDS; WE ALSO HAVE A FRAUD TIER;

20   A SOCIAL MEDIA TIER.  WE HAVE A FEW DIFFERENT TIERS THAT YOU

21   CAN GO THROUGH.  EACH ONE OF THEM IS SIX MONTHS AND ONCE YOU

22   GRADUATE THAT TIER YOU BECOME A PART OF THAT DEPARTMENT.  AND I

23   WAS ABLE TO COMPLETE ALL OF THOSE WHICH PROMOTED ME TO TEAM

24   LEADER OF OUR TECHNICAL SUPPORT TEAM.

25   Q.   OKAY.  IS THERE A BINDER IN FRONT OF YOU?

1    A.   YES.

2    Q.   AND WOULD YOU OPEN IT TO EXHIBIT 2 OR TAB 2?

3    A.   OKAY.

4    Q.   AND IF YOU WOULDN'T MIND, WOULD YOU PLEASE TAKE A MOMENT.

5    I BELIEVE IT'S SEVEN PAGES LONG.  WOULD YOU JUST FLIP THROUGH

6    ALL SEVEN PAGES AND LET ME KNOW WHEN YOU FINISH.

7    A.   OKAY.

8    Q.   DO YOU RECOGNIZE WHAT IS AT TAB 2?

9    A.   I DO.

10   Q.   WHAT IS IT?

11   A.   IT'S A CARD REPORT THAT WE GENERATED.

12   Q.   I'M SORRY.  THIS IS AN EXAMPLE OF A CARD REPORT THAT YOU

13   WERE DESCRIBING TO US EARLIER?

14   A.   CORRECT.

15   Q.   OKAY.  IF YOU WOULDN'T MIND TO TURN TO 2-4, THAT'S THE

16   FOURTH PAGE.

17   A.   OKAY.

18   Q.   WOULD YOU PLEASE DESCRIBE WHAT INFORMATION IS IN THE VERY

19   FIRST COLUMN THAT'S CALLED ACCESS NUMBER?

20   A.   UH-HUH.  SO THAT IS AN ACCESS NUMBER THAT WE PROVIDE FOR

21   OUR CUSTOMERS TO PLACE A CALL TO THE SPOOFCARD, AND THIS

22   SPECIFIC NUMBER IS A TOLL FREE NUMBER THAT WE PROVIDED FOR TOLL

23   FREE CALLS FROM THE INDIVIDUALS'S CELL PHONE OR LAND DEVICE

24   THAT -- WHATEVER THEY'RE USING.

25   Q.   WE MIGHT NEED A LITTLE MORE BACKGROUND.  YOU SAID IT'S A

1    TOLL FREE NUMBER THAT YOU GIVE TO CUSTOMERS TO PLACE CALLS ON

2    THE SPOOFCARD; IS THAT RIGHT?

3    A.   YES.

4    Q.   AND COULD YOU EXPLAIN WHAT THAT MEANS?

5    A.   IN ORDER FOR ANYONE TO PLACE CALLS WITH SPOOFCARD, THERE'S

6    AN ACCESS NUMBER THAT THEY NEED TO CALL FROM THEIR OWN DEVICE.

7         SO IN THIS SITUATION I BELIEVE THIS ACCOUNT IS FROM 2012,

8    AND AT THAT TIME WE ISSUED PHYSICAL CARDS WHICH A USER CAN

9    PLACE CALLS WITH.

10        SO ON THE BACK OF THAT CARD THERE'S AN ACCESS NUMBER THAT

11   WE PROVIDE TO THEM.  THEY WILL CALL THAT NUMBER FROM THEIR OWN

12   DEVICE.  ONCE THEY CALL THAT NUMBER, THIS WOULD THEN PROMPT

13   THEM TO SET UP THEIR CALL.  IT WOULD ASK THEM FOR THE PIN

14   NUMBER THAT IS ALSO LOCATED ON THAT CARD, AND THEN IT WOULD

15   PROMPT THEM TO ENTER THE DESTINATION ON WHICH THEY WOULD CALL.

16   IT WOULD ASK THEM FOR THE NUMBER THAT THEY WOULD LIKE TO

17   DISPLAY AS THE CALLER ID AND ANY FEATURE SUCH AS A VOICE

18   CHANGER OR BACKGROUND NOISE THEY WOULD BE PROMPTED TO CHOOSE

19   ONE OF THOSE AND ALSO PROMPT THEM IF THEY WANT TO RECORD THE

20   CALL.

21        ONCE THEY SET UP ALL OF THAT INFORMATION, THEN IT WILL

22   COMPLETE THE CALL FOR THEM.

23   Q.   OKAY.  THE SECOND COLUMN IS TITLED REAL CALLER ID.  WHAT

24   IS THAT?

25   A.   REAL CALLER ID IDENTIFIES AN ACTUAL PHONE NUMBER THAT

1    THEY'RE CALLING FROM.  SO IT'S GIVING YOU THE ACTUAL NUMBER

2    THAT THEY'RE USING TO PLACE THAT PHONE CALL.

3    Q.  AND WHEN YOU SAY, "THEY," I'M SORRY, WHO DO YOU MEAN?

4    A.  SPOOFCARD.

5    Q.  YOU SAID THAT IT'S THE NUMBER THAT THEY USE WHEN THEY MAKE

6    A CALL?

7    A.  SO ANY OF OUR CUSTOMERS, WHENEVER THEY PLACE A CALL TO AN

8    ACCESS NUMBER, IT'S GOING TO IDENTIFY THEIR PHONE NUMBER.

9    Q.  SO SPOOFCARD KNOWS THE NUMBER THAT SOMEONE IS ORIGINATING

10   A CALL FROM?

11   A.  CORRECT.

12   Q.  AND THAT'S WHAT IS IN THIS COLUMN (INDICATING)?

13   A.  EXACTLY.

14   Q.  THE THIRD COLUMN, WOULD YOU DESCRIBE WHAT INFORMATION IS

15   THERE?

16   A.  YES.  THAT IS A SPOOF NUMBER.  THAT IS A NUMBER THAT WAS

17   MANUALLY SELECTED BY THE USER TO DISPLAY AS THE CALLER ID ON

18   THE RECIPIENT'S PHONE.

19   Q.  OKAY.  AND THE FOURTH COLUMN, WHAT IS THAT?

20   A.  THAT IS THE DESTINATION NUMBER THAT THEY MANUALLY ENTERED

21   TO CONTACT.  SO IT WAS THE PHONE NUMBER OF THE RECIPIENT THAT

22   THEY WERE ACTUALLY CALLING WHILE THEY WERE USING THE SERVICE.

23   Q.  AND WHEN YOU SAY, "THEY," YOU MEAN THE SPOOFCARD CUSTOMER?

24   A.  CORRECT.

25   Q.  AND THAT'S THE NUMBER THAT THEY WANT TO CALL?

DIRECT COOPER BY MR. SCHENK

1    A.   EXACTLY.

2    Q.   NOW, IF WE COMPARE THE SECOND AND FOURTH COLUMNS, THAT IS

3    THE REAL CALLER ID AND THE DESTINATION NUMBER --

4    A.   UH-HUH.

5    Q.   -- DO WE HAVE THE NUMBER THE PERSON IS CALLING FROM AND

6    THE NUMBER THE PERSON IS CALLING TO?

7    A.   CORRECT.

8    Q.   AND WHAT ARE THE AREA CODES OF THOSE TWO NUMBERS?

9    A.   408.

10   Q.   AND DO YOU KNOW WHERE THAT AREA CODE IS?

11   A.   I BELIEVE IT'S CALIFORNIA.

12   Q.   OKAY.  DID A CALL SUCH AS THIS ONE -- AND LET ME ASK YOU

13   ONE MORE QUESTION.  THERE'S A COLUMN ENTITLED START TIME.

14   WOULD YOU READ THAT INFORMATION?

15   A.   YEAH.  WE HAVE FEBRUARY 23RD, 2012, AND 17:26.

16   Q.   IS THAT THE TIME?

17   A.   YES.

18   Q.   AND WHAT IS THAT IN RELATION TO?  WHAT IS THAT THE TIME

19   OF?

20   A.   THAT'S THE ACTUAL START TIME OF THE CALL WHEN IT ACTUALLY

21   CONNECTED.

22   Q.   OKAY.  SO A CALL FROM A 408 NUMBER TO A 408 NUMBER IN

23   FEBRUARY OF 2012, IS WHAT WE'RE LOOKING AT; IS THAT RIGHT?

24   A.   CORRECT.

25   Q.   AND DID THIS CALL CROSS STATE LINES?

1      A.   WHAT DO YOU MEAN BY THAT?

2      Q.   DID THIS CALL THAT WENT FROM 408 TO 408 CAUSE ELECTRONIC

3      WIRES TO BE SENT IN A STATE OUTSIDE OF CALIFORNIA?

4               MR. ARCHER:  OBJECTION.  VAGUE.

5               THE COURT:  DO YOU UNDERSTAND THE QUESTION?

6               THE WITNESS:  I'M NOT SURE I UNDERSTAND THE

7      QUESTION.

8               THE COURT:  REPHRASE IT.

9      BY MR. SCHENK:

10     Q.   OKAY.  THE CALL ORIGINATED FROM A 408 NUMBER?

11     A.   UH-HUH.

12     Q.   AND IT ENDED IN A 408 NUMBER?

13     A.   CORRECT.

14     Q.   BUT DID THIS CALL GO TO SOME OTHER SERVER, TO SOME OTHER

15     PHONE, TO SOME OTHER --

16               MR. ARCHER:  OBJECTION.  LEADING.

17               THE COURT:  HE HASN'T FINISHED THE QUESTION.

18          BUT WHY DON'T YOU FINISH YOUR QUESTION, MR. SCHENK, AND

19     THEN I'LL RULE ON THE OBJECTION.

20     BY MR. SCHENK:

21     Q.   DID THIS CALL GO FROM SOME -- BEYOND THE TWO NUMBERS, THE

22     408 THAT IS THE ORIGINATION NUMBER AND THE DESTINATION NUMBER,

23     DID THE CALL GO ANYWHERE ELSE BESIDES THESE TWO NUMBERS?

24     A.   THE CALL GETS SENT TO THE DESTINATION NUMBER BUT IN ORDER

25     FOR THAT TO HAPPEN IT HAS TO GO THROUGH ANOTHER MEDIUM.  IT

1    DOES HAVE TO BE ROUTED THROUGH ANOTHER SERVICE WHICH

2    ESSENTIALLY IS WHAT THE ACCESS NUMBER DOES.

3         SO THE CALL IS BEING PLACED TO THE ACCESS NUMBER.  THAT

4    ACCESS NUMBER IS ACTUALLY REGISTERED WITH ANOTHER COMPANY.  WE

5    HAVE ANOTHER COMPANY THAT ROUTES OUR CALLS.  THAT COMPANY

6    BASICALLY ROUTES THAT CALL TO THE SERVER AND THEN IT'S DIRECTED

7    TO THE DESTINATION NUMBER THAT WE HAVE HERE.

8    Q.   OKAY.  SO BEFORE THE CALL GOES TO THIS 408-353-6292

9    NUMBER, YOU'RE SAYING THAT IT GOES TO THE ACCESS NUMBER

10   TELEPHONE NUMBER FIRST?

11   A.   CORRECT.

12   Q.   AND HOW DO YOU KNOW WHAT YOU JUST TESTIFIED TO?  THAT IS,

13   HOW DO YOU KNOW THAT IT IS REQUIRED TO GO TO THE ACCESS NUMBER

14   FIRST BEFORE THE DESTINATION?

15   A.   WELL, THE ACCESS NUMBERS ARE SET UP.  THEY'RE THE ID'S,

16   WHICH THEY STAND FOR DIRECT INWARD DIAL, AND THEY BASICALLY

17   HAVE TO FORWARD THAT CALL TO THE DESTINATION NUMBER ALONG WITH

18   ALL OF THE FEATURES THAT THEY HAVE CHOSEN TO MAKE THAT CALL

19   WITH.

20   Q.   SO --

21        MR. ARCHER:  OBJECTION, YOUR HONOR.  MOVE TO STRIKE.

22   THIS IS NONRESPONSIVE.  THE QUESTION WAS HOW DID HE KNOW WHAT

23   HE TESTIFIED TO IN THE PRIOR QUESTION.

24        THE COURT:  HE MAY NOT BE FINISHED TELLING US ABOUT

25   THIS.  THIS IS BACKGROUND FOR THAT.

1          THE WITNESS:  AND HOW I KNOW THAT IS ALL OF OUR

2     ACCESS NUMBERS ARE REGISTERED WITH FLOWROUTE AND WHICH IS A

3     COMPANY THAT WE HAVE SET UP TO PURCHASE THOSE DID'S FROM, AND

4     SO WE PURCHASE THOSE DID'S FROM FLOWROUTE AND FLOWROUTE HAS TO

5     TELL THE CALL WHERE TO BE DIRECTED TO.

6     BY MR. SCHENK:

7     Q.   IS SPOOFCARD A BUSINESS UNDER TELETCH?  ARE WE USING THOSE

8     TWO INTERCHANGEABLY?

9     A.   SPOOFCARD IS AN APPLICATION AND A SERVICE AND THAT IS

10    OWNED BY TELETCH.  SO TELETCH IS THE SYSTEM THAT CREATED

11    SPOOFCARD.

12    Q.   OKAY.  IN YOUR EMPLOYMENT WITH TELETCH, HOW DID YOU HAVE

13    THE OPPORTUNITY TO BECOME FAMILIAR WITH THIS?  WAS IT DIRECT

14    INWARD DIAL?

15    A.   YES.

16    Q.   HOW DID YOU AN OPPORTUNITY TO BECOME FAMILIAR?

17    A.   SO IT'S PART OF THE LEGAL TRAINING AS FAR AS BEING A

18    CUSTODIAN AND IT'S JUST SOMETHING THAT WE HAD TO KNOW AND SO IN

19    MY TRAINING WE WERE INFORMED OF, YOU KNOW, THE ACCESS NUMBER IS

20    GOING TO BE DIRECTED THROUGH FLOWROUTE AND BEING REGISTERED

21    WITH FLOWROUTE AS WELL.

22    Q.   OKAY.  AND, I'M SORRY.  DID YOU SAY THAT YOU KNEW WHERE

23    FLOWROUTE ROUTED THE NUMBER THROUGH?

24    A.   I WAS INFORMED OF WHERE IT WAS ROUTED THROUGH, BUT I DON'T

25    HAVE ACCESS TO KNOW EXACTLY WHERE ALL OF THE CALLS ARE BEING

```
 1    ROUTED THROUGH BUT THE SPECIFIC CALL I WAS INFORMED OF WHERE IT

 2    WAS ROUTED THROUGH.

 3    Q.   AND FOR THIS SPECIFIC CALL, HOW DID YOU GET THAT

 4    INFORMATION?

 5    A.   OUR CTO OVERSEAS, OUR ENGINEERS AND DEVELOPER IS AT THE

 6    COMPANY AND HE HAS ACCESS TO ALL OF THE RECORDS AS FAR AS WHERE

 7    CALLS ARE BEING ROUTED FROM AND TO AND HE WAS THE ONE WHO

 8    ACTUALLY PROVIDED ME THE INFORMATION TO KNOW THAT.

 9    Q.   AND DID HE PROVIDE YOU WITH THE RECORDS OR DID HE TELL YOU

10    I'VE LOOKED AT THE RECORDS AND I KNOW?

11    A.   HE PROVIDED ME -- WE HAD A MEETING, AND HE PROVIDED

12    KNOWLEDGE TO ME BUT HE DIDN'T ACTUALLY PROVIDE THE RECORDS PER

13    SE TO ME.

14    Q.   OKAY.  SO HE TOLD YOU THAT THIS CALL, THIS SPECIFIC CALL

15    WAS ROUTED INTO JERSEY CITY, NEW JERSEY?

16    A.   CORRECT.

17          MR. SCHENK:  YOUR HONOR, THAT WOULD BE THE

18    FOUNDATION.

19          THE COURT:  OKAY.  CROSS-EXAMINATION?

20          MR. ARCHER:  THANK YOU, YOUR HONOR.

21                        CROSS-EXAMINATION

22    BY MR. ARCHER:

23    Q.   GOOD MORNING, MR. COOPER.  MY NAME IS GRAHAM ARCHER, AND

24    I'M MR. YORK'S ATTORNEY.

25    A.   GOOD MORNING.
```

1    Q.   I WANT TO GO VERY BRIEFLY THROUGH YOUR BACKGROUND.  YOUR

2    EDUCATIONAL EXPERIENCE IS IN MUSIC PERFORMANCE; IS THAT

3    CORRECT?

4    A.   UH-HUH.

5    Q.   YOU HAVE FOUR YEARS OF UNDERGRADUATE IN MUSIC PERFORMANCE;

6    IS THAT CORRECT?

7              MR. SCHENK:  YOUR HONOR, I WOULD OBJECT IN FRONT OF

8    THE JURY.  I'M NOT SURE HOW MUCH I NEED TO OBJECT ON RELEVANCE

9    GROUNDS AT THIS TIME.

10             MR. ARCHER:  MR. SCHENK LAID A FOUNDATION THAT HE

11   HAS SOME SORT OF TRAINING IN TECHNICAL SUPPORT AND BASED ON

12   THAT HE HAS SOME BASIS TO -- WHAT MR. SCHENK ESTABLISHED IS HE

13   WAS TOLD THIS INFORMATION BY SOMEBODY ELSE.  I'M HAPPY TO GO

14   THROUGH, IF THE COURT IS INTERESTED IN THIS INQUIRY BECAUSE I

15   CAN WALK THROUGH THAT MR. COOPER DOES NOT APPEAR TO HAVE ANY

16   FORMAL ENGINEERING TRAINING.

17             THE COURT:  WE KNOW HE WAS TRAINED BY THE COMPANY

18   FOR THE COMPANY BUSINESS, AND WE KNOW THAT.

19        I THINK THE ISSUE IS PERHAPS THE LAST QUESTION THAT

20   MR. SCHENK WAS ENGAGED IN, AND THAT'S PROBABLY THE IMPORTANT

21   ISSUE.

22             MR. ARCHER:  OKAY.

23   Q.   AND JUST VERY BRIEFLY ON YOUR TRAINING BY TELETCH.  THEY

24   DIDN'T TRAIN YOU ON THE RECORDS KEPT BY THE TELETCH SYSTEMS;

25   CORRECT?  IS THAT -- I'M SORRY.  THAT'S A COMPLETELY VAGUE

CROSS COOPER BY MR. ARCHER

1    QUESTION.  I APOLOGIZE.

2        YOU SAID THE CTO HANDLES THE ACTUAL ROUTING INFORMATION;

3    RIGHT?

4    A.   YES.

5    Q.   AND THAT'S IN THE CAPACITY AS A NETWORK ENGINEER, I

6    PRESUME?

7    A.   RIGHT.

8    Q.   AND THEY DIDN'T TRAIN YOU AT TELETCH TO BE A NETWORK

9    ENGINEER; CORRECT?

10   A.   NO.

11   Q.   AND YOUR TRAINING IN THE TECHNICAL SUPPORT IS TO

12   PRESUMABLY MANAGE THE TECHNICAL SUPPORT TEAM?

13   A.   RIGHT.

14   Q.   AND AS PART OF THAT YOU'RE REVIEWING THE RECORDS OF THE

15   INDIVIDUAL CUSTOMER TRANSACTIONS; RIGHT?

16   A.   EXACTLY.

17   Q.   BUT THAT DOESN'T INCLUDE REVIEWING THE ACTUAL ROUTING

18   INFORMATION OF ANY OF THE CALLS?

19   A.   RIGHT.

20   Q.   OKAY.  AND THE CTO THAT YOU'RE TALKING TO, HE DIDN'T

21   ACTUALLY -- TO YOUR KNOWLEDGE HE DIDN'T ACTUALLY WORK AT

22   FLOWROUTE AT ANY POINT; CORRECT?

23   A.   NO, NOT THAT I'M AWARE OF.

24   Q.   AND SO THE INFORMATION THAT YOU'RE RELAYING TO US TODAY,

25   WHAT YOU'RE TESTIFYING TO AS TO HOW THIS PARTICULAR CALL WAS

```
 1      ROUTED IS BASED ENTIRELY ON COMMUNICATIONS THAT YOU'VE HAD FROM

 2      THE CTO; CORRECT?

 3      A.   CORRECT.

 4      Q.   AND IT'S NOT FROM YOUR REVIEW OF ANY ACTUAL RECORDS THAT

 5      WOULD DOCUMENT THAT ROUTING; CORRECT?

 6      A.   THAT'S CORRECT.

 7      Q.   OKAY.  THANK YOU.

 8              THE COURT:  ANYTHING FURTHER?

 9              MR. ARCHER:  NO, YOUR HONOR.

10              THE COURT:  MR. SCHENK?

11              MR. SCHENK:  NO, YOUR HONOR.

12              THE COURT:  ALL RIGHT.  THANK YOU.  SIR, YOU CAN

13      STAND DOWN.  YOU'RE NOT EXCUSED.  WE'RE GOING TO NEED YOU

14      PERHAPS LATER THIS MORNING BUT YOU CAN LEAVE THE COURTROOM NOW,

15      PLEASE.

16              THE WITNESS:  OKAY.  THANK YOU.

17              THE COURT:  WAIT OUT WHEREVER YOU WOULD, PLEASE.

18      THANK YOU.

19          ALL RIGHT.  THE RECORD SHOULD REFLECT THAT THE WITNESS HAS

20      LEFT THE COURTROOM.  ALL COUNSEL ARE PRESENT.

21          MR. ARCHER.

22              MR. ARCHER:  YOUR HONOR, WHAT MR. SCHENK ELICITED IN

23      THAT INTERCHANGE IS THAT HE HAS NO PERSONAL KNOWLEDGE ABOUT

24      WHAT HAPPENED WITH THIS PHONE CALL, AND THERE'S NO FOUNDATION

25      THAT HE WORKED THERE IN 2012, AND, IN FACT, IT DOESN'T APPEAR
```

1    THAT HE DID.

2         AND TO ALLOW HIM TO TESTIFY AS TO AN ELEMENT OF THIS CRIME

3    AS A CUSTODIAN OF RECORDS WOULD VIOLATE MR. YORK'S

4    CONFRONTATION CLAUSE.

5              THE COURT:  YOU'RE SPEAKING DIRECTLY OF THE ISSUE OF

6    WHETHER OR NOT THIS PHONE CALL WAS ROUTED TO A DIFFERENT STATE

7    IN SOME MANNER?

8              MR. ARCHER:  RIGHT.  WHAT I'M REFERENCING IS THE

9    PRONG OF COUNT 2, WHICH IS THAT THE COMMUNICATION MUST BE MADE

10   IN INTERSTATE OR FOREIGN COMMUNICATION.

11        WHAT HE'S ACKNOWLEDGED HERE IS THAT THERE ARE TWO 408

12   NUMBERS AND A TOLL FREE ACCESS NUMBER, AND HE'S NOT COMPETENT

13   TO OFFER TESTIMONY ABOUT WHERE THE TOLL FREE ACCESS NUMBER IS.

14        THE DEFENSE INVESTIGATION SEEMS TO INDICATE THAT IT WAS

15   ACTUALLY IN CALIFORNIA AT THE TIME.

16        AND HE'S CERTAINLY NOT COMPETENT TO TESTIFY THAT THE PHONE

17   NUMBER WAS ROUTED TO SOME SERVER BASED ON WHAT HE'S TOLD BY THE

18   CTO.

19              THE COURT:  THAT'S REALLY THE ISSUE.

20              MR. ARCHER:  YEAH, IT IS, YOUR HONOR.

21              THE COURT:  THAT ONE LAST QUESTION.  MR. SCHENK.

22              MR. SCHENK:  MR. COOPER SHOULD CERTAINLY BE ALLOWED

23   TO TESTIFY AS TO EVERY OTHER THAT WE DISCUSSED, AND THE

24   GOVERNMENT SHOULD BE ALLOWED TO BRING THE CTO OUT TO ANSWER

25   THAT QUESTION THAT CANNOT BE ACCOMPLISHED TODAY.

1          SO THE QUESTION REALLY IS DO WE PROCEED NOW AND TAKE

2     ADVANTAGE OF OUR JURY HERE AND THE TIME AND HAVE MR. COOPER AND

3     MS. AGUIRRE TESTIFY AND THEN BREAK AND THEN ALLOW THE

4     GOVERNMENT THE OPPORTUNITY TO CALL THE CTO.

5               THE COURT:  THANK YOU.  DO YOU WANT TO BE HEARD ON

6     THAT, MR. ARCHER?

7               MR. ARCHER:  YES, YOUR HONOR.  I'M CURIOUS AS TO

8     WHAT THE GOOD CAUSE IS TO CONTINUE THIS TRIAL.  A MOMENT AGO

9     MR. SCHENK WAS COMPLAINING ABOUT ME DELAYING THE JURY ABOUT ME

10    INQUIRING OF MR. COOPER, WHY THE GOVERNMENT WOULD BE PERMITTED

11    A CONTINUANCE OF A TRIAL, WHICH IS BEING CONDUCTED UNDER THE

12    SPEEDY TRIAL BASIS -- MR. YORK HAS OBJECTED TO FURTHER

13    EXCLUSIONS OF TIME IN THIS MATTER.

14         WHY THE GOVERNMENT IN THINKING PERHAPS THAT THEY COULD

15    SHOEHORN IN EVIDENCE OF ONE OF THE ELEMENTS THROUGH HEARSAY AND

16    SOMEONE WHO CLEARLY DOESN'T HAVE PERSONAL KNOWLEDGE WOULD THEN

17    BE GRANTED A CONTINUANCE MID TRIAL WHEN WE ARE EXPECTED TO

18    FINISH TODAY IS BEYOND ME.

19         I DON'T THINK THERE'S GOOD CAUSE.  THERE'S NOT EVEN A

20    PROFFER THAT THE CTO HAS ANY PERSONAL KNOWLEDGE ABOUT

21    FLOWROUTE.

22         IN FACT, THE INFORMATION HE HAS RELAYED TO MR. COOPER

23    SEEMS TO BE IN DIRECT CONTRAVENTION TO THE DEFENSE

24    INVESTIGATION ABOUT THE ACTUAL LOCATION OF THE FLOWROUTE

25    COMPANY.

1        THAT ASIDE, WHAT IS HIS NAME?  DOES THE GOVERNMENT HAVE

2   SOME GOOD CAUSE BASIS TO BELIEVE THAT THIS GUY IS ACTUALLY

3   GOING TO HAVE COMPETENT EVIDENCE THAT THEY DISCLOSED SOMETHING

4   TO THE DEFENSE OF THE LOGS OF THIS?  IS HE GOING TO BE AN

5   EXPERT?

6             THE COURT:  WELL, LET'S ASK HIM.  LET'S ASK HIM WHAT

7   THIS GUY WILL SAY.

8             MR. SCHENK:  WE HAVE TO INTERVIEW HIM AND PROVIDE A

9   REPORT REGARDING WHAT HE WOULD SAY.

10        THERE IS ABSOLUTELY NO SPEEDY TRIAL ISSUE.  THE SPEEDY

11   TRIAL ACT IS ABOUT BEGINNING THE TRIAL.

12             THE COURT:  WE'RE IN TRIAL NOW.

13             MR. SCHENK:  WE'RE IN TRIAL.  BY MR. ARCHER'S LOGIC

14   NO DEATH PENALTY CASE WOULD EVER BE ABLE TO BE TRIED, AND IT

15   WOULD EXTEND BEYOND 70 DAYS, AND THAT'S NOT AN ISSUE.

16        AND, IN FACT, THIS WAS AN ISSUE THAT MR. ARCHER KNEW

17   ABOUT, AND IF HE WAS CONCERNED ABOUT A POTENTIAL CONTINUANCE IN

18   THE MIDDLE OF THE TRIAL RESULTING FROM A PARTICULAR PIECE OF

19   THE TESTIMONY BEING EXCLUDED, IT'S AN ISSUE THAT COULD HAVE

20   BEEN RAISED TO THE COURT IN ADVANCE TO PREVENT THAT.

21        THE GOVERNMENT COULD HAVE USED THESE PAST TWO DAYS THAT WE

22   HAVE BEEN DARK TO BRING THE CTO AND PROVIDE A REPORT TO

23   MR. ARCHER OF HIS TESTIMONY.

24        IT WAS A DECISION THAT THE DEFENSE MADE, AND IT WAS A

25   DECISION THAT THEY DIDN'T HAVE TO MAKE ONE WAY OR THE OTHER.

```
 1        I'M NOT SAYING THAT THEY HAD TO GIVE US ANY INSIGHT BUT WHAT

 2        THEY DON'T GET TO DO IS TO SIT ON THE INFORMATION AND THEN

 3        OBJECT TO A DELAY.

 4                THE COURT:  LET ME ASK, WE HAVE THE WITNESS HERE.

 5        HE'S FROM NEW JERSEY.

 6                MR. SCHENK:  YES.

 7                THE COURT:  WE SHOULD GO FORWARD WITH HIS TESTIMONY

 8        THIS MORNING AND CROSS-EXAMINATION, OF COURSE.  I DON'T KNOW

 9        HOW LONG -- I THINK BASED ON OUR CONVERSATION YESTERDAY IT

10        SOUNDED LIKE THIS WITNESS WILL PROBABLY BE 90 MINUTES, MAYBE,

11        PERHAPS LESS NOW, BUT BOTH DIRECT AND CROSS.

12            FOLLOWING THAT DOES THE GOVERNMENT HAVE ANY ADDITIONAL

13        WITNESSES PLANNED FOR THIS MORNING?

14                MR. SCHENK:  YES, YOUR HONOR.

15                THE COURT:  WELL, LET'S PROCEED WITH THE TRIAL.

16            WE HAVE ESTABLISHED, LET ME JUST INDICATE THIS, WE HAVE

17        ESTABLISHED THAT THIS WITNESS, MR. COOPER, DOES NOT HAVE

18        PERCIPIENT KNOWLEDGE ABOUT THE INTERSTATE NATURE OF THE PHONE

19        CALL.  SO HE WILL NOT BE PERMITTED TO TESTIFY ABOUT THAT.

20            HE CAN TESTIFY ABOUT ALL OF THE THINGS THAT, IN ESSENCE,

21        EVERYTHING EXCEPT THAT ONE QUESTION THAT YOU ASKED, MR. SCHENK,

22        THAT LAST QUESTION.  THERE WAS INSUFFICIENT FOUNDATION FOR HIM

23        TO RESPOND TO THAT QUESTION.

24            SO HE WON'T BE PERMITTED TO BE ASKED THAT QUESTION, AND WE

25        NEED NOT HAVE MR. ARCHER OBJECT AND HAVE THE OBJECTION
```

```
1    SUSTAINED IN FRONT OF THE JURY.

2              MR. SCHENK:  YES.

3              THE COURT:  BUT THE OTHER MATTERS YOU CAN CERTAINLY

4    ASK HIM QUESTIONS ABOUT, AND WE'LL SEE WHERE THAT TAKES US THIS

5    MORNING.

6         MY SENSE IS THAT THIS CTO, OR WHOEVER HE OR SHE IS, IS NOT

7    LOCAL.

8              MR. SCHENK:  CORRECT.

9              THE COURT:  AND MAYBE YOUR TEAM CAN START LOOKING

10   INTO THAT SO THAT, YOU KNOW, YOUR TEAM CAN BETTER ADVISE THE

11   COURT AS TO THE TIMING OF THAT.

12             MR. SCHENK:  YES.

13             THE COURT:  OKAY.  ANYTHING FURTHER?

14             MR. ARCHER:  NO, YOUR HONOR.  THANK YOU.

15             THE COURT:  DO WE NEED TO TAKE A BREAK BEFORE WE

16   BRING THE JURY IN?

17             MR. SCHENK:  NO, YOUR HONOR.

18             MR. ARCHER:  NO.

19             THE COURT:  LET'S BRING THEM IN.  THANK YOU.

20        (JURY IN AT 9:59 A.M.)

21             THE COURT:  PLEASE BE SEATED, LADIES AND GENTLEMEN.

22   THE RECORD SHOULD REFLECT THAT WE'RE BACK IN SESSION WITH THE

23   JURY, AND THE JURY AND ALTERNATES ARE PRESENT, AND ALL COUNSEL

24   AND THE DEFENDANT IS PRESENT.

25        LADIES AND GENTLEMEN, THANK YOU FOR THE BREAK.  I NEEDED
```

1      TO TALK TO THESE LAWYERS ABOUT A COUPLE OF THINGS.

2           AND I THINK NOW YOU REALIZE WHY I HAVE THE BEST STAFF IN

3      THE WHOLE COURT BUILDING BECAUSE THEY'VE HAD FRESH -- THEY KNEW

4      THAT WE WERE GOING TO TAKE THIS BREAK AND THAT'S WHY THEY

5      PROVIDED YOU THAT BOX OF DONUTS.  SO I HOPE YOU ENJOYED THOSE

6      DURING THE BREAK.

7           LET'S CONTINUE WITH THE CASE.  MR. SCHENK.

8                MR. SCHENK:  THE UNITED STATES CALLS NATHAN COOPER.

9                THE COURT:  AND, MR. COOPER, WE'RE GOING TO HAVE YOU

10     SWORN IN HERE AGAIN, PLEASE.  IF YOU WOULD FACE OUR COURTROOM

11     DEPUTY, PLEASE.

12          **(GOVERNMENT'S WITNESS, NATHAN COOPER, WAS SWORN.)**

13               THE WITNESS:  YES.

14               THE COURT:  THANK YOU, SIR.  HAVE A SEAT.  FEEL FREE

15     TO ADJUST THE CHAIR AND MICROPHONE AS YOU NEED.  I'LL ENCOURAGE

16     YOU TO SPEAK DIRECTLY INTO THE MICROPHONE.  WHEN YOU ARE

17     COMFORTABLE, STATE YOUR NAME AND SPELL IT, PLEASE.

18               THE WITNESS:  NATHAN JOEL COOPER, N-A-T-H-A-N,

19     C-O-O-P-E-R.

20               THE COURT:  THANK YOU.  COUNSEL.

21                        **DIRECT EXAMINATION**

22     BY MR. SCHENK:

23     Q.   GOOD MORNING.

24     A.   GOOD MORNING.

25     Q.   ARE YOU CURRENTLY EMPLOYED?

DIRECT COOPER BY MR. SCHENK

1    A.    YES.

2    Q.    AND WHERE ARE YOU CURRENTLY EMPLOYED?

3    A.    TELETCH SYSTEMS IN SOUTHAMBOY, NEW JERSEY.

4    Q.    AND WHAT DO YOU DO FOR TELETCH?

5    A.    I'M A CUSTODIAN OF RECORDS AND A TEAM LEADER FOR OUR

6    TECHNICAL SUPPORT DEPARTMENT.

7    Q.    AND WHAT TYPE OF BUSINESS DOES TELETCH SYSTEMS INVOLVE?

8    A.    TELETCH SYSTEMS IS A PORTFOLIO COMPANY THAT DEVELOPS

9    TELEPHONY APPLICATIONS.  WE HAVE MOBILE APPS THAT HAVE BEEN

10   AROUND, CALLING AND PRIVACY APPLICATIONS.

11   Q.    AND WHAT DOES A CUSTODY OF RECORDS FOR TELETCH SYSTEMS DO?

12   A.    WE MANAGE AND MAINTAIN RECORDS FOR ALL OF OUR CUSTOMERS.

13   WE HAVE ACCESS TO TRANSACTION INFORMATION, CALLS, AND ANY

14   ACCOUNT DETAILS.

15   Q.    WHAT DOES A TEAM LEADER FOR TELETCH SYSTEMS DO?

16   A.    BASICALLY A TEAM LEADER OVERSEES THE TECHNICAL SUPPORT

17   DEPARTMENT.  I OVERSEE THE ENTIRE TEAM AND BASICALLY I'M A

18   SUPERVISOR FOR THE TEAM MEMBERS.

19   Q.    OKAY.  SO YOU WEAR BOTH OF THESE HATS?

20   A.    YES.

21   Q.    AND AMONG THE APPLICATIONS OR PRODUCTS OFFERED BY TELETCH

22   SYSTEMS, ARE YOU FAMILIAR WITH ONE CALLED SPOOFCARD?

23   A.    I AM.

24   Q.    WHAT IS SPOOFCARD?

25   A.    SPOOFCARD ALLOWS YOU TO MAKE BOTH INTERNATIONAL AND

DIRECT COOPER BY MR. SCHENK

1    DOMESTIC CALLS.  YOU PURCHASE CREDITS FOR THIS SERVICE.  IT

2    ALLOWS YOU TO CHANGE YOUR CALLER ID, SOME OF THE FEATURES AS

3    WELL THAT ALLOW YOU TO CHANGE YOUR VOICE.  YOU CAN USE

4    BACKGROUND NOISE ON A CALL.  YOU CAN RECORD IT.  YOU CAN ALSO

5    SEND THE CALL DIRECTLY TO VOICEMAIL.

6    Q.   OKAY.  ARE YOU FAMILIAR WITH HOW AN INDIVIDUAL BECOMES A

7    CUSTOMER OR A MEMBER OF SPOOFCARD?

8    A.   YES.

9    Q.   AND HOW ARE YOU FAMILIAR WITH THAT?

10   A.   JUST IN TRAINING IN THE TECHNICAL SUPPORT TEAM WE LEARN

11   HOW THE ACTUAL PROCESS IS INITIATED.  WE HAVE A FEW DIFFERENT

12   METHODS WHERE SOMEONE CAN HAVE SERVICE.  THEY CAN USE THE

13   WEBSITE, AND THEY CAN APPLY MOBILE APPS FOR ANDROID AND IPHONE

14   DEVICES, AND WE HAVE PREVIOUSLY HAD LITTLE CARDS THAT USERS CAN

15   PURCHASE AND PLACE CALLS USING THE CARD ITSELF, THE ACCESS

16   NUMBER THAT IS ON THE CARD.

17        THEY CAN ALSO USE THE MOBILE SITE FROM THEIR SMARTPHONE.

18   Q.   YOU MENTIONED YOUR TRAINING.  WOULD YOU DESCRIBE FOR THE

19   JURY WHAT YOUR TRAINING AT TELETECH HAS INCLUDED?

20   A.   SURE.  MY TRAINING CONSISTED WHEN I INITIALLY GOT HIRED I

21   WAS TRAINED ON ALL OF THE PRODUCTS WITH OUR PREVIOUS TEAM

22   LEADER WHO IS NOW THE DIRECTOR AND YOU BASICALLY LEARN THE

23   PRODUCT HANDS ON, YOU TEST IT OUT, YOU ARE GIVEN AN ACCOUNT TO

24   USE AND PLACE TEST CALLS, AND IT'S PRETTY MUCH AN ONGOING

25   TRAINING.

1          THERE'S ALWAYS GOING TO INVOLVE -- BUT ONCE YOU'RE

2     PROFICIENT IN THE APPLICATION OF THE SERVICE, THAT TRAINING

3     PORTION IS PRETTY MUCH COMPLETED AND YOU'RE ABLE TO TAKE CALLS

4     AND DO LIVE CHATS WITH CUSTOMERS AND E-MAIL AND CONVERSATIONS

5     WITH CUSTOMER AND ASSIST THEM IN ANY TECHNICAL ISSUES THAT THEY

6     MIGHT HAVE WITH THE APPLICATION AND HOW TO RESOLVE THAT.

7     Q.   AND HOW LONG HAVE YOU WORKED WITH TELETECH?

8     A.   TWO AND A HALF YEARS ABOUT.

9     Q.   AND ARE YOU FAMILIAR WITH THE WAY THAT INDIVIDUALS BECAME

10    CUSTOMERS OF SPOOFCARD EVEN BEFORE YOU STARTED THERE?

11    A.   SURE.

12    Q.   YOU DESCRIBED A MOMENT AGO THAT YOU COULD BECOME A

13    CUSTOMERS THROUGH A WEB APPLICATION OR A MOBILE APPLICATION; IS

14    THAT RIGHT?

15    A.   RIGHT.

16    Q.   AND WHAT DOES THAT MEAN?

17    A.   SO THE DIFFERENCE IS VERY SLIGHT.  IT WOULD INVOLVE GOING

18    TO SPOOFCARD.COM FROM A DESKTOP COMPUTER.  IF IT'S A MOBILE

19    SITE THEN IT WOULD BE SPOOFCARD.COM FROM YOUR CELL PHONE OR

20    TABLET AND IT WOULD REDIRECT THE USER TO A MOBILE VERSION OF

21    THE WEBSITE BUT ESSENTIALLY THE LAYOUT IS PRETTY IDENTICAL.

22    Q.   OKAY.  THERE'S A BINDER IN FRONT OF YOU.  DO YOU SEE THAT?

23    A.   I DO.

24    Q.   AND WOULD YOU PLEASE TURN TO TAB 2.  AND IF YOU WOULD

25    PLEASE TAKE A MOMENT AND LOOK THROUGH THE SEVEN PAGES THAT ARE

1     IN TAB 2 AND LET ME KNOW WHEN YOU FINISH.

2     A.   OKAY.

3     Q.   DO YOU RECOGNIZE THE DOCUMENTS CONTAINED IN TAB 2?

4     A.   I DO.

5     Q.   WHAT ARE THESE DOCUMENTS?

6     A.   IT APPEARS TO BE A COPY OF THE CARD REPORT THAT WE

7     PROVIDED.

8     Q.   CARD, C-A-R-D?

9     A.   CARD, C-A-R-D.

10    Q.   AND WHAT IS A CARD REPORT?

11    A.   A CARD REPORT IS A SUMMARY OF ALL OF THE ACCOUNTS

12    INFORMATION.  IT INCLUDES ALL OF THE TRANSACTION INFORMATION

13    AND ANY CALLS, ANY ACCOUNT DETAILS, NAME, E-MAIL ADDRESS.  IT

14    INCLUDES BASICALLY ALL RECORDS OF THAT ACCOUNT FROM START TO

15    CURRENT.

16    Q.   AND SO CARD REPORTS ARE UNIQUE TO ACCOUNTS.  YOU'RE

17    DESCRIBING IT AS RECORDS OF A PARTICULAR ACCOUNT OR OF

18    MULTIPLE?

19    A.   OF ONE PARTICULAR ACCOUNT.

20    Q.   OKAY.  ARE THE DOCUMENTS CONTAINED IN EXHIBIT 2 RECORDS

21    THAT SPOOFCARD OR TELETCH MAINTAINS IN THE ORDINARY COURSE OF

22    BUSINESS?

23    A.   THAT'S CORRECT.

24         MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS

25    EXHIBIT 2 IN EVIDENCE.

1              THE COURT:  MR. ARCHER?

2              MR. ARCHER:  NO OBJECTION.

3              THE COURT:  IT'S RECEIVED.

4              MR. SCHENK:  AND PERMISSION TO PUBLISH, PLEASE?

5              THE COURT:  IT MAY BE PUBLISHED.

6         (GOVERNMENT'S EXHIBIT 2 WAS RECEIVED IN EVIDENCE.)

7    BY MR. SCHENK:

8    Q.   I WOULD LIKE YOU TO TALK US THROUGH SOME OF THESE

9    DOCUMENTS AND IF WE CAN JUST START WITH THAT VERY FIRST SECTION

10   CARDS DOWN THROUGH AND JUST ABOVE CALLS.  DO YOU SEE THAT?

11   A.   I DO.

12   Q.   OKAY.  WHAT ARE WE LOOKING AT HERE?

13   A.   OKAY.  CARDS IS SPECIFYING THE PARTICULAR CARD ITSELF THAT

14   WE PROVIDE WITH THE ACCESS NUMBER AND A PIN NUMBER.  IT

15   SPECIFIES THE PIN NUMBER ITSELF WHICH IS A NINE DIGIT LEGACY

16   PEN THAT WE PROVIDE AS A UNIQUE PEN FOR THE USER TO USE TO SET

17   UP THE CALL.

18   Q.   OKAY.  LET ME STOP YOU THERE.  YOU SAID LEGACY PIN.  WHAT

19   DOES THAT MEAN?

20   A.   SO LEGACY FOR TELETCH MEANS ACCOUNTS OLDER THAN 2012 AND

21   2012, IS WHEN WE SWITCHED OVER AND MIGRATED TO A NEW SYSTEM IN

22   WHICH ALL OF OUR CURRENT CUSTOMERS ARE NOW ON.  BUT PREVIOUSLY

23   WE USED ANOTHER SYSTEM, AND IT WAS CALLED SECRET GARDEN.  SO

24   ALL OF OUR ACCOUNTS FROM 2012 AND PRIOR ARE CONSIDERED LEGACY

25   ACCOUNTS.

1    Q.   ACCOUNTS FROM 2012 AND OLDER?

2    A.   YES.

3    Q.   ARE LEGACY ACCOUNTS?

4    A.   RIGHT.

5    Q.   WHAT IS THE DIFFERENCE NOW?  WHY WOULD SOMEONE HAVE A

6    LEGACY PIN IF THEY'RE FROM THE OLDER VERSION?

7    A.   PREVIOUSLY WE DIDN'T HAVE MOBILE APPLICATION.  WE HAD A

8    VERY BASIC WEBSITE AS WELL.  SO MOST OF OUR SPOOFCARD USERS HAD

9    A PHYSICAL CARD THAT WE PROVIDED TO THEM THAT THEY COULD

10   PURCHASE FROM DIFFERENT RETAILERS.  AND ONCE THEY PURCHASED THE

11   CARD ITSELF, ON THE BACK OF THE CARD IT WOULD HAVE A PHONE

12   NUMBER.  IT WOULD ALSO HAVE THAT PIN NUMBER.  IT WOULD HAVE A

13   NINE DIGIT PIN NUMBER WHICH THEY, WHEN THEY WOULD PLACE A CALL

14   TO THE ACCESS NUMBER, IT WOULD HAVE THAT PIN NUMBER, IT WOULD

15   PROMPT THEM TO SET UP THAT PIN NUMBER TO SET UP A CALL SO IT

16   KNEW WHAT ACCOUNT TO PULL CREDITS FROM.

17   Q.   SO YOU SAID THAT THE CARD, THE PHYSICAL CARD HAS A PHONE

18   NUMBER ON IT?

19   A.   CORRECT.

20   Q.   IS THAT THE SAME THING AS THE ACCESS NUMBER THAT YOU JUST

21   DESCRIBED?

22   A.   YES.

23   Q.   AND WHAT IS THAT?  WHAT IS THE USE OF AN ACCESS NUMBER?

24   A.   SO IN ORDER FOR A SPOOFCARD TO DIRECT A USER'S CALL OR

25   ROUTE A SPECIFIC CALL, THEY NEED THE PHONE ACCESS NUMBER FROM

1    THEIR OWN DEVICE, WHETHER THAT BE A CELL PHONE OR LANDLINE

2    PHONE.

3        ONCE THEY CALL THAT ACCESS NUMBER, IT IS GOING TO ASK THEM

4    TO ESSENTIALLY LOG IN WITH EITHER THAT LEGACY PIN NUMBER OR

5    THEY CAN ALSO CREATE THEIR OWN PHONE NUMBER AND PIN NUMBER TO

6    LOG INTO THEIR ACCOUNT.  ONCE THEY HAVE ENTERED THAT

7    INFORMATION, THEN IT WILL DIRECT THEM TO SET UP THAT CALL.

8    Q.   SO THE FIRST STEP IN MAKING A CALL WITH SPOOFCARD IS TO

9    CALL AN ACCESS NUMBER; IS THAT RIGHT?

10   A.   YES.

11   Q.   AND THEN WHAT IS THE SECOND STEP AFTER YOU CALL THAT

12   ACCESS NUMBER?

13   A.   IF YOU ARE CALLING FROM A NUMBER THAT IS REGISTERED TO

14   YOUR SPOOFCARD ACCOUNT, THE NEXT STEP WOULD JUST BE TO ENTER

15   THAT DESTINATION NUMBER.  BUT IF YOU'RE NOT CALLING FROM A

16   NUMBER THAT IS REGISTERED TO A SPOOFCARD ACCOUNT, THEN IT'S

17   GOING TO ASK YOU TO LOG IN WITH THE PIN NUMBER.

18   Q.   AND THAT'S WHAT WE'RE LOOKING AT IN THIS VERY FIRST

19   COLUMN?

20   A.   YES.

21   Q.   I UNDERSTAND.  THE SECOND COLUMN, WHAT IS THAT?

22   A.   THE SECOND COLUMN IS THE FACE VALUE OR THE CREDIT BALANCE

23   AND AT THE TIME THE REPORT WAS PRINTED, THAT WAS THE BALANCE

24   THAT WAS REMAINING ON THE ACCOUNT.

25   Q.   YOU TESTIFIED A MOMENT AGO THAT INDIVIDUALS COULD PURCHASE

1    CARDS, THESE PHYSICAL CARDS?

2    A.   UH-HUH.

3    Q.   WHAT DO YOU MEAN BY THAT?

4    A.   IN ORDER FOR ANYONE TO MAKE CALLS WITH SPOOFCARD, THEY

5    HAVE TO PURCHASE A CREDIT BALANCE.  SO WE HAVE BALANCES THAT

6    RANGE FROM INITIATION, WHICH IS THEY CAN PURCHASE A 4.95 CREDIT

7    PACKAGE, AND AFTER THEY PURCHASE THAT THEN IT WOULD GO UP TO

8    9.95, AND IT RANGES ALL OF THE WAY UP TO 9.95.  AND SO ONCE

9    THEY PURCHASE A CREDIT PACKAGE, THEN IF THAT'S THE CARD THAT

10   THEY'RE PURCHASING, THAT'S THE BALANCE THAT THEY HAVE ON THEIR

11   ACCOUNT.

12   Q.   AND THE FACE VALUE, THE FIELDS THERE, $7.83 IS WHAT?

13   A.   THAT'S THE REMAINING BALANCES OF CREDITS THAT THEY HAVE

14   NOT USED.

15   Q.   OKAY.  THE NEXT COLUMN IS ENTITLED CREATED.  WHAT DOES

16   THAT MEAN?

17   A.   THAT IS THE DATE THAT THE ACCOUNT ITSELF WAS CREATED.  SO

18   WHEN THE ACCOUNT WAS ACTUALLY REGISTERED WHEN THAT PURCHASE WAS

19   MADE FOR THE CARD ITSELF, THAT WAS THE DATE THAT THE ACCOUNT

20   WAS INITIATED.

21   Q.   OKAY.  AND THIS IS RELATED TO THE ONE ACCOUNT THAT IS

22   EXHIBIT 21 THROUGH 27?

23   A.   CORRECT.

24   Q.   OKAY.  AND THEN THE LAST USED COLUMN, WHAT DOES THAT MEAN?

25   A.   THAT IS THE DATE IN WHICH THE LAST CALL TOOK PLACE ON THE

DIRECT COOPER BY MR. SCHENK

1    ACCOUNT.

2    Q.   OKAY.  SPOOFCARD KEEPS RECORDS OF WHEN CALLS ARE MADE?

3    A.   YES.

4    Q.   AND THE LAST CARD TYPE, WHAT IS THAT?

5    A.   THAT IS THE TRANSACTION AND THE TRANSACTION WAS MADE

6    THROUGH THE WEBSITE SO THAT THEY COULD ACTUALLY AT THAT TIME

7    PURCHASE USING THE WEBSITE FOR THAT.

8    Q.   OKAY.  NOW, IF WE CAN ZOOM OUT AND ZOOM BACK IN TO CALLS

9    AND JUST THE FIRST TWO ENTRIES UNDER CALLS ALL OF THE WAY UNTIL

10   THE END, PLEASE.

11        NOW, IF WE CAN GO THROUGH -- FIRST OF ALL, WHAT

12   INFORMATION IS LISTED UNDER THIS NEXT HEADING CALLS?

13   A.   SO IT'S IDENTIFYING THAT SAME NUMBER THAT WE SAW UNDER

14   CARDS.  SO IT'S THAT LEGACY PIN THAT WE SAW.  IT IS SPECIFYING

15   THE TYPE OF -- IT'S LOGGING THE TYPE OF CALL THAT IT WAS

16   WHETHER IT WAS AN OUTGOING CALL OR JUST A CALL LISTENING TO A

17   RECORDING.

18        IT HAS THE START DATE AND TIME OF THAT CALL.

19   Q.   OKAY.  LET ME STOP YOU THERE.

20   A.   YES.

21   Q.   HOW MANY CALLS ARE LISTED HERE FOR THIS ACCOUNT?

22   A.   THERE ARE FOUR CALLS LISTED.

23   Q.   OKAY.  AND IS THAT ALL OF THE CALLS THAT SPOOFCARD HAS FOR

24   THIS ACCOUNT?

25   A.   FOR THIS ACCOUNT, NO.  WE ALSO LOGGED WHEN A CALL WAS

1      ACTUALLY LISTENED TO.  SO WHEN THEY LOG INTO THE ACCOUNT AND

2      LISTEN TO A RECORDING, THAT DOES IDENTIFY THAT AS WELL.

3      Q.   YOU SAID "THEY" IN YOUR ANSWER.  WHO IS "THEY"?

4      A.   SPOOFCARD.

5      Q.   OKAY.  AND DID SPOOFCARD PROVIDE THESE RECORDS TO THE

6      GOVERNMENT IN THIS CASE?

7      A.   WE DID.

8      Q.   OKAY.  AND DO YOU KNOW IF THAT WAS IN RESPONSE TO

9      SOMETHING?

10     A.   IT WAS IN RESPONSE TO A SUBPOENA THAT WE RECEIVED.

11     Q.   OKAY.  NOW, IF WE CAN WALK THROUGH THIS VERY FIRST ENTRY,

12     THE ONE THAT IS DATED FEBRUARY 23RD.  IF YOU CAN EXPLAIN TO US

13     WHAT CALL START AND CALL END MEANS FOR THAT FIRST CALL?

14     A.   SO IT ESSENTIALLY MEANS EXACTLY WHAT IT SAYS, WHAT TIME

15     AND DATE THE CALL STARTED AND THE NEXT COLUMN IS WHAT TIME AND

16     DATE THE CALL ENDED.

17     Q.   OKAY.  AND WHAT TIME SYSTEM IS USED TO RECORD THE ACTUAL

18     HOUR?

19     A.   EVERYTHING IS LISTED IN EASTERN STANDARD TIME.

20     Q.   AND THE NEXT COLUMN, DESTINATION NUMBER, WHAT DOES THAT

21     MEAN?

22     A.   THAT IS THE DESTINATION NUMBER THAT THEY WERE ACTUALLY

23     CALLING.  SO THAT IS THE RECIPIENT OF THE CALL.

24     Q.   OKAY.  THAT'S WHO THE CALLER -- THE SPOOFCARD MEMBER WAS

25     CALLING?

DIRECT COOPER BY MR. SCHENK

1   A.   CORRECT.

2   Q.   REAL CALLER ID, WHAT DOES THAT MEAN?

3   A.   THAT IS THE NUMBER THAT THEY SELECTED TO HAVE -- I'M

4   SORRY.  THAT IS THE NUMBER THAT THEY'RE ACTUALLY CALLING FROM.

5   SO THE DEVICE THAT THEY WERE USING, THAT IS THE PHONE NUMBER

6   THAT IS REGISTERED TO THAT DEVICE.

7   Q.   OKAY.  THE CALLER'S TELEPHONE NUMBER?

8   A.   THE CALLER'S TELEPHONE NUMBER, THAT'S CORRECT.

9   Q.   OKAY.  THE NEXT COLUMN, SPOOF CALLER ID, WHAT DOES THAT

10  MEAN?

11  A.   THAT'S THE NUMBER THAT THEY MANUALLY SELECTED TO ENTER AS

12  THE CALLER ID TO BE DISPLAYED ON THE RECIPIENT'S DEVICE.

13  Q.   OKAY.  WHAT DOES THAT MEAN?  WHAT IS A CALLER ID NUMBER?

14  A.   A CALLER ID IS A NUMBER THAT IS DISPLAYED SO EVERYONE'S

15  PHONE HAS A UNIQUE CALLER ID, WHICH IS A PHONE NUMBER.

16       AND WITH SPOOFCARD YOU HAVE THE ABILITY TO ENTER WHATEVER

17  NUMBER THAT YOU WANT TO HAVE DISPLAYED ON SOMEONE ELSE'S PHONE.

18  Q.   OKAY.  THE NEXT COLUMN VOICE CHANGER, WHAT DOES THAT MEAN?

19  A.   WE OFFER TWO VOICE CHANGERS WITH SPOOFCARD.  YOU HAVE THE

20  ABILITY TO CHOOSE BETWEEN A MALE AND A FEMALE VOICE CHANGER.

21  THE MALE VOICE CHANGER LOWERS THE PITCH OF YOUR NORMAL VOICE

22  MAKING IT SOUND MORE MASCULINE AND FEMALE DOES THE OPPOSITE, IT

23  HEIGHTENS THE PITCH OF YOUR NORMAL VOICE AND RAISES THE

24  FREQUENCY TO MAKE IT SOUND MORE FEMININE.

25  Q.   WHEN A CALLER MAKES A CALL ON SPOOFCARD, A CUSTOMER OR A

1    MEMBER MAKES A CALL, DO THEY HAVE TO PICK MALE OR FEMALE?

2    A.   THEY DON'T.   THEY CAN CHOOSE TO BYPASS THAT OPTION.   THEY

3    DON'T HAVE TO SELECT THE VOICE CHANGER.

4    Q.   AND THEN WHAT WILL THEIR VOICE SOUND?

5    A.   THE NORMAL -- IT WILL SOUND EXACTLY LIKE IT SOUNDS.

6    Q.   OKAY.   YOU DESCRIBED TO US A FEW MOMENTS AGO THAT WHEN YOU

7    INITIATE A CALL, THE FIRST THING YOU DO IS CALL THE ACCESS

8    NUMBER AND THE SECOND THING IS ENTER A PIN.   WHERE IN THE

9    PROCESS DO THESE ADDITIONAL OPTIONS COME, THAT IS, WHEN WOULD I

10   ENTER THE DESTINATION NUMBER, THE NUMBER THAT I WANT TO APPEAR

11   ON THE CALLER ID OR THE SPOOF CALLER ID?

12   A.   SO IT'S PRETTY LINEAR.   ONCE THE ACCESS NUMBER IS CALLED

13   AND THE PIN IS ENTERED, IT ASKS THEM FOR THE DESTINATION NUMBER

14   THAT THEY WANT TO CALL, IT ASKS FOR THE SPOOFED CALLER ID THAT

15   THEY WANT TO HAVE DISPLAYED AS THE CALLER ID DEVICE, AND THEN

16   IT WILL ASK FOR THE VOICE CHANGER.   IT WILL ASK IF THEY WANT TO

17   HAVE A VOICE CHANGER ON THAT CALL.

18   Q.   OKAY.   IT SEEMS IN YOUR DESCRIPTION THAT YOU SKIPPED THE

19   REAL CALLER ID.   DOES THE INDIVIDUAL HAVE TO ENTER THAT IN AS

20   WELL?

21   A.   NO.   THE REAL CALLER ID IS NOT SOMETHING THAT IS PROMPTED.

22   SPOOFCARD IDENTIFIES THAT INFORMATION AS SOON AS THEY PLACE A

23   CALL TO THE ACCESS NUMBER SO IT DOESN'T ASK FOR IT.

24   Q.   OKAY.

25   A.   IT KNOWS THE NUMBER THAT THEY'RE CALLING FROM.

1    Q.   SO THE INFORMATION ON THIS CARD REPORT IS POPULATED OR

2    GATHERED FROM DIFFERENT SOURCES; IS THAT RIGHT?

3    A.   FROM ONE PRIMARY SOURCE, WHICH WOULD BE THE ACCESS NUMBER.

4    THE ACCESS NUMBER IS IDENTIFYING ALL OF THAT INFORMATION.

5    Q.   I'M SORRY, MY QUESTION WASN'T CLEAR.  WHAT I MEANT WAS THE

6    DESTINATION NUMBER IS SOMETHING THAT THE CARD REPORT GETS FROM

7    THE CUSTOMER.  THE CUSTOMER PICKS THE DESTINATION NUMBER; IS

8    THAT RIGHT?

9    A.   YES.

10   Q.   AND THE SAME IS TRUE FOR THE SPOOF CALLER ID, THE CARD

11   REPORT AT TELETCH DOESN'T POPULATE THAT FIELD.  THAT'S

12   SOMETHING THAT THE CUSTOMER MAKES?

13   A.   THAT'S SOMETHING THAT THE CUSTOMER MAKES.

14   Q.   BUT THAT'S NOT TRUE FOR REAL CALLER?

15   A.   CORRECT, REAL CALLER ID IS WHAT WE GATHERED FROM THE

16   DEVICE THAT THEY'RE USING.

17   Q.   AND AFTER THE CALL IS MADE, WHEN DOES THAT INFORMATION GET

18   POPULATED IN THE CARD?

19   A.   AS SOON AS IT'S ALL COMPLETED, IT GETS LOGGED IN THE

20   ACCOUNT.

21   Q.   THE LAST COLUMN IS RECORDING.  WHAT DOES THAT MEAN?

22   A.   SO WITH A SPOOFCARD, THE CALLER CAN USE RECORD THE CALL.

23   SO AT THE END OF SELECTING THOSE FEATURES THAT I -- THOSE

24   OPTIONS THAT I MENTIONED, AFTER THE VOICE CHANGER THEY WOULD BE

25   PROMPTED TO WHETHER THEY WOULD -- OR TO SELECT WHETHER OR NOT

1      THEY WANT THE CALL RECORDED.

2          IF THEY SELECT YES, THEN ONCE THAT CALL IS AN OUTGOING

3      CALL, IT THEN RECORDS FROM THERE.

4      Q.   OKAY.  SO DID THIS ACCOUNT HOLDER MAKE A CALL AT 4:26 P.M.

5      ON FEBRUARY 23RD, 2012?

6      A.   YES.

7      Q.   AND DID THAT INDIVIDUAL WHO MADE THE CALL ASK THAT THE

8      CALL THAT THEY WERE MAKING BE RECORDED?

9      A.   CORRECT.

10     Q.   AND HOW DO YOU KNOW THAT?

11     A.   BECAUSE IT'S LOGGED AND THOSE ARE THE OPTIONS THAT WERE

12     SELECTED ON THAT SPECIFIC CALL.

13     Q.   OKAY.  WHAT FORMAT IS THE FILE OF THE RECORDING KEPT IN?

14     A.   IT'S AN MP3 FILE.

15     Q.   DO YOU KNOW WHETHER THE GOVERNMENT SUBPOENAED THAT FROM

16     TELETCH IN THIS CASE AS WELL?

17     A.   YES, IT WAS SUBPOENAED AS WELL.

18     Q.   OKAY.  IF WE CAN ZOOM OUT AGAIN AND NOW LET'S GO INTO THE

19     VERY BOTTOM SECTION OF PAYMENTS.

20         I'M GOING TO ASK YOU TO DO A VERY SIMILAR THING.  WOULD

21     YOU WALK US THROUGH THIS BUT BEFORE JUST TELL US GENERALLY WHAT

22     DOES PAYMENTS MEAN?

23     A.   PAYMENTS LOGS AND IDENTIFIES ANY TRANSACTIONS THAT ARE ON

24     THE ACCOUNT.  SO IF THEY ARE USING A CREDIT CARD PURCHASE OR A

25     PAYPAL PURCHASE, THAT WILL BE LOGGED ON THE ACCOUNT AS WELL.

1    Q.   OKAY.  WOULD YOU WALK US THROUGH THIS, NOW THE FIRST

2    COLUMN IS PIN NUMBER?

3    A.   RIGHT.  SO PIN NUMBER IS THE SAME NUMBER ON THE OTHER

4    FIELDS THAT WE WENT THROUGH SO YOU SEE THE PIN THAT THEY WERE

5    PROVIDED.

6         THE NEXT COLUMN OVER IS THE TRANSACTION TIME.  SO, AGAIN,

7    IT'S LOGGING THE DATE AND THE TIME WHEN THE TRANSACTION WAS

8    MADE.  IT WAS LOGGING THE PAYMENT TYPE.  SO IN THIS CASE IT WAS

9    A CREDIT CARD PAYMENT.  THE AMOUNT THAT THEY PURCHASED.  THE

10   FULL NAME ON THE ACCOUNT.  THAT WAS ENTERED BY THE USER.

11        AN AUTHENTICATION NUMBER FIELD IS ALSO LISTED THERE WHICH

12   AT TIMES IT'S NECESSARY FOR A BANK TO PROVIDE AN AUTHENTICATION

13   NUMBER ON A CREDIT CARD TRANSACTION, AND IN THIS CASE IT WAS

14   NOT NECESSARY AND SO WE WERE NOT PROVIDED WITH THAT

15   INFORMATION.

16        IT HAS THE E-MAIL ADDRESS THAT IS REGISTERED TO THAT

17   ACCOUNT, AND WE ALSO LOG THE IP ADDRESS AT THE TIME OF THE

18   TRANSACTION AND ALSO -- I'M SORRY -- UNDERNEATH THE TRANSACTION

19   TIME IT HAS THE ADDRESS THAT IS REQUIRED, THE BILLING ADDRESS

20   THAT IS REQUIRED IN ORDER FOR THE TRANSACTION TO GO THROUGH.

21   Q.   OKAY.  A MOMENT AGO I HAD YOU EXPLAIN TO US THE DIFFERENCE

22   BETWEEN FIELDS THAT A CUSTOMER PROVIDED THE INFORMATION AND

23   THAT SPOOFCARD PULLED ON ITS OWN.

24   A.   UH-HUH.

25   Q.   I'M GOING TO ASK YOU A SIMILAR QUESTION HERE.

DIRECT COOPER BY MR. SCHENK

```
1          SO, FOR INSTANCE, THE FULL NAME, WHAT IS THE FULL NAME
2     HERE?
3     A.   THE FULL NAME IS DOUG YORK.
4     Q.   AND IS THAT SOMETHING THAT SPOOFCARD PULLED DURING THE
5     ACCOUNT OR IS THAT SOMETHING THAT THE CUSTOMER PROVIDED TO
6     SPOOFCARD?
7     A.   THAT'S PROVIDED BY THE CUSTOMER.
8     Q.   OKAY.  HOW ABOUT THE E-MAIL ADDRESS?
9     A.   THAT'S ALSO PROVIDED BY THE CUSTOMER.
10    Q.   HOW ABOUT THE IP ADDRESS?
11    A.   THAT'S SOMETHING THAT SPOOFCARD POPULATES ON ITS OWN.
12    Q.   AND SPOOFCARD GETS THE IP ADDRESS FROM WHERE?
13    A.   WE GET THE IP ADDRESS FROM THE WEBSITE ON WHICH THEY ARE
14    OR THE COMPUTER THAT IS BEING MADE TO MAKE THE TRANSACTION.  SO
15    WE'RE LOGGING THE IP ADDRESS OF THEIR COMPUTER.
16    Q.   AND WHICH IS THE CASE OF THE ADDRESS THAT IS LISTED THERE?
17    IS THAT SOMETHING THAT THE CUSTOMER PROVIDES OR DOES SPOOFCARD
18    PULL THAT?
19    A.   THEY PROVIDE THE BILLING ADDRESS INFORMATION.
20    Q.   THE CUSTOMER DOES?
21    A.   CORRECT.
22    Q.   IF YOU WOULD NOW TURN TO 2-3 AND IF WE CAN SHOW THAT TO
23    THE JURY.  WHAT ARE WE LOOKING AT HERE?  FIRST OF ALL, IS THIS
24    THE CARD REPORT CONTINUED?
25    A.   YES.
```

1    Q.    AND WHAT ARE WE LOOKING AT HERE?

2    A.    THAT WOULD BE THE ACCOUNT SUMMARY FIELD OR THE TAB THAT WE

3    PROVIDE ON THE CARD REPORT AND IT IDENTIFIES THE FIRST AND LAST

4    NAME REGISTERED TO THE ACCOUNT AS WELL AS AN E-MAIL ADDRESS;

5    THE REMAINING DOLLAR BALANCE ON THE ACCOUNT.  IT SPECIFIES IF

6    THE ACCOUNT IS CURRENTLY ACTIVE, AND IT ALSO SPECIFIES IF THE

7    ACCOUNT WAS MARKED AS FRAUDULENT AND THE NUMBER SINCE THE ORDER

8    IT ALSO STANDS FOR WHEN THE ACCOUNT WAS CREATED IN OUR NEW

9    DATABASE.

10   Q.    LET'S START WITH THE "IS FRAUD" CATEGORY.  WHAT IS THE

11   ANSWER THERE?

12   A.    NO.

13   Q.    AND HOW DOES SPOOFCARD DETERMINE WHETHER TO POPULATE THAT

14   FIELD WITH A YES OR A NO?

15            MR. ARCHER:  OBJECTION.  FOUNDATION.

16            THE COURT:  OVERRULED.  YOU CAN ANSWER THAT.

17            THE WITNESS:  WE HAVE A FRAUD DEPARTMENT.  WE HAVE A

18   SYSTEM IN PLACE THAT WAS CREATED TO MONITOR AND IDENTIFY

19   FRAUDULENT TRANSACTIONS AND ACTIVITY ON AN ACCOUNT, AND WE HAVE

20   DIFFERENT TEAM MEMBERS THAT GO THROUGH AND MAKE A DETERMINATION

21   OF WHETHER AN ACCOUNT IS FRAUDULENT OR NOT.

22        SO AFTER LOOKING AT THIS ACCOUNT AND ALL OF THE

23   INFORMATION ON IT, IT WAS DECIDED THAT THE ACCOUNT WAS NOT

24   FRAUDULENT.

25   BY MR. SCHENK:

1    Q.   WHAT TYPE OF FRAUD IS SPOOFCARD WORRIED ABOUT?

2    A.   WE'RE MOSTLY CONCERNED ABOUT --

3              MR. ARCHER:  OBJECTION.  RELEVANCE, YOUR HONOR.

4              THE COURT:  OVERRULED.

5              THE WITNESS:  SPOOFCARD IS MOSTLY WORRIED ABOUT

6    CREDIT CARD FRAUD.  SO WHENEVER AN ACCOUNT IS CREATED, WHETHER

7    IT BE A MOBILE SITE, WEBSITE APPLICATION, WHEN A TRANSACTION IS

8    MADE, WE'RE LOOKING TO IDENTIFY WHETHER THAT IS A LEGITIMATE

9    TRANSACTION OR NOT.

10             SO WE'RE GOING THROUGH ALL OF THE CALLS.  WE'RE GOING

11   THROUGH THE TRANSACTION INFORMATION AND LOOKING TO SEE IF

12   ANYTHING DOESN'T MATCH OR IT LOOKS SUSPICIOUS AND MAKING A

13   DETERMINATION WHETHER THEY'RE FRAUDULENT OR NOT.

14   BY MR. SCHENK:

15   Q.   OKAY.  AND THEN THE NEXT AND LAST COLUMN, MEMBER SINCE

16   DATE.  THAT DATE IS WHAT?

17   A.   JUNE 12TH, 2012.

18   Q.   SO IT SAYS THAT THE INDIVIDUAL, DOUGLAS YORK, WAS A MEMBER

19   SINCE JUNE 12TH, 2012, BUT WE JUST LOOKED AT A CALL FROM

20   FEBRUARY OF 2012.  HOW IS THAT POSSIBLE?

21             MR. ARCHER:  OBJECTION.  FOUNDATION.

22             THE COURT:  OVERRULED.

23             THE WITNESS:  SO WE PREVIOUSLY HAD AN OLDER SYSTEM,

24   AS I MENTIONED EARLIER, CALLED SECRET GARDEN AND ALL OF THOSE

25   ACCOUNTS PRIOR TO 2012 AND BEFORE THAT WERE KEPT IN SECRET

1    GARDEN.

2         WE CREATED A NEW SYSTEM AND HAD TO MIGRATE ALL OF THAT

3    INFORMATION OVER TO THE NEW DATABASE THAT WAS CREATED AND

4    JUNE 12TH, 2012, WAS THE DATE THAT THAT MIGRATION ACTUALLY

5    HAPPENED.

6    BY MR. SCHENK:

7    Q.   SO FOR LEGACY ACCOUNTS, THE MEMBER SINCE DATE IS A

8    MIGRATION?

9    A.   CORRECT.

10   Q.   IF YOU WOULD NOW TURN TO 2-4.  IT'S THE VERY NEXT PAGE.

11        WHAT INFORMATION -- IS THIS STILL PART OF THE CARD REPORT?

12   A.   IT IS.

13   Q.   AND WHAT INFORMATION ARE WE LOOKING AT HERE?

14   A.   WE'RE LOOKING AT A SPECIFIC CALL THAT WAS MADE.

15   Q.   BY WHOM?

16   A.   BY THE USER, I GUESS.  THE NAME ON THE ACCOUNT WAS

17   DOUGLAS YORK.

18   Q.   OKAY.  IF YOU WOULD WALK THROUGH THESE DIFFERENT COLUMNS

19   FOR US.  FIRST, WHAT IS ACCESS?

20            MR. ARCHER:  YOUR HONOR, I WOULD OBJECT AND MOVE TO

21   STRIKE THAT LAST ANSWER AS PERSONAL KNOWLEDGE.  HE'S SPECIFYING

22   THAT THE CALL WAS MADE BY SOMEONE.

23            THE COURT:  HE SAID I GUESS.  I'LL SUSTAIN THE

24   OBJECTION, AND YOU CAN ASK A FOLLOW-UP QUESTION.  AND IT'S

25   BASED ON THE RECORDS.

```
1    BY MR. SCHENK:

2    Q.   OKAY.  IF YOU WOULDN'T MIND, PLEASE, TELL US WHAT IS THE

3    FIRST COLUMN?

4    A.   THE FIRST COLUMN IS THE ACCESS NUMBER THAT WAS CALLED IN

5    ORDER TO PLACE THE CALL THAT WE'RE LOOKING AT.

6    Q.   OKAY.  THE SECOND COLUMN?

7    A.   THAT'S THE ACTUAL CALLER ID THAT WAS LOGGED FROM THE

8    DEVICE THAT THEY USED TO PLACE THE CALL.

9    Q.   AND IF YOU WOULDN'T MIND NOW TAKE A MOMENT AND IF YOU

10   COULD KEEP YOUR HAND BOTH AT 2-4 BUT ALSO FLIP BACK TO 2-1 AND

11   TELL ME IF THE, THE REAL CALLER ID MATCHES ON 2-1 AND 2-4.

12   A.   YES.

13   Q.   WHAT IS THAT NUMBER?

14   A.   THAT IS 1-408-710-9450.

15   Q.   AND THAT'S THE SAME NUMBER THAT WE SEE ON 2-04?

16   A.   CORRECT.

17   Q.   AND THE NEXT COLUMN SPOOF NUMBER, WHAT DOES THAT MEAN?

18   A.   THAT IS -- THAT WAS THE NUMBER THAT WAS DISPLAYED AS TO BE

19   THE NUMBER ON THE CALLER ID'S RECIPIENT'S PHONE.

20   Q.   AND WHAT IS THE NUMBER HERE?

21   A.   1-708-565-1040.

22   Q.   AND DESTINATION NUMBER, WHAT IS THAT?

23   A.   THAT IS THE NUMBER THAT WAS ENTERED TO CALL.  SO THAT'S

24   THE PERSON THAT THEY CALLED.

25   Q.   AND WHAT IS THE NUMBER HERE?
```

1    A.    THAT'S 1-408-353-6292.

2    Q.    OKAY.  THE NEXT COLUMN IS STATUS.  WHAT DOES THAT MEAN?

3    A.    THE STATUS AND THE CALL ITSELF WAS COMPLETED.  OFTENTIMES

4    CALLS DON'T GO THROUGH WHETHER IT BE AN ISSUE WITH THE

5    DESTINATION THAT THEY'RE REACHING OR A SYSTEM ERROR.  SO THE

6    LOG SAYS IN THIS CASE IT WAS COMPLETED.

7    Q.    AND THE NEXT ONE IS RECORDING.  WHAT DOES THAT MEAN?

8    A.    THAT MEANS THAT THEY CHOSE TO HAVE THE CALL RECORDED.

9    Q.    AND THE START TIME, PLEASE, WHAT IS THAT?

10   A.    THAT IS FEBRUARY 23RD, 2012, 17:26.

11   Q.    OKAY.  AND THE NEXT COLUMN IS VOICE CHANGER.  WHAT DOES

12   THAT MEAN?

13   A.    THAT MEANS THAT THEY SELECTED EITHER TO HAVE A VOICE

14   CHANGER OR NOT AND IN THIS CASE A FEMALE OR A WOMAN VOICE

15   CHANGE WAS SELECTED.

16   Q.    AND, AGAIN, IF YOU WOULD DO THE SAME THING.  IF WE FLIP

17   BACK TO 2-1, DOES THE INFORMATION THAT WE JUST DISCUSSED MIRROR

18   WHAT APPEARS IN 2-1, THAT IS, THE DESTINATION NUMBER, THE START

19   TIME, THE VOICE CHANGER?

20   A.    IT DOES.

21   Q.    AND THE LAST COLUMN IS DURATION ON 2-4.  WHAT IS THAT?

22   A.    IT WAS THE -- IT'S LISTED AS 56 SECONDS, AND WE LIST THE

23   DURATION OF THE ACTUAL CALL IN SECONDS.

24   Q.    AND WOULD YOU NOW TURN TO 2-6.  IS 2-6 ALSO PART OF THE

25   CARD REPORT?

1    A.    IT IS.

2    Q.    WHAT INFORMATION ARE WE LOOKING AT HERE?

3    A.    WE'RE LOOKING AT THE TRANSACTION INFORMATION.

4    Q.    AND WHAT DOES THAT MEAN?  WHAT IS TRANSACTION INFORMATION?

5    A.    SO THE PAYMENT ITSELF WE'RE IDENTIFYING HOW THAT PAYMENT

6    WAS MADE.

7    Q.    AND WHEN SOMEONE PURCHASED A CARD OR BECAME A MEMBER OF

8    SPOOFCARD?

9    A.    CORRECT.

10   Q.    OKAY.  I'M GOING TO ASK YOU INFORMATION ABOUT A FEW

11   COLUMNS AND IF WE CAN START WITH FIRST AND LAST NAME, WHAT WAS

12   THAT?  WHAT WAS ENTERED?

13   A.    THE FIRST NAME IS DOUG AND THE LAST NAME IS YORK.

14   Q.    AND IS THAT SOMETHING THAT SPOOFCARD POPULATES OR IS THAT

15   GIVEN TO SPOOFCARD BY THE INDIVIDUAL WHO IS BECOMING A MEMBER?

16   A.    IT'S GIVEN BY THE INDIVIDUAL.

17   Q.    OKAY.  THE ADDRESS, CITY, AND STATE.  WOULD YOU PLEASE

18   READ THOSE?

19   A.    SURE.  THE ADDRESS IS 113 LACROSSE DRIVE, THE CITY IS

20   MORGAN HILL, AND THE STATE IS CALIFORNIA.

21   Q.    AND IS THAT SOMETHING THAT THE USER PROVIDES TO SPOOFCARD

22   OR IS THAT SOMETHING THAT SPOOFCARD POPULATES ON ITS OWN?

23   A.    THE USER WILL PROVIDE THAT.

24   Q.    AND THEN THE LAST COUPLE OF COLUMNS, CREDIT CARD TYPE AND

25   CREDIT CARD NUMBER, WHAT IS THAT TYPE OF INFORMATION?

1    A.   SO IT'S IDENTIFYING THE ACTUAL TYPE OF CARD THAT IS BEING

2    USED AND THE NUMBER THAT THEY NEED TO PROVIDE IN ORDER TO MAKE

3    THE PURCHASE.

4         SO WE IDENTIFIED IT WAS A MASTER CARD AND THEN WE HAVE A

5    FULL CREDIT CARD NUMBER AS WELL.

6    Q.   AND DOES THE USER PROVIDE THAT INFORMATION OR DOES

7    SPOOFCARD PULL THAT?

8    A.   THEY WOULD PROVIDE THE CARD NUMBER AND BASED ON THE FIRST

9    FEW DIGITS OF THE CARD, THEY WOULD IDENTIFY THE TYPE OF CARD

10   THAT IT IS.

11   Q.   OKAY.  AND NOW IF YOU WOULD LASTLY TURN TO 2-7.  IS THIS

12   PAGE PART OF THE CARD REPORT?

13   A.   IT IS.  IT IS A CONTINUATION OF 2-6.

14   Q.   SO THE EXHIBIT 2-6 IS A VERY LONG LINE?

15   A.   YES.

16   Q.   AND THIS IS JUST THE END OF THAT LINE?

17   A.   CORRECT.

18   Q.   AND WHAT IS THE REMAINING INFORMATION HERE?  WHAT IS

19   CREDIT CARD EXPIRATION AND AMOUNT?

20   A.   THE CREDIT CARD EXPIRATION IS THE EXPIRATION DATE OF THE

21   CARD AND IN DECEMBER OF 2014, THAT WAS THE DATE THAT THEY

22   ENTERED AS THE EXPIRATION DATE.  IT'S IDENTIFYING THE AMOUNT

23   THAT THEY PURCHASED AS WELL.

24   Q.   OKAY.  AND WHOSE IP ADDRESS IS LOGGED HERE?

25   A.   THAT WOULD BE THE USERS COMPUTER'S IP ADDRESS.

DIRECT COOPER BY MR. SCHENK

1    Q.   ONE MOMENT, PLEASE.

2         (PAUSE IN PROCEEDINGS.)

3         MR. SCHENK:  NO FURTHER QUESTIONS.

4         THE COURT:  MR. ARCHER, DO YOU HAVE ANY QUESTIONS?

5         MR. ARCHER:  I DO, YOUR HONOR.

6         THE COURT:  CAN WE TAKE A TEN MINUTE BREAK?  LADIES

7    AND GENTLEMEN, WE'RE GOING TO TAKE A TEN MINUTE BREAK, AND THEN

8    WE'LL COME BACK AND ENGAGE IN OUR CROSS-EXAMINATION.

9         SO WE'LL BE IN RECESS.

10        (RECESS FROM 10:31 A.M. UNTIL 10:45 A.M.)

11        THE COURT:  WE'RE BACK ON THE RECORD.  OUR JURY AND

12   ALTERNATES ARE PRESENT.  ALL COUNSEL AND THE DEFENDANT IS

13   PRESENT.  THE WITNESS IS ON THE STAND.

14        CROSS-EXAMINATION, MR. ARCHER?

15        MR. ARCHER:  YES, YOUR HONOR.  THANK YOU.

16                      **CROSS-EXAMINATION**

17   BY MR. ARCHER:

18   Q.   GOOD MORNING AGAIN, MR. COOPER.

19   A.   GOOD MORNING.

20   Q.   SO IN FEBRUARY OF 2012, YOU DID NOT WORK AT TELETCH OR

21   SPOOFCARD; IS THAT CORRECT?

22   A.   I DID NOT.

23   Q.   SO YOU NEVER ACTUALLY USED THE SYSTEM AS IT WAS IN PLACE

24   IN FEBRUARY OF 2012?

25   A.   RIGHT.

1    Q.   AND THERE WAS A SERVICE MIGRATION LATER IN THAT YEAR;

2    CORRECT?

3    A.   CORRECT.

4    Q.   AND YOU DIDN'T WORK THERE WHEN THAT SERVICE MIGRATION

5    OCCURRED; CORRECT?

6    A.   RIGHT.

7    Q.   OKAY.  AND SO ALL OF THE INFORMATION THAT YOU HAVE ABOUT

8    THE RECORDS THAT YOU JUST TESTIFIED TO IS STUFF THAT HAS BEEN

9    TOLD TO YOU BY OTHER PEOPLE; IS THAT CORRECT?

10   A.   YES AND NO.

11   Q.   WELL, YOU DIDN'T ACTUALLY WORK WITH THE SYSTEM IN 2012;

12   CORRECT?

13   A.   I DIDN'T, CORRECT.

14   Q.   OKAY.  SO THESE WERE THINGS THAT WERE RELATED TO YOU BY

15   OTHER PEOPLE LATER ON; CORRECT?

16   A.   CORRECT.  RIGHT.

17   Q.   AND YOU SAID THAT YOU BELIEVED THAT THERE WAS SOME SORT OF

18   PHYSICAL CARD THAT WAS SOLD BACK IN 2012 WITH THE SPOOFCARD

19   NUMBER ON IT?

20   A.   NOT THAT I BELIEVE.  I KNOW.

21   Q.   OKAY.

22   A.   WE STILL HAVE THEM.

23   Q.   AND THAT CARD HAD THE NUMBER THAT WAS REQUIRED TO DIAL

24   INTO THE SYSTEM; CORRECT?

25   A.   CORRECT.

1    Q.   AND THE CARD ALSO HAD ON IT WHAT NUMBER YOU WOULD PUT IN

2    TO MAKE A SPOOFCARD PHONE CALL; RIGHT?

3    A.   RIGHT.

4    Q.   AND SO ANYBODY WITH THAT ACTUAL SPOOFCARD CARD NUMBER,

5    THAT PHYSICAL CARD READING OFF OF IT, COULD MAKE THAT SPOOFCARD

6    CALL; RIGHT?

7    A.   RIGHT.

8    Q.   AND I'M SORRY.  YOU DON'T HAVE ANY INDEPENDENT BASIS TO

9    TELL US TODAY THAT THE INFORMATION IN THE RECORDS THAT YOU JUST

10   TESTIFIED ABOUT IS ACCURATE; CORRECT?

11             MR. SCHENK:  OBJECTION.

12             THE COURT:  DO YOU WANT TO REPHRASE THE QUESTION,

13   PLEASE.

14             MR. ARCHER:  I'D BE HAPPY TO.

15             THE COURT:  ACCURATE AS -- ARE YOU TALKING ABOUT

16   TYPOGRAPHICAL ERRORS ON THE FORM OR THAT'S WHAT I'M SUGGESTING.

17             MR. ARCHER:  SURE.

18   Q.   YOU WEREN'T AT THE COMPANY WHEN THESE LOG ENTRIES

19   OCCURRED; CORRECT?

20   A.   THAT'S CORRECT.

21   Q.   OKAY.  SO YOU DON'T HAVE ANY PERSONAL KNOWLEDGE, THEN,

22   TESTIFYING TODAY THAT THE SYSTEM WAS WORKING CORRECTLY IN

23   LOGGING THESE?

24             MR. SCHENK:  OBJECTION.  IT CALLS FOR SPECULATION.

25             THE COURT:  SUSTAINED.

DIRECT COOPER BY MR. SCHENK

 1                MR. ARCHER:  YOUR HONOR, I'M NOT ASKING WHETHER

 2     THESE ARE CORRECT OR NOT.  I'M ASKING WHETHER HE KNOWS FROM

 3     PERSONAL KNOWLEDGE WHETHER THESE ENTRIES ARE CORRECT.

 4                THE COURT:  HE'S THE CUSTODIAN OF RECORDS.  HE

 5     BROUGHT THE RECORDS HERE FROM -- AS THEY WERE SUBPOENAED BY THE

 6     GOVERNMENT.

 7           ARE YOU ASKING AND TESTING HIS KNOWLEDGE AS TO THE

 8     ACCURACY OF THE INFORMATION THAT IS CONTAINED IN THE RECORDS AS

 9     THEY APPEAR?

10                MR. ARCHER:  I AM, YOUR HONOR, BECAUSE THE

11     GOVERNMENT WENT THROUGH A SERIES OF QUESTIONS WITH HIM ASKING

12     WHAT THESE MEAN AND WHAT THE ENTRIES WERE AND WHAT THE ENTRIES

13     MEAN AND SO HE TESTIFIED BEYOND JUST INTRODUCING THE RECORD TO

14     BE SHOWN TO THE JURY.

15           I THINK IT'S APPROPRIATE TO ASK HIM WHETHER HE ACTUALLY

16     KNOWS WHETHER THESE ENTRIES ARE ACCURATE OR WHETHER HE'S

17     READING OFF A PIECE OF PAPER.

18                THE COURT:  HE TOLD US ABOUT HIS TRAINING.  HE TOLD

19     US HE WAS TRAINED AND HE HAD EXTENSIVE TRAINING, I THINK, HE

20     SUGGESTS AS TO THE RECORDS.

21           YOU CAN CERTAINLY ASK HIM WHAT HE WAS TRAINED TO DO AND IF

22     THAT INFORMS HIS KNOWLEDGE OF THE RECORDS.  PERHAPS THAT'S WHAT

23     YOU'RE DOING?

24                MR. ARCHER:  MY INTENTION WAS TO ASK WHETHER HE

25     KNOWS WHETHER THESE RECORDS ARE ACCURATE OR NOT OR WHETHER HE'S

1      READING OFF OF A RECORD THAT HE'S PRODUCED IN COURT.

2              THE COURT:  YOU CAN ASK THAT QUESTION.

3              MR. ARCHER:  OKAY.

4      Q.   YOU TESTIFIED TO A NUMBER OF THINGS IN THESE RECORDS;

5      CORRECT?

6      A.   CORRECT.

7      Q.   AND YOU DON'T KNOW WHETHER THE COMPUTER SYSTEM WAS

8      ACCURATE IN ENTERING THIS DATA BACK THEN, DO YOU?

9              MR. SCHENK:  YOUR HONOR, OBJECTION.  THAT CALLS FOR

10     THE WITNESS TO SPECULATE ON THE COMPUTERS.

11             THE COURT:  SUSTAINED AS TO THAT.

12     BY MR. ARCHER:

13     Q.   YOU DON'T KNOW WHETHER ANY OF THESE ENTRIES ARE CORRECT OR

14     NOT?

15     A.   I DO IN THE SENSE OF WHEN WE GENERATE A REPORT, WE MATCH

16     IT WITH WHAT WE HAVE IN OUR DATABASE SO THE INFORMATION THAT WE

17     HAVE IN THE DATABASE MATCHES THE REPORT THAT WE PRINTED.

18     Q.   AND CAN YOU TESTIFY TODAY THAT THE DATABASE HAS NEVER MADE

19     ANY MISTAKES?

20     A.   AS FAR AS I'M AWARE.  I'M NOT AWARE OF ANY MISTAKES.

21     Q.   SO YOU DON'T -- WHAT YOU'RE TESTIFYING TO TODAY IS THAT --

22     I'M ASKING YOU NOT WHETHER YOU'RE AWARE OF MISTAKES.  I'M

23     ASKING YOU WHETHER YOU CAN TESTIFY TO THIS COURT, TO THIS JURY

24     TODAY, THAT THE DATABASE HAS NEVER MADE ANY MISTAKES?

25             MR. SCHENK:  OBJECTION.  THAT'S WHY IT'S

 1        SPECULATION.  HE ANSWERED WHAT HE COULD TESTIFY TO.

 2                MR. ARCHER:  I'M ASKING WHETHER HE CAN ANSWER THAT

 3        AND IF HE SAYS I CAN THEN --

 4                THE COURT:  WELL, I THINK HIS PREVIOUS ANSWER WAS

 5        THAT HE'S NOT AWARE OF ANY MISTAKES.

 6                MR. ARCHER:  OKAY.  I HAVE NO FURTHER QUESTIONS.

 7                MR. SCHENK:  NO REDIRECT.

 8                THE COURT:  IS THIS WITNESS EXCUSED OR SUBJECT TO

 9        RECALL?

10                MR. SCHENK:  THE WITNESS MAY BE EXCUSED AND NOT

11        SUBJECT TO RECALL.

12                MR. ARCHER:  YES, YOUR HONOR.

13                THE COURT:  SIR, THANK YOU FOR COMING IN.  YOU'RE

14        EXCUSED.

15                THE WITNESS:  THANK YOU.

16                THE COURT:  YOU'RE WELL.  DOES THE GOVERNMENT HAVE

17        ANOTHER WITNESS TO CALL?

18                MS. PENNA:  YES, YOUR HONOR.  THE GOVERNMENT CALLS

19        SPECIAL AGENT DONNA AGUIRRE.

20                THE COURT:  ALL RIGHT.  IF YOU WOULD COME FORWARD,

21        PLEASE.  AND OUR COURTROOM DEPUTY WILL PLACE YOU UNDER OATH.

22            **(GOVERNMENT'S WITNESS, DONNA AGUIRRE, WAS SWORN.)**

23                THE WITNESS:  I DO.

24                THE COURT:  PLEASE HAVE A SEAT AND MAKE YOURSELF

25        COMFORTABLE.

1    AND FEEL FREE TO THE ADJUST THE MICROPHONE AS YOU NEED.

2    I'LL ENCOURAGE YOU TO SPEAK DIRECTLY INTO THE MICROPHONE.

3    WHEN YOU ARE COMFORTABLE, PLEASE STATE YOUR NAME AND THEN

4    SPELL IT PLEASE.

5    THE WITNESS:  DONNA AGUIRRE, D-O-N-N-A,

6    A-G-U-I-R-R-E.

7    THE COURT:  THANK YOU.  COUNSEL.

8    **DIRECT EXAMINATION**

9    BY MS. PENNA:

10   Q.   GOOD MORNING.

11   A.   GOOD MORNING.

12   Q.   WHERE ARE YOU EMPLOYED?

13   A.   I'M WITH THE TREASURY INSPECTOR GENERAL FOR TAX

14   ADMINISTRATION.

15   Q.   AND COULD YOU TELL US WHAT YOU DO IN THIS JOB?

16   A.   WITH TIGTA, THAT'S WHAT WE CALL IT, I'M A SPECIAL AGENT

17   AND WE OVERSEE THE I.R.S., THE TAX ADMINISTRATION OF THE I.R.S.

18   WHERE WE WANT TO UPHOLD THE MISSION OF THE I.R.S. BY MAKING

19   SURE THAT THERE'S NO FRAUD BASED OR ABUSE RELATING TO THE

20   I.R.S.

21   Q.   HOW LONG HAVE YOU HAD THIS POSITION?

22   A.   I'VE BEEN A SPECIAL AGENT FOR 14 YEARS.

23   Q.   WITH THIS AGENCY?

24   A.   NO.  WITH THIS AGENCY IT'S BEEN ABOUT FIVE AND A HALF

25   YEARS.

1    Q.   WHERE WERE YOU PREVIOUSLY?

2    A.   PREVIOUSLY I WAS A SPECIAL AGENT WITH THE INTERNAL REVENUE

3    SERVICE CRIMINAL INVESTIGATION DIVISION.

4    Q.   AND DID YOU HAVE SPECIAL TRAINING FOR YOUR CURRENT

5    POSITION?

6    A.   YES.

7    Q.   AND COULD YOU DESCRIBE THAT TRAINING?

8    A.   ALL SPECIAL AGENTS GO THROUGH THE CRIMINAL INVESTIGATION

9    TRAINING PROGRAM AND SO THAT'S ABOUT THREE MONTHS LONG, AND

10   THEN AFTER THAT YOU GO INTO YOUR AGENCY SPECIFIC TRAINING.  SO

11   WITH MY CURRENT AGENCY I HAD TO GO FOR ADDITIONAL TRAINING TO

12   LEARN MORE ABOUT WHAT TIGTA DOES.

13   Q.   ARE YOU FAMILIAR WITH THE CASE AGAINST DOUGLAS YORK?

14   A.   YES, I AM.

15   Q.   AND HOW ARE YOU FAMILIAR WITH THE CASE?

16   A.   I WAS THE CASE AGENT.

17   Q.   AND WHAT WAS THE FIRST THING THAT YOU DID WHEN YOU WERE

18   ASSIGNED AS CASE AGENT?

19   A.   I REVIEWED THE E-MAILS THAT WERE RECEIVED THROUGH OUR

20   TIGTA HOTLINE, AND THEN WE MADE CONTACT WITH THE COMPLAINANT OR

21   IN THIS CASE IT WAS MR. HESSENFLOW.

22   Q.   AND WHAT DID YOU REVIEW ON THAT E-MAIL?

23   A.   I LOOKED AT THE E-MAIL AND I SAW WHERE IT CAME FROM, THE

24   CONTACT INFORMATION FOR THE COMPLAINT.  I READ THE BODY OF THE

25   E-MAIL TO SEE WHAT THE ALLEGATIONS WERE AND FROM THERE I DID MY

1     INVESTIGATIVE STEPS TO FIND THE FACTS.

2     Q.   COULD YOU DESCRIBE WHAT YOUR NEXT STEP WAS?

3     A.   WELL, MY NEXT STEP WAS TO CALL MR. HESSENFLOW AND GET MORE

4     DETAILS FROM HIM SO THAT HE COULD ELABORATE MORE ON THE E-MAIL.

5     Q.   COULD YOU ELABORATE ON THAT?

6     A.   SURE.  I MADE CONTACT WITH MR. HESSENFLOW.  HE INDICATED

7     HE HAD A RECORDING OF THE PHONE CALL SO WE REQUESTED A COPY OF

8     THAT AND THEN HE ALSO INDICATED THAT HE HAD LOGS THAT HE HAD

9     KEPT.

10         AND SO, OF COURSE, I ASKED HIM WHY OR WHEN THE LOGS BEGAN.

11     SO I REVIEWED THAT AS WELL.  THEN I WENT THROUGH MY

12     INVESTIGATIVE STEPS.

13     Q.   OKAY.  JUST TO BACK UP A LITTLE BIT.  YOU SAID THAT YOU

14     HAD REQUESTED A RECORDING THAT HAD BEEN REFERENCED AND THAT YOU

15     SPOKE TO MR. HESSENFLOW ABOUT.  DID YOU RECEIVE THAT REPORTING?

16     A.   I DID.

17     Q.   AND DID YOU REVIEW IT?

18     A.   I DID.

19     Q.   AND WHAT DID YOU REVIEW?

20     A.   I LISTENED TO THE RECORDING NUMEROUS TIMES ALONG WITH THE

21     TRANSCRIPT AND THAT MR. HESSENFLOW PROVIDED IN THE E-MAIL, AND

22     THEN I WROTE DOWN NOTES IN TERMS OF WHO THE CALLER SAID THEIR

23     NAME WAS AND WHAT NUMBER THEY WERE CALLING FROM, AND THEN I

24     RESEARCHED TO SEE IF, IN FACT, THE PERSON WHOSE NAME WAS GIVEN

25     ON THE VOICEMAIL WAS AN I.R.S. EMPLOYEE.

1    Q.   AND WHAT WAS THE NAME GIVEN ON THE -- IN THE SPECIFIC

2    CASE?

3    A.   IT WAS REPORTED -- AND I HEARD GIGI SMITH AND A VARIATION

4    LIKE POSSIBLY JUDY SMITH.

5    Q.   WAS IT UNCLEAR?

6    A.   IT WAS UNCLEAR.

7    Q.   AND YOU STATED THAT YOU DID A SEARCH OF THESE NAMES.  WHAT

8    DID -- COULD YOU ELABORATE ON THAT?

9    A.   WE HAD -- BECAUSE WE OVERSEE THE I.R.S., WE HAVE ACCESS TO

10   DATABASES TO IDENTIFY CURRENT AND PAST I.R.S. EMPLOYEES.  SO I

11   RESEARCHED IN THAT DATABASE.

12   Q.   AND WHAT DID YOU FIND?

13   A.   I FOUND THAT WE DID NOT HAVE ANY CURRENT EMPLOYEES UNDER

14   THE NAME GIGI SMITH OR JUDY SMITH.

15   Q.   AND WHAT DID THAT SIGNIFY IN THE CONTEXT OF THE BEGINNING

16   OF THIS INVESTIGATION?

17   A.   WELL, I ALSO LOOKED TO SEE THE PHONE NUMBER TO SEE IF WE

18   HAD ANY I.R.S. OFFICES WHERE THAT AREA CODE CAME FROM.

19   Q.   ARE YOU REFERRING TO THE PHONE NUMBER THAT WAS PROVIDED AS

20   ON THE CALLER ID OF THE VOICEMAIL THAT YOU HAD BEEN DISCUSSING

21   THAT YOU HAD REVIEWED?

22   A.   THAT'S CORRECT.

23   Q.   AND WHAT WAS THAT PHONE NUMBER?

24   A.   I BELIEVE IT WAS AREA CODE 708-565-1040.

25   Q.   AND WHAT IS THIS PHONE NUMBER?

DIRECT AGUIRRE BY MS. PENNA

1    A.   WELL, THAT WAS THE PHONE NUMBER THAT MR. HESSENFLOW'S

2    CALLER ID CAPTURED AS THE ORIGINATION OF THE CALL.

3        SO I LOOKED AT THAT PHONE NUMBER, LOOKED AGAIN IN OUR

4    DATABASE TO SEE IF IT -- WE HAD ANY I.R.S. OFFICES ASSIGNED TO

5    THAT PHONE NUMBER AND WHERE IT WAS LOCATED AND I LOOKED AND I

6    SAW THAT AREA CODE 708 CAME FROM AN ILLINOIS AREA, AND SO I

7    LOOKED TO SEE IF WE HAD ANY OFFICES IN ILLINOIS THAT HAD

8    THAT -- THE LAST DIGITS MATCHING THAT PHONE NUMBER.

9    Q.   WHAT WAS THE PURPOSE OF THE STEPS THAT YOU HAD JUST

10   DESCRIBED TO US?

11   A.   WELL, WE DO THIS TO FIND THE FACTS TO MAKE SURE THAT WHAT

12   IF IT WAS A LEGITIMATE PHONE CALL AND THE RECIPIENT MIGHT HAVE

13   JUST ASSUMED THAT, YOU KNOW, IT WAS A SCAM AS OPPOSED TO A

14   LEGITIMATE CALL.

15       SO WE GO THROUGH STEPS TO CORROBORATE AND TO NEGATE ANY

16   FALSE ALLEGATIONS THAT WE MAY RECEIVE SO IN CASE, YOU KNOW,

17   THERE WAS AN I.R.S. EMPLOYEE WHO HAD A LEGITIMATE BUSINESS

18   PURPOSE TO CALL MR. HESSENFLOW.

19   Q.   AND WHAT WERE YOU ABLE TO DETERMINE FROM THIS

20   INVESTIGATION IN THAT REGARD?

21   A.   FROM THOSE INITIAL STEPS I WAS ABLE TO DETERMINE THAT IT

22   WAS NOT A LEGITIMATE I.R.S. PHONE CALL.

23   Q.   OKAY.  YOU ALSO DISCUSSED WITH US THAT YOU'D RECEIVED SOME

24   LOGS FROM MR. HESSENFLOW.  COULD YOU ELABORATE ON THAT?

25   A.   WELL, THESE ARE LOGS THAT MR. HESSENFLOW HAD KEPT WHICH

1    INCLUDED ALL INTERACTION THAT HE HAD WITH MR. YORK, WHETHER IT

2    BE --

3              MR. ARCHER:  OBJECTION.  FOUNDATION.

4              THE COURT:  OVERRULED.  YOU CAN CONTINUE WITH YOUR

5    ANSWER.

6              THE WITNESS:  THESE LOGS WERE ALL INTERACTIONS WITH

7    MR. YORK SO THEY COULD BE PHONE CALLS, TEXT MESSAGES OR CITINGS

8    OR JUST PERSONAL INTERACTIONS WITH MR. YORK.

9    BY MS. PENNA:

10   Q.   WHAT DID YOU DO NEXT IN YOUR INVESTIGATION?

11   A.   I DETERMINED THAT BECAUSE THE COMPLAINT CAME IN FROM

12   MR. HESSENFLOW, ALLEGED IT COULD HAVE BEEN MR. YORK WHO MADE

13   THE PHONE CALL.  WHAT I DID WAS IDENTIFIED MR. YORK'S CELL

14   PHONE NUMBER SO THAT I COULD DETERMINE WHETHER INDEED THE

15   CALLER WAS MR. YORK.

16   Q.   AND WHAT DID YOU REVEAL?

17   A.   WELL, I GOT CONFIRMATION FROM A NUMBER OF SOURCES TO LET

18   ME KNOW THAT MR. YORK WAS ASSIGNED A CERTAIN CELL PHONE NUMBER

19   WHICH MR. HESSENFLOW PROVIDED INITIALLY IN HIS E-MAIL.

20             MR. ARCHER:  OBJECTION.  FOUNDATION, HEARSAY, MOVE

21   TO STRIKE.

22             THE COURT:  DO YOU WANT TO LAY A FOUNDATION FOR THIS

23   LAST INFORMATION?

24   BY MS. PENNA:

25   Q.   WERE YOU ABLE TO OBTAIN THE DEFENDANT'S PHONE RECORDS --

1      A.    YES.

2      Q.    -- AT ANY TIME IN YOUR INVESTIGATION?

3      A.    I DID.

4      Q.    AND HOW WERE YOU ABLE TO OBTAIN THESE?

5      A.    I GOT INFORMATION FROM A NUMBER OF PEOPLE TO IDENTIFY HIS

6      CELL PHONE NUMBER, AND THEN I ALSO GOT INFORMATION ON THE CELL

7      PROVIDER FOR MR. YORK'S CELL PHONE AND HIS ACCOUNT NUMBERS SO I

8      SUBPOENAED VERIZON WIRELESS FOR THOSE RECORDS.

9      Q.    DID YOU RECEIVE RECORDS BASED ON THE SUBPOENA?

10     A.    I DID.

11     Q.    WHAT INFORMATION DID YOU REQUEST SPECIFICALLY?

12     A.    I WAS INTERESTED IN THAT ONE PARTICULAR PHONE CALL SO I

13     REQUESTED FROM VERIZON WIRELESS ABOUT HALF A MONTH BEFORE THAT

14     PHONE CALL AND HALF A MONTH AFTER.

15          SO THE RECORDS ONLY COVERED THE TIME PERIOD FROM FEBRUARY

16     16, 2012 THROUGH MARCH 16, 2012.

17     Q.    AND DID YOU RECEIVE THESE PHONE RECORDS?

18     A.    I DID.

19     Q.    COULD YOU TURN TO THE BINDER IN FRONT OF YOU TO TAB 3.  DO

20     YOU RECOGNIZE THESE DOCUMENTS?

21     A.    I DO.

22     Q.    ARE THESE THE RECORDS THAT YOU REVIEWED?

23     A.    YES.

24     Q.    HOW DO YOU KNOW THAT?

25     A.    BECAUSE THEY WERE E-MAILED TO ME DIRECTLY FROM VERIZON.

1   Q.   AND WHAT DID YOU REVIEW ON THESE RECORDS?

2   A.   I VERIFIED THAT THE ACCOUNT NUMBER WAS WHICH I HAD

3   REQUESTED RECORDS FOR AND THE PHONE NUMBER INFORMATION THAT WAS

4   PROVIDED BY VERIZON IS THE INFORMATION THAT I REQUESTED.

5        I SAW THAT THE SUBSCRIBER INFORMATION WAS PAMELA BEALE,

6   AND I KNEW THAT THAT WAS MR. YORK'S MOM.

7        AND I REVIEWED ALL OF THE PHONE CALLS AND THE LOGS, AND I

8   SPECIFICALLY WAS LOOKING TO PHONE CALLS THAT WERE MADE TO

9   MR. HESSENFLOW'S RESIDENCE AND CELL PHONE NUMBER.

10            THE COURT:  PARDON ME, COUNSEL.  THE OBJECTION IS

11  OVERRULED, AND THE FOUNDATION HAS BEEN LAID.

12  BY MS. PENNA:

13  Q.   AND COULD YOU WALK US THROUGH WHAT YOU LOOKED FOR ON THESE

14  RECORDS IN REGARD TO THOSE PHONE NUMBERS AND WHAT YOU FOUND?

15  A.   WELL, WHAT I ALSO KNEW IS I LOOKED AT MR. HESSENFLOW'S

16  LOG, AND I DID A RECONCILIATION WITH THE VERIZON'S RECORD AND

17  ALL OF THE PHONE CALLS OF MR. HESSENFLOW AS HAVING RECEIVED, I

18  SAW THAT IN THESE VERIZON LOGS.

19            MR. ARCHER:  OBJECTION.  HEARSAY, MOVE TO STRIKE,

20  YOUR HONOR.

21            THE COURT:  OVERRULED.  YOU CAN CONTINUE.

22            THE WITNESS:  I SAW THAT ON THE CALL LOG THAT

23  MR. YORK MADE THOSE PHONE CALLS TO, AGAIN, MR. HESSENFLOW'S

24  RESIDENCE.

25            MR. ARCHER:  AGAIN, SAME OBJECTION.  SHE'S

1    TESTIFYING AS TO THE CONTENTS OF THE DOCUMENT THAT SHE RECEIVED

2    FROM MR. HESSENFLOW.  IT'S HEARSAY WITHOUT AN EXCEPTION.

3              THE COURT:  OVERRULED.

4              THE WITNESS:  IN ADDITION -- GO AHEAD.

5    BY MS. PENNA:

6    Q.   SORRY.  GO AHEAD.

7    A.   SO I LOOKED AT ALL OF THOSE PHONE CALLS BUT THEN IN

8    PARTICULAR I WAS VERY INTERESTED IN THE I.R.S. IMPLICATION CALL

9    THAT WAS RECEIVED ON FEBRUARY 23RD, 2012, AT OR AROUND 1:25

10   P.M.

11   Q.   AND WHAT DID YOU FIND IN THESE RECORDS IN REFERENCE TO

12   THAT CALL?

13   A.   I SAW THAT THERE WERE TWO CALLS MADE ON THAT SAME DATE

14   ABOUT THE SAME TIME.  SO THERE WAS -- CAN I FLIP TO THE RIGHT

15   PAGE?

16   Q.   OF COURSE.  I BELIEVE IT'S 313.

17   A.   SO AS I STATED ON THAT DATE AND ABOUT THE SAME TIME, AT

18   1:24 P.M. AND 1:25 P.M. THERE WERE TWO CALLS MADE TO A PHONE

19   NUMBER WHICH I DID NOT RECOGNIZE.

20   Q.   AND WHAT WAS THAT PHONE NUMBER?

21   A.   IT WAS TO 866-967-6594.

22   Q.   OKAY.  AND YOU STATED -- COULD YOU TELL US WHAT TIMES THE

23   TWO CALLS WERE MADE THAT YOU'RE REFERENCING TO?

24   A.   THE FIRST ONE WAS AT 1:24 P.M., AND THE SECOND ONE WAS AT

25   1:25 P.M.

1          MS. PENNA:  YOUR HONOR, COULD WE HAVE PERMISSION TO

2     PUBLISH THE EXHIBIT?  IT WOULD BE HELPFUL FOR THE JURY.

3          THE COURT:  THE EXHIBIT WAS ADMITTED.

4          MS. PENNA:  YES, YOUR HONOR.

5          THE COURT:  SO IT MAY BE PUBLISHED.

6          MS. PENNA:  THANK YOU.  WE'RE ON PAGE 313.

7     Q.   SO I'LL HAVE YOU START WITH THE FIRST ONE THAT OCCURRED ON

8     1:24.  COULD YOU WALK US THROUGH WHAT YOU REVIEWED IN TERMS OF

9     THIS CALL?

10    A.   I SAW THE DATE OF FEBRUARY 23RD, AND I KNOW THESE RECORDS

11    ARE FOR THE YEAR 2012.  AND THEN FOR THE TIME I SEE THAT THERE

12    IS ONE FOR 1:24 P.M., WHICH IS IN THE NEXT COLUMN, AND THEN THE

13    1:25 P.M., WHICH IS IN THE NEXT ROW, AND THE PHONE NUMBERS

14    DIALED WERE EXACTLY THE SAME FOR BOTH CALLS, WHICH WAS THE

15    866-967-6594.

16    Q.   DO THE RECORDS PROVIDE A DURATION OF THESE CALLS?

17    A.   YES, THEY DO.

18    Q.   WHAT WERE THOSE?

19    A.   THE FIRST CALL MADE ON 1:24 WAS FOR ONE MINUTE AND THE

20    SECOND CALL AT 1:25 WAS FOR THREE MINUTES.

21    Q.   NOW, YOU'VE MENTIONED THAT YOU HAD ALSO REVIEWED THESE

22    RECORDS FOR CORROBORATION FOR OTHER CALLS THAT WERE MADE TO

23    MR. HESSENFLOW.  COULD YOU TELL US WHAT YOU FOUND IN THAT

24    REGARD JUST ON THIS ONE BILL?

25    A.   ON THIS ONE MONTH'S TIME PERIOD I, I NOTED THAT THERE WERE

DIRECT AGUIRRE BY MS. PENNA

```
1    25 PHONE CALLS MADE TO MR. HESSENFLOW'S RESIDENCE AND DURING

2    THAT SAME TIME PERIOD THERE WERE SIX PHONE CALLS MADE TO

3    MR. HESSENFLOW'S CELL PHONE NUMBER AND THEN THE TWO CALLS MADE

4    TO THIS 866 NUMBER.

5    Q.   AND WERE YOU ABLE TO IDENTIFY THAT 866 NUMBER?

6    A.   I DID.

7    Q.   AND WHAT DID YOU FIND?

8    A.   I WENT ON THE INTERNET AND FOUND AND SEARCHED AND FOUND

9    THAT IT WAS AN ACCESS FOR SPOOFCARD.

10   Q.   AND WHAT IS SPOOFCARD?

11   A.   SPOOFCARD IS A THIRD PARTY SERVICE WHERE YOU CAN GET

12   ACCESS TO IT AND YOU BUY BASICALLY LIKE A MEMBERSHIP OR SERVICE

13   POINTS AND YOU CAN CALL THEIR ACCESS NUMBER AND FROM THERE YOU

14   CAN MAKE PHONE CALLS TO ANYBODY WHERE YOU INDICATE WHATEVER YOU

15   WANT TO SHOW UP ON YOUR -- AS THE CALLER ID FOR THE RECIPIENT'S

16   PHONE LINE.

17           MR. ARCHER:  OBJECTION, YOUR HONOR.  FOUNDATION AND

18   IT'S CUMULATIVE.

19           THE COURT:  OVERRULED.  DO YOU HAVE ANOTHER

20   QUESTION?

21           MS. PENNA:  YES, YOUR HONOR.  THANK YOU.

22   Q.   WHAT INFORMATION DID YOU NEXT REQUEST IN YOUR

23   INVESTIGATION?

24   A.   AFTER I IDENTIFIED THAT PHONE NUMBER AS AN ACCESS FOR

25   SPOOFCARD, I SUBPOENAED RECORDS FOR SPOOFCARD.
```

DIRECT AGUIRRE BY MS. PENNA

1    Q.   AND WHAT SPECIFICALLY DID YOU SUBPOENA?

2    A.   I SUBPOENAED ACTUALLY JUST SUBSCRIBER INFORMATION, CALL

3    DURATION, FEATURES THAT WERE SELECTED FOR ALL OF THE CALLS, FOR

4    ANY PAYMENT INFORMATION SO I COULD GET THE BILLING INFORMATION

5    AND THE PERSON WHO PURCHASED THE SERVICES FROM SPOOFCARD.

6         MY SUBPOENA REQUEST JUST REQUESTED RECORDS FOR THE

7    SUBSCRIBER WHO HAD THE PHONE NUMBER 408-710-9450.

8    Q.   AND DID YOU RECEIVE RECORDS IN RESPONSE TO THAT SUBPOENA?

9    A.   I DID.

10   Q.   COULD YOU PLEASE TURN TO THE BINDER TAB NUMBER 2.  IT'S

11   BEEN MARKED AS GOVERNMENT'S EXHIBIT 2.  DO YOU RECOGNIZE THESE

12   DOCUMENTS?

13   A.   I DO.

14   Q.   ARE THESE THE RECORDS THAT YOU RECEIVED FROM THE SPOOFCARD

15   SUBPOENA?

16   A.   YES.

17   Q.   AND WHAT DID YOU REVIEW ON THESE DOCUMENTS?

18   A.   I LOOKED AT EVERY LINE AND COLUMN JUST TO GET A BETTER

19   IDEA OF WHAT WAS LAID OUT BEFORE ME AND THEN I SAW THE CALLS

20   THAT MATCHED THE TIME THAT WAS CALLED ON MR. YORK'S VERIZON

21   WIRELESS CALL LOG, AND THEN I SAW THEIR MP3 RECORDINGS.  SO I

22   CLICKED ON THOSE TO LISTEN TO THEM.

23   Q.   SO BACKING UP JUST A LITTLE BIT.  YOU REVIEWED THE

24   DOCUMENTS.  WERE YOU ABLE TO IDENTIFY WHOSE ACCOUNT THIS --

25   THESE DOCUMENTS BELONGED TO?

1    A.    YES.

2    Q.    AND THEN YOU SAID THAT THERE WAS AN MP3 RECORDING THAT WAS

3    ATTACHED TO THE DOCUMENTS THAT WERE IN REFERENCE TO THE CALLS

4    THAT WERE MADE.

5         IS THAT CORRECT?

6    A.    CORRECT.

7              MS. PENNA:  YOUR HONOR, AT THIS TIME WE WILL BE

8    SEEKING TO PLAY THE AUDIO FILE AND THE TRANSCRIPT.  I KNOW WE

9    MENTIONED WE WANTED TO HAVE A JURY INSTRUCTION.

10             THE COURT:  IS THERE A TRANSCRIPT?  WHAT TRANSCRIPT

11   ARE YOU REFERENCING?

12             MS. PENNA:  WE WILL -- AS WITH THE GOVERNMENT'S

13   EXHIBIT 4, WE WILL BE PLAYING A RECORDING THAT WILL BE HAVING A

14   TRANSCRIPT SCROLLING ALONG THE BOTTOM OF THE SCREEN.

15             THE COURT:  I SEE.  AND THE TRANSCRIPT, IT'S A

16   VISUAL TRANSCRIPT?  IT'S NOT A HARD COPY TRANSCRIPT?

17             MS. PENNA:  IT IS NOT.  IT IS A VISUAL.

18             THE COURT:  OKAY.  ALL RIGHT.  LADIES AND GENTLEMEN,

19   YOU'RE NOW GOING TO -- YOU'RE ABOUT TO HEAR A RECORDING THAT

20   HAS BEEN RECEIVED IN EVIDENCE.  YOU'LL SEE, AS COUNSEL

21   INDICATED, A VISUAL TRANSCRIPT, WHICH IS BEING PROVIDED TO YOU

22   TO HELP IDENTIFY THE SPEAKERS AND THE WORDS THAT ARE SPOKEN IN

23   THIS.

24        IF YOU HEAR SOMETHING DIFFERENT FROM WHAT APPEARS IN THE

25   TRANSCRIPT, WHAT YOU HEAR IS CONTROLLING.  LISTEN CAREFULLY

1    BECAUSE THE TRANSCRIPT WILL NOT BE AVAILABLE DURING YOUR

2    DELIBERATIONS.

3        YOU PREVIOUSLY HEARD, I BELIEVE, THE SAME EXHIBIT, WHEN WE

4    WERE LAST IN SESSION, AND I DID NOT INSTRUCT YOU AND GIVE YOU

5    THIS INSTRUCTION BEFORE.  I WANT YOU TO, AS BEST YOU CAN,

6    INCORPORATE BY REFERENCE THIS INSTRUCTION AS TO THE EVIDENCE

7    THAT WAS RECEIVED WHEN THIS RECORDING WAS FIRST PLAYED.

8        AGAIN, WHAT YOU HEAR OF THE RECORDING IS WHAT CONTROLS,

9    NOT THE TRANSCRIPT.  THERE IS A PIECE OF EVIDENCE THAT I THINK

10   WAS INTRODUCED THAT HAS I BELIEVE IT'S MR. HESSENFLOW'S OWN

11   OPINION ABOUT WHAT THE RECORDING IS.

12       AGAIN, WHAT CONTROLS IS YOUR HEARING OF THE RECORDING.  SO

13   WE CAN PLAY THAT NOW.  DO YOU HAVE THAT CUED UP?

14            MS. PENNA:  YES, YOUR HONOR.  I FIRST NEED TO LAY

15   THE FOUNDATION FOR THE EXHIBIT.

16            THE COURT:  SURE.

17            MS. PENNA:  THANK YOU, YOUR HONOR.  MAY I HAVE

18   PERMISSION TO APPROACH?

19            THE COURT:  YES.  YES.

20            MS. PENNA:  THANK YOU.

21   Q.   I'M HANDING YOU A DISK.  DO YOU RECOGNIZE THAT DISK?

22   A.   YES.

23   Q.   AND WHAT IS IT?

24   A.   IT'S A CD OF THE MP3 RECORDING OF THE PHONE CALL.

25   Q.   HOW DO YOU KNOW THAT?

1    A.   BECAUSE I LISTENED TO IT AND THEN I INITIALED IT.

2    Q.   THANK YOU.

3         PERMISSION TO ADMIT THIS EXHIBIT, YOUR HONOR?

4              THE COURT:  YES.  YOU CAN PLAY IT.  I THINK IT'S

5    BEEN ADMITTED.

6              MS. PENNA:  YOUR HONOR, THIS IS GOVERNMENT'S

7    EXHIBIT 1.  IT'S A DIFFERENT RECORDING.  THE PRIOR RECORDING

8    WAS GOVERNMENT'S EXHIBIT 4.

9              THE COURT:  4 WAS ADMITTED.  THIS IS EXHIBIT 1?

10             MS. PENNA:  YES, YOUR HONOR.

11             THE COURT:  ANY OBJECTION?

12             MR. ARCHER:  NO, YOUR HONOR.

13             THE COURT:  IT WILL BE ADMITTED, AND IT MAY BE

14   PUBLISHED AT THIS TIME.

15             MS. PENNA:  THANK YOU, YOUR HONOR.

16        (GOVERNMENT'S EXHIBIT 1 WAS RECEIVED IN EVIDENCE.)

17        (AUDIO PLAYING.)

18             THE COURT:  PARDON ME FOR INTERRUPTING.  LET'S SEE

19   IF WE CAN TURN THE VOLUME UP SOMEHOW.  ADJUST THE SPEAKERS.

20        BEFORE YOU PLAY IT, WOULD IT BE HELPFUL TO PUT IT ON OUR

21   SYSTEM ON THE MICROPHONE?

22        ALL RIGHT.  LET'S TRY IT AGAIN.

23        (AUDIO PLAYING.)

24             THE COURT:  THAT CONCLUDES THE RECORDING?

25             MS. PENNA:  YES, YOUR HONOR.

1          THE COURT:  ALL RIGHT.

2          MS. PENNA:  THANK YOU.

3     Q.  WAS THIS A COPY OF THE RECORDING THAT YOU REVIEWED DURING

4     YOUR INVESTIGATION THAT YOU RECEIVED FROM SPOOFCARD?

5     A.  YES, IT WAS.

6     Q.  AND HAD YOU ALSO REVIEWED THE RECORDING THAT HAD BEEN

7     PROVIDED BY MR. HESSENFLOW?

8     A.  YES, I DID.

9     Q.  HOW DID THOSE RECORDINGS COMPARE?

10    A.  THEY'RE A LITTLE DIFFERENT IN THE RESPECT THAT

11    MR. HESSENFLOW'S RECORDING HAD THE DATE AND TIMESTAMP THAT HIS

12    PHONE RECEIVED IT AND SO, THEREFORE, YOU DID NOT HEAR

13    MR. HESSENFLOW'S VOICEMAIL GREETING.  IT JUST WENT RIGHT INTO

14    THE CALL FROM -- THROUGH SPOOFCARD.

15    Q.  AND HOW DID THE CONTENT OF THAT CALL COMPARE OF THE TWO

16    RECORDINGS?  SORRY.

17    A.  THE SPOOFCARD CALL WAS A LITTLE MORE CLEAR BUT OTHERWISE

18    IT WAS IDENTICAL.

19    Q.  AND AS PART OF YOUR JOB, ARE YOU FAMILIAR WITH THE JOB

20    FUNCTIONS OF VARIOUS EMPLOYEES OF THE I.R.S.?

21    A.  YES, I AM.

22    Q.  AND HOW ARE YOU FAMILIAR WITH THAT?

23    A.  BECAUSE WE OVERSEE THE I.R.S. AND WE INTERACT WITH THEM

24    PRETTY MUCH ON A DAILY BASIS.  WE HAVE TO UNDERSTAND THE

25    DIFFERENT BUSINESS FUNCTIONS AND POSITIONS WITHIN THE I.R.S.

DIRECT AGUIRRE BY MS. PENNA

1    Q.   WOULD A PERSON EMPLOYED BY THE I.R.S. REQUEST A TAX RETURN

2    DURING A LEGITIMATE INVESTIGATION?

3    A.   YES, THEY WOULD.

4    Q.   AND WOULD THEY DO THAT OVER THE PHONE?

5    A.   THEY COULD.

6    Q.   WOULD INVESTIGATING TAX RECORDS BE CONSISTENT WITH SOMEONE

7    WHO IS LEGITIMATELY EMPLOYED BY THE I.R.S.?

8    A.   YES.

9    Q.   AND AT ANY TIME WERE YOU ABLE TO DETERMINE IF MR. -- OR IF

10   DOUGLAS YORK -- I KNOW WE DISCUSSED WHETHER THERE WAS A PERSON

11   NAMED GIGI SMITH OR A PERSON NAMED JUDY SMITH THAT WAS EMPLOYED

12   BY THE I.R.S.

13        WERE YOU ABLE TO DETERMINE IF A PERSON NAMED DOUGLAS YORK

14   WAS EMPLOYED BY THE I.R.S.?

15   A.   I DID CHECK INTO THAT, AND WE DON'T HAVE OR HAVE EVER HAD

16   ANYBODY NAMED DOUGLAS SMITH WITH THE I.R.S. OR I MEAN

17   DOUGLAS YORK OR DOUG YORK WITH THE I.R.S.

18   Q.   OKAY.  MOVING BACK TO THE RECORDS THAT YOU REVIEWED FROM

19   SPOOFCARD, DID YOU INVESTIGATE THE IP ADDRESS THAT WAS

20   CONTAINED IN THEIR CARD REPORT?

21   A.   YES.

22   Q.   AND WHAT PAGE WAS THAT ON?

23   A.   EXHIBIT 2-1.

24   Q.   AND CAN YOU TELL US WHAT THAT IP ADDRESS WAS?

25   A.   THE IP ADDRESS IS 71.92.228.25.

1    Q.   THANK YOU.  DID THIS IP ADDRESS LATER BECOME RELEVANT IN

2    THIS INVESTIGATION?

3    A.   YES, IT DID.

4    Q.   AND CAN YOU TELL US?

5    A.   WELL, THIS GOES BACK TO MR. HESSENFLOW'S INFORMATION THAT

6    HE PROVIDED TO ME ON A CD AND THAT INCLUDED THE CRAIGSLIST POST

7    FOR MR. HESSENFLOW'S PORCH FOR A DOLLAR.

8    Q.   AND DID YOU INVESTIGATE THIS?  I TAKE THIS TO BE A CLAIM

9    THAT MR. HESSENFLOW HAD PROVIDED.  AND THEN DID YOU LOOK INTO

10   THE LEGITIMACY OF THAT CLAIM?

11   A.   I DID.

12   Q.   AND WHAT DID YOU DO?

13   A.   I GOT RECORDS FROM CRAIGSLIST AND INCLUDING WHERE THE POST

14   CAME FROM AND JUST INFORMATION RELATED TO THAT ONE PARTICULAR

15   POST ACCORDING TO THAT POSTING ID.

16   Q.   AND YOU SENT THEM A SUBPOENA?

17   A.   I DID.

18   Q.   COULD YOU PLEASE TURN TO WHAT HAS BEEN MARKED AS

19   GOVERNMENT'S EXHIBIT 7.  IT'S THE TAB 7 IN YOUR BINDER.

20        DO YOU RECOGNIZE THAT DOCUMENT?

21   A.   I DO.

22   Q.   WHAT IS IT?

23   A.   PURSUANT TO MY SUBPOENA CRAIGSLIST PROVIDED THIS

24   INFORMATION.

25   Q.   AND HOW WERE YOU ABLE TO RECOGNIZE THAT?

1    A.   BECAUSE I RECEIVED IT VIA E-MAIL TO MY INBOX.

2    Q.   OKAY.

3         PERMISSION TO ADMIT EXHIBIT 7, YOUR HONOR?

4              THE COURT:  ANYTHING FURTHER ON 7?

5              MR. ARCHER:  NO, YOUR HONOR.

6              THE COURT:  IT'S ADMITTED.

7              MS. PENNA:  AND PERMISSION TO PUBLISH?

8              THE COURT:  IT MAY BE PUBLISHED.

9         (GOVERNMENT'S EXHIBIT 7 WAS RECEIVED IN EVIDENCE.)

10             MS. PENNA:  THANK YOU.

11   Q.   WHAT DID YOU REVIEW ON THIS DOCUMENT?

12   A.   I LOOKED AT EVERY LINE TO ATTEMPT TO DETERMINE WHO POSTED

13   THIS AD.

14   Q.   AND CAN YOU WALK US THROUGH WHAT YOU FOUND AND WHAT YOU --

15   A.   SURE.  SO THE POSTING ID MATCHED THE POSTING ID OF THAT

16   SCREEN PRINT THAT MR. HESSENFLOW PROVIDED TO ME.

17        SO THERE'S THE NUMBER.

18        AND THEN THE POSTER E-MAIL IS FROM WHAT I UNDERSTAND FROM

19   CRAIGSLIST SUBPOENAED INFORMATION, AND THAT'S THE INFORMATION

20   THAT THEY HAD INDICATED WHEN THEY CREATED THIS POST.

21             MR. ARCHER:  OBJECTION, FOUNDATION.  MOVE TO STRIKE

22   AND HEARSAY.

23             THE COURT:  I'M GOING TO SUSTAIN THE OBJECTION AS TO

24   THAT LAST PORTION.  THE RECORD SPEAKS FOR ITSELF.

25             MS. PENNA:  THANK YOU, YOUR HONOR.

1    Q.   WE CAN MOVE ON TO THE NEXT LINES THAT YOU REVIEWED THAT'S

2    PERTINENT TO THIS INVESTIGATION.

3    A.   OKAY.  THE POSTER IP, THAT'S WHAT STOOD OUT TO ME BECAUSE

4    THAT MATCHED THE SAME IP ADDRESS AS THE INFORMATION PROVIDED

5    FROM SPOOFCARD.

6    Q.   OKAY.  NOW, LET'S MOVE TO THE DESCRIPTION OF THE POSTING

7    IN ITSELF, AND I BELIEVE THAT'S THE BOTTOM OF THE FIRST PART OF

8    THE TEXT.

9         CAN YOU WALK US THROUGH THAT, THE DATE THAT IT WAS POSTED?

10   A.   THE RECORD CREATED WAS ON FEBRUARY 24TH, 2012.

11   Q.   OKAY.  DOES IT -- WHAT DOES THE POSTED DATE READ?

12   A.   THE POSTED DATE ALSO READS FEBRUARY 24TH, 2012.

13   Q.   DOES IT PROVIDE A DESCRIPTION OF THE POSTING?

14   A.   YES, IT DOES.

15   Q.   AND WHAT DOES THAT SAY?

16   A.   THE AREA?

17   Q.   YES.  COULD YOU JUST WALK US THROUGH THE LINES OF THE

18   DOCUMENT THAT YOU REVIEWED.

19   A.   OKAY.  SO THE AREA DESCRIPTION IS SAN FRANCISCO BAY AREA.

20   THE SUBAREA DESCRIPTION IS THE SOUTH BAY AREA AND THE

21   NEIGHBORHOOD IS LOS GATOS.

22        AND THEN IT MOVES ON TO CATEGORY DESCRIPTION WHICH IS CARS

23   AND TRUCKS BY OWNER AND THE CATEGORY TYPE IS FOR SALE AND THE

24   PRICE IS 1.

25   Q.   WHAT DOES IT READ BY THE PRIVACY?

1    A.    IT SAYS PRIVACY ANONYMIZED E-MAIL ADDRESS.

2    Q.    AND THE POSTED DATE?

3    A.    STAFF DELETED.

4    Q.    AND WHAT ABOUT THE POSTING TITLE?

5    A.    PORCH.

6    Q.    CAN YOU READ TO US THE POSTING BODY AT THE BOTTOM OF THE

7    DOCUMENT?

8    A.    SURE.  IT STATES '85 TARGA, C-O-N-V, B-L-K, WHICH I WOULD

9    ASSUME MEANS CONVERTIBLE BLACK.  COME GET IT.  DIVORCE PAYOUT

10   FOR YOU.  YOU MIGHT AS WELL GET IT BEFORE THE EX GETS IT.

11   23097 SUMMIT ROAD, LOS GATOS.  IT'S NOT OK TO CONTACT THIS

12   POSTER WITH SERVICES OR OTHER COMMERCIAL INTERESTS.

13   Q.    OKAY.  ARE YOU AWARE OF THAT LAST LINE THAT PART OF THAT

14   BODY OR IF IT WAS COMPILED BY CRAIGSLIST?

15   A.    I BELIEVE SO.

16   Q.    I'M WONDERING IF THAT LAST LINE WAS PART OF THE POSTING

17   BODY OR IF YOU DON'T KNOW ONE WAY OR THE OTHER?

18   A.    I DON'T KNOW.

19   Q.    OKAY.  AND WHOSE ADDRESS IS POSTED IN THE BODY OF THIS

20   TEXT?

21   A.    IT'S MR. HESSENFLOW'S.

22          MS. PENNA:  COULD I HAVE A FEW MINUTES, YOUR HONOR?

23          THE COURT:  YES.

24       (PAUSE IN PROCEEDINGS.)

25

1      BY MS. PENNA:

2      Q.   BACKING UP A FEW STEPS IN THE INVESTIGATION, YOU SAID THAT

3      YOU HAD REVIEWED THE ORIGINAL PHONE DOCUMENTS -- VERIZON

4      DOCUMENTS, OR I APOLOGIZE.  YOU HAD ORIGINALLY BEEN INFORMED OF

5      THE NUMBER THAT APPEARED ON THE CALLER ID OF MR. HESSENFLOW'S

6      VOICE MESSAGE.

7           AND I BELIEVE WE STARTED TO DISCUSS WHAT THAT NUMBER WAS.

8      CAN YOU REMIND US AGAIN WHAT NUMBER DID APPEAR ON THE CALLER

9      ID?

10     A.   IT WAS 708-565-1040.

11     Q.   AND WHAT WAS THE SIGNIFICANCE OF THAT NUMBER?

12     A.   THE 1040 REALLY STOOD OUT.

13     Q.   AND WHY IS THAT?

14     A.   BECAUSE 1040 IS THE I.R.S. TAX FORM FOR INDIVIDUAL INCOME

15     TAX FILERS, BUT IT'S ALSO THE LAST FOUR DIGITS OF THE

16     LEGITIMATE I.R.S. HOT NUMBER.

17     Q.   SO A NUMBER THAT PEOPLE CAN CALL IN ORDER TO GET HELP WITH

18     THEIR TAX RECORDS OR?

19     A.   CORRECT.  IF YOU HAD ANY QUESTIONS REGARDING YOUR

20     INDIVIDUAL TAX RETURN, ANYBODY CAN CALL THE I.R.S. HOT NUMBER

21     AND THAT ALSO ENDS WITH THE NUMBERS 1040 BECAUSE, YOU KNOW, IT

22     RELATES TO THE FORM 1040 THAT YOU WOULD FILE.

23     Q.   OKAY.

24          NO FURTHER QUESTIONS AT THIS TIME.

25               THE COURT:  CROSS-EXAMINATION?

1          MR. ARCHER:  YES, YOUR HONOR.

2                    **CROSS-EXAMINATION**

3     BY MR. ARCHER:

4     Q.   GOOD MORNING, MS. AGUIRRE.

5     A.   GOOD MORNING.

6     Q.   I'D LIKE TO TALK VERY BRIEFLY ABOUT THAT CRAIGSLIST

7     POSTING.

8          THE POSTER E-MAIL WAS AN LWILLIS96@YAHOO.COM; IS THAT

9     CORRECT?

10    A.   THAT'S CORRECT.

11    Q.   AND YOU HAVE NO REASON TO BELIEVE THAT THAT E-MAIL ADDRESS

12    IS ASSOCIATED WITH MR. YORK; CORRECT?  YOU DIDN'T DO ANY

13    INVESTIGATION TO CONFIRM THAT?

14    A.   I DON'T KNOW WHO THAT E-MAIL BELONGS TO, NO.

15    Q.   AND THE LAST NAME WILLIS IS NOT AN AKA OF MR. YORK OR

16    ANYTHING THAT YOU'RE FAMILIAR WITH FROM YOUR INVESTIGATION?

17    A.   NOT THAT I KNOW OF.

18    Q.   OKAY.  AND SO YOU DIDN'T SEEK THE SUBSCRIBER INFORMATION

19    OF THAT E-MAIL ADDRESS TO FIND OUT WHOSE E-MAIL THAT WAS;

20    CORRECT?

21    A.   CORRECT.

22    Q.   CORRECT.  THIS IP ADDRESS, THE 71.93.228.25 IP ADDRESS,

23    YOU DIDN'T SEEK THE SUBSCRIBER INFORMATION OF THAT EITHER;

24    CORRECT?

25    A.   CORRECT.

1    Q.   OKAY.  SO YOU DON'T KNOW IF THAT'S A PUBLIC ACCESS

2    WIRELESS OR AN INTERNET CAFE OR ANYTHING LIKE THAT; IS THAT

3    CORRECT?

4    A.   CORRECT.

5    Q.   OKAY.  SO THAT IP ADDRESS COULD HAVE BEEN AVAILABLE TO THE

6    PUBLIC TO YOUR KNOWLEDGE; IS THAT CORRECT?

7    A.   I WOULDN'T KNOW.

8    Q.   OKAY.  AND YOU DIDN'T ASK MR. HESSENFLOW IF HE KNEW AN

9    L. WILLIS, DID YOU?

10   A.   I DID NOT ASK HIM.

11   Q.   OKAY.  THE L. WILLIS E-MAIL, JUST TO BE CLEAR, WAS

12   DIFFERENT THAN THE ONE PROVIDED IN THE SPOOFCARD RECORDS; IS

13   THAT CORRECT?

14   A.   THAT'S CORRECT.

15   Q.   I WANTED TO CLARIFY ONE THING FROM THE -- THIS IS THE

16   PHONE CALL, THE RECORDED PHONE CALL.

17        YOU SAID THAT THE VOICEMAIL WAS ASKING FOR A TAX RETURN.

18   THAT'S NOT CORRECT, IS IT?

19   A.   COULD I REVIEW THE TRANSCRIPT?

20   Q.   SURE.

21        (PAUSE IN PROCEEDINGS.)

22          THE WITNESS:  CAN YOU REPEAT THE QUESTION, PLEASE.

23   BY MR. ARCHER:

24   Q.   I GUESS MORE SIMPLY IN THAT TRANSCRIPT IN THAT VOICEMAIL,

25   YOU NEVER HEARD THE WORDS TAX RETURN MENTIONED, DID YOU?

1     A.   NOT THOSE TWO WORDS.

2     Q.   OKAY.  SO YOUR INVESTIGATION INTO THIS, DID IT BEGIN WHEN

3     MR. HESSENFLOW SENT THE E-MAIL ON THE 24TH OF FEBRUARY?

4     A.   IF THAT'S WHEN THE E-MAIL WAS SENT, YES.

5     Q.   THE E-MAIL THE DAY AFTER THE VOICEMAIL RECORDING?

6     A.   YES.

7     Q.   OKAY.  AND YOU SPOKE TO MR. HESSENFLOW -- SORRY.

8          MY UNDERSTANDING IS THAT MR. HESSENFLOW WAS INTERVIEWED BY

9     AN AGENT HEARTMAN ON FEBRUARY 24TH; IS THAT CORRECT?

10    A.   I DON'T REMEMBER THE DATES, BUT, YES.

11    Q.   BUT SOME TIME SHORTLY AFTER THE REPORT?

12    A.   YES.

13    Q.   OKAY.  AND YOU INTERVIEWED MR. HESSENFLOW ON MAY 4TH OF

14    2012?

15    A.   YES.

16    Q.   AND THAT'S WHEN YOU RETRIEVED THE DISK OF THE SAVED

17    VOICEMAILS; IS THAT CORRECT?

18    A.   YES.

19    Q.   OKAY.  YOU WROTE YOUR FINAL REPORT IN THIS CASE ON

20    NOVEMBER 13TH OF 2012 OR WHAT YOU CONSIDERED A CASE CLOSING

21    REPORT; IS THAT CORRECT?

22    A.   I DON'T REMEMBER THE DATE.

23    Q.   WOULD IT REFRESH YOUR RECOLLECTION TO LOOK AT A COPY OF

24    THAT REPORT?

25    A.   SURE.

```
 1                    MR. ARCHER:  MAY I APPROACH THE WITNESS, YOUR HONOR?
 2                    THE COURT:  YES.
 3                    MR. ARCHER:  THANK YOU.
 4        Q.   I GUESS I'M FOCUSSING MOST NOW ON THE TOP RIGHT-HAND
 5        CORNER OF THE FIRST PAGE OF YOUR REPORT.
 6        A.   UH-HUH.
 7        Q.   BASED ON YOUR REVIEW OF THAT, IS IT ACCURATE TO SAY THAT
 8        THAT WAS LISTED AS A FINAL REPORT IN NOVEMBER OF 2012; CORRECT?
 9        A.   CORRECT.
10        Q.   OKAY.  AND THERE AGAIN WAS SOME INTERCHANGE BETWEEN YOU
11        AND MR. HESSENFLOW AROUND MAY 17TH OF 2015; IS THAT ACCURATE?
12        A.   I DON'T KNOW THE DATE BUT --
13        Q.   BUT IN MAY OF THIS YEAR AFTER THIS CASE WAS CHARGED, DID
14        MR. HESSENFLOW RESPOND TO AN INQUIRY FROM YOU WITH AN E-MAIL?
15        A.   YES.
16        Q.   OKAY.  AND THEN YOU, AGAIN, E-MAILED MR. HESSENFLOW ON
17        JULY 9TH OF 2015, JULY OF 2015?
18        A.   YES.
19        Q.   OKAY.  AND MR. HESSENFLOW, PRIOR TO JULY 9TH OF 2015, DID
20        NOT MENTION ANYTHING ABOUT HIM DOING AN EXPERIMENT TO IDENTIFY
21        MR. DOUGLAS YORK'S VOICE; IS THAT CORRECT?
22        A.   CORRECT.
23        Q.   OKAY.  AND HE MENTIONED THAT TO YOU IN JULY OF 2015?  NO?
24        A.   YES.
25        Q.   AND YOU DIDN'T ASK HIM FOR A COPY OF THE EXPERIMENT THAT
```

1    HE HAD DONE; CORRECT?

2    A.   CORRECT.

3    Q.   AND YOU INTERVIEWED ANDREA YORK IN YOUR INVESTIGATION IN

4    THIS CASE AS WELL?

5    A.   I DID.

6    Q.   AND YOU UNDERSTAND THAT MS. YORK IS MR. YORK'S WIFE; IS

7    THAT CORRECT?

8    A.   YES.

9    Q.   AND DID MS. YORK MENTION TO YOU THAT SHE BELIEVED THAT

10   THERE WERE PEOPLE DOING MR. YORK'S DIRTY WORK FOR HIM DURING

11   YOUR INTERVIEW OF HER?

12            MS. PENNA:  OBJECTION, YOUR HONOR.  IT CALLS FOR

13   HEARSAY AND ALSO ON THE GROUNDS OF RELEVANCE.

14            MR. ARCHER:  YOUR HONOR, I'M ASKING THE QUESTION TO

15   ESTABLISH WHETHER IT'S FOR THE EFFECT ON THE HEARER, WHETHER

16   AGENT AGUIRRE RECEIVED THAT INFORMATION FROM MS. YORK, NOT

17   OFFERING IT FOR THE TRUTH OF THE MATTER.

18            THE COURT:  I'LL SUSTAIN THE RELEVANCE OBJECTION.

19            MR. ARCHER:  YOUR HONOR, I'D LIKE TO INQUIRE

20   ABOUT -- AGENT AGUIRRE HAS TESTIFIED ALREADY ABOUT THE --

21            THE COURT:  LET'S GO TO SIDE-BAR.

22            MR. ARCHER:  YES, YOUR HONOR.

23        (SIDE-BAR CONFERENCE ON THE RECORD.)

24            THE COURT:  WE'RE AT SIDE-BAR.  MR. ARCHER.

25            MR. ARCHER:  YES, YOUR HONOR.  THE DEFENSE OFFER OF

CROSS AGUIRRE BY MR. ARCHER

```
1    PROOF AS TO THIS LINE OF QUESTIONING IS THAT AGENT AGUIRRE HAS

2    ALREADY TESTIFIED ABOUT TAKING HER INVESTIGATIVE STEPS AND THE

3    DEFENSE CERTAINLY SHOULD BE ALLOWED LEEWAY TO POINT OUT

4    FAILURES TO INVESTIGATE, ESPECIALLY IF THEY MAY LEAD TO AN

5    ALTERNATE EXPLANATION OF THE EVENTS HERE.

6         I HAVE ON GOOD FAITH BASED ON A REPORT AUTHORED BY THIS

7    AGENT THAT SHE WAS TOLD BY, BY ANDREA YORK THAT THERE WERE

8    OTHER PEOPLE THAT HAD BEEN DOING DOUG'S DIRTY WORK AND THAT SHE

9    RECEIVED PHONE CALLS FROM THESE OTHER PEOPLE, AND I'D LIKE TO

10   ASK HER IF SHE'S FOLLOWED UP ON ANY OF THOSE BECAUSE THERE'S NO

11   INDICATION THAT SHE DID.

12            MR. SCHENK:  IT IS ONLY RELEVANT IF IT'S OFFERED FOR

13   THE TRUTH.  IT'S NOT FOR ITS EFFECT ON THE LISTENER.

14            THE COURT:  I JUST, I JUST DON'T UNDERSTAND HOW THAT

15   COMES IN BASED ON WHAT YOU'VE INDICATED.

16            MR. ARCHER:  WHAT I'M NOT -- I'M NOT ASKING TO PROVE

17   THAT THAT WAS HAPPENING.  I'M ASKING WITHOUT THAT FOUNDATION, I

18   CAN'T JUST ASK HER, YOU DIDN'T FOLLOW UP ON ANYTHING THAT YOU

19   WERE TOLD BY ANDREA YORK.  I MEAN, THAT'S SORT OF WITHOUT

20   MENTIONING THAT THERE WOULD BE A REASON FOR HER TO FOLLOW UP ON

21   THAT.  MY QUESTION DOESN'T MAKE ANY SENSE.

22        SO I'M OFFERING IT ONLY FOR A FOUNDATIONAL MATTER AND THE

23   COURT, AND I THINK A LIMITING INSTRUCTION WOULD BE APPROPRIATE

24   THERE, BUT HOW -- I CERTAINLY DON'T INQUIRE ABOUT HER FAILURE

25   TO INVESTIGATE OTHER LEADS AND OTHER ALTERNATE THEORIES OF THIS
```

CROSS AGUIRRE BY MR. ARCHER

1    CASE AND THAT IS ONE, AND SO WITHOUT THE -- WITHOUT

2    ESTABLISHING THAT SHE DID HEAR THAT FROM A WITNESS THAT SHE

3    INTERVIEWED AND THEN DIDN'T FOLLOW UP ON IT, I'M KIND OF

4    HANDCUFFED SO.

5            THE COURT:  SO YOU WANT TO ASK THIS WITNESS WHETHER

6    THIS WITNESS INTERVIEWED HIS WIFE, MR. YORK?

7            MR. ARCHER:  UH-HUH.

8            THE COURT:  AND WHETHER HIS WIFE TOLD THE WITNESS

9    SHE BELIEVED THAT THERE WERE OTHER PEOPLE DOING HER HUSBAND'S

10   DIRTY WORK.

11           MR. ARCHER:  RIGHT.  AND I'D LIKE TO ASK HER WHETHER

12   SHE FOLLOWED UP ON ANY OF THE THINGS THAT SHE WAS TOLD TO

13   UNDERMINE HER INVESTIGATION, WHICH IS CERTAINLY APPROPRIATE FOR

14   CROSS-EXAMINATION.

15           MR. SCHENK:  THAT IS GOING TO OPEN THE DOOR TO THE

16   GOVERNMENT'S RESPONSE WHICH IS WHAT ANDREA YORK WAS REFERRING

17   TO WAS NOT DOUGLAS YORK'S DIRTY WORK IN HARASSING

18   MR. HESSENFLOW BUT RATHER DOUG YORK'S DIRTY WORK IN HARASSING

19   HER THAT WAS THE BASIS FOR THE RESTRAINING ORDER AND THE ENTIRE

20   PARADE OF HORRIBLES THAT WE'RE NOT INTERESTED IN GETTING INTO.

21           MR. ARCHER:  IT'S AN INTERESTING THREAT BUT --

22           THE COURT:  IT COULD -- BASED ON WHAT I UNDERSTAND

23   THERE IS THIS ONGOING DISSOLUTION AND THE RESTRAINING ORDERS

24   AND ALL OF THE OTHER ISSUES ANCILLARY TO THIS CASE, BUT THAT'S

25   THE RISK THAT YOU RUN OF OPENING THE DOOR TO THIS OTHER

CROSS AGUIRRE BY MR. ARCHER

1    INFORMATION ABOUT HIM, THE RESTRAINING ORDER AND ALL OF THESE

2    OTHER THINGS.

3         IT MAY DEPEND ON WHAT SHE SAYS, IT MIGHT BECOME ADMISSIBLE

4    AGAIN TO EXPLAIN.

5              MR. ARCHER:  MY ONLY OTHER QUESTION REGARDING

6    ANDREA YORK WAS WHETHER SHE WAS ABLE TO IDENTIFY THE VOICEMAIL

7    THAT WAS MENTIONED, THE NAME ON THE VOICEMAIL.

8         I'LL WITHDRAW IT.  I APOLOGIZE.

9              THE COURT:  SO I THINK THAT'S THE -- YOU RUN INTO

10   THAT IF I PERMIT YOU TO ASK THIS QUESTION.  THEY MAY BE ABLE TO

11   ASK QUESTIONS ABOUT WHAT DID SHE REALLY MEAN AND PERHAPS CALL

12   ANDREA YORK TO ASK HER WHAT DID SHE MEAN WHICH THEN GETS INTO

13   HER RESTRAINING ORDER ISSUE WHICH MY SENSE IS THAT EVERYBODY

14   WANTS TO AVOID BUT MAYBE NOT.

15             MR. SCHENK:  THE GOVERNMENT'S VIEW IS THAT REALLY

16   THAT THE COURT'S PRETRIAL RULING WAS THAT THAT STUFF IS 403 AND

17   USING THAT SAME LOGIC SHOULD EXCLUDE THIS LINE OF QUESTIONING

18   RATHER THAN AN OPENING TO THE --

19             THE COURT:  WELL, I DON'T THINK ANY OF US WANT TO

20   GET INTO THAT, BUT I THINK MR. ARCHER IS PERMITTED TO INQUIRE

21   ON CROSS-EXAMINATION AS TO IF THERE ARE ALTERNATIVE, IF THERE

22   ARE VIABLE ALTERNATIVES, INDIVIDUALS WHO MAY HAVE DONE THIS.

23   HE'S CERTAINLY GOING TO PROBE ON THAT.

24        I THINK IT'S INAPPROPRIATE TO SAY THAT, NO, YOU CAN'T

25   INQUIRE AS TO WHETHER OR NOT THERE WERE OTHER INDIVIDUALS WHO

1    HAVE DONE THIS.

2              MR. ARCHER:  BUT I UNDERSTAND THAT THE COURT IS

3    GIVING ME FAIR WARNING THAT I MAY BE THREADING ON DANGEROUS

4    GROUND.

5              THE COURT:  AS I FREQUENTLY SAY, THERE'S A

6    DIFFERENCE BETWEEN TURNING THE KNOB AND OPENING THE DOOR.

7         WELL, I THINK YOU SHOULD BE ABLE TO ASK HER A QUESTION

8    ABOUT WHETHER OR NOT BASED ON ANY INFORMATION THAT SHE

9    RECEIVED, I'M NOT TELLING YOU HOW TO TRY YOUR CASE.

10             MR. ARCHER:  PLEASE DO.

11             THE COURT:  BUT DID ANDREA YORK FIND, AND SHE DID,

12   AND BASED ON ANYTHING SHE LEARNED IN THE INVESTIGATION WHETHER

13   THERE WERE OTHER VIABLE ALTERNATIVES OR OTHER INDIVIDUALS THAT

14   MAY HAVE BEEN INVOLVED BUT THEN, YOU KNOW, YOU WILL RUN THE

15   RISK OF WHO ARE THOSE PEOPLE AND WHY AND THEN WE GET INTO THAT

16   WHOLE ISSUE ABOUT THE RESTRAINING ORDER.

17             MR. ARCHER:  UNDERSTOOD.

18             THE COURT:  BUT YOU CAN CERTAINLY ASK WHETHER THERE

19   WERE OTHER INDIVIDUALS.  I'M NOT PRECLUDING YOU -- IF THE

20   EVIDENCE SUGGESTS THERE MIGHT BE OTHER PEOPLE.  AND I

21   UNDERSTAND HOW THIS MS. YORK'S SUGGESTED DIRTY WORK.

22        BUT, YOU KNOW, THE THREE OF YOU KNOW THE CONTEXT OF THAT

23   BETTER THAN I DO, WHETHER THAT WAS RELATED TO THE DV ISSUE AND

24   HER PERSONAL HARASSMENT AND THIS PHONE CALL.

25             MR. ARCHER:  FOR THE COURT'S BENEFIT, IT IS TWO

1    LINES AT THE END OF THE REPORT AND SO I MAY NOT WANDER DOWN

2    THAT PATH.

3              THE COURT:  YES.  I MEAN, THE JURY MIGHT FIND IT

4    INTERESTING ENOUGH JUST BECAUSE IT'S A DIVORCE CASE BUT -- ALL

5    RIGHT.

6              MR. SCHENK:  SCHEDULING, IS THE COURT THINKING AFTER

7    THIS RECESS WE'LL TAKE A LUNCH BREAK AND WE CAN ADDRESS --

8              THE COURT:  I WOULD LIKE TO KNOW WHAT TO TELL THE

9    JURY, IF AT ALL POSSIBLE, BEFORE LUNCH.

10         IF THEY'RE GOING TO GO HOME TODAY, IN OTHER WORDS, IF WE

11   HAVE RUN OUT OF WITNESSES TODAY, THAT IS, IF THE COURT ALLOWS

12   YOU, ONCE YOU TELL ME WHAT THIS OTHER WITNESS TIMING IS, I

13   DON'T WANT THEM TO HAVE TO STAY FOR LUNCH AND HAVE THEM COME

14   BACK AND SEND THEM HOME.

15             MR. SCHENK:  WE CALLED THE WITNESS DURING THE LAST

16   BREAK AND MAYBE HER PHONE RANG WHILE SHE WAS ON THE STAND, AND

17   SHE DOESN'T KEEP HER PHONE ON IN COURT AND IT'S POSSIBLE WE MAY

18   HAVE SOME INFORMATION.

19             THE COURT:  SO LET'S TAKE A SHORT RECESS, THEN,

20   BEFORE WE TAKE A NOON BREAK, AND WE'LL HEAR WHETHER OR NOT, YOU

21   KNOW, WE'RE GOING TO HAVE THIS WITNESS COME BACK.

22         HOW MUCH LONGER DO YOU THINK YOU HAVE WITH HER?

23             MR. ARCHER:  FIVE MINUTES I WOULD SAY.

24             THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

25             (END OF DISCUSSION AT SIDE-BAR.)

CROSS AGUIRRE BY MR. ARCHER

1           THE COURT:  THANK YOU, COUNSEL.

2           MR. ARCHER:  IF I MAY HAVE A MOMENT, YOUR HONOR?

3           THE COURT:  YES, OF COURSE.

4     (PAUSE IN PROCEEDINGS.)

5           MR. ARCHER:  THANK YOU, YOUR HONOR.

6           THE COURT:  SO YOU CAN ASK THE SAME QUESTION OR

7    ANOTHER QUESTION.

8           MR. ARCHER:  INDEED.

9    Q.  AGENT, DURING YOUR INVESTIGATION HERE YOU NEVER CONSULTED

10   WITH A VOICE ANALYSIS EXPERT; CORRECT?

11   A.  NO, I DIDN'T.

12   Q.  OKAY.  AND YOU UNDERSTAND THAT THE GOVERNMENT HAS THE

13   RIGHT TO SEEK AN ORDER FROM THE COURT TO COMPEL MR. YORK TO

14   GIVE A VOICE SAMPLE IN A CASE LIKE THIS; IS THAT CORRECT?

15   A.  I DON'T KNOW.

16   Q.  OKAY.  THAT WASN'T DISCUSSED WITH THE PROSECUTION, THEN?

17   A.  NOT WITH ME.

18   Q.  OKAY.  AND BEYOND MR. HESSENFLOW'S SUSPICION THAT THE

19   VOICEMAIL IS LEFT BY MR. YORK, NOBODY IN YOUR INVESTIGATION WAS

20   ABLE TO IDENTIFY THE VOICE ON THE VOICEMAIL AS MR. YORK;

21   CORRECT?

22     I CAN CLARIFY.  DID YOU INTERVIEW ANYONE DURING YOUR

23   INVESTIGATION THAT WAS ABLE TO LISTEN TO THE VOICEMAIL AND

24   IDENTIFY THAT THE VOICE ON THERE BELONGED TO MR. YORK?

25   A.  WELL, ACCORDING TO THE SPOOFCARD AND THE INFORMATION THAT

CROSS AGUIRRE BY MR. ARCHER

```
1     I RECEIVED FROM SPOOFCARD IT WAS ALTERED.

2             MR. ARCHER:  IF I COULD MOVE TO STRIKE THAT AS

3     NONRESPONSIVE, YOUR HONOR.

4     Q.   THE QUESTION THAT I HAVE FOR YOU, AGENT AGUIRRE, IS DURING

5     THE COURSE OF YOUR INVESTIGATION, DID YOU INTERVIEW ANYONE WHO

6     REVIEWED THE RECORDING OF THE VOICEMAIL WITH YOU AND WAS ABLE

7     TO IDENTIFY IT AS MR. YORK'S VOICE?

8     A.   NO.

9     Q.   OKAY.

10            THE COURT:  AND I'M GOING TO -- THE PRIOR ANSWER

11    WILL REMAIN.

12            MR. ARCHER:  OKAY.

13    Q.   AND SO YOU MENTIONED THAT YOU LEARNED FROM SPOOFCARD THAT

14    THE VOICE WAS ALTERED; CORRECT?

15    A.   YES.

16    Q.   AND WAS IT NOT ALSO APPARENT TO YOU AS SOON AS YOU

17    LISTENED TO IT THAT THE VOICE WAS ALTERED?

18    A.   YOU'RE SAYING NOT APPARENT?

19    Q.   I'M SAYING WHEN YOU LISTENED TO THE RECORDING, IT SOUNDED

20    ALTERED TO YOU; RIGHT?

21    A.   YES.

22    Q.   OKAY.  AND THE I.R.S. DOESN'T USE ALTERATION SOFTWARE IN

23    THEIR PHONE COMMUNICATIONS; CORRECT?

24    A.   NOT THAT I KNOW OF.

25    Q.   OKAY.  IT'S, IN FACT, NOT THE I.R.S.'S POLICY TO CALL WHEN
```

1    IT'S REGARDING TAX ISSUES; IS THAT CORRECT?

2    A.   COULD YOU REPEAT THAT, PLEASE.

3    Q.   IF THE I.R.S. IS GOING TO CONTACT SOMEBODY ABOUT A TAX

4    ISSUE, THEY DON'T, IN FACT, CALL THEM.  IS THAT THE POLICY?

5    A.   THEY CAN CALL.

6    Q.   THEY CAN CALL.  OKAY.  DURING THE COURSE OF YOUR

7    INVESTIGATIONS, YOU'VE -- IS IT ACCURATE TO SAY THAT YOU'VE

8    INVESTIGATED A NUMBER OF FRAUDULENT IMPERSONATIONS OF I.R.S.

9    EMPLOYEES?

10   A.   YES.

11   Q.   AND IS IT FAIR TO SAY THAT THE VAST BULK OF THOSE

12   INVESTIGATIONS IS PEOPLE TRYING TO EXTORT MONEY FROM THE PERSON

13   ON THE OTHER END?

14   A.   I CAN'T SAY AFFIRMATIVELY OR I CAN'T SAY COLLECTIVELY LIKE

15   IT'S ALWAYS.  I DON'T THINK IT'S ALWAYS.

16   Q.   BUT YOU'RE FAMILIAR WITH THE SCAM THAT SEEMS TO BE QUITE

17   POPULAR OF CALLING UP AND PRETENDING TO BE THE I.R.S. AND THEN

18   DEMANDING IMMEDIATE PAYMENT FOR A TAX LIEN?

19        IS THAT A SCAM THAT YOU'RE FAMILIAR WITH?

20   A.   IT'S ONE OF THE SCAMS.

21   Q.   OKAY.  AND IN THAT CASE IT ONLY WORKS IF THERE'S LIVE

22   COMMUNICATION; CORRECT?

23   A.   NO.

24   Q.   OKAY.  BUT A FAKE PHONE CALL OR A FAKE PHONE NUMBER WOULD

25   NOT BE OF ANY USE TO A SCAMMER, USING A FAKE PHONE NUMBER, THAT

CROSS AGUIRRE BY MR. ARCHER

```
 1    WOULDN'T BE USE TO A SCAMMER; CORRECT?

 2    A.   IT HAPPENS.

 3    Q.   SO IT HAPPENS THAT SOMEONE WHO IS TRYING TO SCAM SOMEONE

 4    OUT OF MONEY IS SAYING CALL ME BACK TO A NUMBER THAT DOESN'T

 5    EXIST, THAT HAPPENS IN YOUR EXPERIENCE?

 6    A.   IT HAPPENS.

 7    Q.   OKAY.  NOTHING IN THIS VOICEMAIL IS CONSISTENT WITH ANY OF

 8    THE SCAM INVESTIGATIONS THAT YOU'VE DONE AND THOSE EXTORTION

 9    SCHEMES; CORRECT?

10    A.   THEY'RE NOT -- GO AHEAD.

11            MS. PENNA:  YOUR HONOR, OBJECTION.  ASKED AND

12    ANSWERED.

13            THE COURT:  OVERRULED.  YOU CAN ANSWER THE QUESTION.

14            THE WITNESS:  THEY'RE NOT EXACTLY THE SAME, BUT THIS

15    COULD FALL IN THE REALMS OF SUCH SCAMS.

16    BY MR. ARCHER:

17    Q.   OKAY.  THIS PHONE NUMBER THAT WE'RE TALKING ABOUT, THAT

18    ENDED IN 1040; RIGHT?

19    A.   UH-HUH.

20    Q.   THIS IS NOT A REAL PHONE NUMBER; CORRECT?

21    A.   CORRECT.

22    Q.   BECAUSE YOU CALLED IT AND NOBODY ANSWERED?

23    A.   CORRECT.

24    Q.   OKAY.  SO IN EFFECT THIS VOICEMAIL DOES NOT LEAVE ANY

25    MEANS FOR THE CALLER, THE RECIPIENT, TO CALL BACK; CORRECT?
```

```
1     A.   CORRECT.

2     Q.   SO IS IT A FAIR CONCLUSION TO DRAW THEN THAT THIS CALLER

3     WAS NOT ACTUALLY TRYING TO ELICIT A PHONE CALL BACK?

4     A.   I CANNOT SPECULATE WHAT HIS INTENT WAS.

5     Q.   OKAY.  SO YOU DON'T KNOW THE INTENT OF THE CALLER WHO LEFT

6     THE VOICEMAIL HERE; CORRECT?

7     A.   CORRECT.

8          MR. ARCHER:  MAY I HAVE A MOMENT, YOUR HONOR.

9          (PAUSE IN PROCEEDINGS.)

10         MR. ARCHER:  THAT'S ALL, YOUR HONOR.  THANK YOU.

11         THANK YOU, AGENT AGUIRRE.

12              THE WITNESS:  THANK YOU.

13              THE COURT:  REDIRECT?

14              MS. PENNA:  NO REDIRECT, YOUR HONOR.

15              THE COURT:  ALL RIGHT.  MAY THIS WITNESS BE EXCUSED?

16              MR. ARCHER:  YES, YOUR HONOR.

17              MS. PENNA:  YES, YOUR HONOR.

18              THE COURT:  THANK YOU.

19              THE WITNESS:  THANK YOU.

20              THE COURT:  YOU'RE EXCUSED.

21              MR. ARCHER:  MAY I RETRIEVE MY DOCUMENT, YOUR HONOR?

22              THE COURT:  YES, OF COURSE.

23              MR. ARCHER:  THANK YOU, AGENT.

24              THE COURT:  LET ME ASK THE GOVERNMENT, SHOULD WE

25     TAKE A BRIEF RECESS NOW FOR SCHEDULING PURPOSES?
```

```
1              MR. SCHENK:  YES.

2              THE COURT:  ALL RIGHT.  LET'S TAKE A RECESS,

3     COUNSEL.  I WANT TO GAUGE WHERE WE ARE, LADIES AND GENTLEMEN.

4     WE'RE PERILOUSLY CLOSE TO THE NOON HOUR.  WE'LL TAKE A RECESS.

5     I'LL ASK YOU TO -- WE'RE NOT TAKING OUR LUNCH RECESS, AND I'LL

6     LET YOU KNOW MORE ABOUT THAT WHEN WE RECONVENE PROBABLY IN

7     SHORT ORDER HERE, PROBABLY BEFORE NOON.

8          THANK YOU.

9          (JURY OUT AT 11:45 A.M.)

10             THE COURT:  ALL RIGHT.  PLEASE BE SEATED.  THANK

11    YOU.  THE RECORD SHOULD REFLECT THAT THE JURY HAS LEFT THE

12    COURTROOM.  ALL COUNSEL AND THE DEFENDANT ARE PRESENT.

13             MR. ARCHER:  YOUR HONOR, MAY I RUN TO THE BATHROOM

14    REALLY QUICKLY?

15             THE COURT:  OF COURSE.  OF COURSE.  LET'S TAKE FIVE

16    MINUTES.  WE'LL BE BACK IN FIVE MINUTES.

17         (RECESS FROM 11:46 A.M. UNTIL 11:57 A.M.)

18             THE COURT:  PLEASE BE SEATED.  WE'RE BACK ON THE

19    RECORD.  ALL COUNSEL ARE PRESENT, AND THE DEFENDANT IS PRESENT.

20    WE'RE OUTSIDE OF THE PRESENCE OF THE JURY.

21         AS TO OUR SCHEDULE, MR. SCHENK?

22             MR. SCHENK:  YES, YOUR HONOR.  WE HAVE NOT YET

23    SPOKEN TO -- THE INDIVIDUAL'S NAME IS ELI FINKELMAN.  I BELIEVE

24    IT'S E-L-I, F-I-N-K-E-L-M-A-N.  WE HAVE NOT SPOKEN TO

25    MR. FINKELMAN, AND WE HAVE ATTEMPTED BOTH VIA TELEPHONE AND
```

1    E-MAIL TO GET IN TOUCH WITH HIM, AND WE HAVE NOT CONTACTED HIM

2    THIS MORNING.

3         AND MY FEAR IS THAT EVEN IF WE TALKED TO HIM TODAY, THE

4    LIKELIHOOD THAT HE WOULD BE HERE ON MONDAY IS PROBABLY NOT

5    GREAT AND WITHOUT BEING ABLE TO TELL THE COURT WE SHOULD SEND

6    THE JURY HOME AND BRING THEM BACK TUESDAY OR WEDNESDAY, IT

7    SEEMS UNFAIR TO TELL TO THE JURY TO BRING THEM BACK ON MONDAY

8    OR TO LEAVE A RECORDING.

9         SO WHILE I APPRECIATE THE COURT INDICATING AN INITIAL

10   WILLINGNESS TO ENTERTAIN THE GOVERNMENT'S REQUEST FOR A

11   CONTINUANCE, I THINK WHAT IS PRUDENT IS FOR THE GOVERNMENT TO

12   MOVE TO DISMISS THAT COUNT, WHICH IS COUNT 2, AND PROCEED BASED

13   UPON THE REMAINING COUNT 1 IN THE INDICTMENT.  AND THE

14   GOVERNMENT HAS NO MORE WITNESSES.  SO UNLESS THERE'S ARGUMENT,

15   WE WOULD REST ON THAT.

16        THE COURT:  WELL, LET ME HEAR THE OBJECTIONS OF THE

17   DEFENSE.

18        MR. ARCHER:  UNDERSTANDING THAT THE JURY HAVING BEEN

19   SWORN AND THAT THAT WOULD BE A DISMISSAL WITH PREJUDICE, THERE

20   IS NO OBJECTION.

21        THE COURT:  SO DOES THE GOVERNMENT THEN FORMALLY

22   MOVE TO DISMISS COUNT 2?

23        MR. SCHENK:  YES, YOUR HONOR, WE DO.

24        THE COURT:  ALL RIGHT.  ALL RIGHT.  SO COUNT 2 WILL

25   BE DISMISSED THEN IN THIS CASE.

1        LET ME JUST ASK THEN, ASK WHAT THE CURRENT POSTURE OF THE

2   CASE IS WITH COUNT 1?

3        ARE WE READY TO MOVE INTO ARGUMENT?

4            MR. SCHENK:  THE GOVERNMENT RESTS.  I DON'T KNOW IF

5   THE DEFENSE HAS A CASE.

6            THE COURT:  OKAY.

7        (PAUSE IN PROCEEDINGS.)

8            MR. ARCHER:  YES, YOUR HONOR, SAVE FOR THE RULE 29

9   MOTION, THE DEFENSE DOES NOT INTEND TO PUT ON A CASE.

10           THE COURT:  ALL RIGHT.  SO I CAN SEND THE JURY OUT

11  FOR THEIR NOON RECESS, AND THEN WE COULD RECONVENE FOR

12  ARGUMENT, ASSUMING THE COURT DOESN'T GRANT THE MOTION AT THE

13  OUTSET, THE DEFENSE MOTION AT THE OUTSET.

14       WHEN SHOULD WE SCHEDULE ARGUMENTS, THEN?

15           MR. SCHENK:  IF WE DO -- WE CAN TELL THE JURY TO

16  COME BACK AT 1:30, AND WE CAN DO OUR RULE 29 AT 1:00 AND CLOSE

17  AT 1:30.

18           MR. ARCHER:  I WOULDN'T MIND HAVING THE FULL LUNCH

19  BREAK, THE 1:00 TO 1:30.  SO THE RULE 29 MOTION IS GOING TO BE

20  VERY BRIEF.

21           MR. SCHENK:  CAN WE DO IT RIGHT NOW?

22           MR. ARCHER:  SURE.

23           MR. SCHENK:  IF YOUR HONOR WILL INDULGE.  MAYBE WE

24  SHOULD TELL THE JURY TO GO TO LUNCH.

25           THE COURT:  I'M TRYING TO GET A HANDLE ON WHAT WE'LL

349

```
1    DO.  SO WE'LL ENGAGE A RULE 29 NOW.  DEPENDING ON THE OUTCOME

2    OF THAT THEN, IF WE ARE TO COME BACK THEN, SHOULD WE BEGIN

3    ARGUMENT AT 1:30, 1:00 O'CLOCK?

4              MR. ARCHER:  1:30 WOULD BE MY PREFERENCE, YOUR

5    HONOR.

6              MR. SCHENK:  THAT'S FINE.

7              THE COURT:  ALL RIGHT.

8              MR. ARCHER:  IF I MAY HAVE A MOMENT, YOUR HONOR?

9    I'M CONSULTING WITH THE BRAIN TRUST.

10             THE COURT:  SURE.

11        (PAUSE IN PROCEEDINGS.)

12        (JURY IN AT 12:01 P.M.)

13             THE COURT:  PLEASE BE SEATED.  THANK YOU, LADIES AND

14   GENTLEMEN.  PLEASE BE SEATED.  ALL RIGHT.  THE RECORD SHOULD

15   REFLECT THAT THE JURY IS BACK AND THE ALTERNATES AND ALL

16   COUNSEL AND THE DEFENDANT ARE PRESENT.

17        LADIES AND GENTLEMEN, WE'LL TAKE OUR NOON RECESS NOW, AND

18   WE WILL RECONVENE AT 1:30.

19        LET ME JUST ASK SOME PRELIMINARY QUESTIONS AS TO THAT.

20        DOES THE GOVERNMENT HAVE ANY ADDITIONAL WITNESSES?

21             MR. SCHENK:  NO, YOUR HONOR.  THE UNITED STATES

22   RESTS.

23             THE COURT:  ALL RIGHT.  THANK YOU.  DOES THE DEFENSE

24   HAVE ANY WITNESSES THEY WISH TO CALL?

25             MR. ARCHER:  NO, YOUR HONOR.  THE DEFENSE RESTS.
```

1          THE COURT:  THANK YOU.  LADIES AND GENTLEMEN, WHAT

2     THAT MEANS IS THAT THE EVIDENCE, YOU NOW HAVE ALL OF THE

3     EVIDENCE THAT YOU WILL NEED TO DECIDE THE CASE.

4          THE ONLY THING NOW REMAINING PRIOR TO YOUR DELIBERATIONS

5     ARE MY INSTRUCTIONS, THE ARGUMENTS OF COUNSEL, AND THEN MY

6     INSTRUCTIONS.

7          WHAT WE'LL DO IS TAKE OUR NOON RECESS NOW, AND I'LL ASK

8     YOU TO COLLECT YOURSELVES AGAIN DOWNSTAIRS SUCH THAT WE WILL

9     HOPEFULLY BEGIN AT 1:30, AND WE'LL START AT 1:30 WITH CLOSING

10    ARGUMENTS WITH COUNSEL, AND I'LL, SUBSEQUENT TO THAT, INSTRUCT

11    YOU AS TO THE LAW THAT APPLIES TO THE CASE.  SO DO HAVE A GOOD

12    LUNCH, AND WE'LL SEE YOU AT 1:30.  THANK YOU.

13          (JURY OUT AT 12:03 P.M.)

14          THE COURT:  ALL RIGHT.  PLEASE BE SEATED.  THANK

15    YOU.  THE RECORD SHOULD REFLECT THAT THE JURY HAS LEFT THE

16    COURTROOM FOR THEIR NOON RECESS.  ALL COUNSEL AND THE DEFENDANT

17    REMAIN PRESENT.

18          MR. ARCHER?

19          MR. ARCHER:  YOUR HONOR, THE DEFENSE MOVES UNDER

20    RULE 29 FOR JUDGMENT OF ACQUITTAL FROM THE COURT.  COUNT 2, I

21    THINK, HAS BEEN DISMISSED.  IT IS THE DEFENSE'S POSITION THAT

22    THE GOVERNMENT HAS FAILED TO ESTABLISH SUFFICIENT EVIDENCE FOR

23    EACH OF THE ELEMENTS CONTAINED WITHIN COUNT 1.

24          THE COURT:  ALL RIGHT.  THANK YOU.

25          MR. SCHENK:  AND AT THIS POINT THE STANDARD IS IN

1    THE EVIDENCE TAKEN IN THE LIGHT MOST FAVORABLE TO THE

2    GOVERNMENT, THERE CERTAINLY IS SUFFICIENT EVIDENCE IF THE JURY

3    IS TO BELIEVE THE EVIDENCE THAT THE GOVERNMENT HAS PRESENTED

4    FOR THEM TO FIND THAT THE GOVERNMENT HAS PROVED THAT THE TWO

5    ELEMENTS AS THE COURT INTENDS TO GIVE THEM FOR A SECTION 912

6    VIOLATION, THE FIRST BEING THAT THE DEFENDANT FALSELY PRETENDED

7    TO BE AN OFFICER OR EMPLOYEE ACTING UNDER THE AUTHORITY OF THE

8    UNITED STATES INTERNAL REVENUE SERVICE.

9        THE EVIDENCE THAT SUPPORTS THAT COUNT INCLUDES THAT IT WAS

10   THE DEFENDANT'S SPOOFCARD ACCOUNT THAT MADE A PHONE CALL ON THE

11   DATE THAT THE VOICEMAIL WAS RECEIVED SO THAT THE GOVERNMENT HAS

12   NOW INTRODUCED EVIDENCE ON BOTH SIDES OF THIS TRANSACTION.

13   EXHIBITS 1 AND 4 ARE AN IDENTICAL VOICEMAILS BUT RECEIVED FROM

14   TWO DIFFERENT SOURCES.

15       ONE COMES FROM SPOOFCARD BECAUSE THE DEFENDANTS SELECTED

16   THE OPTION TO RECORD HIS CALL OR VOICEMAIL OR WHATEVER HE

17   INTENDED TO DO AFTER THE CALL WAS COMPLETED AS WELL AS

18   MR. HESSENFLOW TESTIFIED THAT HE MADE A RECORDING OF THE

19   VOICEMAIL THAT HE RECEIVED.

20       SO WE HAVE BOTH ENDS OF THAT TRANSACTION AND THE ACCOUNT

21   INFORMATION BOTH THROUGH VERIZON AND SPOOFCARD SHOWING THAT IT

22   WAS THE DEFENDANT, DOUGLAS YORK, WHO MADE THAT CALL.

23       THE CONTENT OF THE CALL IN CONJUNCTION WITH THE SPECIAL

24   AGENT'S TESTIMONY SHOWS THAT HE WAS ACTING LIKE AN I.R.S.

25   EMPLOYEE.  MS. AGUIRRE PROVIDED TESTIMONY TO THE JURY ABOUT

1    WHAT AN I.R.S. EMPLOYEE WOULD DO, FOR INSTANCE, AT TIMES THEY

2    WOULD CALL AND ASK PEOPLE TAX QUESTIONS.

3        HE, ON THE VOICEMAIL, SAID THAT MY NAME IS MRS. SMITH FROM

4    THE I.R.S. LOOKING INTO TAX RECORDS LOOKING INTO A TAX AUDIT.

5    SO IT CERTAINLY WAS CONSISTENT WITH SOMEONE PRETENDING TO BE OR

6    ACTING UNDER THE AUTHORITY OF THE I.R.S. AND MUCH OF THAT

7    EVIDENCE DOVETAILS WITH THE SECOND ELEMENT WHICH IS THAT THE

8    DEFENDANT ACTED AS SUCH.

9        BUT IT GOES FURTHER BECAUSE THE DEFENDANT DIDN'T JUST SAY

10   I'M AN I.R.S. EMPLOYEE AND HANG UP.  HE MADE MORE STATEMENTS

11   CONSISTENT WITH WHAT AN I.R.S. EMPLOYEE WOULD DO, WHAT, IN

12   FACT, THEY WOULD DO IF THEY WERE ACTING ON BEHALF OF THE

13   INTERNAL REVENUE SERVICE.

14       THE DEFENDANT TOOK THE ADDITIONAL STEP OF CHOOSING A

15   CALLER ID NUMBER TO MAKE HIS CALL MORE BELIEVABLE.

16       HE KNEW THAT I.R.S. FORMS OR THE I.R.S. HELP LINE NUMBERS

17   ENDED IN 1040 AND PICKED THAT NUMBER SO THE VICTIM WOULD NOTICE

18   THAT -- WOULD BE MORE LIKELY TO BELIEVE IT.  HE WENT A STEP

19   FURTHER AND EVEN IN THE VOICEMAIL DIRECTED THE VICTIM TO PAY

20   ATTENTION TO HIS CALLER ID.

21       SO THE DEFENDANT DIDN'T JUST PICK THE CALLER ID NUMBER BUT

22   NOT REALLY CARE OR KNOW WHETHER THE VICTIM RECOGNIZED BUT ON

23   THE VOICEMAIL SAID CALL ME BACK ON THE NUMBER ON YOUR CALLER

24   ID.

25       THE DEFENDANT'S ARGUMENTS ON CROSS THAT HE COULD HAVE

```
1    NEVER CALLED HIM BACK, THE VICTIM COULD HAVE NEVER MADE A PHONE
2    CALL BACK IS IRRELEVANT.  THERE'S NO ELEMENT THAT REQUIRES THAT
3    MONEY COULD HAVE EXCHANGED HANDS, AND THE PHONE CALL WOULD HAVE
4    BEEN OR COULD HAVE BEEN RETURNED.  SO IT'S OF NO HARM TO THE
5    GOVERNMENT'S CASE EVEN IF THAT FACT IS TRUE AND THAT RULE 29
6    STANDARD IS TAKING ALL OF THE EVIDENCE THAT THE GOVERNMENT HAS
7    PRESENTED IN THE LIGHT MOST FAVORABLE TO THE GOVERNMENT AND
8    UNDER THAT STANDARD THERE CERTAINLY IS SUFFICIENT EVIDENCE FOR
9    THE JURY TO CONVICT.
10              THE COURT:  ANYTHING FURTHER?
11              MR. ARCHER:  NO, YOUR HONOR.
12              THE COURT:  THANK YOU.  AND, OF COURSE, THE COURT
13   HAS HEARD ALL OF THE EVIDENCE, THE EXTENSIVE EVIDENCE THAT HAS
14   BEEN PRESENTED IN THE CASE AND IN EVALUATING THAT EVIDENCE IN
15   THE LIGHT MOST FAVORABLE TO THE GOVERNMENT THE COURT FINDS THAT
16   THE JURY COULD, ALBEIT THE EVIDENCE MIGHT BE CIRCUMSTANTIAL, OR
17   EVIDENCE OF SOME THINGS, BUT THE COURT IS GOING TO RESPECTFULLY
18   DECLINE THE MOTION TO DISMISS THE COUNT.  THE EVIDENCE IS
19   SUFFICIENT TO MOVE FORWARD TO THE JURY FOR THEIR DELIBERATIONS.
20   SO THE MOTION IS DENIED.
21        LET ME ASK ABOUT THE INSTRUCTIONS, THOUGH, BECAUSE WE'LL
22   NEED TO DO SOME DELETIONS AS TO THE INSTRUCTIONS NOW.
23        INSTRUCTION NUMBER 13 WILL BE PULLED AND REMOVED AND WE
24   WILL HAVE TO GIVE INSTRUCTION 2.13, WHICH IS DISMISSAL OF SOME
25   CHARGES AGAINST THE DEFENDANT.  IT'S MODEL INSTRUCTION 2.13.  I
```

```
1    DON'T KNOW IF YOU HAVE A COPY OF THAT AT HAND.

2              MR. ARCHER:  YES, YOUR HONOR.

3              THE COURT:  AND THIS WILL NEED TO BE PROVIDED TO

4    YOU, THE JURY, I BELIEVE.

5              MR. SCHENK:  WE AGREE.

6              MR. ARCHER:  NO OBJECTION, YOUR HONOR.

7              THE COURT:  AND, COUNSEL, YOU CAN INSERT THE

8    APPROPRIATE BRACKETED INFORMATION RELATED TO COUNT 2, AND THIS

9    ALSO RELATES TO INSTRUCTION NUMBER 10.

10        INSTRUCTION 10 IS NO LONGER NECESSARY.

11             MR. SCHENK:  YES, YOUR HONOR.

12             THE COURT:  THAT'S THE MULTIPLE COUNTS INSTRUCTION

13   AND SO THAT SHOULD BE REMOVED.

14        2.13 THEN SHOULD FOLLOW INSTRUCTION 12, I BELIEVE, CURRENT

15   INSTRUCTION 12 WHICH IS THE 9.12 INSTRUCTION THAT WOULD REPLACE

16   13, WHICH IS THE 2.23 INSTRUCTION, AND WE'LL JUST REPLACE 2.13

17   FOR THE INSTRUCTION FOR THAT SECOND COUNT IF THAT MAKES SENSE.

18             MR. SCHENK:  YES, WE CAN ALSO MAKE THE INSTRUCTION

19   ABOUT THE DEFENDANT NOT TESTIFYING.

20             THE COURT:  THAT WILL BE REDACTED OR REMOVED.  THE

21   DEFENDANT NOT TESTIFYING IS TAKEN OUT.

22        IS THAT WHAT YOU WERE REFERENCING?

23             MR. SCHENK:  CORRECT.

24             THE COURT:  AND THEN IF YOU CAN E-MAIL WITH THOSE

25   CHANGES BACK TO MS. GARCIA A COPY OF THE FINALS, I WOULD
```

```
 1        APPRECIATE THAT, AND TO MR. ARCHER AS WELL.  I WOULD APPRECIATE
 2        THAT.
 3                   MR. ARCHER:  I THINK WE'RE GOING TO BE TRYING TO
 4        WORK OVER THE LUNCH BREAK TO TRY TO GET A JOINT COPY.
 5                   MR. SCHENK:  YES.
 6                   THE COURT:  OKAY.  GREAT.  ANYTHING ELSE BEFORE WE
 7        RECESS?
 8                   MR. SCHENK:  THE SAME MODIFICATION OBVIOUSLY TO THE
 9        VERDICT FORM?
10                   THE COURT:  YES, OF COURSE.
11                   MR. ARCHER:  AND, YOUR HONOR, THE DEFENSE WAS IN THE
12        PROCESS OF PREPARING OR HAD PREPARED A THEORY OF DEFENSE
13        INSTRUCTION WHICH WE WOULD LIKE TO MAKE MINOR MODIFICATION TO
14        AND THEN SUBMIT TO THE COURT AND THE GOVERNMENT.
15            SO THAT SHOULD BE DONE IN THE NEXT FIVE MINUTES BUT
16        PERHAPS IT CAN BE TAKEN UP AFTER THE RECESS.
17                   THE COURT:  OKAY.  SO I SHOULD SEE YOU BACK AT MAYBE
18        1:15 FOR THAT?
19                   MR. SCHENK:  THAT WOULD BE FINE.
20                   THE COURT:  OKAY.  GREAT.  SEE UP THEN.  THANK YOU.
21                   MR. ARCHER:  THANK YOU.
22                   THE COURT:  ONE FURTHER THING, JUST OUT OF AN
23        ABUNDANCE OF CAUTION, ARE ALL OF THE EXHIBITS ADMITTED THAT THE
24        PARTIES SOUGHT TO BE ADMITTED?
25            I HAVE 1, 2, 3, 4, 5, 7, AND 8 AS BEING ADMITTED.
```

356

1                    MS. PENNA:  YES, YOUR HONOR.

2                    MR. SCHENK:  YES.

3                    THE COURT:  DID THE DEFENSE HAVE ANY EXHIBITS THAT

4         THEY WANTED TO ADMIT?

5                    MR. ARCHER:  NO, YOUR HONOR.

6                    THE COURT:  ALL RIGHT.  THANK YOU.

7              (LUNCH RECESS TAKEN AT 12:12 P.M.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    AFTERNOON SESSION

2         (JURY OUT AT 1:23 P.M.)

3              THE COURT:  COUNSEL.  PLEASE BE SEATED.  COUNSEL AND

4    THE DEFENDANT ARE PRESENT.

5         ANYTHING EITHER SIDE WISHES TO PUT ON THE RECORD?

6              MR. ARCHER:  YES, YOUR HONOR.  THE DEFENSE WOULD

7    LIKE TO SAY TWO THINGS.  ONE, THE DEFENSE WOULD LIKE TO, AFTER

8    HAVING HEARD THE EVIDENCE IN THE CASE, BOTH SIDES HAVE RESTED,

9    RENEW OUR REQUEST FOR THE PREVIOUSLY DENIED JURY INSTRUCTIONS

10   YESTERDAY THAT WERE IN DOCKET 67 AND 69.

11             THE COURT:  OKAY.  THANK YOU.

12             MR. ARCHER:  AND ALSO IMPOSE A DEFENSE POSITION OF

13   THE CASE INSTRUCTION.  IF I MAY APPROACH?

14             THE COURT:  YES.

15        AND, COUNSEL, YOU HAVE THIS?

16             MS. PENNA:  YES.

17        (PAUSE IN PROCEEDINGS.)

18             THE COURT:  ANYTHING FURTHER?

19             MR. ARCHER:  NOTHING.

20             MR. SCHENK:  IT'S ARGUMENT.  IT'S THE LINE SECOND

21   AND A HALF, SECOND, THE VOICEMAIL'S MERE STATEMENT OF AN I.R.S.

22   AGENT INVESTIGATING TAX RECORDS, THEN IT SHOULD HAVE GRANTED

23   THE RULE 29 MOTION.  IT'S ESSENTIALLY THE CONCLUSION ABOUT THE

24   EVIDENCE IN THE CASE, AND THAT'S SUFFICIENT.

25             SO IT'S CERTAINLY NOT THE CASE THAT THEY NEED TO BOTH MAKE
```

1      A RULE 29 MOTION AND HAVE THE JURY READ THIS INSTRUCTION.

2          IF THAT WERE THE CASE, THEN THE CASE SHOULDN'T GO TO THE

3      JURY AT THIS POINT BUT REALLY MORE TO THE POINT IS THAT THIS IS

4      NOT AN INSTRUCTION BY THE COURT.

5          THIS IS ARGUMENT, AND IT'S CERTAINLY ARGUMENT THAT

6      MR. ARCHER CAN MAKE IN HIS CLOSING.  BUT IT SHOULDN'T COME FROM

7      THE COURT WITH A REPEAT OF WHAT BEYOND A REASONABLE DOUBT IS,

8      HOW A DEFENDANT HAS NO OBLIGATION TO MAKE A CASE, AND THEN

9      SUMMARIZING FOR THE JURY THE ARGUMENTS THAT MR. ARCHER HAS

10     ALREADY MADE IN CLOSING WHEN THE COURT DOES THE INSTRUCTIONS.

11                 THE COURT:  MR. ARCHER?

12                 MR. ARCHER:  THE POSITION IS THAT THIS IS A DEFENSE

13     POSITION OF THE CASE INSTRUCTION.  IT'S NOT SUBMITTED TO BE A

14     NEUTRAL STATEMENT OF THE CASE.  IT'S, IN FACT, LAYING OUT WHAT

15     THE DEFENSE THEORY OF THE CASE IS AND SO, OF COURSE, IT'S GOING

16     TO BE ELEMENTS THAT THE GOVERNMENT FINDS TO BE ARGUMENT BUT

17     DOESN'T MAKE IT ARGUMENT TO GIVE WITH, OF COURSE, THE PREFACE

18     THAT THIS IS NOT THE COURT'S OPINION ON THE EVIDENCE.  IT'S THE

19     DEFENSE'S POSITION AND THE DEFENSE'S THEORY OF THE INSTRUCTION

20     OR THE POSITION OF THE CASE.

21                 THE COURT:  ALL RIGHT.  THANK YOU.  WELL, I'M

22     LOOKING AT THE THREE PARAGRAPHS, AND THE COURT HAS ALREADY

23     INFORMED THE JURY ABOUT PARAGRAPH 1 IN THE COURT'S OPENING --

24     DURING VOIR DIRE.

25                 THE COURT INDICATED THAT MR. YORK HAD PLED NOT GUILTY TO

1    THE OFFENSE AND HIS ABSOLUTE DENIAL OF THE CHARGES.

2         AND THE GOVERNMENT BEARS THE BURDEN OF PROVING EACH OF THE

3    ELEMENTS AND IF IT THEY FAIL, THE JURY WILL BE INSTRUCTED, AS I

4    TOLD THEM EARLIER IN THE PRELIMINARY INSTRUCTIONS THAT THEY

5    MUST RETURN -- IT'S THEIR DUTY TO RETURN A VERDICT OF NOT

6    GUILTY.

7         THE SECOND PARAGRAPH, MIDDLE PARAGRAPH, APPEARS TO BE,

8    THAT IS, THE DEFENSE POSITION, THAT THE VOICEMAIL'S MERE

9    STATEMENT OF AN I.R.S. AGENT INVESTIGATING TAX RECORDS IS

10   INSUFFICIENT TO PROVE THE ELEMENT OF ACTING AS SUCH BECAUSE

11   THERE WERE NO STEPS TAKEN TO ACT IN THE CONTEXT OF, THAT IS

12   ARGUMENT, AND I REALIZE THAT THAT IS MR. YORK'S POSITION AND

13   ARGUMENT, BUT I THINK ALL OF THESE THINGS, FIRST OF ALL, AS I

14   HAVE SAID, THE COURT HAS PRESENTED IN THE PRELIMINARY

15   INSTRUCTIONS THE POSITIONS STATED IN PARAGRAPH 1 AND 2 AND WILL

16   REAFFIRM THOSE IN THE FINAL INSTRUCTIONS AND THE SECOND

17   PARAGRAPH, THE MIDDLE PARAGRAPH, IS CERTAINLY FAIR ARGUMENT

18   THAT I EXPECT THE DEFENSE WILL MAKE.

19        SO I DON'T FIND IT NECESSARY TO GIVE THIS POSITION OF THE

20   CASE, AND I DON'T THINK THAT PREJUDICES MR. YORK.

21        AS I'VE SAID, THE COURT HAS MADE ITS POSITION OR READ THE

22   INSTRUCTIONS AND CERTAINLY COUNSEL IS GOING TO BE ABLE TO ARGUE

23   THE SUFFICIENCY OF THE EVIDENCE, WHICH I THINK IS THE GRAVAMEN

24   OF THE MIDDLE PARAGRAPH.

25        SO I DON'T FIND IT NECESSARY TO GIVE THE POSITION OF THE

1    CASE INSTRUCTION.  SO I WON'T GIVE THIS.

2         AND I, I -- YOU'VE RENEWED YOUR REQUEST FOR THE OTHER

3    INSTRUCTIONS THAT WE DISCUSSED YESTERDAY, AND I'M NOT GOING TO

4    DISTURB THE COURT'S PREVIOUS RULING.

5         BUT YOU'VE PRESERVED YOUR OBJECTION FOR THE RECORD AS TO

6    AT LEAST COUNT 1 NOW, I THINK, WHICH IS REALLY THE GRAVAMEN OF

7    THE CONVERSATION, I THINK.

8         OKAY.  ANYTHING FURTHER?

9              MR. SCHENK:  NO, YOUR HONOR.  WE SUBMITTED DURING

10   THE BREAK THE JOINT --

11             THE COURT:  I DID RECEIVE THAT, AND I HAVE IT HERE.

12   AND I NOTE THAT THIS IS THE TYPE SIZE IN THIS CASE TELLS ME

13   THAT THIS IS AN INSTRUCTION FOR INDIVIDUALS WHO ARE MUCH

14   YOUNGER THAN THE COURT.  SO WE ARE TO HAVE OUR -- OUR COURTROOM

15   DEPUTY IS GOING TO INCREASE THE FONT SIZE FOR SOMETHING THAT

16   WOULD BE MORE CONVENIENT FOR THE JURY, I'LL PUT IT THAT WAY.

17        ANY OTHER COMMENT AS TO THE INSTRUCTIONS, THE ORDER OF THE

18   INSTRUCTIONS, THE CONTENT, THAT IS, THE REVISED INSTRUCTIONS

19   THAT THE COURT NOW HAS?

20             MR. SCHENK:  NO, YOUR HONOR.

21             MR. ARCHER:  NO, YOUR HONOR.

22             THE COURT:  ALL RIGHT.  THANK YOU.  IS THE

23   GOVERNMENT PREPARED TO PRESENT THEIR ARGUMENT?

24             MS. PENNA:  YES, YOUR HONOR.

25             THE COURT:  OKAY.  IS THE JURY DOWNSTAIRS?

1          SO MS. GARCIA WILL COLLECT OUR JURY, AND THEN WE'LL BEGIN

2     WITH ARGUMENT.

3          PARDON ME.  WE ALSO HAVE THE REVISED VERDICT FORM.  ANY

4     COMMENT ON THE REVISED VERDICT FORM?

5               MR. SCHENK:  NO, YOUR HONOR.

6               MR. ARCHER:  NO, YOUR HONOR.

7               THE COURT:  WHICH I SHOULD NOTE DOES APPEAR IN

8     APPROPRIATE FONT SIZE.

9          ALL RIGHT.  THANK YOU.

10         (RECESS FROM 1:29 P.M. UNTIL 1:39 P.M.)

11         (JURY IN AT 1:39 P.M.)

12              THE COURT:  WE'RE ON THE RECORD, AND ALL COUNSEL ARE

13    PRESENT AND THE DEFENDANT IS PRESENT AND OUR JURY AND

14    ALTERNATES ARE PRESENT.

15         DOES THE GOVERNMENT HAVE AN ARGUMENT?

16              MS. PENNA:  YES, YOUR HONOR.

17         **(GOVERNMENT'S COUNSEL GAVE THEIR CLOSING ARGUMENT.)**

18              MS. PENNA:  LADIES AND GENTLEMEN OF THE JURY, ON

19    FEBRUARY 23RD, 2012, THE DEFENDANT CALLED MR. HESSENFLOW AND

20    REPRESENTED HIMSELF AS AN I.R.S. EMPLOYEE.  IN THIS MESSAGE THE

21    DEFENDANT ACTED IN THE CHARACTER OF THE I.R.S. EMPLOYEE, AND BY

22    LEAVING THAT SPECIFIC VOICE MESSAGE THE DEFENDANT BROKE THE

23    LAW.

24         IN MY OPENING I DISCUSSED WITH YOU THAT THE DEFENDANT'S

25    CONDUCT CAUSED HIM TO COMMIT TWO SEPARATE CRIMES.  NOW I'M

1    GOING TO SHOW YOU HOW THE EVIDENCE THAT WE HAVE PRESENTED HAS

2    PROVEN BEYOND A REASONABLE DOUBT THE DEFENDANT COMMITTED THE

3    FIRST CRIME OF FALSE IMPERSONATION OF A GOVERNMENT EMPLOYEE.

4        YOU WILL HEAR A JURY INSTRUCTION AFTER CLOSING ARGUMENTS

5    ABOUT WHY YOU SHOULDN'T SPECULATE ABOUT THE SECOND CRIME.

6        SO NOW FIRST TURNING TO THE CRIME OF -- ENTITLED TITLE 18

7    UNITED STATES CODE SECTION 912.  THIS CRIME HAS TWO SEPARATE

8    ELEMENTS.  AND WE ARE REQUIRED, AS THE GOVERNMENT, TO PROVE

9    THESE ELEMENTS BEYOND A REASONABLE DOUBT.

10       HERE BEING, FIRST, THAT THE DEFENDANT FALSELY PRETENDED TO

11   BE AN OFFICER OR EMPLOYEE ACTING UNDER THE AUTHORITY OF THE

12   UNITED STATES INTERNAL REVENUE SERVICE; AND, SECOND, THAT THE

13   DEFENDANT ACTED AS SUCH.

14       NOW, THIS FIRST ELEMENT SEEMS TO BE BEST BROKEN DOWN INTO

15   TWO SEPARATE PARTS:  FIRST, WE HAD TO SHOW YOU THAT THE

16   DEFENDANT, HIMSELF, WAS THE ONE WHO COMMITTED THE CRIME; AND,

17   SECOND, THAT HE FALSELY IMPERSONATED AN I.R.S. EMPLOYEE.

18       SO NOW STARTING WITH THE FIRST.  HOW DID WE SHOW YOU THAT

19   THE DEFENDANT HIMSELF LEFT THAT VOICEMAIL?  WE ESTABLISHED THAT

20   IN SEVERAL WAYS.  OUR WITNESSES TESTIFIED AND OUR EVIDENCE THAT

21   WE PRESENTED LINKED THE DEFENDANT DIRECTLY TO THAT VOICE

22   MESSAGE.

23       MR. HESSENFLOW TESTIFIED THAT HE RECEIVED THE VOICE

24   MESSAGE ON FEBRUARY 23RD, 2012, AT AROUND 1:25 P.M. SHOWING A

25   CALLER ID OF 708-565-1040.

1    THE DEFENDANT'S VERIZON WIRELESS BILL SHOWED US THAT THE

2    DEFENDANT MADE TWO OUTGOING CALLS ON THE DATE AND TIME IN

3    QUESTION AND THAT THOSE CALLS WERE MADE TO THE PHONE NUMBER

4    THAT WAS LINKED TO THE SPOOFCARD COMPANY.

5    WE NOW KNOW THAT THE DEFENDANT HAD AN ACCOUNT WITH THAT

6    COMPANY SPOOFCARD.  HOW DO WE KNOW THAT?  THROUGH SPOOFCARD

7    RECORDS THAT NATHAN COOPER TESTIFIED TO TODAY THAT SHOWED THE

8    DEFENDANT, DOUGLAS YORK, MADE AN ACCOUNT USING HIS NAME, HIS

9    PHONE NUMBER, HIS ADDRESS, HIS IP ADDRESS, AND OTHER

10   IDENTIFYING INFORMATION.

11   SPOOFCARD RECORDS SHOWED THAT THE DEFENDANT USED THE

12   SPOOFCARD ACCOUNT ON FEBRUARY 23RD, 2012, TO CALL

13   MR. HESSENFLOW'S HOME NUMBER AT 2:26 P.M.  THE RECORD SHOWED

14   THAT HE USED HIS SPOOFCARD FEATURE TO SELECT THAT VERY SAME

15   NUMBER THAT ENDED IN 1040 TO APPEAR ON MR. HESSENFLOW'S CALLER

16   ID.

17   HE ALSO ELECTED TO DISGUISE HIS VOICE USING THE SPOOFCARD

18   FEATURE IN ORDER TO MAKE HIS VOICE SOUND LIKE A WOMAN.

19   THE AUDIO FILE THAT WAS PROVIDED FROM SPOOFCARD OF THIS

20   RECORDING THAT YOU HEARD TODAY PERFECTLY MATCHES THE VOICE

21   MESSAGE THAT MR. HESSENFLOW RECEIVED AND WE PLAYED FOR YOU BACK

22   ON TUESDAY.

23   WE ALSO PROVIDED EVIDENCE THAT THERE WAS A HISTORY AND A

24   PATTERN HERE AND THIS ALSO HELPS IDENTIFY THAT THE DEFENDANT

25   WAS THE CALLER AND THE ONE THAT LEFT THIS VOICE MESSAGE.

1        MR. HESSENFLOW DISCUSSED WITH YOU PARTICULAR INSTANCES

2    DEMONSTRATING THE DEFENDANT'S PATTERN OF HARASSMENT OF HIM.

3        CRAIGSLIST RECORDS WERE PRESENTED TODAY THAT CORROBORATED

4    MR. HESSENFLOW'S TESTIMONY THAT THE DEFENDANT PUBLICLY POSTED

5    HIS CAR FOR SALE ON CRAIGSLIST AND ALSO POSTED HIS HOME

6    ADDRESS.

7        THE DEFENDANT PUBLICLY POSTED MR. HESSENFLOW'S HOME

8    ADDRESS A SECOND TIME ON A PUBLIC FACEBOOK POSTING.

9        MR. HESSENFLOW ALSO TESTIFIED TO INCESSANT TELEPHONE CALLS

10   THAT WERE SOMETIMES IN THE MIDDLE OF THE NIGHT.

11       YOU HAVE SEEN THE EVIDENCE AND YOU HAVE HEARD

12   MR. HESSENFLOW GO THROUGH GOVERNMENT'S EXHIBIT 3, THE

13   DEFENDANT'S VERIZON WIRELESS RECORDS.  HE IDENTIFIED 13

14   TELEPHONE CALLS FROM THE DEFENDANT ON THE VERY DAY THAT HE

15   RECEIVED THAT VOICE MESSAGE.

16       YOU WILL HAVE THAT PHONE BILL AND YOU CAN GO BACK AND YOU

17   CAN LOOK AT THOSE PHONE CALLS AND YOU CAN LOOK AT THE OTHER

18   DATES OF THOSE PHONE CALLS AS WELL AND AS WELL AS THE TIMES OF

19   THOSE PHONE CALLS.

20       ALL OF THESE SOURCES AND THESE RECORDS HAVE VERIFIED THAT

21   IT WAS THE DEFENDANT WHO CALLED MR. HESSENFLOW AND LEFT THAT

22   VOICE MESSAGE ON FEBRUARY 23RD, 2012, AT THE TIME IN QUESTION.

23       NOW THAT WE KNOW THAT THE DEFENDANT WAS THE ONE WHO MADE

24   THE PHONE CALL, HOW DID WE SHOW YOU THAT THE DEFENDANT FALSELY

25   PRETENDED TO BE AN EMPLOYEE ACTING UNDER THE AUTHORITY OF THE

1      I.R.S.?

2           WELL, LET'S TAKE ONE MORE LISTEN TO THE VOICE MESSAGE.  IT

3      WAS THE GOVERNMENT'S EXHIBIT 1 THAT WE PLAYED FOR YOU TODAY.

4           (AUDIO PLAYING.)

5               MS. PENNA:  THE DEFENDANT JUST SAID MY NAME IS

6      JUDY SMITH.  I'M WITH THE I.R.S., THE INTERNAL REVENUE SERVICE.

7      IT IS IMPORTANT TO NOTE HERE THAT THE DEFENDANT ALSO STATED

8      THAT HE WAS REQUESTING A TAX AUDIT AND WOULD BE INVESTIGATING

9      TAX RECORDS AND INFORMATION FOR PARTICULAR YEARS.

10          FURTHER, HE REQUESTS A CALL BACK FROM MR. HESSENFLOW AT

11     THE NUMBER THAT WAS LISTED ON HIS CALLER ID.

12          NOW, BASED ON WHAT WE HAVE JUST HEARD, THE DEFENDANT

13     REPRESENTED HIMSELF TO BE WORKING UNDER THE AUTHORITY OF THE

14     I.R.S. WHEN HE SAID THOSE SPECIFIC WORDS.  MY NAME IS

15     JUDY SMITH.  I'M WITH THE I.R.S., THE INTERNAL REVENUE SERVICE.

16          THE EVIDENCE I JUST REVIEWED WITH YOU ESTABLISHES ELEMENT

17     1 BEYOND A REASONABLE DOUBT.

18          NEXT, WE MUST DEMONSTRATE BEYOND A REASONABLE DOUBT THAT

19     THE DEFENDANT ACTED AS SUCH.  WHAT DID WE DO TO SHOW YOU THAT

20     DEMONSTRATED THAT THE DEFENDANT ACTED BEYOND JUST STATING THAT

21     HE WORKED FOR THE I.R.S.?

22          WELL, AS I JUST DISCUSSED, ON THIS VOICE MESSAGE, THE

23     DEFENDANT TOOK STEPS BEYOND JUST REPRESENTING THAT HE WAS

24     JUDY SMITH WITH THE I.R.S.  IN FACT, HE MADE SPECIFIC REQUESTS

25     OF MR. HESSENFLOW.

GOVERNMENT'S CLOSING ARGUMENT

1        THE DEFENDANT STATED THAT HE WAS REQUESTING A TAX AUDIT

2    AND WOULD BE CHECKING INTO MR. HESSENFLOW'S RECORDS FOR

3    SPECIFIC YEARS.  AS TIGTA SPECIAL AGENT DONNA AGUIRRE TESTIFIED

4    TODAY, THIS IS ACTING AS AN I.R.S. EMPLOYEE WOULD.

5        BEYOND THIS, OUR EVIDENCE HAS SHOWN THAT THE DEFENDANT

6    SELECTED A PHONE NUMBER ENDING IN 1040 TO APPEAR ON

7    MR. HESSENFLOW'S CALLER ID.

8        THE SIGNIFICANCE OF THIS, AS DISCUSSED WITH TIGTA SPECIAL

9    AGENT DONNA AGUIRRE, IS THAT THIS NUMBER IS BOTH A RECOGNIZED

10   I.R.S. PERSONAL INCOME TAX HELP LINE NUMBER AS WELL AS THE

11   WIDELY RECOGNIZED TAX INCOME FORM NUMBER.

12       THIS PHONE NUMBER WAS NOT SELECTED AT RANDOM.  THIS WAS AN

13   ATTEMPT TO MAKE THE MESSAGE MORE BELIEVABLE AND TO FURTHER ACT

14   AS AN INTERNAL REVENUE SERVICE EMPLOYEE WOULD.

15       IN THE VOICE MESSAGE, THE DEFENDANT TOLD MR. HESSENFLOW TO

16   RETURN HIS PHONE CALL AT THE NUMBER THAT APPEARED ON HIS CALLER

17   ID.  NOT ONLY WAS HE REQUESTING THAT MR. HESSENFLOW TAKE STEPS

18   IN RESPONSE TO THE CALL, BUT HE WAS MAKING SURE THAT

19   MR. HESSENFLOW PAID CLOSE ATTENTION TO THE VOICE MESSAGE BY

20   SELECTING THE CALLER ID NUMBER THAT HAD MEANING AND

21   SIGNIFICANCE OF A LEGITIMATE I.R.S. NUMBER.

22       YOU HEARD THAT THIS MESSAGE WAS NOT SOMETHING THAT

23   MR. HESSENFLOW IGNORED OR WROTE OFF AS A PRANK.  MR. HESSENFLOW

24   TOLD YOU THAT WHEN HE RECEIVED THE VOICE MESSAGE, HE WAS

25   SUSPICIOUS.  HE DIDN'T KNOW DEFINITIVELY IF HE HAD A PROBLEM

DEFENDANT'S CLOSING ARGUMENT

1    WITH THE I.R.S.  HE DIDN'T KNOW UNTIL HE GOOGLED THAT NUMBER

2    AND REALIZED IT WAS A FAKE NUMBER, AND THEN HE TOOK STEPS TO

3    REPORT THE CALL AS SUSPICIOUS, AND THEN HE EXPLAINED THAT HE

4    SUSPECTED THE DEFENDANT WAS BEHIND THE CALL BECAUSE IT FIT THIS

5    ONGOING PATTERN OF HARASSMENT BY THE DEFENDANT.

6         THE TESTIMONY FROM THE WITNESSES AND THE EVIDENCE THAT WE

7    HAVE PRESENTED HAVE DEMONSTRATED EACH OF THE ABOVE ELEMENTS

8    BEYOND A REASONABLE DOUBT.

9         ACCORDINGLY, WE ASK THAT YOU RETURN THE ONLY VERDICT THAT

10   THE EVIDENCE SUPPORTS, A VERDICT FINDING THE DEFENDANT

11   DOUGLAS YORK GUILTY OF THE CRIME OF FALSE IMPERSONATION OF A

12   GOVERNMENT OFFICER OR EMPLOYEE.

13        THANK YOU.

14             THE COURT:  THANK YOU, COUNSEL.

15        DO YOU HAVE A CLOSING ARGUMENT, MR. ARCHER?

16             MR. ARCHER:  YES, YOUR HONOR.

17        **(DEFENDANT'S COUNSEL GAVE THEIR CLOSING ARGUMENT.)**

18             MR. ARCHER:  GOOD AFTERNOON, LADIES AND GENTLEMEN.

19   AS I SAID AT THE BEGINNING OF THIS CASE, THIS IS A CASE

20   INVOLVING A SINGLE VOICEMAIL.  THAT'S THE CASE.

21        WE HAVE A VOICEMAIL THAT YOU HAVE HEARD SEVERAL TIMES, AND

22   I'D ACTUALLY LIKE TO READ THE LANGUAGE OF IT RIGHT NOW.  I KNOW

23   YOU JUST HEARD IT.

24        HELLO ALLAN.  MY NAME IS GIGI SMITH OR JUDY SMITH,

25   DEPENDING OR YOUR PERSPECTIVE ON THE E-MAIL.  I'M WITH THE

DEFENDANT'S CLOSING ARGUMENT

1     I.R.S. SERVICE.  I'M CALLING YOU SOMETHING ABOUT A TAX AUDIT

2     AND SOME INFORMATION, AND WE WOULD LIKE TO CHECK YOUR RECORDS

3     FOR THE FOLLOWING YEARS:  2005, 2006, 2007.  AND IF YOU COULD

4     PLEASE RETURN MY CALL AT THE NUMBER LISTED AT YOUR CALLER ID,

5     THAT WOULD BE APPRECIATED.  AND, ONCE AGAIN, IF WE CANNOT REACH

6     YOU, WE WILL DEFINITELY BE CHECKING INTO YOUR PAST, AND I'LL BE

7     LOOKING INTO YOUR RECORDS.  THANKS A LOT, AND WE'LL CALL YOU

8     BACK TOMORROW.

9         IN THE UNITED STATES THERE ARE NO SUCH THINGS AS MAGIC

10    WORDS, AND WHAT I MEAN BY THAT IS THAT THERE ARE NO WORDS THAT

11    YOU CAN UTTER WITHOUT CONTEXT THAT CONSTITUTE A CRIME.

12        THE GOVERNMENT IN THEIR CLOSING ARGUMENT AND APPARENTLY

13    THEIR PERSPECTIVE ON THIS CASE BELIEVE THAT THERE ARE WORDS

14    THAT CAN SIMPLY BE UTTERED AND THEIR MERE EXISTENCE CAUSES A

15    CRIME WITHOUT CONTEXT.

16        I'M GOING TO COME BACK TO THAT, BUT LET'S JUST START

17    ABOUT -- LET'S START TALKING ABOUT THE GOVERNMENT'S BURDEN.

18    THE GOVERNMENT HAS THE BURDEN TO SHOW TWO THINGS:  ONE IS THAT

19    BEYOND A REASONABLE DOUBT MR. YORK IS ACTUALLY THE VOICE ON THE

20    VOICEMAIL.  NOT THAT HE'S INVOLVED WITH THE VOICEMAIL OR

21    CONNECTED TO IT OR THAT IT'S HIS SPOOFCARD CALL.

22        AND I'D LIKE TO DISCUSS THEIR BURDEN FOR A SECOND.

23        SO, MS. SENIA, IF YOU CAN PULL UP, WE HAVE A VERY FAVORITE

24    DEFENSE CHART HERE.

25        AND, FOLKS, THIS IS THEIR BURDEN:  IT'S GUILTY BEYOND A

1    REASONABLE DOUBT.  AND SOME OF THESE THINGS ON THAT CHART MIGHT

2    BE SURPRISING TO YOU BECAUSE SOME OF THOSE THINGS MIGHT BE

3    SUFFICIENT FOR YOU TO MAKE A DECISION IN YOUR EVERY DAY LIFE,

4    BUT THIS IS NOT AN EVERY DAY LIFE DECISION IF YOU CAN'T BANISH

5    FROM YOUR MINDS A DOUBT THAT HAS SOME REASON TO IT THAT

6    SOMEBODY ELSE MADE THAT PHONE CALL.

7         THE GOVERNMENT HAS INTRODUCED EVIDENCE THAT IT WAS HIS

8    MOM'S CELL PHONE COMPANY AND THAT THERE WERE CALLS FROM HIS

9    PHONE THAT DAY.  THEY HAVE INTRODUCED EVIDENCE FROM THE

10   SPOOFCARD THAT HE SIGNED UP FOR AND HE PAID FOR THE SPOOFCARD.

11        BUT THE GOVERNMENT JUST STOPPED THERE.  MR. HESSENFLOW

12   TESTIFIED THAT HE HAD DONE SOME KIND OF AN EXPERIMENT.

13        OF COURSE HE DIDN'T MENTION IT AT THE BEGINNING OR A

14   REMINDER IF YOU HAD FORGOTTEN THAT MR. HESSENFLOW IS MY

15   CLIENT'S WIFE'S NEW BOYFRIEND AT THE TIME THAT THIS IS ALL

16   GOING DOWN, HE'S CLAIMING THAT HE HAS THIS, I GUESS DEFINITIVE

17   EVIDENCE, THAT THIS IS ACTUALLY DOUG YORK ON THE VOICEMAIL, BUT

18   DIDN'T TURN IT OVER BECAUSE THE GOVERNMENT DIDN'T ASK, WHICH IS

19   STRANGE BECAUSE HE'S SO METICULOUS ABOUT HIS RECORDS AND HE'S

20   PROVIDED ALL OF THESE OTHER RECORDINGS AND YET NOTHING WHEN IT

21   COMES TO THIS ONE SUPPOSEDLY DEFINITIVE PIECE OF PROOF TO SHOW

22   THAT THAT'S ACTUALLY DOUG YORK'S VOICE ON THERE.

23        AND THE AGENT TESTIFIED THAT SHE DID NO VOICE ANALYSIS.

24   YOU HEARD THE REPRESENTATIVE COME OUT FROM TELETECH AND

25   SPOOFCARD AND TELL YOU THAT IT'S A CHANGE IN PITCH.  THE

1    GOVERNMENT HASN'T PRESENTED YOU ANY EVIDENCE SHOWING YOU THAT

2    THAT VOICEMAIL IS ACTUALLY MR. YORK'S.  THEY'VE SHOWN YOU HIS

3    CONNECTION TO THE SPOOFCARD, HIS CONNECTION TO THE CELL PHONE,

4    AND THEY JUST STOP THERE AND ASSUME THAT WOULD BE ENOUGH FOR

5    YOU.

6         SO IF YOU HAVE A DOUBT THAT IT WAS MR. YORK THAT LEFT THAT

7    VOICEMAIL, NOT JUST MR. YORK INVOLVED WITH IT, CONNECTED TO IT,

8    HE'S NOT GUILTY.  YOUR VOTE IS NOT GUILTY.

9         LET'S TALK ABOUT THE ELEMENTS OF THE CRIME.

10        AND, MS. SENIA, IF YOU COULD BRING UP THE JURY INSTRUCTION

11   FOR A PERSON IMPERSONATING A FEDERAL EMPLOYEE.

12        THE GOVERNMENT'S PERSPECTIVE SEEMS TO BE ON THIS IF THOSE

13   WORDS WERE UTTERED, CONTEXT ASIDE, YOU'VE COMMITTED A CRIME.

14   THAT'S, OF COURSE, NOT WHAT THIS PUNISHES.  A LAW THAT DID THAT

15   WOULD BE ILLEGAL.

16        A MOMENT AGO I SPOKE THOSE WORDS, I SPOKE THE EXACT WORDS

17   ON THE VOICEMAIL.  TO PUT IT MILDLY, I DON'T HAVE ANY SPECIAL

18   PROTECTIONS FROM THE LAWS AS A DEFENSE ATTORNEY.  BUT NONE OF

19   YOU THINK I'VE COMMITTED THE CRIME OF IMPERSONATING A FEDERAL

20   EMPLOYEE BECAUSE YOU HAVE CONTEXT.  SO LET'S LOOK AT SOME OTHER

21   CONTEXTS AND THEN APPLY THE GOVERNMENT'S APPROACH TO THIS CRIME

22   IN THOSE CONTEXTS.

23        LET'S TAKE, SAY, AN EIGHT-YEAR-OLD BOY RUNNING AROUND A

24   PLAYGROUND WITH A LITTLE PLASTIC BADGE THAT SAID FBI AND HE'S

25   SAYING I'M FBI, I'M FBI.  AND HE'S ARRESTING.  HE'S SAYING

DEFENDANT'S CLOSING ARGUMENT

1    YOU'RE UNDER ARREST.  HE GOES TO OTHER KIDS ON THE PLAYGROUND

2    AND HE SAYS YOU'RE UNDER ARREST.

3        ON ITS FACE JUST TAKE THOSE WORDS, NO CONTEXT.  I'M AN FBI

4    AGENT.  ACCORDING TO THE GOVERNMENT THAT SIMPLY SATISFIES THEIR

5    FIRST ELEMENT.  YOU'RE UNDER ARREST.  THAT'S SOMETHING THAT FBI

6    AGENTS DO.  THEY PLACE PEOPLE UNDER ARREST.  HE'S ACTING AS

7    SUCH.  BUT THAT'S INSANE.  THE LITTLE BOY IS NOT GUILTY OF THIS

8    CRIME.  HE'S RUNNING AROUND.  YOU HAVE CONTEXT.  HE'S RUNNING

9    AROUND PLAYING A GAME.

10        LET'S TAKE A COMEDIAN IN A NIGHTCLUB AND THE COMEDIAN

11   COMES IN AND SAYS IN A VOICE THAT I'M NOT GOING TO ATTEMPT TO

12   DO, MY NAME IS BARRACK OBAMA AND I'M THE SITTING PRESIDENT OF

13   THE UNITED STATES OF AMERICA, AND HE POINTS OUT AND SAYS YOU

14   OVER THERE IN THE RED SHIRT, WHOOPS, YOU, SIR, IN THE RED

15   SHIRT, I'M NOW MAKING YOU MY SECRETARY OF STATE.  I'VE

16   APPOINTED YOU TO MY CABINET.

17        SO HE'S IDENTIFIED HIMSELF AS BARRACK OBAMA, A FEDERAL

18   EMPLOYEE, WHO HE CERTAINLY IS NOT.  HE HAS DONE SOMETHING THAT

19   BARRACK OBAMA DOES, WHICH IS APPOINT PEOPLE TO HIS CABINET AND

20   HE HAS ACTED AS SUCH FROM THE GOVERNMENT'S PERSPECTIVE.  IS HE

21   GUILTY OF A CRIME?  ABSOLUTELY NOT BECAUSE THERE'S CONTEXT.

22        LET'S TAKE WHAT DOUGLAS YORK IS ACCUSED OF DOING.

23   DOUG YORK IS ACCUSED OF LEAVING A VOICEMAIL WITH AN INCREDIBLY

24   HIGH PITCHED HELIUM INJECTED VOICE USING LANGUAGE THAT IS --

25   THAT DOESN'T EVEN APPROACH PROFESSIONAL.  IT'S ALMOST LUDICROUS

DEFENDANT'S CLOSING ARGUMENT

1    TO SUGGEST THAT THAT LANGUAGE WOULD BE USED BY AN ACTUAL I.R.S.

2    EMPLOYEE, CALL ME BACK ON THE CALLER ID, YOU KNOW, BUT WE'RE

3    GOING TO BE LOOKING INTO IT.  IF YOU DON'T CALL ME BACK, WE'RE

4    GOING TO KEEP LOOKING INTO YOU.  I'LL CALL YOU BACK TOMORROW.

5        IT'S A PRANK VOICEMAIL AND A PRANK CALL.  THAT'S THE

6    CONTEXT.  IT'S NOT AN IMPERSONATION.

7        TO IMPERSONATE SOMEONE YOU HAVE TO TAKE ON THEIR IDENTITY;

8    RIGHT?  I MEAN, IT'S NOT JUST UTTERING WORDS.  YOU HAVE TO HAVE

9    INTENDED TO ACTUALLY IMPERSONATE SOMEBODY.

10       LEAVING A PRANK CALL TO ANNOY MR. HESSENFLOW.  THAT'S NOT

11   IMPERSONATING AN OFFICER.

12       THE GOVERNMENT PRETENDS IT'S NOT A VOICEMAIL LEFT IN A

13   PARTICULAR VOICE.  MR. HESSENFLOW IMMEDIATELY IDENTIFIED THIS

14   VOICE WAS ALTERED, SOMETHING WAS SUSPICIOUS ABOUT IT.  THAT'S A

15   GENEROUS WAY OF PUTTING IT.

16       AGENT AGUIRRE SAID WHEN SHE LISTENED TO IT, IT IMMEDIATELY

17   SOUNDED ALTERED; RIGHT?  SO HOW CAN YOU, IF YOU IMMEDIATELY

18   HEAR IT, IT SOUNDS ALTERED AND THAT'S YOUR IMMEDIATE IMPRESSION

19   AND THEN THINK, OH, THIS IS A GENUINE ATTEMPT TO IMPERSONATE

20   SOMEBODY WITH AN ALTERED VOICE BEFORE YOU GET INTO THE LANGUAGE

21   THAT IS BEING USED THERE?

22       THIS LAW IS INCREDIBLY IMPORTANT, AND IT'S IMPORTANT THAT

23   WE HAVE THIS ON THE BOOKS.  THERE ARE REAL CRIMES THAT OCCUR

24   THAT THIS LAW NEEDS TO PUNISH.

25       IF SOMEBODY GOES TO AIRPORT SECURITY AND SAYS I'M AN AIR

DEFENDANT'S CLOSING ARGUMENT

1    MARSHAL AND CRUISES THROUGH AIRPORT SECURITY UNDER THAT

2    PRETENSE, THIS IS EXACTLY WHAT THIS IS DESIGNED TO PUNISH.  IF

3    SOMEONE IS USING THEIR BADGE TO PULL PEOPLE OUT, CLAIMING TO BE

4    FBI, PULLING PEOPLE OVER.

5         LEAVING A PRANKED VOICEMAIL?  IT'S NOT IN THAT CATEGORY.

6         THE GOVERNMENT WANTS YOU TO PERVERT THE LAW, TO CONTORT

7    THE LAW TO TRY AND FIT THE LAW TO THE FACTS THAT THEY HAVE.

8    THE FACTS THAT THEY HAVE ARE THAT A VOICEMAIL WAS LEFT FOR

9    ALLAN HESSENFLOW.  ALLAN HESSENFLOW BELIEVES THAT VOICEMAIL WAS

10   LEFT BY DOUG YORK, AND THEY WANT YOU TO CONTORT THE LAW TO FIT

11   THE FACTS.  IT'S NOT THE CASE.  IT'S IMPOSSIBLE TO IMPERSONATE

12   A FEDERAL EMPLOYEE AND THEN ACT AS SUCH, DO SOMETHING.  ACTING

13   AS A FEDERAL EMPLOYEE -- FEDERAL EMPLOYEES DON'T LEAVE PRANKED

14   VOICEMAILS.  THEY DON'T LEAVE THEM IN RIDICULOUSLY ALTERED

15   VOICES, AND THEY DON'T LEAVE IN THE LANGUAGE THAT THEY USE

16   THERE.

17        A PRANK VOICEMAIL, ESPECIALLY IN THIS CONTEXT, CANNOT BE

18   AN IMPERSONATION AND CERTAINLY CAN'T BE ACTING AS SUCH.  I

19   UNDERSTAND THAT'S A VAGUE TERM, WHAT IS ACTING AS SUCH, BUT YOU

20   GET TO USE YOUR COMMON SENSE.  YOU DON'T HAVE TO CHECK THAT AT

21   THE DOOR HERE.

22        YOU CAN USE YOUR COMMON SENSE AND SAY, THIS DOESN'T MAKE

23   ANY SENSE.  A PRANKED VOICEMAIL CANNOT BE AN IMPERSONATION.

24        FOLKS, IT IS YOUR COMMON SENSE APPLYING THIS LAW TO THE

25   FACTS THAT THE GOVERNMENT HAS BROUGHT BEFORE YOU THAT PROTECTS

1    PEOPLE LIKE AN EIGHT-YEAR-OLD KID RUNNING AROUND IN A

2    PLAYGROUND THAT PROTECTS PEOPLE LIKE MR. YORK WHO IS ACCUSED OF

3    LEAVING THIS VOICEMAIL.

4         SO RETURN A VOTE FROM EACH OF YOU OF NOT GUILTY, NOT FOR

5    MY SAKE, NOT FOR MR. YORK'S SAKE, BUT FOR THE SAKE OF THIS LAW,

6    THIS INCREDIBLY IMPORTANT LAW WHICH EXISTS TO PROTECT SOCIETY

7    FROM PEOPLE WHO ARE ACTUALLY IMPERSONATING EMPLOYEES OF THE

8    FEDERAL GOVERNMENT AND THEN ACTUALLY DOING SOMETHING UNDER THAT

9    GUISE.

10        SO PLEASE VOTE NOT GUILTY.  THANK YOU.

11             THE COURT:  THANK YOU, COUNSEL.

12        DOES THE GOVERNMENT HAVE ANY REBUTTAL?

13             MR. SCHENK:  YES, YOUR HONOR.

14        **(GOVERNMENT'S COUNSEL GAVE THEIR REBUTTAL ARGUMENT.)**

15             MR. SCHENK:  JURIES LIVE TWO LIVES.  YOUR FIRST LIFE

16   IS PASSIVE.  YOU LISTEN TO THE LAWYERS, AND YOU LISTEN TO THE

17   WITNESSES, AND YOU LOOK AT EXHIBITS.  YOU STRAIN TO LISTEN TO

18   VOICEMAILS.  YOU LISTEN TO THE JUDGE.

19        BUT MOMENTS FROM NOW YOU BEGIN YOUR ACTIVE LIFE, THE

20   SECOND LIFE.  YOU'RE ASKED TO ANSWER TWO QUESTIONS:  DID THE

21   GOVERNMENT PROVE THE FIRST ELEMENT BEYOND A REASONABLE DOUBT?

22   AND DID THE GOVERNMENT PROVE THE SECOND BEYOND A REASONABLE

23   DOUBT?

24        YOU AREN'T JUST SENT OFF INTO THE DELIBERATION WITH NO

25   GUIDANCE.  THE JUDGE, WHEN I FINISH, WILL READ YOU

1    INSTRUCTIONS, AND THOSE INSTRUCTIONS ARE GOING TO DEFINE TERMS

2    FOR YOU LIKE BEYOND A REASONABLE DOUBT, DIRECT AND

3    CIRCUMSTANTIAL EVIDENCE, THE ELEMENTS.  BOTH OF OUR SIDES HAVE

4    SHOWN YOU SLIDES OF WHAT THOSE ELEMENTS ARE, AND YOU'LL GET

5    THEM FROM THE INSTRUCTIONS THE JUDGE WILL READ TO YOU.

6         BUT YOU'RE NOT SENT OFF TO ANSWER QUESTIONS IN A VACUUM.

7    YOU'RE GIVEN THESE TOOLS, AND YOUR JOB IS TO DECIDE WHETHER THE

8    FACTS IN THE CASE AND THE GOVERNMENT'S WITNESSES, THE

9    GOVERNMENT'S EVIDENCE PROVE BEYOND A REASONABLE DOUBT THOSE TWO

10   ELEMENTS.

11        AND THE INSTRUCTIONS WILL TELL YOU THAT BEYOND A

12   REASONABLE DOUBT IS A DOUBT BASED ON REASON AND COMMON SENSE

13   AND NOT BASED PURELY ON SPECULATION.

14        LET ME GIVE YOU AN EXAMPLE OF A DOUBT BASED PURELY ON

15   SPECULATION.

16        THE EVIDENCE IN THE CASE IS THAT DOUG YORK REGISTERED WITH

17   SPOOFCARD; THAT DOUG YORK MADE A PHONE CALL THROUGH HIS

18   SPOOFCARD ACCOUNT.  YOU'VE SEEN EVIDENCE CONNECTING HIS CELL

19   PHONE NUMBER TO THIS SPOOFCARD ACCOUNT; YOU'VE SEEN EVIDENCE OF

20   THEM CONNECTING THAT CALL TO ALLAN HESSENFLOW'S NUMBER BUT THEN

21   YOU HEARD THE VOICEMAIL.  BUT YOU'VE HEARD TWO VERSIONS OF

22   EXHIBIT 1 AND EXHIBIT 4.

23        EXHIBIT 1 CAME FROM SPOOFCARD.  AND YOU HEARD MR. COOPER

24   TELL YOU THIS MORNING THAT IF THE USER DECIDES TO RECORD A

25   CALL, WHEN IT'S A VOICEMAIL OR LIVE CALL, THEY CAN MAKE THAT

1    DECISION AND RECORD THE CALL.  AND THAT DECISION IS SPOOFCARD'S

2    RECORDING THAT DOUG YORK ASKED TO BE MADE.

3        EXHIBIT 4 WAS MR. HESSENFLOW, THE VICTIM, RECORDING HIS

4    VOICEMAIL, AND HE HAS THE COPY AT HOME WITH HIS HOME ANSWERING

5    MACHINE AND HE RECORDED IT AND PROVIDED IT TO THE GOVERNMENT.

6    SO YOU HEARD BOTH SIDES.  YOU KNOW THAT THE ACCOUNT HOLDER AT

7    SPOOFCARD CALLED MR. HESSENFLOW AND LEFT A VOICEMAIL, AND THOSE

8    TWO VOICEMAILS, THE CONTENT OF THEM ARE THE SAME.

9        SO THE SPECULATION THAT THE DEFENSE IS ASKING YOU TO MAKE

10    IS NOT JUST, AND YOU HEARD THIS COME OUT DURING THE

11    CROSS-EXAMINATION OF MR. COOPER, IT'S NOT JUST THE ACCESS PIN

12    CODE THAT USED TO BE ON THE CARD FROM SPOOFCARD AND SO SOMEONE

13    THAT WAS TRAPPED AND SOMEBODY PICKED IT UP.  THAT PERSON WOULD

14    HAVE HAD TO STEAL MR. YORK'S CELL PHONE ALSO BECAUSE YOU HEARD

15    MR. COOPER TELL YOU THAT THE REAL CALLER ID NUMBER WAS

16    SOMETHING THAT WAS PULLED FROM THE CELL PHONE OF THE CALL.

17    THAT'S NOT A NUMBER OF THE CALLER.  THE MEMBER OF SPOOFCARD

18    ENTERED INTO THE SYSTEM.  THEY GET TO DECIDE WHAT CALLER ID

19    THEY WANT, WHETHER THEY WANT TO SOUND LIKE A MAN OR WOMAN WHEN

20    THEY MAKE A CALL, BACKGROUND NOISES OR OTHER OPTIONS.

21        BUT THE ORIGINAL NUMBER THAT THEY'RE ORIGINATING THE CALL

22    FROM IS FROM SPOOFCARD BY SPOOFCARD.

23        SO NOT ONLY DO THEY HAVE TO FIND THIS CARD, AND THERE'S NO

24    EVIDENCE OF THAT, BUT THEY ALSO HAVE TO STEAL MR. YORK'S PHONE.

25        BUT MORE THAN, THEY HAVE TO CALL AND KNOW TO CALL

1    MR. HESSENFLOW, AND THERE'S NO EVIDENCE OF THAT.

2         THE DEFENSE WANTS YOU TO BELIEVE THAT BECAUSE THERE'S NO

3    DIRECT EVIDENCE IN THE CASE, THERE WASN'T SOMEONE SITTING NEXT

4    TO DOUG YORK WHEN HE MADE THAT PHONE CALL, THAT THE GOVERNMENT

5    HAS FAILED TO MEET ITS BURDEN, AND, THEREFORE, THAT IS NOT

6    PROOF BEYOND A REASONABLE DOUBT.

7         THE INSTRUCTIONS THAT YOU ARE GOING TO GET TELL YOU

8    DIFFERENT.  THE INSTRUCTIONS THAT YOU ARE GOING TO GET THAT THE

9    JUDGE WILL READ TO YOU THAT YOU USE WHEN YOU DELIBERATE ARE

10   GOING TO TELL YOU THAT THERE ARE DIFFERENT KINDS OF EVIDENCE,

11   DIRECT AND CIRCUMSTANTIAL, AND YOU'RE ALLOWED TO THEM GIVE BOTH

12   WEIGHT, AND THE LAW MAKES NO DISTINCTION BETWEEN IN THE AMOUNT

13   OF AMOUNT OF WEIGHT THAT YOU'RE TO GIVE.

14        IS THE EVIDENCE THAT DOUG YORK MADE THAT PHONE CALL

15   CIRCUMSTANTIAL?  OF COURSE, IT IS.  WE DO NOT HAVE A WITNESS TO

16   CALL AND SAY, I WAS SITTING NEXT TO DOUG YORK WHEN HE MADE THAT

17   PHONE CALL OR A MAGIC VOICE DESCRIPTION TECHNOLOGY THAT REVERTS

18   THE CALL FROM A WOMAN BACK TO THE ORIGINATING CALL.  THAT

19   EVIDENCE IS NOT IN FRONT OF YOU.

20        THE EVIDENCE THAT YOU HAVE IS THAT DOUGLAS YORK HAD MOTIVE

21   TO MAKE THE CALL.  YOU KNOW AT THAT TIME HE'S POSTING THE

22   VICTIM'S ADDRESS ON CRAIGSLIST, ON FACEBOOK.  HE'S CALLING HIM

23   DOZENS, IF NOT MORE TIMES, IN THAT 30-DAY PERIOD OF TIME BOTH

24   AT HIS HOME AND ON HIS CELL PHONE NUMBER.  THAT'S

25   CIRCUMSTANTIAL EVIDENCE THAT HE MADE THE CALL.

 1          BUT MORE THAN THAT, YOU KNOW THAT YOU PEOPLE HAVE SEEN

 2     BOTH SIDES OF THE CARD, THAT DOUG YORK OPENED AN ACCOUNT WITH

 3     SPOOFCARD, HIS CELL PHONE BILL HAD A CALL AT THAT TIME TO THE

 4     SPOOFCARD ACCESS NUMBER AND THEN THE SPOOFCARD REFERENCE SHOWED

 5     THE CALL FROM SPOOFCARD TO THE NUMBER THAT MR. YORK ASKED IT TO

 6     CALL, AND THEN THE NUMBER THAT MR. YORK ASKED TO APPEAR ON THE

 7     CALLER ID.

 8          AND THAT'S WHERE I'LL TURN NOW, THE SECOND ARGUMENT THAT

 9     THE DEFENSE RAISED TO YOU IN THEIR CLOSING, AND THAT WAS NOT

10     ONLY WAS THERE NO EVIDENCE THAT MR. YORK MADE THIS CALL BUT

11     THAT HE DIDN'T ACT AS SUCH, THAT HE WAS JUST PRETENDING.  THAT,

12     IF YOU WILL, IT WAS A HALLOWEEN COSTUME.  HE WAS DRESSING UP

13     LIKE AN I.R.S. AGENT BUT THAT'S WHERE IT ENDS, HE'S AN

14     EIGHT-YEAR-OLD ON A PLAYGROUND.  AND, UNFORTUNATELY, AGAIN, THE

15     EVIDENCE TELLS YOU OTHERWISE.

16          IN THE VOICEMAIL AND THE EVIDENCE BEFORE YOU FROM SPECIAL

17     AGENT AGUIRRE IS THAT I.R.S. AGENTS, I.R.S. EMPLOYEES DO AT

18     TIMES CALL PEOPLE AND ASK FOR INFORMATION.  THAT'S WHAT

19     HAPPENED ON THIS CALL.  SO HE CERTAINLY WAS ACTING LIKE I.R.S.

20     AGENTS ACT.

21          THE VICTIM TOLD YOU WHEN HE GOT THE MESSAGE.  THE FIRST

22     TIME HE LISTENED TO THE VOICEMAIL MESSAGE, HE WAS SUSPICIOUS.

23     HE DID NOT KNOW WHETHER HE WAS ON INVESTIGATION BY THE I.R.S.

24     THE FIRST THING HE DID WAS GOOGLE THE NUMBER THAT APPEARED ON

25     HIS VOICEMAIL, ON HIS CALLER ID.

1            AND THE REASON HE DID THAT IS BECAUSE HE FIGURED IF WHEN I

2       GOOGLE THIS, IT COMES BACK TO A REAL I.R.S. OFFICE, I MIGHT

3       HAVE SOME TAX PROBLEMS.  AND IF, ON THE OTHER HAND, I CAN'T

4       FIND IT, THAT PROBABLY MEANS I DON'T HAVE TAX PROBLEMS AND AS A

5       RESULT THERE WAS A PERIOD OF TIME WHERE MR. HESSENFLOW, THE

6       VICTIM, DIDN'T KNOW.  MAYBE I HAVE TAX PROBLEMS AND MAYBE I

7       DON'T.

8            SO THE DEFENSE'S ARGUMENTS TO YOU THAT THE VOICE SOUNDED

9       SILLY OR HE SAID THINGS THAT OTHER I.R.S. EMPLOYEES ACTING IN

10      THEIR JOB WOULD DO, THAT'S NOT THE EVIDENCE BEFORE YOU.

11           THE EVIDENCE IS THAT THE VICTIM HEARD THE VOICEMAIL AND

12      WONDERED WHETHER HE HAD TAX PROBLEMS.  THE EVIDENCE BEFORE YOU

13      IS THAT HE MADE REQUESTS THAT I.R.S. EMPLOYEES MAKE, THAT

14      PEOPLE WHO DO, IN FACT, WORK FOR THE I.R.S. MAKE AND WHAT'S

15      MORE IMPORTANT IS THAT THE DEFENDANT WAS SO PROUD OF HIMSELF

16      USING THE SPOOFCARD SYSTEM WANTED TO DRAW THE ATTENTION OF THE

17      VICTIM TO HIS CALLER ID.

18           WE PLAYED FOR YOU, AND THEN MR. ARCHER JUST READ IT TO

19      YOU, YOU'LL RECALL IN IT, HE SAYS CALL ME BACK ON A NUMBER THAT

20      IS ON YOUR CALLER ID.  HE SET OFF A FLARE.  HE WANTED TO DRAW

21      THE VICTIM'S ATTENTION TO THAT CALLER ID.  HE DIDN'T PICK THIS

22      NUMBER THAT ENDED IN 1040 AND NOT CARE IF THE VICTIM NOTED

23      THIS.  HALF OF THE VALUE OF HIS SCHEME WAS NOT JUST CAN I

24      CHANGE MY VOICE SO IF I'VE GOT BAD BLOOD WITH HIM AND I CALL

25      HIM AND USE MY GENUINE VOICE, I, MR. YORK, HE'S GOING TO KNOW

1    AND SO PART OF MY SCHEME IS THAT I CHANGE MY VOICE TO A WOMAN

2    SO HE DOESN'T SUSPECT ME, AND I WANT TO MAKE SURE THAT HE LOOKS

3    AT THE CALL.  I WANT HIM TO BE WORRIED FOR SOME PERIOD OF TIME.

4    I WANT HIM TO LOOK AT THAT CALLER ID AND SEE THE 1040 NUMBER.

5         AND THE REASON YOU KNOW THAT WAS IMPORTANT TO MR. YORK IS

6    BECAUSE HE DREW THE VICTIM'S ATTENTION TO IT.

7         IN THE VOICEMAIL HE SAYS CALL ME BACK ON THE NUMBER ON

8    YOUR CALLER ID.  AND AT THE END OF THE VOICEMAIL HE SAYS IF YOU

9    DON'T, IF WE DON'T HEAR BACK FROM YOU, WE'LL CALL YOU TOMORROW.

10   HE COULD HAVE LEFT IT.  HE DIDN'T.  HE WANTED TO MAKE SURE THAT

11   THE VICTIM KNEW THAT HE HAD TAKEN THIS ADDITIONAL STEP BECAUSE

12   EVEN MORE ACTING LIKE AN I.R.S. EMPLOYEE, EVEN MORE APPEARED TO

13   LOOK LIKE IT WAS GENUINE AND AUTHENTIC AND SO HE PICKED THE

14   NUMBER THAT MATCHED AS BOTH THE INDIVIDUAL INCOME TAX FORM BUT

15   ALSO THE I.R.S. LINE, IF THE PERSON HAS QUESTIONS, YOU CAN CALL

16   THAT NUMBER AND THAT ENDS IN 1040.

17        THE DEFENDANT KNEW THAT, AND HE WANTED THE VICTIM TO

18   APPRECIATE THAT.  HE WANTED THE VICTIM TO KNOW THAT HE HAD

19   TAKEN THE TIME TO CREATE THE CALLER ID NUMBER TO REFLECT THAT.

20        BECAUSE THE EVIDENCE FOR BOTH COUNT 1 AND -- I'M SORRY --

21   BOTH ELEMENTS OF COUNT 1 IS OVERWHELMING, THE GOVERNMENT ASKS

22   YOU TO RETURN A VERDICT OF GUILTY ON THAT COUNT.  THANK YOU.

23             THE COURT:  THANK YOU, COUNSEL.

24        MEMBER OF THE JURY, NOW THAT YOU HAVE HEARD ALL OF THE

25   EVIDENCE, IT IS MY DUTY TO INSTRUCT YOU ON THE LAW THAT APPLIES

1    IN THIS CASE.  A COPY OF THESE INSTRUCTIONS WILL BE AVAILABLE

2    IN THE JURY ROOM FOR YOU TO CONSULT.

3         IT IS YOUR DUTY TO WEIGH AND TO EVALUATE ALL OF THE

4    EVIDENCE RECEIVED IN THE CASE AND IN THAT PROCESS TO DECIDE THE

5    FACTS.  IT IS ALSO YOUR DUTY TO APPLY THE LAW AS I GIVE IT TO

6    YOU TO THE FACTS AS YOU FIND THEM WHETHER YOU AGREE WITH THE

7    LAW OR NOT.

8         YOU MUST DECIDE THE CASE SOLELY ON THE EVIDENCE AND THE

9    LAW AND MUST NOT BE INFLUENCED BY ANY PERSONAL LIKES OR

10   DISLIKES, OPINIONS, PREJUDICES OR SYMPATHY.  YOU WILL RECALL

11   THAT YOU TOOK AN OATH PROMISING TO DO SO AT THE BEGINNING OF

12   THE CASE.

13        YOU MUST FOLLOW ALL OF THESE INSTRUCTIONS AND NOT SINGLE

14   OUT SOME AND IGNORE OTHERS.  THEY ARE ALL IMPORTANT.  PLEASE DO

15   NOT READ INTO THESE INSTRUCTIONS OR INTO ANYTHING I MAY HAVE

16   SAID OR DONE ANY SUGGESTION AS TO WHAT VERDICT YOU SHOULD

17   RETURN.  THAT IS A MATTER ENTIRELY UP TO YOU.

18        THE INDICTMENT IS NOT EVIDENCE.  THE DEFENDANT HAS PLEADED

19   NOT GUILTY TO THE CHARGE.  THE DEFENDANT IS PRESUMED TO BE

20   INNOCENT UNLESS AND UNTIL THE GOVERNMENT PROVES THE DEFENDANT

21   GUILTY BEYOND A REASONABLE DOUBT.  IN ADDITION, THE DEFENDANT

22   DOES NOT HAVE TO TESTIFY OR PRESENT ANY EVIDENCE TO PROVE

23   INNOCENCE.  THE GOVERNMENT HAS THE BURDEN OF PROVING EVERY

24   ELEMENT OF THE CHARGE BEYOND A REASONABLE DOUBT.

25        A DEFENDANT IN A CRIMINAL CASE HAS A CONSTITUTIONAL RIGHT

1    NOT TO TESTIFY.  YOU MAY NOT DRAW ANY INFERENCE OF ANY KIND

2    FROM THE FACT THAT THE DEFENDANT DID NOT TESTIFY.

3        PROOF BEYOND A REASONABLE DOUBT IS PROOF THAT LEAVES YOU

4    FIRMLY CONVINCED THAT THE DEFENDANT IS GUILTY.  IT IS NOT

5    REQUIRED THAT THE GOVERNMENT PROVE GUILT BEYOND ALL POSSIBLE

6    DOUBT.  A REASONABLE DOUBT IS A DOUBT BASED UPON REASON AND

7    COMMON SENSE AND IS NOT BASED PURELY UPON SPECULATION.

8        IT MAY ARISE FROM A CAREFUL AND IMPARTIAL CONSIDERATION OF

9    ALL OF THE EVIDENCE OR FROM LACK OF EVIDENCE.

10       IF AFTER A CAREFUL AND IMPARTIAL CONSIDERATION OF ALL OF

11   THE EVIDENCE YOU ARE NOT CONVINCED BEYOND A REASONABLE DOUBT

12   THAT THE DEFENDANT IS GUILTY, IT IS YOUR DUTY TO FIND THE

13   DEFENDANT NOT GUILTY.

14       ON THE OTHER HAND, IF AFTER A CAREFUL AND IMPARTIAL

15   CONSIDERATION OF ALL OF YOUR EVIDENCE, YOU ARE CONVINCED BEYOND

16   A REASONABLE DOUBT THAT THE DEFENDANT IS GUILTY, IT IS YOUR

17   DUTY TO FIND THE DEFENDANT GUILTY.

18       THE EVIDENCE YOU ARE TO CONSIDER IN DECIDING WHAT THE

19   FACTS ARE CONSISTS OF:

20       THE SWORN TESTIMONY OF ANY WITNESS; AND,

21       THE EXHIBITS RECEIVED IN EVIDENCE; AND,

22       ANY FACTS TO WHICH THE PARTIES HAVE AGREED.

23       IN REACHING YOUR VERDICT, YOU MAY CONSIDER ONLY THE

24   TESTIMONY AND EXHIBITS RECEIVED IN EVIDENCE.  THE FOLLOWING

25   THINGS ARE NOT EVIDENCE AND YOU MAY NOT CONSIDER THEM IN

1    DECIDING WHAT THE FACTS ARE:

2        1.  QUESTIONS, STATEMENTS, OBJECTIONS, AND ARGUMENTS BY

3    THE LAWYERS ARE NOT EVIDENCE.  THE LAWYERS ARE NOT WITNESSES.

4    ALTHOUGH YOU MUST CONSIDER A LAWYER'S QUESTIONS TO UNDERSTAND

5    THE ANSWERS OF A WITNESS, THE LAWYER'S QUESTIONS ARE NOT

6    EVIDENCE.

7        SIMILARLY, WHAT THE LAWYERS HAVE SAID IN THEIR OPENING

8    STATEMENTS, CLOSING ARGUMENTS, AND AT OTHER TIMES IS INTENDED

9    TO HELP YOU INTERPRET THE EVIDENCE, BUT IT IS NOT EVIDENCE.

10        IF THE FACTS AS YOU REMEMBER THEM DIFFER FROM THE WAY THAT

11    THE LAWYERS STATE THEM, YOUR MEMORY OF THEM CONTROLS.

12        2.  ANY TESTIMONY THAT I HAVE EXCLUDED, STRICKEN OR

13    INSTRUCTED YOU TO DISREGARD IS NOT EVIDENCE.  IN ADDITION, SOME

14    EVIDENCE WAS RECEIVED ONLY FOR A LIMITED PURPOSE.  WHEN I HAVE

15    INSTRUCTED YOU TO CONSIDER CERTAIN EVIDENCE IN A LIMITED WAY,

16    YOU MUST DO SO.

17        ANYTHING THAT YOU MAY HAVE SEEN OR HEARD WHEN THE COURT

18    WAS NOT IN SESSION IS NOT EVIDENCE.  YOU ARE TO DECIDE THE CASE

19    SOLELY ON THE EVIDENCE RECEIVED AT THE TRIAL.

20        EVIDENCE MAY BE DIRECT OR CIRCUMSTANTIAL.

21        DIRECT EVIDENCE IS DIRECT PROOF OF A FACT SUCH AS

22    TESTIMONY BY A WITNESS ABOUT WHAT THAT WITNESS PERSONALLY SAW

23    OR HEARD OR DID.

24        CIRCUMSTANTIAL EVIDENCE IS INDIRECT EVIDENCE, THAT IS, IT

25    IS PROOF OF ONE OR MORE FACTS FROM WHICH YOU CAN FIND ANOTHER

1    FACT.

2        YOU ARE TO CONSIDER BOTH DIRECT AND CIRCUMSTANTIAL

3    EVIDENCE.  EITHER CAN BE USED TO PROVE ANY FACT.

4        THE LAW MAKES NO DISTINCTION BETWEEN THE WEIGHT TO BE

5    GIVEN TO EITHER DIRECT OR CIRCUMSTANTIAL EVIDENCE.  IT IS FOR

6    YOU TO DECIDE HOW MUCH WEIGHT TO GIVE TO ANY EVIDENCE.

7        IN DECIDING THE FACTS IN THIS CASE, YOU MAY HAVE TO DECIDE

8    WHICH TESTIMONY TO BELIEVE AND WHICH TESTIMONY NOT TO BELIEVE.

9    YOU MAY BELIEVE EVERYTHING A WITNESS SAYS OR PART OF IT OR NONE

10    OF IT.

11        IN CONSIDERING THE TESTIMONY OF ANY WITNESS, YOU MAY TAKE

12    INTO ACCOUNT:

13        THE WITNESS'S OPPORTUNITY AND ABILITY TO SEE OR HEAR OR

14    KNOW THE THINGS TESTIFIED TO;

15        THE WITNESS'S MEMORY;

16        THE WITNESS'S MANNER WHILE TESTIFYING;

17        THE WITNESS'S INTEREST IN THE OUTCOME OF THE CASE, IF ANY;

18        THE WITNESS'S BIAS OR PREJUDICE, IF ANY;

19        WHETHER OTHER EVIDENCE CONTRADICTED THE WITNESS'S

20    TESTIMONY;

21        THE REASONABLENESS OF THE WITNESS'S TESTIMONY IN LIGHT OF

22    ALL OF THE EVIDENCE; AND,

23        ANY OTHER FACTORS THAT BEAR ON BELIEVABILITY.

24        THE WEIGHT OF THE EVIDENCE AS TO A FACT DOES NOT

25    NECESSARILY DEPEND ON THE NUMBER OF WITNESSES WHO TESTIFY.

1    WHAT IS IMPORTANT IS HOW BELIEVABLE THE WITNESSES WERE AND HOW

2    MUCH WEIGHT YOU THINK THEIR TESTIMONY DESERVES.

3        YOU ARE HERE ONLY TO DETERMINE WHETHER THE DEFENDANT IS

4    GUILTY OR NOT GUILTY OF THE CHARGE IN THE INDICTMENT.  THE

5    DEFENDANT IS NOT ON TRIAL FOR ANY CONDUCT OR OFFENSE NOT

6    CHARGED IN THE INDICTMENT.

7        YOU HAVE HEARD TESTIMONY THAT THE DEFENDANT MADE

8    STATEMENTS.  IT IS FOR YOU TO DECIDE, ONE, WHETHER THE

9    DEFENDANT MADE THE STATEMENTS; AND, TWO, IF SO, HOW MUCH WEIGHT

10   TO GIVE TO THEM.

11       IN MAKING THOSE DECISIONS, YOU SHOULD CONSIDER ALL OF THE

12   EVIDENCE ABOUT THE STATEMENTS, INCLUDING THE CIRCUMSTANCES

13   UNDER WHICH THE DEFENDANT MAY HAVE HAD MADE THEM.

14       THE DEFENDANT IS CHARGED IN COUNT 1 OF THE INDICTMENT WITH

15   FRAUD WHILE IMPERSONATING A FEDERAL OFFICER OR EMPLOYEE IN

16   VIOLATION OF SECTION 912 OF TITLE 18 OF THE UNITED STATES CODE.

17       IN ORDER TO BE FOUND GUILTY OF THAT CHARGE, THE GOVERNMENT

18   MUST PROVE EACH OF THE FOLLOWING ELEMENTS BEYOND A REASONABLE

19   DOUBT.

20       FIRST, THAT THE DEFENDANT FALSELY PRETENDED TO BE AN

21   OFFICER OR EMPLOYEE ACTING UNDER THE AUTHORITY OF THE UNITED

22   STATES INTERNAL REVENUE SERVICE; AND,

23       SECOND, THE DEFENDANT ACTED AS SUCH.

24       AT THE BEGINNING OF THE TRIAL, I DESCRIBED THE CHARGES

25   AGAINST THE DEFENDANT.  FOR REASONS THAT DO NOT CONCERN YOU,

```
1     COUNT TWO, INTERSTATE TELECOMMUNICATIONS HARASSMENT IS NO

2     LONGER BEFORE YOU.  DO NOT SPECULATE ABOUT WHY THAT CHARGE IS

3     NO LONGER PART OF THIS TRIAL.

4          THE DEFENDANT IS ONLY ON TRIAL FOR THE CHARGE OF FALSE

5     IMPERSONATION OF FEDERAL OFFICER OR EMPLOYEE, COUNT 1.  YOU MAY

6     CONSIDER THE EVIDENCE PRESENTED ONLY AS IT RELATES TO THE

7     REMAINING COUNT.

8          WHEN YOU BEGIN YOUR DELIBERATIONS, ELECT ONE MEMBER OF THE

9     JURY AS YOUR FOREPERSON WHO WILL PRESIDE OVER YOUR

10    DELIBERATIONS AND SPEAK FOR YOU HERE IN COURT.

11         YOU WILL THEN DISCUSS THE CASE WITH YOUR FELLOW JURORS TO

12    REACH AGREEMENT IF YOU CAN DO SO.  YOUR VERDICT, WHETHER GUILTY

13    OR NOT GUILTY, MUST BE UNANIMOUS.

14         EACH OF YOU MUST DECIDE THE CASE FOR YOURSELF BUT YOU

15    SHOULD DO SO ONLY AFTER YOU HAVE CONSIDERED ALL OF THE

16    EVIDENCE, DISCUSSED IT FULLY WITH THE OTHER JURORS, AND

17    LISTENED TO THE VIEWS OF YOUR FELLOW JURORS.

18         DO NOT BE AFRAID TO CHANGE YOUR OPINION IF THE DISCUSSION

19    PERSUADES YOU THAT YOU SHOULD.  BUT DO NOT COME TO A DECISION

20    SIMPLY BECAUSE OTHER JURORS THINK IT IS RIGHT.

21         IT IS IMPORTANT THAT YOU ATTEMPT TO REACH A UNANIMOUS

22    VERDICT BUT, OF COURSE, ONLY IF EACH OF YOU CAN DO SO AFTER

23    HAVING MADE YOUR OWN CONSCIENTIOUS DECISION.  DO NOT CHANGE AN

24    HONEST BELIEF ABOUT THE WEIGHT AND EFFECT OF THE EVIDENCE

25    SIMPLY TO REACH A VERDICT.
```

1    BECAUSE YOU MUST BASE YOUR VERDICT ONLY ON THE EVIDENCE

2    RECEIVED IN THE CASE AND ON THESE INSTRUCTIONS, I REMIND YOU

3    THAT YOU MUST NOT BE EXPOSED TO ANY OTHER INFORMATION ABOUT THE

4    CASE OR TO THE ISSUES THAT IT INVOLVES.

5    EXCEPT FOR DISCUSSING THE CASE WITH YOUR FELLOW JURORS

6    DURING YOUR DELIBERATIONS:

7    DO NOT COMMUNICATE WITH ANYONE IN ANY WAY AND DO NOT LET

8    ANYONE ELSE COMMUNICATE WITH YOU IN ANY WAY ABOUT THE MERITS OF

9    THE CASE OR ANYTHING TO DO WITH IT.  THIS INCLUDES DISCUSSING

10   THE CASE IN PERSON, IN WRITING, BY PHONE, OR ELECTRONIC MEANS,

11   VIA E-MAIL, TEXT MESSAGING, OR ANY INTERNET CHAT ROOM, BLOG,

12   WEBSITE OR OTHER FEATURE.  THIS APPLIES TO COMMUNICATING WITH

13   YOUR FAMILY MEMBERS, YOUR EMPLOYER, THE MEDIA OR PRESS AND THE

14   PEOPLE INVOLVED IN THE TRIAL.  IF YOU ARE ASKED OR APPROACHED

15   IN ANY WAY ABOUT YOUR JURY SERVICE, OR ANYTHING ABOUT THIS

16   CASE, YOU MUST RESPOND THAT YOU HAVE BEEN ORDERED NOT TO

17   DISCUSS THE MATTER AND TO REPORT THE CONTACT TO THE COURT.

18   DO NOT READ, WATCH OR LISTEN TO ANY NEWS OR MEDIA ACCOUNTS

19   OR COMMENTARY ABOUT THE CASE OR ANYTHING TO DO WITH IT.  DO NOT

20   DO ANY RESEARCH, SUCH AS CONSULTING DICTIONARIES, SEARCHING THE

21   INTERNET, OR USING OTHER REFERENCE MATERIALS AND DO NOT MAKE

22   ANY INVESTIGATION OR IN ANY OTHER WAY TRY TO LEARN ABOUT THE

23   CASE ON YOUR OWN.

24   THE LAW REQUIRES THESE RESTRICTIONS TO ENSURE THAT THE

25   PARTIES HAVE A FAIR TRIAL BASED ON THE SAME EVIDENCE THAT EACH

1    PARTY HAS HAD AN OPPORTUNITY TO ADDRESS.  A JUROR WHO VIOLATES

2    THESE RESTRICTIONS JEOPARDIZES THE FAIRNESS OF THESE

3    PROCEEDINGS AND A MISTRIAL COULD RESULT THAT WOULD REQUIRE THE

4    ENTIRE TRIAL PROCESS TO START OVER.

5         IF ANY JUROR IS EXPOSED TO ANY OUTSIDE INFORMATION, PLEASE

6    NOTIFY THE COURT IMMEDIATELY.

7         SOME OF YOU HAVE TAKEN NOTES DURING THE TRIAL.  WHETHER OR

8    NOT YOU TOOK NOTES, YOU SHOULD RELY ON YOUR OWN MEMORY OF WHAT

9    WAS SAID.  NOTES ARE ONLY TO ASSIST YOUR MEMORY.  YOU SHOULD

10   NOT BE OVERLY INFLUENCED BY YOUR NOTES OR THOSE OF YOUR FELLOW

11   JURORS.

12        THE PUNISHMENT PROVIDED BY LAW FOR THIS CRIME IS FOR THE

13   COURT TO DECIDE.  YOU MAY NOT CONSIDER PUNISHMENT IN DECIDING

14   WHETHER THE GOVERNMENT HAS PROVED ITS CASE AGAINST THE

15   DEFENDANT BEYOND A REASONABLE DOUBT.

16        A VERDICT FORM HAS BEEN PREPARED FOR YOU.  AFTER YOU HAVE

17   REACHED UNANIMOUS AGREEMENT ON A VERDICT, YOUR FOREPERSON

18   SHOULD COMPLETE THE VERDICT FORM ACCORDING TO YOUR

19   DELIBERATIONS, SIGN AND DATE IT, AND ADVISE THE CLERK THAT YOU

20   ARE READY TO RETURN TO THE COURTROOM.

21        IF IT BECOMES NECESSARY DURING YOUR DELIBERATIONS TO

22   COMMUNICATE WITH ME, YOU MAY SEND A NOTE THROUGH THE CLERK

23   SIGNED BY ANY ONE OR MORE OF YOU.  NO MEMBER OF THE JURY SHOULD

24   EVER ATTEMPT TO COMMUNICATE WITH ME EXCEPT BY A SIGNED WRITING,

25   AND I WILL RESPOND TO THE JURY CONCERNING THE CASE IN WRITING

1     OR HERE IN OPEN COURT.

2         IF YOU SEND OUT A QUESTION, I WILL CONSULT WITH THE

3     LAWYERS BEFORE ANSWERING IT, WHICH MAY TAKE SOME TIME.

4         YOU MAY CONTINUE YOUR DELIBERATIONS WHILE WAITING FOR THE

5     ANSWER TO ANY QUESTION.

6         REMEMBER THAT YOU ARE NOT TO TELL ANYONE, INCLUDING ME,

7     HOW THE JURY STANDS NUMERICALLY OR OTHERWISE ON ANY QUESTION

8     SUBMITTED TO YOU, INCLUDING THE QUESTION OF THE GUILT OF THE

9     DEFENDANT UNTIL AFTER YOU HAVE REACHED A UNANIMOUS VERDICT OR

10    HAVE BEEN DISCHARGED.

11        THAT CONCLUDES THE READING OF THE INSTRUCTIONS.  ANY

12    OBJECTION TO THE COURT'S READING OF THE INSTRUCTIONS FROM THE

13    GOVERNMENT?

14            MR. SCHENK:  NO, YOUR HONOR.

15            THE COURT:  THE DEFENSE?

16            MR. ARCHER:  OTHER THAN PRIOR PREVIOUSLY PRESERVED,

17    NO, YOUR HONOR.

18            THE COURT:  ALL RIGHT.  THANK YOU.  LADIES AND

19    GENTLEMEN OF THE JURY, THAT IS THE 12 OF YOU, YOU WILL NOW

20    RETIRE TO DELIBERATE THE MERITS OF THE CASE.  AND MS. GARCIA

21    WILL ESCORT YOU TO THE DELIBERATION ROOM.

22        MR. MCNAMARA AND MR. WOOD, IF YOU WOULD JUST PLEASE STAY

23    SEATED FOR JUST A MOMENT, PLEASE.

24        (JURY OUT AT 2:24 P.M.)

25            THE COURT:  PLEASE BE SEATED, COUNSEL.  ALL RIGHT.

1     THE RECORD SHOULD REFLECT THAT OUR 12 JURORS HAVE LEFT TO

2     DELIBERATE ON THE CASE.

3         MR. WOOD AND MR. MCNAMARA, I SHOULD REFERENCE YOU AS OUR

4     LOU GEHRIGS.  AS I TOLD YOU PREVIOUSLY, WE MAY NEED YOUR

5     SERVICE SHOULD ONE OF THE SEATED JURORS BE UNABLE TO CONTINUE

6     WITH THE DELIBERATIONS.

7         IF THAT WERE TO OCCUR, WE WOULD CONTACT YOU TO RETURN AND

8     TAKE THAT JUROR'S PLACE.

9         AS OF NOW, HOWEVER, I'M GOING TO ALLOW YOU TO LEAVE THE

10    COURTROOM.  HOWEVER, I WOULD ASK YOU TO PLEASE PROVIDE

11    MS. GARCIA WITH YOUR CURRENT CONTACT INFORMATION AND TO PLEASE

12    HAVE THAT INFORMATION, THAT IS, YOUR MOBILE PHONES OR WHATEVER

13    THE CONTACT IS AVAILABLE SHOULD WE NEED TO REACH YOU.

14        I DO REMIND YOU OF THE ADMONITION AS TO THIS CASE AND YOUR

15    ROLE AS JURORS HERE IS STILL IN PLACE AND SO YOU MAY NOT

16    DISCUSS THE CASE WITH ANYONE, AS I PREVIOUSLY ADVISED.

17        MS. GARCIA WILL CONTACT YOU, OF COURSE, IF YOU'RE NEEDED

18    TO RETURN TO SUBSTITUTE A SEATED JUROR.

19        SHE WILL ALSO CONTACT YOU WITH UPDATES ON THE CASE AS TO

20    WHETHER OR NOT YOUR SERVICE WILL BE NEEDED ONGOING.

21        ONCE YOU'RE NOTIFIED THAT YOUR SERVICES WILL NOT BE

22    NEEDED, ASSUMING YOU HAVEN'T BEEN CALLED BACK, AND THE

23    ADMONITION WILL NO LONGER BE IN PLACE AND YOU WILL BE RELEASED

24    FROM YOUR JURY SERVICE AND FROM THAT ADMONITION.

25        ANY QUESTION ABOUT THAT, MR. MCNAMARA AND MR. WOOD?

1                    ALTERNATE JURORS:  NO.

2              THE COURT:  ALL RIGHT.  THANK YOU.  IN THE EVENT I

3     DON'T GET TO SEE YOU AGAIN, I WANT TO THANK YOU FOR YOUR

4     SERVICE THIS WEEK.  IT'S A PLEASURE MEETING YOU AND ON BEHALF

5     OF COUNSEL ALSO, I THINK I CAN SPEAK FOR THEM, AND PARDON MY

6     PRESUMPTION, BUT I'M SURE THEY JOIN ME IN THANKING YOU FOR YOUR

7     SERVICE TO THE COMMUNITY.

8          SO WITH THAT YOU'RE FREE TO GO, AND WE'LL CONTACT YOU

9     LATER SHOULD THAT BE NECESSARY.  THANK YOU VERY MUCH.

10          (JURY OUT AT 2:27 P.M.)

11              THE COURT:  THANK YOU.  PLEASE BE SEATED.  THE

12     RECORD SHOULD REFLECT THAT OUR JURORS ARE DELIBERATING AND THE

13     TWO ALTERNATES LEFT THE COURTROOM NOW.

14          COUNSEL, SHOULD THERE BE A QUESTION, I'D LIKE YOU TO BE

15     ABLE TO REPORT BACK TO COURT WITHIN 15 MINUTES, NO LONGER THAN

16     15 MINUTES, SO IF YOU WOULD OTHERWISE MAKE YOURSELF AVAILABLE I

17     WOULD APPRECIATE THAT.

18              MR. SCHENK:  WE WILL, YOUR HONOR.

19              THE COURT:  ANYTHING FURTHER?

20              MR. SCHENK:  WE HAVE AGREED ON THE EXHIBITS THAT

21     SHOULD GO BACK TO THE DELIBERATION ROOM.  I CAN GIVE THEM.

22              THE COURT:  MS. GARCIA WILL TAKE CHARGE OF THOSE.

23          ANYTHING FURTHER?

24              MR. SCHENK:  NO, YOUR HONOR.

25              MR. ARCHER:  NO.  THANK YOU.

1          THE COURT:  ALL RIGHT.  WE'LL BE IN RECESS.  THANK

2     YOU.

3          (RECESS TAKEN PENDING THE DELIBERATIONS OF THE JURY.)

4          (JURY IN AT 3:15 P.M.)

5          THE COURT:  WE'RE BACK ON THE RECORD.  OUR JURY IS

6     PRESENT, AND ALL COUNSEL AND THE DEFENDANT IS PRESENT.

7          WHO SPEAKS FOR YOU?  MR. DUVERNAY?

8          JUROR:  THAT'S CORRECT.

9          THE COURT:  I'VE BEEN INFORMED THAT THE JURY HAS

10    REACHED A VERDICT.

11          JUROR:  THAT'S CORRECT.

12          THE COURT:  ALL RIGHT.  THANK YOU.  I'M NOW GOING TO

13    ASK MS. GARCIA TO NOW PUBLISH THE VERDICT, THAT IS, SHE IS

14    GOING TO READ YOUR VERDICT INTO THE RECORD.

15          BUT BEFORE SHE DOES THAT, LADIES AND GENTLEMEN, LET ME ASK

16    YOU, PLEASE LISTEN CLOSELY TO THE VERDICT AS IT'S READ BY

17    MS. GARCIA.  I AM GOING TO POLL THE JURY SUBSEQUENT TO THE

18    READING TO ASK WHETHER OR NOT THIS IS YOUR TRUE AND CORRECT

19    VERDICT.

20          MS. GARCIA.

21          THE CLERK:  LADIES AND GENTLEMEN OF THE JURY,

22    HEARKEN TO YOUR VERDICT AS IT WILL STAND RECORDED.

23          IN CASE NUMBER 15-226, UNITED STATES VERSUS DOUGLAS YORK.

24          COUNT 1.  TITLE 18 UNITED STATES CODE SECTION 912, FALSE

25    IMPERSONATION OF A FEDERAL OFFICER OR EMPLOYEE, WE, THE JURY,

```
 1         FIND THE DEFENDANT DOUGLAS YORK IN THE ABOVE-ENTITLED CASE

 2    GUILTY OF FALSE IMPERSONATION OF A FEDERAL OFFICER OR EMPLOYEE

 3    AS CHARGED IN COUNT 1.

 4         DATED AUGUST 28TH, 2015.  FOREPERSON, BRAD DUVERNAY.

 5         JUROR NUMBER 1, IS THIS YOUR TRUE VERDICT?

 6              JUROR:  YES.

 7              THE COURT:  I DIDN'T HEAR THE ANSWER, I'M SORRY.

 8              JUROR:  YES.

 9              THE CLERK:  JUROR NUMBER 2, IS THIS YOUR TRUE

10    VERDICT?

11              JUROR:  YES.

12              THE CLERK:  JUROR NUMBER 3, IS THIS YOUR TRUE

13    VERDICT?

14              JUROR:  YES.

15              THE CLERK:  JUROR NUMBER 4, IS THIS YOUR TRUE

16    VERDICT?

17              JUROR:  YES.

18              THE CLERK:  JUROR NUMBER 5, IS THIS YOUR TRUE

19    VERDICT?

20              JUROR:  YES.

21              THE CLERK:  JUROR NUMBER 6, IS THIS YOUR TRUE

22    VERDICT?

23              JUROR:  YES.

24              THE CLERK:  JUROR NUMBER 7, IS THIS YOUR TRUE

25    VERDICT?
```

```
 1                    JUROR:  YES.

 2                    THE CLERK:  JUROR NUMBER 8, IS THIS YOUR TRUE

 3        VERDICT?

 4                    JUROR:  YES.

 5                    THE CLERK:  JUROR NUMBER 9, IS THIS YOUR TRUE

 6        VERDICT?

 7                    JUROR:  YES.

 8                    THE CLERK:  JUROR NUMBER 10, IS THIS YOUR TRUE

 9        VERDICT?

10                    JUROR:  YES.

11                    THE CLERK:  JUROR NUMBER 11, IS THIS YOUR TRUE

12        VERDICT?

13                    JUROR:  YES.

14                    THE CLERK:  JUROR NUMBER 12, IS THIS YOUR TRUE

15        VERDICT?

16                    JUROR:  YES.

17                    THE COURT:  ALL RIGHT.  THANK YOU.  THE JURY HAS

18        BEEN POLLED, AND I'LL ORDER THE VERDICT RECORDED AT THIS TIME.

19            LADIES AND GENTLEMEN, I WANT TO THANK YOU, THANK YOU FOR

20        YOUR SERVICE.  AS JURORS IN THIS CASE WHEN WE MET ON TUESDAY, I

21        THINK I TOLD YOU MY EXPECTATION WAS THAT THIS CASE WOULD BE

22        RATHER BRIEF, AND I THINK -- OBVIOUSLY I THINK THE EVIDENCE

23        CAME IN, IN A RATHER SHORT ORDER, AND I APPRECIATE THAT.  I

24        HOPE YOU HAVE ENJOYED YOUR JURY SERVICE HERE THIS AFTERNOON.

25            IN JUST A MOMENT I'M GOING TO RELEASE YOU FROM YOUR
```

1      SERVICE AND ALSO FROM THE ADMONITION THAT I PREVIOUSLY PLACED

2      IN THE CASE, MEANING THAT IF YOU RECALL THE ADMONITION WAS THAT

3      YOU WERE NOT PERMITTED TO DISCUSS THE CASE WITH ANYONE.

4           ONCE YOU ARE RELEASED, YOU MAY, IF YOU WISH, DISCUSS THE

5      CASE AMONGST YOURSELVES, WITH ANYONE ELSE, INCLUDING THE

6      LAWYERS HERE.  THE LAWYERS -- SOMETIMES THE LAWYERS HAVE

7      QUESTIONS THAT THEY MAY WANT TO POSE TO THE JURORS AND YOU MAY

8      SPEAK TO ANYONE IF YOU WISH.  HOWEVER, YOU'RE NOT OBLIGATED TO

9      SPEAK TO ANYONE IF YOU DO NOT WISH TO DO SO.

10          IF SOMEONE CONTACTS YOU ABOUT THE CASE AND WANTS TO TALK

11     TO YOU AND YOU DO NOT WANT TO TALK TO THAT PERSON, YOU CAN JUST

12     SIMPLY SAY THAT.

13          IF ANYONE IN YOUR OPINION CONTINUES TO, NOTWITHSTANDING

14     YOUR REFUSAL, TO SPEAK BUT CONTINUES TO IN ANY WAY BOTHER YOU

15     ABOUT THAT, YOU SHOULD REPORT THAT TO THE COURT IMMEDIATELY SO

16     THAT THE COURT CAN TAKE ACTION ON THAT.

17          SO ON BEHALF OF BOTH COUNSEL I DO WANT TO THANK YOU, THANK

18     YOU FOR YOUR SERVICE.

19          ANYTHING FURTHER, COUNSEL, BEFORE I RELIEVE THE JURY?

20               MR. SCHENK:  NO, YOUR HONOR.

21               MR. ARCHER:  NO, YOUR HONOR.

22               THE COURT:  ALL RIGHT.  THANK YOU.  ONE THING I DO,

23     WITH SOME REGULARITY, LADIES AND GENTLEMEN, IS I DO INVITE

24     JURORS TO MY CHAMBERS AND MY OFFICE FOR JUST A MOMENT TO ALLOW

25     ME AN OPPORTUNITY TO PERSONALLY THANK YOU FOR YOUR SERVICE AND

```
 1        ALSO TO ASK YOU YOUR THOUGHTS AS TO HOW WE CAN IMPROVE YOUR

 2        JURY SERVICE.

 3            SO IF ANYONE -- AND THIS IS NOT MANDATORY, BUT IF ANYONE

 4        WOULD LIKE TO DO THAT, I'LL EXTEND AN INVITATION FOR YOU TO

 5        COME TO MY OFFICE.

 6            MS. GARCIA WILL SHOW YOU AND ESCORT YOU BACK TO THE

 7        OFFICE.  I'M NOT GOING TO KEEP YOU LONG.  AS I SAID, I JUST

 8        WANT TO PERSONALLY THANK YOU FOR YOUR SERVICE AND ASK YOU IF

 9        YOU HAVE ANY THOUGHTS OR OPINIONS ABOUT WHAT WE IN THIS

10        COURTHOUSE CAN DO TO ENHANCE THE JURY SERVICE AND THE SERVICE

11        OF THE JURIES ONGOING, AND I'D BE GRATEFUL AND HAPPY TO RECEIVE

12        THAT INFORMATION.

13            NOW, AS I SAID, I DON'T INTEND TO KEEP YOU, AND THIS IS

14        NOT AN ORDER.  YOU DON'T HAVE TO COME BACK IF YOU DON'T WANT

15        TO.  IF YOU'D LIKE TO, I'D BE HAPPY TO MEET YOU, AND AS I SAID,

16        IF NOT, YOU'RE FREE TO GO.

17            I SHOULD TELL YOU, SOMETIMES LAWYERS DO LIKE TO SPEAK WITH

18        JURORS AND TO GET THEIR IMPRESSION, CANDIDLY, AND IF YOU'LL

19        PARDON THE PRESUMPTION, SOMETIMES THEY'LL WANT TO KNOW "HOW DID

20        I DO?  HOW WAS MY PERFORMANCE?  HOW DID I DO IN THE CASE?"

21        AND, OF COURSE, YOU'RE THE BEST JUDGES OF THAT, AND THEY MIGHT

22        ASK YOU THOSE QUESTIONS.  I DON'T KNOW.

23            BUT FEEL FREE TO ANSWER THOSE QUESTIONS IF YOU WISH AS

24        WELL AS TO COME TO MY OFFICE FOR JUST A MOMENT IF YOU WISH.

25            IF I DON'T SEE YOU, THANK YOU VERY MUCH, AND I APPRECIATE
```

1    YOUR SERVICE AND ON BEHALF OF THE JUDGES OF THE NORTHERN

2    DISTRICT OF CALIFORNIA, I THANK YOU, THANK YOU VERY MUCH FOR

3    YOUR SERVICE.  AND YOU ARE NOW EXCUSED.  THANK YOU.

4         COUNSEL, IF YOU COULD REMAIN.

5         (JURY OUT AT 3:22 P.M.)

6              THE COURT:  PLEASE BE SEATED.  THANK YOU.  WE'RE

7    BACK ON THE RECORD WITH AND COUNSEL IS PRESENT, AND THE

8    DEFENDANT IS PRESENT.  EXCUSE ME.

9         THE JURY HAS RETURNED A VERDICT.  THE VERDICT HAS BEEN

10   RECORDED.

11        MR. ARCHER, YOUR CLIENT IS REFERRED TO PROBATION FOR

12   PREPARATION OF A PRESENTENCE REPORT.

13        DO COUNSEL HAVE A DATE THAT THEY WOULD LIKE TO SUGGEST FOR

14   SENTENCING?

15             MR. ARCHER:  NINETY DAYS.

16             THE CLERK:  DECEMBER 14, 2015.

17             MR. SCHENK:  NO, YOUR HONOR.

18             MR. ARCHER:  YES.

19             THE COURT:  I'M SORRY, MS. GARCIA?

20             THE CLERK:  DECEMBER 14TH.

21             THE COURT:  DECEMBER YOU SAID?

22             THE CLERK:  DECEMBER.

23             THE COURT:  DOES THAT DATE WORK FOR COUNSEL?

24             MS. PENNA:  YES, YOUR HONOR.

25             MR. ARCHER:  YES, YOUR HONOR.

1          THE COURT:  ALL RIGHT.  WE'LL SET SENTENCING FOR

2    DECEMBER 14TH, DECEMBER 14TH AT 1:30.

3       AND, MR. YORK, MR. ARCHER WILL TAKE YOU TO THE PROBATION

4    DEPARTMENT THIS AFTERNOON SO YOU CAN BEGIN SOME PRELIMINARY

5    PAPERWORK IN REGARDS TO YOUR REPORT.

6       I'M GOING TO ASK JUST BECAUSE I THINK I NEED TO ASK, IS

7    THE GOVERNMENT REQUESTING A REMAND AT THIS TIME?

8          MR. SCHENK:  NO, WE ARE NOT, YOUR HONOR.

9          THE COURT:  THANK YOU.  AND THE COURT DOES NOT FIND

10   ANY REASON TO REMAND MR. YORK INTO CUSTODY NOTWITHSTANDING THE

11   VERDICT HERE.

12      SO HE'LL REMAIN AT LIBERTY IN HIS CURRENT STATUS.

13         MR. ARCHER:  THANK YOU, YOUR HONOR.

14         THE COURT:  ANYTHING FURTHER?

15         MR. SCHENK:  NO.  THANK YOU VERY MUCH, YOUR HONOR.

16         MR. ARCHER:  NO, YOUR HONOR.

17         THE COURT:  ALL RIGHT.  THANK YOU.

18      (COURT CONCLUDED AT 3:42 P.M.)

19

20

21

22

23

24

25

1

2

3                        CERTIFICATE OF REPORTER

4

5

6

7        I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8   STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9   280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10  CERTIFY:

11       THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12  A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13  ABOVE-ENTITLED MATTER.

14

15

16       IRENE RODRIGUEZ, CSR, RMR, CRR
         CERTIFICATE NUMBER 8074

17

18

19       DATED:  FEBRUARY 12, 2016

20

21

22

23

24

25